Joseph F. Postnikoff
State Bar No. 16168320
Email: jpostnikoff@romclaw.com
ROCHELLE MCCULLOUGH, LLP
300 Throckmorton Street, Suite 520
Fort Worth, Texas 76102
Telephone: 817.347.5260
Facsimile: 817.347.5269
http://www.romclaw.com

Curt Hochbein
IN Bar No.2984-29
Email: chochbein@romclaw.com
211 North Pennsylvania Street, Suite 1330
Indianapolis, IN 46204
Telephone: 317.608.1137
Facsimile: 888.467.5979
http://www.romclaw.com

J. Mark Chevallier
State Bar No. 04189170
Email: mchevallier@romclaw.com
Michael Pipkin
State Bar No. 24122988
Email: mpipkin@romclaw.com
901 Main Street, Suite 3200
Dallas, TX 75202
Telephone: 214.580.2530
Facsimile: 888.467.5979
http://www.romclaw.com

PROPOSED COUNSEL FOR DEBTORS IN POSSESSSION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **ABUELO'S INTERNATIONAL, LP,** *et al.,*[1] | § | **Case No. 25-43339-elm11** |
| | § | |
| **Debtors.** | § | **Joint Administration Requested** |

### DECLARATION OF ROBERT LIN, PRESIDENT OF FOOD CONCEPTS INTERNATIONAL HOLDINGS, INC., IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Robert L. Lin, state and declare as follows:

1.      I am over 18 years of age, of sound mind, and fully competent to make this Declaration.  If called upon to testify, I could and would competently testify to the matters set forth herein.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, include: Abuelo's International, LP (1108), Food Concepts International, L.P. (5079) and Food Concepts International Holdings, Inc. (2576).

2. I am the President and CEO of Food Concepts International Holdings, Inc. ("FCIH"), as well as an officer of the general partners of Food Concepts International, LP ("FCI") and Abuelo's International, L.P. ("ABI", and collectively, the "Debtors"). In that capacity, I am the authorized representative of the Debtors in these bankruptcy cases (the "Chapter 11 Cases").

3. Based upon my personal knowledge of the Debtors and their business operations, ownership, history, industry, and book and records, and based upon information contained in the Debtors' books and records, I am qualified to make this Declaration on behalf of the Debtors. Some of the information contained herein is based upon my review of data regularly compiled by the Debtors in the ordinary course of its business.

4. This Declaration is being submitted to give an overview of the Debtors' businesses, their reasons for filing these chapter 11 cases and in support of the facts in the Debtors' First-Day Motions (collectively, the "Motions")[2], including:

  a. Motion for Joint Administration [Docket No. 4][3] (the "Joint Administration Motion");

  b. Emergency Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, and Statements of Financial Affairs, and (II) Granting Related Relief [Docket No. 5] (the "Deadline Extension Motion");

  c. Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Top 40 Unsecured Creditors and Consolidated List of Creditors, and (II) Authorizing the Debtors to Redact Certain Personal Identification Information of Individual Creditors and Current and Former Employees [Docket No. 6] (the "Creditor Notice Motion");

  d. Emergency Motion to Reject Leases of Nonresidential Real Property [Docket No. 7] (the "Lease Rejection Motion");

  e. Emergency Motion for an Order (I) Authorizing Continued Use of Existing Business Forms and Records, (II) Authorizing Maintenance of Existing Corporate Bank

---

[2] Docket numbers refer to the ABI docket unless otherwise noted.

[3] FCI Docket No. 3 and FCIH Docket No. 4.

---

Accounts and Cash Management System, (III) Authorizing Payment of Prepetition Costs and Fees Associated with Customer Credit and Debit Card Transactions, and (IV) Waiving Certain United States Trustee Requirements [Docket No. 9] (the "Cash Management Motion");

f. Emergency Motion for Interim and Final Orders (I) Authorizing Use of Cash Collateral; (II) Granting Adequate Protection; and (III) Scheduling a Final Hearing [Docket No. 11] (the "Cash Collateral Motion");

g. Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Superpriority Administrative Claims; and (III) Scheduling a Final Hearing [Docket No. 12] (the "DIP Financing Motion");

h. Emergency Motion for Entry of an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Employee Benefits Obligations, and Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefit Programs and Pay Related Administrative Obligations, and (II) Granting Related Relief [Docket No. 13] (the "Employee Compensation Motion");

i. Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Insurance Policies and Honor all Obligations in Respect Thereof, (B) Renew, Supplement, and Enter Into New Insurance Policies, (C) Honor the Terms of Related Premium Financing Agreement and Pay Premiums Thereunder, and (D) Honor the Terms of Related Broker Agreement and Pay Amounts Thereunder, and (II) Granting Related Relief [Docket No. 14] (the "Insurance Policy and Premium Finance Agreement Motion");

j. Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition, and Post-Petition Taxes and Fees, and (II) Granting Related Relief [Docket No. 16] (the "Sales Tax Motion");

k. Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Pre-Petition Obligations Related Thereto, and (II) Granting Related Relief [Docket No. 18] (the "Customer Programs Maintenance Motion");

l. Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief [Docket No. 21] (the "Utility Motion"); and

m. Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to Pay Prepetition Obligations of Critical Vendors and Additional Use of Cash Collateral [Docket No. 22] (the "Critical Vendors Motion").

## ABOUT THE COMPANIES

5.      Food Concepts International Holdings, Inc. ("FCIH") is the sole member of the general partner of Food Concepts International, L.P., a Texas limited partnership ("FCI").  FCI is the 99.99% limited partner of the Abuelo's International, L.P., a Texas limited partnership ("ABI").

6.      The Debtors own and operate a chain of full-service, casual dining Mexican restaurants serving made-from-scratch Mexican food.  The Debtors' first restaurant opened in 1989, and they now operate a total of 16 restaurants located in 9 states throughout the nation. The states and cities in which Debtors' restaurant operates are as follows:

Arizona
    Peoria
Arkansas
    Rogers
Florida
    Lakeland
Kansas
    Wichita Ridge Road
    Wichita Waterfront
Oklahoma
    Tulsa Nickel Creek
South Carolina
    Myrtle Beach
Texas
    Abilene
    Amarillo
    Arlington
    Fort Worth
    Hurst
    Lubbock
    Midland
    The Colony
    Tyler

7.      The Debtors' operations have been impacted by a significant drop in sales, rising food and labor costs, continued staffing challenges, and changes in consumer preferences.

8.      The Debtors began seeing headwinds in 2023 as inflation persisted and consumer willingness to spend on discretionary items, such as dining out, remained low.  In 2023, the Debtors experience a reduction in store traffic of 5.9% from 2022.  Additionally, as a result of rampant inflation, the Debtors were battling labor shortages and increased wage pressure.

9.      Unfortunately, consumer weakness, labor shortages, and rising labor and food costs continued through 2024. Furthermore, certain locations experienced extreme weather events through the busy months of May and June caused store closures totaling 63 days which resulted in a conservative estimate of $550,000 of lost revenue in those two months alone.

10.      However, while in store traffic and sales remained lower in 2024, the Debtors saw an increase in off premises sales of 7.7% as consumers pivoted to ordering online and eating at home where they could save on drink and tip expenses.

11.      To combat the drop in sales and profitability experienced through 2023 and 2024, the Debtors' reduced corporate overhead costs, and have closed certain low performing stores.

12.      As of the Petition Date, the Debtors had cash deposits, payment facilitator deposits, and credit card receivables totaling approximately $484,665, and inventory with a value of approximately $643,536 that will be used to generate sales in the Debtors' continued operations. The Ongoing operations are anticipated to continue to generate revenues sufficient to not only support current operating expenses, but an exit from this reorganization proceeding.  The cash reserves, together with accounts receivable and inventory, constitute the "Cash Collateral" of the Debtors.

## SECURED CREDITORS

13. On or about April 9, 2008, FCI and ABI entered into a Master Credit Agreement with First Bank & Trust, Lubbock, Texas, a state bank ("FBT"), which has been amended from time to time.

14. Pursuant to the terms of the Master Credit Agreement, FCI and ABI obtained several term loans from FBT which are evidenced by (i) that certain Promissory Note dated December 12, 2013 in the original principal amount of $3,500,000 ("Construction Note") and all amendments thereto, (ii) that certain Promissory Note dated May 18, 2017 in the original principal amount of $2,857,083 ("2017 Term Note") and all amendments thereto, (iii) that certain Promissory Note dated May 18, 2018 in the original principal amount of $2,000,000 ("2018 Term Note"), (iv) that certain Promissory Note dated October 21, 2019 in the original principal amount of $2,500,000 ("2019 Term Note") and all amendments thereto, and (v) that certain revolving loan evidenced by a Promissory Note dated August 18, 2024, and amended August 26, 2025, in the principal amount of $2,000,000.00 ("RLOC" and together with the Construction Note, 2017 Term Note, 2018 Term Note, and 2019 Term Note, the "FBT Notes").

15. On or about August 26, 2025 FTB and the Debtors entered into a certain loan modification pursuant to which, among other things, FBT agreed to extend the maturity date of the RLOC to December 31, 2025 and to increase the credit limit to $2,500,000.00.

16. As of the Petition Date, the obligations under the FBT Notes totaled approximately $8 million ("FBT Prepetition Obligations").

17. In order to secure amounts loaned to the Debtors pursuant to the Master Credit Agreement, including the FBT Prepetition Obligations, FCI and ABI delivered to FBT a certain Commercial Security Agreement dated March 26, 2020 and certain deeds of trust and mortgages

granting FBT a security interest in substantially all of their assets, including rents and profits derived from certain leasehold interests of FCI from which ABI operates its restaurants ("FBT Prepetition Collateral").

18. FBT filed a UCC-1 Financing Statement with the office of the Texas Secretary of State on August 17, 1998 as Filing Number 98-166246 and continuation statements in 2003, 2008, 2013, 2018, and 2023 with the office of the Secretary of State of Texas. The UCC-1 Financing Statement describes the FBT Prepetition Collateral as:

("FBT Prepetition Collateral") including

> All inventory, wherever located, whether new, used or repossessed, presently owned or hereafter acquired, and all equipment, present and future, used or intended for use in connection therewith, and all accounts, contract rights, documents, accounts receivable, instruments, general intangibles, chattel paper, books and records, presently existing and hereafter arising; together with any such property returned to or repossessed by the debtor and all present and future accessions to, substitutions for, products and proceeds of any of the foregoing; all reserves of any type, description or origin, established at any time by secured party and all funds or property of the debtor in possession of secured party, or in transit to or for secured party; all buildings,. improvements, furniture, furnishings, fixtures and equipment including goods which are fixtures or become fixtures, including but not limited to: Life insurance proceeds, inventory, equipment, fixtures, accounts receivable, contract rights, general intangibles, collateral including all accessions, all collateral owned by debtor and hereinafter acquired, including all accessions thereto and products wherever located, any interest in and to the leasehold estate and any and all improvements made to said leasehold estate.

19. The 1998 Financing Statement asserts an interest in the assets of Food Concepts International, Inc. d/b/a Abuelo's Restaurant. In 2002, Food Concepts International, Inc. converted its corporate form from a Texas corporation to a Texas limited partnership.

20. FBT subsequently filed UCC-1 Financing Statements with the office of the Texas Secretary of State naming Food Concepts International, L.P. as the debtor in 2005 and 2015 as

Filing Numbers 05-0014925450 and 15-0018120038, respectively. However, each of those financing statements have lapsed.

21. On or about August 18, 2025, FBT filed UCC-1 Financing Statements with the office of the Texas Secretary of State naming Abuelo's International, L.P. and Food Concepts International, L.P. as the Debtors as Filing Numbers 25-0051482491 and 25-0051480237, respectively. Each of the financing statements asserts an interest in "All assets of the Debtor, whether now owned or hereafter required (sic)."

22. FBT also recorded certain Deeds of Trust or Mortgages with the county recorder in the county and state where the leasehold interests in which the Debtors granted FBT a security interest are located.

23. FCIH and James Young, a non-debtor and director and/or officer of FCIH, gave FBT certain Commercial Guaranties. Each guarantor guaranteed payment and performance of all prepetition obligations owed to FBT.

24. Ben E. Keith, one of the Debtors' main inventory suppliers, may also claim an interest in Cash Collateral as a result of a UCC-1 Financing Statement filed with the office of the Texas Secretary of State on October 14, 2019 under Filing Number 19-0038981160 asserting a purchase money security interest in "all goods sold or equipment leased, and a security interest in all other personal property of" FCI including "all goods, equipment, inventory, vehicles, fixtures, work in process, accounts receivable, instruments, chattel paper, causes of action, general intangibles, including any liquor license and all proceeds thereof" ("Ben E. Keith Prepetition Collateral").

25. Ben E. Keith and FBT will collectively be referred to as the "Secured Creditors".

26. On or about October 4, 2019, Ben E. Keith, FBT, and FCI entered into a Subordination Agreement wherein Ben E. Keith agreed to subordinate any security interest it may have in the Ben E. Keith Prepetition Collateral to all of FBT's liens in the FBT Prepetition Collateral.

27. Nearly, all assets that would constitute cash collateral within the meaning of the Bankruptcy Code are generated and held in ABI, the operating entity.

## UNSECURED CREDITORS

28. The Debtors have upwards of 300 unsecured creditors holding claims aggregating approximately $5 million.

## JOINT ADMINISTRATION MOTION

29. The Debtors are affiliates of each other in that Food Concepts International, LP and Abuelo's International, LP are the wholly-owned subsidiaries of Food Concepts International Holdings, Inc.

30. In my opinion, the joint administration of the Debtors' chapter 11 cases will expedite the administration of these cases and reduce administrative expenses without prejudicing any creditor's substantive rights. I anticipate that numerous notices, applications, motions, other pleadings and orders in these cases will affect all three of the Debtors. Based on my understanding, the joint administration of the cases will permit counsel for all parties in interest to include the Debtors' respective cases in a single caption on the documents that will be filed and served in these cases, and will enable parties in interest in the above-captioned chapter 11 cases to be apprised of the various matters before the Court in these cases.

31. I further understand that the entry of an order of joint administration will: (a) significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court;

(b) simplify for the Office of the United States Trustee the supervision of the administrative aspects of these chapter 11 cases; (c) render the completion of various administrative tasks less costly; and (d) minimize the number of unnecessary delays associated with the administration of separate chapter 11 cases.

32.    I understand that the Joint Administration Motion does not seek to substantively consolidate the cases.  Thus, I do not believe the rights of parties in interest will be prejudiced by the proposed joint administration of these cases because each creditor may still file its claim against a particular estate.  I therefore believe that joint administration of the above-captioned cases is in the Debtors' best interest, as well as those of their respective estates, creditors and other parties in interest.

**DEADLINE EXTENSION MOTION**

33.    Completing the Schedules and Statements requires the Debtors and their advisors to spend considerable time and effort to collect, review, and assemble copious amounts of information in addition to attending to the daily demands of the chapter 11 process. In the days leading up to the Petition Date, the Debtors focused primarily on preparing for this chapter 11 case, including negotiating with certain creditor constituencies, and thus the Debtor's management and professionals were not in a position to complete the Schedules and Statements as of the Petition Date. Post-petition, the substantial amount of work entailed in completing the Schedules and Statements will be directly competing with the demands upon the Debtor's personnel to address critical operational matters during the initial post-petition period.

34.    Focusing the attention of key personnel and advisors on critical operational and chapter 11 compliance issues during the early days of this chapter 11 case will facilitate the

Debtors' smooth transition into chapter 11, thereby maximizing value for their estates, creditors, and other parties in interest.

35.     It is my opinion that extension of the deadline to file Schedules and Statements by an additional fourteen (14) days, through and including September 30, 2025, will allow the Debtors' sufficient time to complete the work without dramatically impacting the reorganization effort. Additionally, there will still be time for the Debtors' creditors and parties in interest to review and Schedules and Statements in advance of the first meetings of creditors scheduled to be conducted in the Chapter 11 Cases on October 8, 2025, at 9:30 a.m.

## CREDITOR NOTICE MOTION

36.     In my opinion the filing of a consolidated service list limiting notice of routine motions and to the 40 largest unsecured creditors of the three Debtors will reduce the photocopy and mailing expense to the Debtors as well as creditors in the case and prevent creditors with small claims from being inundated with papers filed with this Court, the bulk of which are of only passing interest.

37.     In order to protect personal information of individual creditors as well as employees and contractors of the Debtors, it is my opinion that redacting, from any papers filed or to be filed with the Court in these Chapter 11 Cases, including the Schedules and Statements, the home addresses of individual creditors—including the Debtors' employees and contract workers— is necessary and appropriate. Such information can be used to perpetrate identity theft or locate survivors of domestic violence, harassment, or stalking.

38.     The Debtors would certainly provide, upon request, an unredacted version of the consolidated service list as well as Schedules and Statement to the Court, the Office of the United

**In re Abuelo's International, LP, *et al.*, Debtors in Possession**
**Declaration of Robert L. Lin in Support of Petitions and First Day Motions - Page 11 of 50**

States Trustee for the Northern District of Texas, and counsel to the official committee of unsecured creditors should one be appointed in the Chapter 11 Cases.

## EMPLOYEE COMPENSATION MOTION

39.     The Employee Compensation Motion relates to funding of pre-petition payroll and other employment related obligations earned by the Debtors' workforce.

40.     In my opinion the Debtors' ability to preserve their business and successfully reorganize is dependent on the expertise and continued service of their active workforce. As of the Petition Date, ABI employed approximately 1,074 employees across the country, of which 60 are employed on a full-time basis and 1,014 are employed on an hourly basis[4] while FCI employed approximately 28 individuals on a full-time basis. All told, approximately 1,014 employees are paid hourly (the "Hourly Employees"), and approximately 88 employees are salaried (together with the Hourly Employees, the "Employees").

41.     The Employees perform a wide variety of functions critical to the Debtors' business, to say nothing of the administration of these chapter 11 cases and the Debtors' restructuring. The Debtors' Employees are skilled personnel intimately familiar with the Debtors' business, processes, and systems—many of whom have developed relationships with customers and vendors that are essential to the Debtors' business. Without the continued, uninterrupted services of the Debtors' Employees, the Debtors' business operations will halt and the administration of the estates will be materially impaired.

42.     Additionally, the Debtors' Employees rely on compensation and benefits to pay their daily living expenses and other necessities. These individuals could experience significant hardship if the Court does not permit the Debtors to continue paying their compensation and providing them

---

[4] Of the 1,014 hourly employees, 338 qualify as full-time employees while the remaining 676 are part-time.

with health and other benefits. For these reasons, I believe the relief requested in the Employee Compensation Motion is necessary and appropriate.

43. In the ordinary course of business, the Debtors (a) pay standard wage compensation and paid time off, (b) maintain reimbursement programs, and (c) maintain certain benefits for their workforce (collectively, the "Workforce Programs"), as provided below.

44. Employees of ABI are paid biweekly with compensation due and owing for the period of August 14, 2025 through August 27, 2025 due September 3, 2025. On August 29, 2025, the Debtors funded the September 3, 2025 payroll through ADP which consisted of net wages of $658,042.74, 401k plan deposit of $11,367.97 and a Federal tax deposit payment of $226,108.51. Portions of the funded deposits are likely to have not been fully processed as of the Petition Date. The next ABI payroll for the period covering August 28, 2025 through September 10, 2025 is due to be funded no later than September 15, 2025.

45. Additionally, pursuant to ABI's store management incentive bonus program, the Debtors commenced the process with ADP of funding July 2025 bonuses on August 14, 2025, for August 18, 2025 pay date which consisted of net wages of $21,068.35, 401k plan deposit of $2,326.20, and Federal tax deposit payment of $11,857.36. The next ABI store management incentive bonus program payment is due September 24, 2025 and will need to be funded to ADP on September 22, 2025 for the month of August 2025.

46. Employees of FCI are paid semi-monthly with payroll due on the 20th of each month for the 1st through 15th day of the month and on the 5th of each month for the 16th thru last day of the month. The FCI payroll is funded through a payroll account maintained by FCI at First Bank & Trust. On August 29, 2025, the Debtors funded the September 5, 2025 payroll which consisted of net wages of $68,906.97, 401K plan deposit of $10,817.76 and Federal tax deposit payment of

$22,282.34. Portions of the funded deposits are likely to have not been fully processed as of the Petition Date. The next FCI payroll is due to be funded by September 19, 2025 for the period of September 1, 2025 thru September 15, 2025.

47.     In addition to compensation and bonuses as set forth above, certain employees of the Debtors participate in benefit programs offered by the Debtors including medical, vision, dental and disability insurance.

48.     As of the Petition Date, it is estimated the total amount outstanding on account of the Workforce Programs (above and beyond that satisfied as detailed above) is approximately $705,000.00[5] (the "Workforce Obligations"), all, or nearly all, of which will become due and owing within the two-week period immediately after the Petition Date.

49.     There are two Employees who are owed prepetition amounts in excess of the $17,150.00 priority wage cap imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. The Debtors do not seek authority to pay these amounts in excess of such cap at this time.

50.     Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Workforce Programs in the ordinary course of business. Out of an abundance of caution, the Debtors also request confirmation of their right to modify, change, and discontinue any of their Workforce Programs and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

**Compensation, Withholding, and Expense Reimbursement.**

    A.    **Wage Obligations.**

---

[5] Consisting of wages, PTO obligations, Employee Reimbursements, Bonus Program, Netspend (gratuity for Employees), Withholding Taxes and Obligations, ADP Payroll Processing Fees, plus other Benefit Obligations including Medical Insurance, Dental and Vision Insurance, Life, AD&D, Disability, 401k Plan and Workers Compensation Obligations.

51.     Generally, ABI Employees are paid bi-weekly in arrears and FCI Employees are paid semi-monthly in arrears. As a result, Employees often have wages and other compensation that has accrued, but is unpaid, at any given point in time. As of the Petition Date, it is estimated that they owe approximately $352,500.00 on account of accrued but unpaid wages to active employees prior to the Petition Date for the pay period of August 14, 2025 thru August 27, 2025 for ABI Employees and August 16, 2025 thru August 31, 2025 for FCI Employees. Additionally, the Debtors owe approximately $2,512.50 in severance pay for one FCI Employee released in July 2025 which the Debtors propose to retire over the next payroll.

52.     The Debtors' payroll processing functions for Employees are managed by ADP. The Debtors are current, as of the Petition Date, in compensating ADP for its payroll processing services and in make state and federal withholding deposits. The Debtors seek authority to pay this amount post-petition and to continue honoring their payroll processing obligations in the ordinary course of business during the administration of these chapter 11 cases.

53.     The Debtors seek authority to pay any accrued but unpaid prepetition wage obligations owing to the Employees post-petition, and to continue to pay wage obligations in the ordinary course.

**B.      Payment of Credit Card Gratuity to Employees.**

54.     In the ordinary course of the Debtors' business, customers may use credit cards to pay for their food and dining experience at the Debtors' restaurants, including the payment of gratuity to Employees. The Debtors use the services of Netspend Corporation ("Netspend") to ensure that tips paid on a customer's credit card are given to the server Employee who earned the tip. Generally, when a customer pays a tip on a credit card, each restaurant location records the amount of tips earned by each server Employee daily, and then Netspend funds the tips directly to a

debit card held in the server Employee's name. Netspend provides a monthly statement to the Debtors summarizing the amounts paid by Netspend to the Employees for the preceding month. Thus, although the Debtors collect and remit tips on a daily basis through Netspend, the true up for the amounts paid by Netspend and thus owed by the Debtors occurs in arrears. The average amount in tips over weekends is approximately $150,000. These numbers vary from day to day. The Debtors anticipate that as of the Petition Date, the Debtors will owe approximately $150,000 for tips to server Employees.

55.     I understand that, pursuant to DOL regulations under the FLSA, tips are considered the property of the employee, and an employer cannot keep them. Employers are prohibited from keeping any portion of the employees' tips, except to distribute them to the employee who received them or through a valid tip pool. Any direct cash tips earned by the tipped employee are theirs to keep and are not transmitted through Netspend.  Netspend is utilized to get the employee their net credit card tips they are owed.

56.     Because certain of the Employees rely on tips for the majority of their pay, uninterrupted payment of such gratuity to the Employees entitled to them is critical to the Debtors' continued operations and to avoid Employee hardship. Therefore, the Debtors request authority to pay the amount owed to Netspend on account of tips earned prepetition and seek to continuing paying Netspend for the payment of tips to Employees in the ordinary course of business post-petition.

C.     **Employee Incentive Programs.**

57.     Certain non-insider Employees are entitled to bonuses (a "Bonus") on a monthly basis for achieving performance targets in the key areas of sales growth and guest satisfaction at each restaurant (the "Bonus Program"). Approximately 43 Employees are eligible for bonuses.

These Employees are either in managerial roles at the restaurant level or are in other manager roles. None of these Employees are insiders of the Debtors. The approximate amount owed on account of the Bonus Program as of the Petition Date is $42,000.00. No single Employee entitled to a bonus will be owed more than the $17,150 priority cap, including their wages. The Debtors seek authority but not direction to pay such amounts post-petition and to continue the Bonus Program in the ordinary course post-petition.

58.     Additionally, in the ordinary course of business, and as an Employee incentive, the Debtors provide a certain number of free meals to certain Employees at the Debtors' restaurants (the "Employee Meal Program"). Under the Employee Meal Program, employees receive discounts on meals or free meals depending on their role with the Debtors. I understand there are not any outstanding amounts owed as of the Petition Date on account of the Employee Meal Program. To show good will and to maintain employee morale, the Debtors seek to honor and continue providing the Employee Meal Program to the Employees.

**D.     Reimbursable Expenses.**

59.     In the ordinary course of business, the Debtors maintain a travel and entertainment policy, whereby the Debtors reimburse certain Employees for a variety of ordinary, necessary, and reasonable expenses that the Employees incurs within the scope of their job duties. Such expenses include costs for travel, transportation, lodging, telephone, and meals and entertainment, among other things. The Employees must follow the written company guidelines to be eligible for reimbursement. For travel, once an Employee's travel is approved by management, travel bookings (such as hotel and airfare) are made through a company travel service provider, Egencia. Employees pay the expenses eligible or approved for reimbursement with personal funds and submit requests for reimbursement of such expenses. The Employee is expected to follow the

written policy and use sound judgment when incurring business expenses for which they seek reimbursement. To be reimbursed, Employees must submit their receipts to the Debtors for approval.

60.    Once expenses are approved by the Debtors, the reimbursements are paid in the ordinary course of the Debtors' businesses. As of the Petition Date, the Debtors do not believe they owe any amounts for accrued but unpaid reimbursable expenses to the Employees. The Debtors seek to continue the expense reimbursements in the ordinary course of business.

**E.    Paid Time Off, Vacation, and Sick Days.**

61.    All of the Debtors' full-time Employees are entitled to paid time off for vacation and for those in Arizona, for sick days ("PTO"). These numbers are subject to fluctuation and not readily predictable. For example, there was no Arizona PTO paid on the August 20, 2025 or September 3, 2025 payroll; however, there was $520.00 paid on the August 6, 2025 payroll. With respect to vacation PTO, the request must be submitted by an Employee in advance. The total hourly vacation paid with the August 6, 2025 payroll was $13,058.58,$11,105.81 for the August 20, 2025 payroll and $12,756.40 for the September 3, 2025 payroll.

**E.    Deductions.**

62.    In the ordinary course of business, ADP processes deductions from Employees' payroll in respect of federal, state, and local income taxes, FICA, court-ordered garnishments, child support, and other pretax deductions payable pursuant to certain of the health, welfare, and retirement savings programs detailed herein (collectively, the "Deductions"), and forwards those amounts to the various third-party entities on whose behalf the Deductions were made. Some Deductions are taken from each paycheck, while other Deductions are taken less frequently

---

**In re Abuelo's International, LP,** *et al.*, **Debtors in Possession**
**Declaration of Robert L. Lin in Support of Petitions and First Day Motions - Page 18 of 50**

63.     As of the Petition Date, it is estimated that the aggregate amount of Deductions that have been taken but not yet paid to the appropriate recipient is approximately $26,897.04[6]. The Debtors seek to remit the Deductions taken for prepetition wage obligations as they come due post-petition and to continue processing future Deductions in the ordinary course.

**II.     Insurance, Disability, and other Benefits.**

64.     Prior to the Petition Date, the Debtors offered their Employees various standard employee benefits, including, without limitation, (a) medical, dental and vision insurance, (b) life insurance, (c) disability insurance, (d) retirement savings plans, and (e) employee assistance programs provided to the workforce in the ordinary course of business (collectively, the "Benefits"), as described more fully below. The Debtors seek to pay any amounts incurred prepetition and owed post-petition, if any, for such benefits and to continue paying such Benefit obligations as they arise post-petition in the ordinary course.

**A.     Medical, Dental, and Vision Insurance.**

65.     The Debtors maintain three tier plans (Base, Low and High) for medical insurance through BCBS of Texas ("Health Insurance") and dental and vision insurance through Humana ("Dental and Vision Insurance"), although the Debtors will be moving to BCBS of Texas effective September 1, 2025. For BCBS of Texas, the Debtors currently owe $27,580.66 for medical claims incurred August 23, 2025 through August 29, 2025 which is due September 4 20, 2025. With the change from Humana to BCBS effective as of September 1, 2025, Debtors have not yet received the invoice for September 2025; however, it is anticipated to be in range of $7,000.00. The Debtors request authority but not the direction to pay such amount and to continue paying the Health

---

[6] Consisting of: ABI W/H for September 3, 2025 payroll of $7,509.51 due September 10, 2025; ABI Child Support from the September 3, 2025 payroll of $4,684.75 due September 10, 2025; and FCI W/H for third quarter 2025 of $3,125.04 due October 15, 2025.

---

Insurance and Dental and Vision Insurance Premiums as well as all required medical provider reimbursements, as applicable, in the ordinary course on a post-petition basis.

**B.      Retirement Savings.**

66.      The Debtors also provide a 401k retirement savings plan (the "401k Plan"). The 401k Plan generally provides for pretax and post-tax salary deductions of compensation up to limits set by the Internal Revenue Code and Employee 401k contributions are deducted automatically from their respective wages. The average annual 401k. As of the Petition Date, the Debtors estimate that they will owe approximately $ 7,720.92 ($3,401.80 for FCI and $4,319.12 for ABI) in matching payments. The Debtors seek to pay such matching payments post-petition and to continue paying these retirement savings Benefits post-petition in the ordinary Course.

**C.      Life, Accidental Death and Dismemberment, and Disability Insurance.**

67.      The Debtors provide life insurance, accidental death, and dismemberment ("AD&D"), and disability insurance to the Employees. The AD&D insurance programs are 100% employee paid. However, the Debtors pay the upfront costs on the claims on a weekly or monthly basis in arrears and then deduct such costs from the Employee's wages. As of the Petition Date, and based on the prior month's experience, the Debtors estimate that there will be approximately $3,679.62 to New York Life and $937.60 to AllState Whole Life in claims to be paid on behalf of the Employee on account of the AD&D and then deducted from the Employee's wages. Aflac group accident and group critical illness is approximately $1,500 per month for all participants.

**D.      Workers Compensation.**

68.      With the exception of Texas for which a non-subscriber umbrella policy is maintained, in each state in which the Debtors operate, they maintain workers' compensation insurance for Employees at the statutorily required levels for claims arising from or related to their

employment with the Debtors (collectively, the "Workers' Compensation Program," and any obligations thereto, the "Workers' Compensation Obligations"). The Debtors maintain workers' compensation insurance through AmTrust and through state-run insurance funds. The current Workers' Compensation Program is effective from May 15, 2025 through May 15, 2026 with a monthly premium on the Workers' Compensation Obligations of approximately $9,490.00 exclusive of the annual prepaid premium on the Texas non-subscriber umbrella policy.

69.     The Debtors request authority to pay prepetition amounts owing with respect to the Workers' Compensation Obligations, and to continue honoring their obligations with respect to the Workers' Compensation Program in the ordinary course of business. It is critical that the Debtors be permitted to continue their Workers' Compensation Program and to pay outstanding prepetition claims, taxes, charges, assessments, premiums, and third-party administrator fees in the ordinary course of business because alternative arrangements for workers' compensation coverage would most certainly be more costly, and the failure to provide coverage may subject the Debtors and/or their officers to penalties.

**E.     Other Miscellaneous Employee Programs.**

70.     The Debtors also offer Employees a number of miscellaneous benefits (the "Miscellaneous Employee Programs") including, among others, (a) flexible spending accounts, (b) prescription drug coverage, and (c) telehealth services. As of the Petition Date, the Debtors do not believe they owe any amounts for the Employees' Miscellaneous Employee Program but seek authority to pay any amounts incurred prepetition owed post-petition, if any, and seek to pay future amounts as they become due in the ordinary course throughout these bankruptcy cases.

71.     The continued loyalty of the Debtors' workforce is a necessary component for a successful reorganization.  Under the best of circumstances, the filing of a chapter 11 petition is a

stressful and uncertain time for a debtor's employees, most of whom are not familiar with the nuances that bankruptcy practitioners often take for granted.  Such stress and uncertainty may cause poor employee morale at a time when the Debtors need their workforce to be most loyal. Moreover, many employees live paycheck to paycheck and will suffer immediate adverse consequences if they fail to receive their full compensation. Honoring the Pre-Petition Workforce Obligations will minimize the hardship that employees will certainly endure if compensation or benefits are interrupted and will provide comfort to the Debtors' workforce that the reasonable expectations of compensation for services will be met.  As such, the Debtors seek to continue funding the Pre-Petition Workforce Obligations in the ordinary course.

72.    The relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors. A failure by the Debtors to honor Pre-Petition Workforce Obligations to employees may result in the loss by the Debtors of their workforce at a time when they need them most.  Consequently, it is essential to the Debtors' continued operations that employees receive assurance that they will receive all pre-petition compensation without interruption.

## CASH MANAGEMENT MOTION

73.    In my opinion, the reorganization effort will be advanced by (a) authorizing the Debtors to continue using their existing business forms and records; (b) authorizing the Debtors to maintain the Bank Accounts and Cash Management System to the extent permitted under and subject to the terms of any cash collateral and debtor- in-possession financing orders approved by the Court (together with any approved budgets and in accordance with any budget(s) approved in connection therewith the "DIP Order"); (c) authorizing the Debtors to implement changes to the Cash Management System including the opening and closing of bank accounts (to the extent permitted under and subject to the terms the DIP Order); (d) authorizing the Debtors to maintain

**In re Abuelo's International, LP,** *et al.*, **Debtors in Possession**
**Declaration of Robert L. Lin in Support of Petitions and First Day Motions - Page 22 of 50**

their Card Processing System, including the payment of prepetition credit card processing fees and related charges (to the extent permitted under the DIP Order); (e) granting the Debtors a waiver of certain bank account and related requirements of the Office of the United States Trustee for the Northern District of Texas (the "U.S. Trustee") and Bankruptcy Code § 345(b) to the extent that such requirements are inconsistent with (i) the Debtors' existing practices under their Cash Management System or (ii) any action taken by the Debtors in accordance with any order granting this Motion or any other order entered in the Chapter 11 Cases.

**A.     The Debtors' Bank Accounts.**

74.     The Debtors' Cash Management System (defined below) is comprised of the following 31 bank accounts (collectively, the "Accounts" or "Bank Accounts"):

> 28 accounts at Wells Fargo Bank, N.A. ("Wells Fargo"); and
> 3 accounts at FBT.

75.     In my opinion, each of the Bank Accounts is in a financially stable banking institution with the Federal Deposit Insurance Corporation or other appropriate government-guaranteed deposit protection insurance.

76.     The Debtors currently manage their cash receipts, transfers, and disbursements through routine deposits, withdrawals, and fund transfers to, from, and between the Bank Accounts by various methods including check, wire transfer, automated clearing house transfer, and electronic funds transfer (the "Cash Management System"). The Cash Management System is centered around the main ABI operating account (the "ABI Main Account") to which revenues received from all sources are swept nightly and funds required for satisfaction of obligations are disbursed as directed.

77.     On a daily basis, the Debtors process large numbers of transactions through the Cash Management System. The Debtors maintain current and accurate records of all transactions

processed through the Cash Management System. The Debtors' Cash Management System is similar to those commonly employed by restaurant chains of comparable size and complexity. Among other benefits, the Cash Management System permits the Debtors to accurately monitor cash availability at all times. The Cash Management System also permits the Debtors to centrally manage and track the collection and transfer of funds, which reduces administrative burden and expense and minimizes interest expense. The following chart summarizes the roles of the key Bank Accounts:

| Type of Account | Account Description |
|---|---|
| ABI Store Depository Accounts) | The ABI Store Depository Accounts comprise the vast majority of the Debtors' Bank Accounts and are the store-level accounts where cash receipts from in-store sales are deposited. The cash receipts deposited into the ABI Store Depository Accounts are swept nightly into the ABI Depository Account and then to the ABI Main Account. |
| ABI Main Account (8427) | The ABI Main Account is the master account to which all revenues are swept nightly and from which funds are distributed for satisfaction of Debtors' liabilities. |
| ABI Depository Account (5435) | Funds deposited to the ABI Store Depository Accounts are swept nightly to the ABI Depository Account and then to the ABI Main Account. |
| ABI Credit Card Account (5443) | The ABI Credit Card Account is the account to which all receipts from Card Companies are deposited. Fund deposited to the ABI Credit Card Account swept nightly to the ABI Main Account. |
| ABI Accounts Payable Account (5972) | The ABI Accounts Payable Account is the account from which vendors invoices are paid by check. Funds are transferred from the ABI Main Account to the ABI Accounts Payable Account as needed. |
| ABI Liquor Account (Fintech) (1925) | The ABI Liquor Account (Fintech) is the account from which the vast majority of ABI's liquor vendors are paid. Funds are transferred from the ABI Main Account to the ABI Liquor Account as needed. |

| | |
|---|---|
| ABI Flexible Spending Account (1917) | The ABI Flexible Spending Account is the account into which funds deducted from employee compensation are deposited pending payment for the purpose held. |
| ABI Utility Account (7297) | The ABI Utility Account is the account from which obligations to utilities are satisfied. Funds are transferred from the ABI Main Account to the ABI Utility Account as needed. |
| ABI EFT Safe Transmissions Account (3906) | The ABI EFT Safe Transmissions Account is the account from which vendor invoices are paid by ACH payment. Funds are transferred from the ABI Main Account to the ABI EFT Safe Transmissions Account as needed. |
| FCI Main Account (6991) | The FCI Main Account is the account used to satisfy FCI payroll and other obligations with funds transferred from the ABI Main Account. |
| FCIH Account (5300) | The FCIH Account is generally inactive and has only a modest sum of money on deposit. |
| ABI Giving Hearts Fund Account (6312) | The ABI Giving Hearts Fund Account is the account to which voluntary employee contributions are deposited for the benefit of employees in financial need. The ABI Giving Hearts Fund monies are administered by the Giving Hearts Fund Committee. Contributions to the Giving Hearts Fund program have been suspended. |

### i. Revenues

57.     The Debtors' revenues are generated by sales at the Debtors' store locations throughout the U.S. The majority of sales at the Debtors' stores are conducted through credit and debit card transactions through the Debtors' card processing system (the "Card Processing System"). The Debtors also conduct a significant number of sales through cash and, to a lesser extent, checks.[7]

---

[7] Prior to the filing of these Chapter 11 Cases the Debtors sold gift cards. A small percentage of sales are conducted through the use of gift cards. The Debtors estimate that the total amount of outstanding gift cards is approximately $4.7 million as of the Petition Date. Gift card funds are not held in a separate account but are tracked in the Debtors' books and records and appropriate credits and debits are made in the Debtors' books and records upon the sale and use of gift cards.

---

58.     **Card Processing System Transactions.** Credit and debit card sales are processed through the Card Processing System pursuant to an agreement (the "Card Processing Agreement") with Wells Fargo Bank, N.A. (the "Card Processor"). The Debtors' Card Processing System is critical to its operations and cash flows. The Card Processor deducts its fees from settlement on a daily basis. Visa, Master Card, and Discover ("Card Companies") also deduct fees owed by the Debtors from settlement on a daily basis.  Because credit and debit card sales account for a significant percentage of the Debtors' total sales, it is critical to the Cash Management System that there be no disruptions in these payments. The Debtors seek authority, but not direction, to pay all prepetition unpaid fees due to Card Processor and the Card Companies and to continue such payments to Card Processor and the Card Companies in the ordinary course of business on a postpetition basis.

59.     The proceeds of debit and credit card transactions are periodically transferred by credit card providers to the ABI Credit Card Account. Funds in the ABI Credit Card Account are automatically swept to the ABI Main Account nightly.

60.     **Cash and Check Transactions.** Each of the Debtors' store locations maintains deposit account into which each individual store's cash and check receipts and collections are deposited daily (collectively, the "ABI Store Depository Accounts"). The ABI Store Depository Accounts are  swept nightly to the ABI Depository Account and in turn to the ABI Main Account.

ii.     **Disbursements.**

61.     The Debtors' disbursements are made with funds transferred from the ABI Main Account to the various payables accounts which consist of ABI Accounts Payable, ABI Liquor Account (Fintech), ABI Flexible Spending Account, and ABI Utility Account. With respect to

payroll and other expenditures required to be made by FCI, funds are transferred from the ABI Main Account to the FCI Main Account.

**B. The Debtors' Business Records.**

62.     In addition to the Cash Management System and Bank Accounts, the Debtors use in the ordinary course of their business numerous business forms (including but not limited to checks, deposit slips, letterhead, contracts, purchase orders, and invoices). The Debtors have a supply of these forms on hand. It would be expensive, wasteful, and disruptive to the Debtors' business to destroy all of these forms and order new ones.

**C. The U.S. Trustee Guidelines.**

63.     The U.S. Trustee has established its Guidelines for Chapter 11 Cases for Region VI (the "Guidelines") in order to supervise the administration of chapter 11 cases. These Guidelines require debtors-in-possession to, among other things, (a) close all existing bank accounts and open new accounts, including an operating account, a tax account, a payroll account, and, if required by the Court, a cash collateral account, (b) obtain checks for all debtor in possession accounts that have the designation "debtor in possession," and the bankruptcy case number, (c) close their books and records as of the petition date and to open new books and records, and (d) maintain their bank accounts with a depository bank approved by the U.S. Trustee. The U.S. Trustee designed these requirements to provide, among other things, a clear demarcation between prepetition and postpetition transactions and operations, which would, in theory, prevent the inadvertent postpetition payment of a prepetition claim.

64.     In my opinion, waiver of these requirements is appropriate under the circumstances.

Case 25-43339-elm11   Doc 34   Filed 09/04/25   Entered 09/04/25 18:59:59   Desc Main
Document     Page 28 of 50

**CUSTOMER PROGRAMS MAINTENANCE MOTION**

65.     The Debtors have developed a variety of incentives, discounts, promotions, and related programs to attract customers and maintain positive customer relationships at each of their restaurants. Prior to the Petition Date, in the ordinary course of the Debtors' business and as is customary in its industry, the Debtors offered and engaged in certain customer and other programs and practices. These programs include customer gift card programs and promotion, discount, and cooperative marketing programs (collectively, the "Customer Programs"). The Debtors' liability for the Customer Programs depends on consumer demand, the Debtors' marketing initiatives and promotions, and specific store performance at any given point in time. Due to such variables, it is difficult to quantify the Debtors' obligations attributable to the Customer Programs as a whole at a particular point in time.

66.     In my opinion, to effectuate a smooth transition into chapter 11, the Debtors must maintain customer loyalty and goodwill by continuing to honor their obligations under the Customer Programs. The Debtors compete in highly competitive businesses and must regularly provide both existing and potential customers with programs similar to (or better than) those offered by their competitors. The Debtors have implemented each of the Customer Programs in the ordinary course of businesses as a means to promote positive, productive, and profitable relationships with their customers which ultimately promote customer satisfaction, encourage new purchases, and ensure the Debtors remain competitive.

67.     In my opinion, failure to continue the Customer Programs, or failure by the Debtors to meet their obligations under such programs, would damage the Debtors' reputation and relationship with their current and potential customers at this critical time in their operations. The success and viability of the Debtors' businesses, and ultimately the Debtors' ability to

**In re Abuelo's International, LP,** *et al.*, **Debtors in Possession**
**Declaration of Robert L. Lin in Support of Petitions and First Day Motions - Page 28 of 50**

maximize the value of their assets, is dependent upon the continued patronage and loyalty of their customers. Any delay in honoring obligations to customers and third parties on account of the Customer Programs would severely and irreparably impair customer relations and drive away valuable customers, thereby harming the Debtors' efforts to maximize the value of their assets to the benefit of all interested parties.

68.     Accordingly, by the Customer Programs Maintenance Motion, the Debtors seek authority to honor any prepetition obligations related to their Customer Programs and to continue to honor the Customer Programs in the ordinary course of businesses on a post-petition basis without disruption.

**A.  The Gift Card Program.**

69.     The Debtors maintain a program pursuant to which its customers can purchase gift certificates and cards (collectively, the "Gift Cards") in various denominations (the "Gift Card Program"). Gift Cards are available in any amount and can be purchased in-store, online or at Costco. Gift Cards sold in-store or online may be subject to seasonal promotions. For example, the purchase of a $100 Gift Card may be accompanied by a $10 Gift Card that must be used within a specified period of time. Gift Cards offered for sale at Costco are generally sold at a twenty percent discount.

70.     Gift Cards drive, on average, more than $35,000.00 in revenues for the Debtors on an average week. Once purchased, a Gift Card may be used like cash for purchases in the Debtors' restaurants. As a result, the Debtors could be liable for any Gift Cards that are redeemed at any given time. Additionally, the Debtors historically refund the unused balance on a Gift Card for purchasers located in a region in which one of the Debtors' restaurants has closed and there are no nearby restaurants. Such refunds are honored upon request and paid by check.

As of the Petition Date, the value of outstanding Abuelo Gift Cards is approximately $4.7 million and, after adjustments for breakage (lost or discarded cards), approximately $3.5 million. Gift cards are an important part of any restaurant's business. They allow customers to conveniently gift friends and family, which in addition to new sales, widens the restaurant's customer base. Placing gift cards with Costco, even at a discount, widens the customer base as Costco customers are now potentially the Debtors' customers.

71.     The Gift Cards are administered by NCR/Aloha (the "Gift Card Administrator") as one of the products provided pursuant to an individual Master Aloha as a Service Program Agreement (the "Master Agreement") issued for each restaurant location and is one of the products included in the entire point of sale suite of products. As a result, Debtors' are unable to isolate the fees and expenses of the Gift Card Administrator; however, for purposes of comparison, the Debtors' have previously been quoted monthly fees ranging from $85.00 to $120.00 per location, per month, with an additional cost for each card swipe for similar services. With 16 locations at an average of $100.00 per month, the administrative fee for similar services is in the range of $1,600.00 per month. The Debtors are current in payment of monthly installments under the Master Agreement with the next monthly payment due September 1.

**B. Sales Promotions.**

72.     The Debtors conduct sales promotions on dine-in, delivery and takeout offerings (the "Sales Promotions"). Sales Promotions include discounts for e-mail offer subscribers, happy hour discounts on select food and beverages, birthday rewards, periodic holiday and seasonal offers and other discounts, and other similar non-cash promotions. The Sales Promotions are planned well in advance, with anticipated promotions scheduled through at least year end. The Debtors notify customers of their Sales Promotions via mobile, email, website, mailings, and

certain advertisements, among other channels. Further, the Debtors offer discounts for larger events and catering including discounts for groups, banquets, graduations, and holiday parties to incentivize larger ticket sizes.

73. As of the Petition Date, the Debtors do not believe that there are any amounts outstanding on account of Sales Promotions. The Debtors seek authorization to continue the Sales Promotions and to honor all of the Debtors' obligations related thereto, including satisfying any pre-petition obligations on a post-petition basis in a manner consistent with past practice.

**C. Third-Party Delivery Providers.**

74. The Debtors benefit from contractual arrangements (the "Third-Party Delivery Agreements") with third-party delivery providers to allow customers to order food from their chosen app to be picked up or delivered from the Debtors' restaurants, including Grubhub, Doordash, Foodja, and Uber Eats (each, a "Third-Party Delivery Provider"). Pursuant to the Third-Party Delivery Agreements, customers can place orders through their favorite Third-Party Delivery Provider's platform and have food from one of the Debtors' restaurants quickly delivered to their door. In order to increase customer retention and reward customers who make online purchases using certain Third-Party Delivery Providers, the Debtors periodically offer promotions such as free delivery. The commissions and fees associated with the Third-Party Delivery Providers vary by, among other things, the geographic area in which the Debtor's restaurant is located and average approximately $95,000.00 per month.

75. In my opinion the Third-Party Delivery Providers are integral to the Debtors' business, encourage repeat customers, and generate substantial sales, all of which inure benefits to the estate. Shifts in consumer preferences have driven increased need for delivery services as many consumer are primarily ordering meals from restaurants through delivery, rather than dine-

in experiences. As a result, Third-Party Delivery Providers continue the Debtors' relationship with its customers beyond its restaurants and improve sales while maintaining the Debtors' competitiveness in the marketplace.

### D.    Customer Loyalty Program.

76.    The Debtors maintain a loyalty program (the "Rewards Program") aptly named "Mi Abuelo's Rewards" to increase customer retention and reward customers for frequenting their local Abuelo's restaurant. Employing Paytronix software, the Debtors' marketing team is able run promotions and easily communication offers to rewards members via email, text or social media. In addition to discounts for food and/or beverages earned via the Rewards Program point system, members of the Rewards Program benefit from birthday and/or anniversary promotions offered exclusively to rewards members.

77.    In my opinion, the Rewards Program enhances customer loyalty which in turn drives sales, thereby increasing the value of the Debtors' estates.

### E.    Community Programs.

78.    In order to promote connections with community, the Debtors provide assistance with fundraising auctions in the form of in-kind contributions as well as Community Giveback Nights which allow organizations dining at Abuelo's to earn money for their cause. There are no cash contributions made to Community Programs. Rather, the contributions come in the form of discounts for purchases of food.

### F.    Marketing and Advertising Programs.

79.    As an additional way of communicating with existing customers and as a means for expanding the customer base, the Debtors employ a marketing and advertising program which includes maintenance of a website and digital media advertising as well as traditional

advertising such as radio and billboards (collectively "Marketing and Advertising Programs"). Online, digital and print media are valuable tools in reinforcing loyalty among existing customers as well as expanding the customer base. The Debtors allocate approximately $75,000.00 to $80,000.00 monthly to marketing and advertising (collectively, "Marketing and Advertising Expenses"). As of the Petition Date, the Debtors' did not have any prepaid promotional expenses.

80.    In my opinion, the entire array of Customer Programs provides a balanced marketing package for the Debtors' restaurants while providing tangible benefits to customers. Continuation of the Customer Programs is beneficial to the bankruptcy estates of the Debtors and creditors thereof. Accordingly, on behalf of the Debtors, I submit the Customer Programs Maintenance Motion should be approved.

### SALES TAX MOTION

81.    The Debtors collect, withhold, and incur certain sales and use taxes ("Sales and Use Taxes") and franchise taxes ("Franchise Taxes") and fees (collectively, the "Taxes and Fees"). The Debtors collect (as applicable) and remit the Taxes and Fees to various state and federal taxing authorities (collectively, the "Taxing Authorities"). Taxes and Fees are remitted or paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions.

82.    The Debtors pay the Taxes and Fees to the Taxing Authorities on a periodic basis, remitting them monthly, quarterly, or annually depending on the nature, jurisdiction, and incurrence of a particular Tax or Fee. Through this Motion, the Debtors seek to pay certain unpaid Taxes and Fees which (a) accrued or were incurred prepetition and become due post-petition which Debtors project total $459,929.82 through September 30, 2025, (b) constitute

"trust fund" taxes, and (c) arise or accrue post-petition in the ordinary course of business, consistent with prepetition practices.

**A.      Sales and Use Taxes.**

83.      In the ordinary course of business, the Debtors incur, collects, and remits Sales and Use Taxes to the applicable Taxing Authorities in connection with the sale and purchase of goods and services. The Debtors purchase a variety of equipment, materials, and services necessary for the operation of its business from certain vendors who collect sales taxes in connection with the Debtors' purchases of such goods or services. The Debtors also incur use taxes for the purchase of such goods and services when vendors are not registered to collect or have not collected sales taxes. In these cases, applicable law generally requires the Debtors to subsequently pay use taxes on such purchases to the applicable Taxing Authorities.

84.      Additionally, the Debtors collect and remit Sales and Use Taxes in the ordinary course of its business in connection with the sale of food and liquor. When such amounts are collected by the Debtors from the ultimate purchaser, they are held in trust. Since January 1, 2025, the Debtors have paid approximately $4,117,926.78 in Sales and Use Taxes.

**B.      Franchise Taxes.**

85.      The Debtors are required to pay various state Franchise Taxes to continue conducting its business in accordance with state laws. Since January 1, 2025, the Debtors have made annual Franchise Tax payments to applicable Taxing Authorities in the total approximate amount of $97,000.00. I understand that, as of the Petition Date, the Debtors do not owe any additional Franchise Taxes, which will become due and payable in the near term.

86.      I understand that many of the Sales and Use Taxes collected by the Debtors on behalf of the applicable Taxing Authorities are held in trust by the Debtors. Because the Debtors

do not have an equitable interest in these funds, I believe the Debtors should be permitted to pay those funds to the applicable Taxing Authorities post-petition as they become due in the ordinary course of business.

87.    I understand that claims for Taxes and Fee are or may be priority claims entitled to payment before general unsecured claims. Therefore, payment of the Taxes and Fees at this time only affects the timing of the payment for the amounts at issue and will not prejudice the rights and recoveries of junior creditors. I believe it is in the best interests of the bankruptcy estates of the Debtors and their creditors for the Debtors to continue paying Franchise Taxes post-petition in the ordinary course of their business as requested in the Sales Tax Motion. Accordingly, on behalf of the Debtors, I submit the Sales Tax Motion should be granted.

## UTILITY MOTION

88.    In my opinion the Debtors will benefit from an order of this Court (a) approving the Debtor's proposed adequate assurance of payment for future utility services; (b) prohibiting utility companies from altering, refusing, or discontinuing services; and (c) approving the Debtors' proposed procedures for resolving Adequate Assurance Requests.

### A.  The Utility Services and Utility Companies.

89.    In connection with the operation of their business and management of their properties, the Debtors obtain electricity, natural gas, telecommunications, water, waste management (including sewer and trash), internet, cable, and other similar services (collectively, the "Utility Services") from various utility companies, municipalities, or brokers (each, a "Utility Company," and collectively, the "Utility Companies") to facilitate their business operations. In conjunction with establishing utility services, the Debtors were often required to make a utility deposit. As of the Petition Date, the Debtors had utility deposits with various of the Utility

Companies of $109,299.50 (the "Security Deposits").

90.     The Utility Services are essential for the Debtors to maintain and operate their business, which require electricity, water, natural gas, telecommunications, and other Utility Services to transact businesses and safely provide food service. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted.

91.     The Debtors generally pay for all Utility Services by check, ACH, and online payments. As of the Petition Date, the Debtors owe approximately $134,613.28 on account of prepetition Utility Services. On average, over the last six months the Debtors paid approximately $201,204.63 each month for Utility Services, with some fluctuations depending on the season.

92.     The Debtors estimate that, after rejecting certain leases as contemplated in the *Debtors' Emergency Motion to Reject Leases of Nonresidential Real Property* [Docket No. 7] filed September 2, 2025, their cost for Utility Services during the next 30 days (not including any deposits to be paid) will be approximately $130,000.00 per month.

**B.  Proposed Adequate Assurance of Payment.**

93.     The Debtors intend to pay post-petition obligations owed to the Utility Companies in a timely manner. Cash held by the Debtors, cash generated in the ordinary course of business, and cash made available to the Debtors under the proposed DIP facility will provide sufficient liquidity to pay the Debtors' Utility Service obligations for post-petition services.

94.     The Debtors believe that each of the foregoing satisfies the requirements under section 366 of the Bankruptcy Code. Nonetheless, as additional adequate assurance, the Debtors propose to segregate $50,000.00 within the Debtors' existing cash management system (the "Adequate Assurance Deposit") within five (5) business days of this Court's entry of the Order.

The Adequate Assurance Deposit represents an amount equal to approximately one-quarter of the Debtors' average monthly cost of Utility Services over the last six months, not including amounts owed to Utility Companies that are currently paid in advance for their services or already hold a deposit equal to or greater than their *pro rata* share of the Adequate Assurance Deposit (which existing deposit shall be deemed to be the Adequate Assurance Deposit).

95. The Adequate Assurance Deposit will consist of segregated funds within the Debtors' existing cash management system for the duration of the chapter 11 cases, subject to the Debtors' right to terminate or discontinue the applicable Utility Services and may be applied to any post-petition defaults in payment to the applicable Utility Companies.

96. I believe the Adequate Assurance Deposit and the Debtors' ability to pay for future utility services in accordance with prepetition practice (collectively, the "Proposed Adequate Assurance"), constitute sufficient adequate assurance to the Utility Companies in full satisfaction of section 366 of the Bankruptcy Code.

**C. Adequate Assurance Procedures.**

97. The Any Utility Company that is not satisfied with the Proposed Adequate Assurance may make a request for adequate assurance of future payment (each, an "Adequate Assurance Request") pursuant to the adequate assurance procedures set forth in the Order (the "Adequate Assurance Procedures"). The Adequate Assurance Procedures provide a streamlined process for Utility Companies to address potential concerns with respect to the Proposed Adequate Assurance, while allowing the Debtors to continue uninterrupted operations. Specifically, the Adequate Assurance Procedures permit a Utility Company to object to the Proposed Adequate Assurance by serving an Adequate Assurance Request upon certain notice parties. The Debtors, in their discretion, may then resolve any Adequate Assurance Request by

mutual agreement with the Utility Company and without further order of the Court. If the Debtors determine that the Adequate Assurance Request cannot be resolved by mutual agreement, the Debtors will seek Court resolution of the Adequate Assurance Request.

98.    Moreover, unless and until a Utility Company files an objection or serves an Additional Assurance Request, such Utility Company shall be (a) deemed to have received adequate assurance of payment "satisfactory" to such Utility Company in compliance with section 366 of the Bankruptcy Code and (b) forbidden to discontinue, alter, or refuse services to, or discriminate against, the Debtors on account of any unpaid prepetition charges, or require additional assurance of payment other than the Proposed Adequate Assurance.

99.    Absent compliance with the Adequate Assurance Procedures, the Debtors request that the Utility Companies, including those subsequently added to the Utility Services List, be forbidden from altering, refusing, or discontinuing service or requiring additional assurance of payment other than the Proposed Adequate Assurance.

**D.  Modifications to the Utility Services List.**

100.    In my opinion the Debtors have made a good-faith effort to identify all Utility Companies and include them on the Utility Services List. If the Debtors identify new or additional Utility Companies or discontinue services from existing Utility Companies, the Debtors seek authority, in their sole discretion, to amend the Utility Services List to add or remove parties from the Utility Services List, provided that the Debtors shall give notice of any such amendment to the Notice Parties (as defined in the proposed Order). For any Utility Company that is subsequently added to the Utility Services List, the Debtors will serve such Utility Company with a copy of the Court's order regarding Utility Services, including the Adequate Assurance Procedures, and provide such Utility Company two weeks' notice of the

inclusion of such Utility Company on the Utility Services List. The Debtors further request that the relief requested in this Motion, including the proposed Adequate Assurance Procedures, and the Order granting this Motion shall apply to any subsequently identified Utility Company, regardless of when such Utility Company was added to the Utility Services List.

101.   In my opinion the relief requested by the Debtors in the Utility Motion is appropriate under the circumstances and bring certainty to both the Debtors and Utility Companies of their relative rights during the pendency of the Chapter 11 Cases. As a result, the Utility Motion is in the best interests of the bankruptcy estates of the Debtors and creditors thereon. Accordingly, on behalf of the Debtors, I submit the Utility Motion should be granted.

## CRITICAL VENDOR MOTION

102.   A key component to the Debtors' business is the ability to provide their customers a fine dining experience. That service is dependent on a multitude of vendors who provide goods or services to the Debtors on a regular basis. I understand, and the critical vendors (the "Critical Vendors") contemplated in this Motion have stated – that the failure to pay the pre-petition claims of the Critical Vendors would result in the Critical Vendors refusing to provide their goods or services to the Debtors post-petition, or altering the credit terms the Debtors currently enjoy. Finding reasonable and cost-effective replacements in this somewhat narrow field is also problematic.

103.   Insofar as the Debtors operations extend to 16 cities across the State of Texas as well as into the States of Arizona, Arkansas, Florida, Kansas, Oklahoma and South Carolina, there are few instances where the Debtors' restaurants are served by the same vendors. Instead, the Debtors' restaurants are served by vastly different vendors from location to location.

104.   Before filing this Motion, the Debtors examined whether payment of these

Critical Vendor claims: (i) was necessary; (ii) would ameliorate immediate and irreparable harm to the Debtors' business operations; and (iii) would ensure that the Debtors could continue to operate in the pre-petition ordinary course of business. Specifically, the Debtors reviewed accounts payable and Debtors' pre-petition vendors to identify those vendors who, because of the goods or services they provide, were essential to the Debtors' continued operations. The criteria used to identify vendors qualifying as "Critical Vendors" was the overall impact on the Debtors' business operations if the particular Critical Vendor ceased providing goods or services to the Debtors.

105. Once the Critical Vendors were identified, the Debtors estimated the total payments which would be necessary to ensure the continued supply of critical goods and services to the Debtors and further, considered (i) the Debtors' urgent need to continue to receive goods or services uninterrupted, (ii) their ability to find additional sources to provide the goods or services, and (iii) the likelihood that the Critical Vendor or an alternate vendor (if available) would extend trade terms post-petition despite the Debtors' failure to pay such vendors pre-petition outstanding trade debt.

106. The Critical Vendors identified by the Debtors fall into two general categories. First, the food suppliers who provide the Debtors' inventory of food. Second, the liquor suppliers who supply the Debtors' inventory of liquor. Specifically, the List of Critical Vendors, and the payment for which authority is sought is as follows.

**A. Critical Vendors – Food and Restaurant Products Vendors**

107. As of the Petition Date, many of the food vendors of the Debtors have outstanding claims against the Debtors arising from prepetition delivery of goods. While the Debtors anticipate they will be able to continue to transact business with a majority of their pre-petition

vendors, Nonpayment of the pre-petition claims of certain of the Debtors' vendors creates a significant risk of disruption or termination of the Debtor's operations. Thus, the Debtors request authority to pay the pre-petition claims of five Food and Restaurant Products Vendors identified below because such payment will allow the Debtors' businesses to avoid a likely loss, or to gain a likely economic advantage, disproportionate to the amount of such vendors' pre-petition claims.

108.    The Food and Restaurant Products Vendors, and the rationale for including them within the Critical Vendor group, are as follows:

| Vendor Name | Reason for Inclusion in Critical Vendor Group | Payment Schedule[8] |
|---|---|---|
| Ben E Keith Company | Debtors' primary food and products source for [13] locations. | Maintain 21-day payment terms on post-petition orders with cure of pre-petition balance over an agreed upon term of weeks. |
| Gordon Food Service Inc. | A major provider of food and restaurant products for [2] locations. | TBD |
| Shamrock Foods Company | A major provider of food and restaurant products for [1] locations. | TBD |
| Edward Don | A major provider of food and restaurant products for [16] locations. | TBD |
| Farmers Bros | A major provider of food and restaurant products for [16] locations | TBD |

## B. Critical Vendors – Liquor Vendors

109.    Sale of alcohol by the drink to customers is a major source of revenue for the Debtors operations. In order to maintain their liquor licenses and continue with the sale of alcohol at their restaurants, the Debtors must remain current in payment for products provided by

---

[8] Negotiations concerning the payment schedule are ongoing.

---

**In re Abuelo's International, LP,** *et al.***, Debtors in Possession**
**Declaration of Robert L. Lin in Support of Petitions and First Day Motions - Page 41 of 50**

their Liquor Vendors, including invoices created pre-petition. The Debtors request authority to satisfy the pre-petition claims of 22 Liquor Vendors identified below because such payment will allow the Debtors' businesses to avoid a likely loss, or to gain a likely economic advantage, disproportionate to the amount of such vendors' pre-petition claims.

110. The Liquor Vendors, and the rationale for including them within the Critical Vendor group, are as follows:

| Vendor Name | Reason for Inclusion in Critical Vendor Group | Payment Schedule |
|---|---|---|
| Barmalade LLC | Liquor Vendor | Pay in the ordinary course of business. |
| Pinkie's Liquor – Midland | Liquor Vender | Pay in the ordinary course of business. |
| Southern Glazer's Wine and Spirits | Liquor Vender | Pay in the ordinary course of business. |
| SPECS Family Partners LTD | Liquor Vender | Pay in the ordinary course of business. |
| Premier Beverage Company | Liquor Vender | Pay in the ordinary course of business. |
| Reedco LLC | Liquor Vender | Pay in the ordinary course of business. |
| Crescent Crown Distributing LLC | Liquor Vender | Pay in the ordinary course of business. |
| Owen's Liquor | Liquor Vender | Pay in the ordinary course of business. |
| Reed Beverage Inc. | Liquor Vender | Pay in the ordinary course of business. |
| Republic National Dist-Tampa | Liquor Vender | Pay in the ordinary course of business. |
| Standard Sales Co. | Liquor Vender | Pay in the ordinary course of business. |
| Andrews Distributing | Liquor Vender | Pay in the ordinary course of business. |
| GG Distributing LLC | Liquor Vender | Pay in the ordinary course of business. |
| Republic National Dist-Grand Praire | Liquor Vender | Pay in the ordinary course of business. |
| Budweiser Distributing Co. | Liquor Vender | Pay in the ordinary course of business. |
| Southern Crown Partners | Liquor Vender | Pay in the ordinary course of |

| Coastal | | business. |
|---|---|---|
| LDF Sales & Distributing | Liquor Vender | Pay in the ordinary course of business. |
| RNDC Texas LLC | Liquor Vender | Pay in the ordinary course of business. |
| Alliance Beverage Distributing Co. | Liquor Vender | Pay in the ordinary course of business. |
| Jacob Liquor Exchange | Liquor Vender | Pay in the ordinary course of business. |
| Chris Yahnis Coastal | Liquor Vender | Pay in the ordinary course of business. |
| Republic National Dist-Lubbock | Liquor Vender | Pay in the ordinary course of business. |

111.    Debtors request authority to pay the amounts specified to these Critical Vendors in the Critical Vendors Motion. I understand that critical vendor motions are generally disfavored in this District and elsewhere. However, for the reason set forth herein, it is my opinion that ensuring the Debtors' ability to obtain the services of these Critical Vendors is critical to the viability of their business and will maximize value to creditors. Debtors should accordingly be authorized to pay the Critical Vendors in order to avoid irreparable harm to the Debtors' estates. I believe satisfaction of the Critical Vendor Claims described herein is essential to the Debtors' ongoing operations and will allow the Debtors to continue their operations on a post-petition basis.

**Cash Collateral Motion**

112.    Aside from the Cash Collateral, which may be encumbered by the liens of the Secured Creditors, the Debtors have no other source of revenue available to carry on operations. For example, Debtors' available cash, including Cash Collateral, must be available to fund the Debtors' payments to employees and vendors and to satisfy other ordinary costs of operation, including taxes and insurance. For the first two weeks of this bankruptcy proceeding, the Debtors have projected the expenses of operation which are necessary to be satisfied to preserve the assets

of the estate.

113.    In the Budget, the Debtors propose to use Cash Collateral of $4,225,000.00 to fund ongoing operations on an interim basis. Prior to a final hearing on this Motion, the Debtors will present cash flow projections and a budget for the continued operations of the Debtors pending confirmation of a chapter 11 plan of reorganization.

114.    The Debtors propose to use Cash Collateral to fund post-petition operations on an interim basis consistent with the Budget and on a continued basis pursuant to cash flow projections to be provided. In my opinion, satisfaction of these budgeted expenses is necessary to preserve the Debtors' estate for the benefit of its creditors and to avoid immediate and irreparable harm to the estate. If the Debtor is unable to fund post-petition operations, the value of the Debtors' estates will rapidly decline as the Debtors will be unable to serve their customers.  The harm to the estate of the Debtors will be irreparable.

115.    Key terms and provisions of the Cash Collateral Motion are summarized as follows:

| | |
|---|---|
| **Entities Interested in Cash Collateral** | 1.    FBT, the Debtors' prepetition senior secured lender with a blanket lien in the FCI and ABI's assets.<br><br>2.    Ben E. Keith a critical vendor and the Debtors' main inventory supplier. |
| **Purpose of Cash Collateral Use** | The Cash Collateral will be used in the ordinary course of continued operations of the Debtors' business, to provide working capital, and for other general corporate purposes of the Debtors during the administration of the bankruptcy cases, including the payment of administrative claims allowed in these bankruptcy cases. |
| **Duration of Cash Collateral Use** | The Cash Collateral may be used for the purposes described so long as the bankruptcy cases continue under Chapter 11 in compliance with any interim or final order authorizing the use of Cash Collateral. |

| | |
|---|---|
| **Adequate Protection / Replacement Liens**<br><br>**Interim Order ¶ 9** | From and after entry of an order authorizing the use of Cash Collateral, Secured Creditors shall receive customary adequate protection in exchange for their consent to the Debtors' use of Cash Collateral, including Replacement Liens against the Debtors' assets to the same extent, validity and priority of their prepetition liens. The Replacement Liens shall be superpriority claims (in the amount of diminution of value) senior to all other liens and administrative expense claims, subject only to the Carve-Out. |
| **Carve-Out**<br><br>**Interim Order ¶ 10** | Notwithstanding any other provision of this Order, the Replacement Liens are all subject to a carve-out of funds (hereinbefore and hereinafter, the "Carve-Out") for the following administrative expenses: (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930; (b) all fees and expenses of the Debtors' bankruptcy counsel or other professionals; and (c) any counsel or other professionals for any creditors' committee. |

116.    I believe that the relief requested in this Motion will provide the Secured Creditors with adequate protection for the use of Cash Collateral. The Debtors' continued use of Cash Collateral for operations will continue the going concern value of the Debtors' businesses and will maximize the position of all of the Debtors' creditors, including the Secured Creditors. In the course of operations, the Debtors will continue to transact business and generate and collect new receivables. Such ongoing operations benefit the Secured Creditors and all other creditors in that new accounts receivable will be created by the use of Cash Collateral.

117.    To remain in possession of their property, to continue their business activities, and to achieve a successful reorganization, the Debtors request use of Cash Collateral in the Debtors' ordinary business operations.  I believe that payment of operating expenses in accordance with the Budget is reasonable and that such payment is for necessary business expenses that must be paid in

order to continue the Debtors' business operations.

118. In the event the Court does not authorize the Debtors' proposed use of Cash Collateral, I believe that the Debtors will be unable to maintain their current business operations and to confirm a plan of reorganization as contemplated by the Bankruptcy Code. Without the use of Cash Collateral, the Debtors will be seriously and irreparably harmed, resulting in significant losses to the Debtors' estates and their creditors.

119. The Debtors request immediate authority to use the Cash Collateral to fund the Debtors' day-to-day operations. Absent such relief, the Debtors will not be able to continue to operate their businesses. In sum, failure to obtain authorization for the use of the Cash Collateral will be disastrous to the Debtors and their creditors. Entry of an order authorizing the use of Cash Collateral will minimize disruption to the Debtors' business and operations and permit the Debtors to meet ongoing costs of operations. Absent use of the Cash Collateral, the Debtors' estates would not have sufficient funds to satisfy ongoing business obligations. I therefore believe allowing use of Cash Collateral is in the best interest of the Debtors' estates and each of their creditors.

## DIP FINANCING MOTION

120. As reflected in the Budget, in addition to use of cash collateral, the Debtors require additional funds to meet ordinary expenses of operation on both an interim and continuing basis.

121. In the DIP Financing Motion, the Debtors request entry of Interim and Final Orders authorizing them to enter into a post-petition line of credit with the DIP Lenders of up to $1,500,000 including $500,000 in interim financing ("DIP Facility") pursuant to the terms set forth below and in the Terms Sheet attached to the DIP Financing Motion.

| Summary of Material DIP Facility Terms | |
| --- | --- |
| **DIP Facility Parties** | Borrowers: ABI, FCI, and FCIH |

| | |
|---|---|
| | Lenders: Andrews and Sharbutt |
| **Term** | The DIP Facility shall terminate earlier of August 30, 2026 or after substantial consummation of a plan, consummation of a sale of substantially all of the Borrower's assets under section 363 of the Bankruptcy Code, entry of an order converting the case to chapter 7 or for appointment of a trustee. |
| **Roll Up** | The DIP Facility does not contemplate a roll up of any prepetition debt. |
| **Use of Proceeds** | General working capital. |
| **Interest Rate** | 0% |
| **Default Rate** | The greater of 12% or the maximum allowed by law.<br><br>The Default Rate shall automatically accrue from and after maturity or acceleration. |
| **Loan Fees** | No fees.<br>No penalty for early payment. |
| **Expenses** | None. |
| **Covenants** | Loan documents to be prepared on entry of Interim Order; however, DIP Lenders will advance authorized interim borrowing based off Term Sheet upon entry of Interim Order. |
| **Conversion Features** | $1,000,000 of principle amount convertible into 50 shares of Series A Super Voting Preferred Stock of FCIH<br><br>• Liquidation Preference: None. On sale or liquidation, the same consideration as 40,000 shares of Common Stock of Food Concepts Holding, Inc. per share<br>• Voting rights: 120,000 votes/share, votes with Common Stock<br>• Dividends: Same as 40,000 shares of Common Stock per share<br><br>$500,000 of principle amount convertible into 10 shares of Series B Non Voting 8.5% pay in kind ("PIK") Preferred Stock of FCIH<br><br>• Liquidation Preference: $60,000 per share<br>• Voting rights. None |

| | |
|---|---|
| | • Dividends: Same as 100,000 shares of Common Stock per share<br>• PIK Dividends: 8.5% PIK dividends cumulating quarterly at 2.125%<br>• Call: Callable after 3 years.  If not called, PIK Dividend Rate increases by 1% beginning year 4 with further 1% increases annually.  The maximum rate will be 12%.<br><br>Preemptive Rights:  At time of conversion, Common Stock owners of FCIH will be given pro rata rights to subscribe for both Series of Preferred Stock based upon their current shareholdings.  Fractional shares of Preferred Stock will be offered. |
| **Break-Up Fee** | None. |
| **Due Diligence** | None. |
| **Priority**<br><br>**Interim Order ¶3 Superpriority Administrative Claim** | For all borrowings under the DIP Facility, the DIP Lenders are granted an allowed superiority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code (the "DIP Lenders Superpriority Claim"), having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, whether now in existence or incurred by the Debtors after the Petition Date, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 331, 503(b), 507(a), 364(c)(1), 564(c), 726 or 1114 of the Bankruptcy Code, provided, however, that the Superiority DIP Claim shall be *pari-passu* with any superpriority claim granted to Debtors prepetition Secured Creditors as adequate protection for the Debtors' use of Cash Collateral and   subordinate to the Carve-Out.<br><br>The super-priority status of the Superiority DIP Claim shall not apply with respect to any payment from the proceeds of any chapter 5 causes of action. Rather, with respect to the proceeds of any chapter 5 causes of action, the DIP Lenders shall share *pari-passu* with other general unsecured creditors. |
| **Interim Order ¶ 6 Carve-Out** | Notwithstanding any other provision of this Order, the DIP loan documents and the Superiority DIP Claim granted to the DIP Lenders, as applicable, pursuant to this Interim Order all |

| | are subject to a carve-out of funds (hereinbefore and hereinafter, the "Carve-Out") for the following administrative expenses: (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to section 1930(a) of Title 28, United States Code; and (b) all fees and expenses of the Debtors' bankruptcy counsel or other professionals and any counsel or other professionals of any creditors' committee that may be appointed. |
|---|---|

122.   Prior to a final hearing on the DIP Financing Motion, the Debtors will present cash flow projections and a budget for the continued operations of the Debtors pending confirmation of a chapter 11 plan of reorganization.

123.   The Debtors propose the DIP Facility to fund post-petition operations on an interim basis consistent with the Budget and on a continued basis pursuant to cash flow projections to be provided. In my opinion, satisfaction of these budgeted expenses is necessary to preserve the Debtors' estate for the benefit of its creditors and to avoid immediate and irreparable harm to the estate. If the Debtor is unable to fund post-petition operations, the value of the Debtors' estates will rapidly decline as the Debtors will be unable to serve their customers.  The harm to the estates of the Debtors will be irreparable.

124.   Before entering into the DIP Facility, the Debtors engaged in a search for alternative financing.  This search included asking FBT to serve as the Debtor's debtor in possession lender. Additionally, I am generally aware of the market and availability of funding in the restaurant industry. I believe there are no lenders willing and able to make a post-petition loan to the Debtors on similar or superior terms as provided by the DIP Lenders. I understand the DIP Lenders will only enter into the DIP Facility unless the terms proposed in the DIP Financing Motion are approved by this Court.

125.   It is my opinion that entering into the DIP Facility is an exercise of the Debtors'

good faith sound business judgment and in the best interests of the Debtors' estates and their creditors.

126.    To remain in possession of their property, to continue their business activities, and to achieve a successful reorganization, the Debtors request approval of the DIP Facility. I believe that payment of operating expenses in accordance with the Budget is reasonable and that such payment is for necessary business expenses that must be paid in order to continue the Debtors' business operations.

127.    In the event the Court does not authorize the DIP Facility, I believe that the Debtors will be unable to maintain their current business operations and to confirm a plan of reorganization as contemplated by the Bankruptcy Code.  Without the DIP Facility, the Debtors will be seriously and irreparably harmed, resulting in significant losses to the Debtors' estates and their creditors.

128.    The Debtors request immediate approval of the DIP Facility to fund the Debtors' day-to-day operations. Absent such relief, the Debtors will not be able to continue to operate their businesses. In sum, failure to obtain authorization for the DIP Facility will be disastrous to the Debtors and their creditors.  Entry of an order authorizing the DIP Facility will minimize disruption to the Debtors' business and operations and permit the Debtors to meet ongoing costs of operations. Absent approval of the DIP Facility, the Debtors' estates would not have sufficient funds to satisfy ongoing business obligations. I therefore believe approving the DIP Facility is in the best interest of the Debtors' estates and each of their creditors.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 4th day of September 2025.

*/s/ Robert Lin*_____
Robert L. Lin

---

**In re Abuelo's International, LP,** *et al.*, **Debtors in Possession**
**Declaration of Robert L. Lin in Support of Petitions and First Day Motions - Page 50 of 50**