

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 23, 2025**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **ABUELO'S INTERNATIONAL, LP, *et al.,*[1]** | § | **Case No. 25-43339-elm11** |
| | § | |
| **Debtors.** | § | **Jointly Administered** |

**ORDER GRANTING DEBTORS' EMERGENCY MOTION FOR FINAL ORDER (I)**
**AUTHORIZING THE DEBTORS TO OBTAIN POSTPEITION FINANCING AND (II)**
**GRANTING SUPERPIORITY ADMINISTRATIVE CLAIMS**
**[REFERS TO DKT. NO. 12]**

This matter is before the Court on the *Debtors' Emergency Motion for Interim and Final*

*Orders (I) Authorizing the Debtors to Obtain Post-petition Financing; (II) Granting Superpriority*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, include: Abuelo's International, LP (1108), Food Concepts International, L.P. (5079) and Food Concepts International Holdings, Inc. (2576).

_____

Abuelo's International, LP, et al
Order Granting Final DIP Financing – Page 1

*Administrative Claims; and (III) Scheduling a Final Hearing* [Dkt. No. 12] ("Motion")[2] filed by Abuelo's International, L.P. ("ABI"), Food Concept International, L.P., ("FCI"), and Food Concepts International Holdings, Inc. ("FCIH"), the Debtors in Possession in the above captioned chapter 11 cases (collectively "Debtors").  The Court conducted an interim hearing on September 5, 2025 ("Interim Hearing") and a final hearing on September 22, 2025 ("Final Hearing"). Following the Interim Hearing, the Court entered its *Interim Order (I) Authorizing the Debtors to Obtain Post-petition Financing and Granting Superpriority Administrative Claims; and (II) Scheduling a Final Hearing* ("Interim Order") [Dkt. No. 56].

The Court having considered the aspects of the Motion and the exhibits attached thereto, evidence submitted at the Interim Hearing and Final Hearing, arguments of counsel, and in accordance with Bankruptcy Rules 2002, 4001(c), and (d), and Local Bankruptcy Rule 9014, due, proper and adequate notice of the Motion, Interim Hearing, and the Final Hearing having been given; and it appearing that approval of final relief requested in the Motino is necessary to avoid immediate irreparable harm to the Debtors, their estates, and their creditors, and all objections, if any, to entry of this Final Order having been withdrawn, resolved, or overruled by the Court; and after due and deliberate consideration and good and sufficient cause appearing therefor, the Court finds the relief requested in the Motion should be granted on final basis as set forth herein.

In Addition to any findings and conclusions announced on the record at the Interim Hearing or Final Hearing, which are incorporated hereby by reference, the Court makes the following Findings of Fact and Conclusions of Law:

A.      The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on September 2, 2025 ("Petition Date").  The Debtors also filed motions in each of their

---

[2] Capitalized terms not defined herein have the meaning ascribed to them in the Motion.

respective bankruptcy cases requesting joint administration. The Debtors continue to operate their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committee of unsecured creditors has been appointed.

B.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief granted herein are section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c).  Venue of this Chapter 11 proceeding and the Motion is proper in this district pursuant to 28 U.S.C. § 1408 and 1409.

C.      The Debtors' business requires additional working capital on an immediate basis inasmuch as the Debtors have determined, in their business judgment, that they are unable to operate generally without obtaining post-petition financing.  Without obtaining financing on a post-petition basis, the Debtors will not be able to pay their operating expenses so that it may continue operating to preserve and maintain the value of their assets.

D.      G. Randall Andrews and David Sharbutt (collectively, "DIP Lenders"), current shareholders and members of FCIH's Board of Directors, have agreed to provide debtor in possession financing pursuant to the terms of the loan documents ("Loan Documents") attached hereto as **Exhibit A**.

E.      Subject to more detailed provisions of the Loan Documents, the terms of the DIP Facility are summarized as follows.  Capitalized terms that are not otherwise defined have the meanings given to them in the Loan Documents. The terms of the Loan Documents will control in the event of any conflict in terms with this order.

(i)      Borrower.  FCIH and FCI.

(ii)      Facility Amount.  Up to $1,500,000.  Interim Authorization: up to $500,000

new borrowing. Final Authorization: additional $1,000,000 new borrowing.

(iii)   Use of Proceeds.  The Debtor may use the proceeds of the DIP Facility to fund its working capital needs and administrative expenses of the bankruptcy estate as set forth in the budget.

(iv)   Roll Up.  None.

(v)   Interest Rate.  0%

(vi)   Default Rate.  Greater of 12% or maximum allowed by law.

(vii)   Term.  The Facility shall terminate earlier of August 30, 2026 or after substantial consummation of a plan, consummation of a sale of substantially all of the Borrowers' assets under section 363 of the Bankruptcy Code, entry of an order converting the case to chapter 7 or for appointment of a trustee or examiner with duties similar to a trustee, unless accelerated prior following default.

(viii)   Loan Fees.  None.

(ix)   Expenses.  None.

(x)   Breakup Fee.  None.

(xi)   Priority.  DIP Lenders are granted an allowed superiority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code (the "DIP Lenders Superpriority Claim"), having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, whether now in existence or incurred by the Debtors after the Petition Date, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 331,

503(b), 507(a), 364(c)(1), 564(c), 726 or 1114 of the Bankruptcy Code, provided, however, that the Superiority DIP Claim shall be *pari-passu* with any superpriority claim granted to Debtors' prepetition secured creditors as adequate protection for the Debtors' use of Cash Collateral and  subordinate to the Carve-Out.

(xii)   Indemnity Obligations.  None.

(xiii)   Due Diligence.  None.

F.      The DIP Lenders are current shareholders and members of the Board of Directors of FCIH.

G.      The Debtors are unable to obtain unsecured or secured credit on terms superior to the proposed DIP Facility with the DIP Lenders and are unable to obtain secured financing without granting superpriority administrative claim status to the DIP Lenders.  The DIP Lenders are able to economically facilitate the Debtors' liquidity needs to utilize the chapter 11 process and is in the best interest of the Debtors' estates and their creditors.

H.      The DIP Facility has been proposed in good faith and is necessary to preserve the assets of the Debtors' bankruptcy estate.  The Court finds that the terms of the DIP Facility are fair, reasonable, and adequate given the circumstances of this case, and demonstrate the Debtors' exercise of good faith sound business judgment.  The Debtors are therefore authorized to enter into the DIP Facility which is necessary to preserve the assets of their bankruptcy estates. The relief granted in this final order is supported by reasonably equivalent value and consideration and all obligations incurred, payments made, and transfers or grants of security set forth herein that are granted to the DIP Lenders are for fair consideration and reasonably equivalent value and are granted contemporaneously with the making of the loans and other financial accommodations

secured thereby.  The agreements reached and approved by this final order were the product of arm's length negotiations and made for valid business purposes.  As such the DIP Lenders are entitled to the protection and benefits of section 364(e) of the United States Bankruptcy Code.

**ACCORDINGLY, IT IS HEREBY ORDERED AND ADJUDGED THAT:**

1.     **Motion Granted on a Final Basis**.  The Motion is **GRANTED** on a final basis on the terms set forth herein.

2.     **Authority to Enter into the DIP Facility.**  The Debtors are immediately authorized to enter into the DIP Facility upon the terms of the Loan Documents and draw on the DIP Loan as set forth in the budget from the DIP Lenders.

3.     **Conditions to Final DIP Facility**.  The funding of the DIP Facility on a final basis is conditioned on the satisfaction of the following:

   a.  entry of this Final Order;

   b.  execution of the Loan Documents;

   c.  there is no existing default; and

   d.  the DIP Lenders shall have an allowed Superpriority Claim (as defined below) in accordance with the administrative expense priority set forth in this Final Order.

4.     **Effectiveness of Final DIP Loan**.  From and after entry of this Final Order, the terms and conditions hereof shall constitute a valid and binding obligation of the Debtor, enforceable against the Debtor in accordance with the terms of this Final Order for all purposes during these chapter 11 cases, any subsequently converted case of the Debtors under chapter 7 of the Bankruptcy Code or after the dismissal of the chapter 11 cases.  No obligation, payment, transfer or grant of security under this Final Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable state Uniform Fraudulent

Transfer Act, Uniform Voidable Transactions Act, Uniform Fraudulent Conveyance Act or similar statue or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

5.      **Superpriority Administrative Claims**.  For all borrowings under the DIP Facility (collectively, the "DIP Obligations"), for the benefit of themselves, the DIP Lenders are granted an allowed superiority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code (the "Superpriority DIP Claim"), having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, whether now in existence or incurred by the Debtors after the Petition Date, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 331, 503(b), 507(a), 364(c)(1), 564(c), 726 or 1114 of the Bankruptcy Code, provided, however, that the Superiority DIP Claim shall be *pari-passu* with any superpriority claim granted to Debtors' prepetition secured creditors as adequate protection for the Debtors' use of Cash Collateral and subordinate to the Carve-Out.  Notwithstanding any other provisions of this Final Order, the super-priority status of the Superiority DIP Claim shall not apply with respect to any payment from the proceeds of any chapter 5 causes of action. Rather, with respect to the proceeds of any chapter 5 causes of action, DIP Lenders shall share *pari-passu* with other general unsecured creditors.

6.      **Section 364(e)**.  The Court finds that the DIP Lenders being members of the FCIH's Board of Directors has been adequately disclosed to all parties in interest. Further, the DIP Lenders have acted in good faith in extending credit, and the Debtors have demonstrated the exercise of good faith sound business judgment in seeking the DIP Facility.  Accordingly, the DIP Lenders shall be entitled to all protections pursuant to section 364(e) of the Bankruptcy Code to the fullest extent available.

7.      **Modification of Automatic Stay**.  The automatic stay of section 362(a) of the

Bankruptcy Code shall be and hereby is modified and vacated without further order, notice or application to the Court to the extent necessary to allow the DIP Lenders to perform any act authorized by this Final Order, the Terms Sheet, or the DIP loan documents (including, but not limited to execution of the DIP loan documents and being bound by the same).

8.    **Carve-Out**. Notwithstanding any other provision of this Final Order, the Loan Documents, and the Superiority DIP Claim granted to the DIP Lenders, as applicable, pursuant to this Final Order all are subject to a carve-out of funds (hereinbefore and hereinafter, the "Carve-Out") for the following administrative expenses: (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to section 1930(a) of Title 28, United States Code; and (b) all fees and expenses of the Debtors' bankruptcy counsel or other professionals and any counsel or other professionals of any official creditors' committee that may be appointed.

9.    **PACA Liens**. Nothing in this Final Order or any final order on the Motion is intended to affect the rights any creditor may have under the Perishable Agricultural Commodities Act ("PACA Claimants").

10.    ***Ad Valorem* Tax Liens**. Notwithstanding any provisions in the Motion, this Final Order or any final orders, the statutory tax liens held by the Texas Taxing Authorities,[3] or which shall arise during the course of this case pursuant to applicable non-bankruptcy law for prepetition and postpetition taxes (the "Tax Liens"), shall neither be primed by nor subordinated to any liens granted thereby or pursuant to this Final Order to the extent such Tax Liens are valid, senior,

---

[3] Texas Taxing Authorities is defined as Randall County, Harris County ESD #08, Katy ISD, Lewisville Independent School District, Smith County, Tarrant County, Plano ISD, Denton County, Midland CAD, Taylor County CAD, Lubbock CAD and Midland County.

Abuelo's International, LP, et al
Order Granting Final DIP Financing – Page 8

perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount, and extent of the claims and liens asserted by the Texas Taxing Authorities are fully preserved.

11.     **Events of Default; Remedies**.  Events of Defaults with respect to the DIP Facility shall be those specified in the Loan Documents.

12.     **Survival of Final Order**.  The provisions of this final order and any actions taken pursuant thereto (a) shall survive the entry of any order: (i) confirming any chapter 11 plan in this chapter 11 case, (ii) converting the chapter 11 case to a successor case, or (iii) dismissing this bankruptcy case, and (b) shall continue in full force and effect notwithstanding entry of any such order, and the claims, liens and security interest granted pursuant to this Final Order shall maintain their priority as provided by this final order until all of the funds approved and advanced pursuant to this final order are paid in full.

13.     **No Waiver.**   This final order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lenders may have to bring or be heard on any matter before this Court.

14.     **No Proof of Claim**.  The DIP lender(s) shall not be required to file proofs of claim in this chapter 11 case or any successor case in order to maintain their respective claims with respect to the DIP facility, all of which shall be due and payable in accordance with this final order and the DIP Terms Sheets, without the necessity of filing any such proof of claim; the statements of claim in respect to the DIP facilities set forth in this final order, together with the evidence accompanying the underlying motion, and presented at the Interim Hearing and Final Hearing, are deemed sufficient to and do constitute the proofs of claim in respect to such obligations and super priority status.

15.     **Books and Records**.  Upon written request, the DIP Lender(s), and its consultants

_____

and advisors, shall be given reasonable and timely access to the Debtors' books, records, assets and properties.

16.     **No Stay**.   There is no stay of this Final Order, including no stay pursuant to Bankr.R.Proc. 6004(h) (to the extent applicable).

17.     This Court shall retain jurisdiction over any and all matters arising from or related to the implementation or interpretation of this Order.

### ### End of Order ###

# EXHIBIT A


**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**BY AND BETWEEN**

**ABUELO'S INTERNATIONAL, L.P., FOOD CONCEPTS INTERNATIONAL, L.P. &
FOOD CONCEPTS INTERNATIONAL HOLDINGS, INC.,**

**AS BORROWERS / DEBTORS**

**AND**

**G. RANDALL ANDREWS & DAVID SHARBUTT**

**AS DIP LENDER**

**DATED AS OF SEPTEMBER [·], 2025**

## DEBTOR IN POSSESSION CREDIT AGREEMENT

This *Debtor in Possession Credit Agreement* (the "Agreement") is entered into as of [Date], between Food Concepts International, L.P. ("FCI") and Food Concepts International Holdings, Inc. ("FCHI"), Abuelo's International, L.P. ("ABI" and together with FCI and FCIH, the "Borrower") on one hand and G. Randall Andrews and David Sharbutt (the "DIP Lender") on the other.  Borrower and DIP Lender shall herein be referred to as the "Parties".  In support of the Agreement, the Parties would state as follows:

## RECITALS

WHEREAS, on September 2, 2025 (the "Petition Date"), Abuelo's International, L.P., Food Concepts International, L.P. and Food Concepts International Holdings, Inc. (collectively, the "Debtors") filed voluntary petitions for relief under Title 11 of the United States Code entitled, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court"), Case No. 25-43339 (the "Bankruptcy Case"), and is continuing to operate its business as debtor and debtor-in-possession under Bankruptcy Code sections 1107 and 1109.

WHEREAS, the Debtors operations consist of owning and managing restaurants.

WHEREAS the Borrower has requested that the DIP Lender provide a draw term loan credit facility (the "DIP Facility") of up to $1,500,000.00 (the "Maximum Commitment"), which consists of up to $500,000.00 of interim principal amount of new money term loans and up to $1,000,000.00 additional funds to be funded on a final basis (collectively, the "DIP Financing"), to fund the operational costs of the Borrower, and the DIP Lender is willing to extend the DIP Financing to the Borrower pursuant to the terms and conditions set forth in this Agreement, the DIP Orders (as defined below), and all other documents, instruments and agreements related to the DIP Obligations (as defined below) executed and/or delivered in connection with this Agreement from time to time (collectively with this Agreement and the DIP Orders, the "DIP Loan Documents").

WHEREAS, the DIP Lender is only willing to provide the DIP Financing hereunder if the Debtor grants to the DIP Lender a superpriority administrative claim, subject only to the Carve-Out.

Whereas, the Borrower and the DIP Lender have entered into this Agreement to evidence the DIP Financing and pursuant to the *Interim Order (i) Authorizing the Debtors to Obtain Post Petition Financing and Granting Super Priority Administrative Claims; and  (ii) Scheduling a Final Hearing* [Docket No. 56] (as amended, supplemented or otherwise modified, the "Interim DIP Order" and including the Final DIP Order (as defined below), the "DIP Orders"). Capitalized terms not defined herein have the meanings given thereto in the Interim DIP Order.

AGREEMENT

NOW THEREFORE, in consideration of the premises and the mutual covenants and the agreements herein set forth, and other good and valuable consideration, the receipt and sufficiency

of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1. **Advances.**

   a. The Budget attached hereto as **Exhibit "A"** (as may be updated, modified, and/or supplemented from time to time by the Borrower, in all instances, with the consent of the DIP Lender in its sole discretion, the "Budget") is hereby approved by the DIP Lender.

   b. Subject to the terms and conditions set forth in this Agreement, the DIP Lender shall make advances to the Borrower as follows (each individually a "Loan" and collectively, the "Loans"):

      i. pursuant to the Budget during the week in which a draw on the DIP Financing is forecast provided that no default exists, unless funds are needed at different intervals.  However, Borrower shall not request more than $500,000 in any two week period; and

      ii. subject to the DIP Lender's receipt of a Funding Request (as defined below) pursuant to clause (c) provided that no funding request shall exceed $500,000.00.

   c. **Funding Requests.**

      i. Subject to satisfaction of the Draw Conditions (as defined below), at least one week before the Loan is to be funded (unless such date is not a business day at which point funding shall occur on the next succeeding business day) (each, a "Funding Date") the Borrower shall give the DIP Lender written notice of its request for a draw and shall specify the Funding Date, the amount of the requested  draw (a "Funding Request"), and provide an updated 18-week Budget.  The Funding Request can be sent to the DIP Lender via electronic mail.  The obligation of the DIP Lender to fund is subject to compliance with the terms and conditions of this Agreement, the Interim DIP Order and, subject to its entry, a final order on the DIP Motion in a form agreeable to the DIP Lender (as amended, modified or otherwise supplemented, the "Final DIP Order"). The DIP Lender shall be obligated to fund under this Agreement and the DIP Orders, as applicable, all amounts set forth in the Funding Request, subject to the Budget.

   d. The DIP Lender shall not be obligated to make any Loan, unless the Borrower certifies, in a writing signed by an officer of the Borrower, that the following conditions (each, a "Draw Condition") are met as of the date of each draw:

      i. All of the representations and warranties contained in the DIP Loan Documents are true and correct in all material respects as of that date;

ii.  The consummation of the transactions contemplated hereby or entered into in contemplation hereof shall not contravene, violate or conflict with, nor involve the DIP Lender in, a violation of applicable law or regulation;

iii.  All consents, authorizations and filings, if any, required in connection with the execution, delivery and performance by the Borrower, and the validity and enforceability against the Borrower, of this Agreement, shall have been obtained or made, and such consents, authorizations and filings shall be in full force and effect;

iv.  The DIP Lender shall have received a copy of the applicable DIP Order, and such DIP Order(s) shall have been entered by the Bankruptcy Court in form and substance acceptable to the DIP Lender in its sole discretion, and shall be in full force and effect and shall not have been vacated, stayed, reversed, modified, or amended;

v.  No event shall have occurred and be continuing, or would result from the Loan requested thereby, that with the giving of notice or the passage of time or both, would constitute an Event of Default (as defined below) and no Event of Default (as defined below) shall be continuing;

vi.  The Maturity Date (as defined below) shall not have occurred;

If (and only if) the Draw Conditions are met, the DIP Lender shall make each properly authorized Loan in immediately available funds by wire transfer to an account designated by the Borrower, as soon as practicable, but in no event later than the 5:00 p.m. Central Time on the applicable Funding Date.

2.  **Interest; Payments; Commitment Fee**.
    a.  Interest on the DIP Financing shall be 0.00% provided no default exists.

    b.  The default rate of interest shall be the greater of (i) 12.00% per annum or (ii) the maximum permitted by law.

3.  **Maturity Date; Termination**. The DIP Obligations shall be due and payable, in full, in cash, without notice or demand, on the date (the "Maturity Date") that is the earliest of (i) the date on which the DIP Lender accelerates the DIP Obligations and terminates the DIP Facility after the occurrence of an Event of Default; (iii) the date that any of the following shall occur: (a) the Bankruptcy Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or the Borrower shall file a motion or other pleading seeking the dismissal of the Bankruptcy Case under Bankruptcy Code section 1112 or otherwise, (b) a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Bankruptcy Code section 1106(a)(3) and (4)) under Bankruptcy Code section 1106(b) shall be appointed in the Bankruptcy Case, (c) the sale of all or substantially all of the Borrower's assets (or equity interests in the Borrower) occurs, (d) a plan of reorganization or liquidation is confirmed, or

(e) the amendment, modification, reversal, revocation, issuance of a stay or order to vacate or supplement the DIP Orders or any other order of the Bankruptcy Court affecting this Agreement or the transactions contemplated hereby or thereby unless expressly approved by the DIP Lender in writing in its sole discretion; and (iv) August 30, 2026 the ("Final Maturity Date"). On the Maturity Date, the DIP Lender's obligation to make any Loan shall immediately and automatically terminate.

4. **Representations and Warranties**.  To induce the DIP Lender to enter into this Agreement and to make the Loans, the Borrower hereby represents and warrants to the DIP Lender that:

   a. *Existence, Power and Authority*. The Borrower is duly organized, validly existing and in good standing under the laws of the State of Delaware and has the power and authority to own and operate its assets and to conduct its business as now or proposed to be carried on, and is duly qualified, licensed and in good standing to do business in all jurisdictions where its ownership of property or the nature of its business requires such qualification or licensing, except where the failure to be so qualified could not reasonably be expected to give rise to or constitute a Material Adverse Occurrence. The Borrower is duly authorized to execute and deliver this Agreement, all necessary action to authorize the execution and delivery of this Agreement has been properly taken, and, pursuant to the DIP Orders, the Borrower is duly authorized to borrow and obtain the DIP Financing under this Agreement and to perform all of the other terms and provisions of this Agreement. This Agreement constitutes a valid and binding agreement or instrument of the Borrower, enforceable against the Borrower in accordance with its terms.

   b. *Disclosure*. There is no event, circumstance or change that has caused or evidences, either in any case or in the aggregate, a material adverse occurrence and which has not otherwise been fully disclosed to the DIP Lender in writing prior to the date hereof.

   c. *Bankruptcy Matters*.
      i. Proper notice has been given for (a) the motion seeking approval of this Agreement and the DIP Orders, and (b) the hearing for the approval of the DIP Orders.

      ii. The DIP Orders are in full force and effect and have not been reversed, stayed, modified, or amended.

      iii. No order has been entered in the Bankruptcy Case (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of an examiner with expanded powers (beyond those set forth in Bankruptcy Code section 1106(a)(3) and (4)) under Bankruptcy Code section 1104, (iii) to convert the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, or (iv) to dismiss the Bankruptcy Case.

5. **<u>Affirmative Covenants</u>**. The Borrower agrees that from the date of execution of this Agreement until all DIP Obligations (other than unasserted contingent indemnity and reimbursement obligations) have been paid in full in cash and any commitments of the DIP Lender to the Borrower have been terminated ("Paid in Full") the Borrower will:

a. *Budget*. Provide an updated budget and financials as may be reasonably requested by the DIP Lender.

b. *Payment of Taxes and Other Charges*. Pay and discharge all indebtedness and all taxes, assessments, charges, levies and other liabilities and obligations imposed upon the Borrower, its income, profits, property or business, except those (i) which arose prior to the Petition Date or currently are being contested in good faith by appropriate proceedings and for which the Borrower shall have set aside adequate reserves or made other adequate provision with respect thereto, (ii) the nonpayment of which is expressly permitted by the Bankruptcy Code, and/or (iii) which would not give rise to a material adverse occurrence if not paid.

c. *Maintenance of Existence, Operation and Assets*. (i) Maintain, renew and keep in full force and effect its organizational existence and all rights, permits and franchises necessary to enable it to continue its business as currently conducted; (ii) keep its properties in good operating condition and repair, ordinary wear and tear excepted; and (iii) make all necessary and proper repairs, renewals, replacements, additions and improvements thereto.

d. *Insurance*. Maintain, with financially sound and reputable insurers, insurance with respect to its property and business against such casualties and contingencies, of such types and in such amounts, as is customary for established companies engaged in the same or similar business and similarly situated and such other types and amounts.

e. *Compliance with Laws*. Comply with all federal, state, provincial, territorial, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules and other similar governmental restrictions applicable to the Borrower and to the operation of its business (including without limitation any statute, ordinance, rule or regulation relating to employment practices, pension benefits or environmental, occupational and health standards and controls), except where failure to so comply could not reasonably be expected to constitute or give rise to a material adverse occurrence.

f. *Collateral Further Assurances*.
   i. [Intentionally Deleted]

g. *Provide Information to DIP Lender*. The Borrower agrees to provide the DIP Lender with access to information (including historical data and information and, to the extent necessary, personnel), including, without limitation, regularly scheduled meetings, as mutually agreed, with the Borrower's senior management and/or the Chief Restructuring Advisor, Chief Financial Officer, or such other officer(s) of the Borrower with similar responsibilities, and other company advisors, which meetings

shall include reports with respect to any asset sales, account receivables, net operating losses, location of equipment and inventory and other matters reasonably requested by the DIP Lender and its advisors; *provided, however*, that the Borrower shall not be required to provide access to or otherwise disclose to the DIP Lender (or any agent or representative thereof) any information that: (i) is prohibited by applicable law, (ii) is subject to confidentiality restrictions, unless disclosure is permitted if a nondisclosure agreement is signed by the DIP Lender, and/or (iii) constitutes attorney work-product, unless a joint and common interest agreement has been executed by the parties.

h. *Bankruptcy Matters*.
    i. The Borrower shall use the proceeds of the DIP Financing solely for (a) financing ongoing debtor in possession working capital needs and general corporate purposes relating to post-petition operations consistent with the Budget; and (b) payment of the costs of administration of the Bankruptcy Case as approved by the Bankruptcy Court, including payment of fees and expenses of professionals retained by the Borrower.

    ii. Promptly after the sending, receiving or filing thereof, copies of all reports, motions, affidavits, statements and other documents that the Borrower sends, receives or files in connection with the Bankruptcy Case and/or the adversary pending in the Bankruptcy Case, including all correspondence with the Bankruptcy Court, shall be delivered to the DIP Lender's counsel.

    iii. The Borrower shall ensure that the equity conversion feature of this DIP Facility is included in any plan proposed by the Debtors, or any of them individually.

6. **Negative Covenants**. The Borrower covenants and agrees that from the date of this Agreement until all DIP Obligations (other than unasserted contingent indemnity and unasserted contingent reimbursement obligations) have been Paid in Full, the Borrower will not:

a. *Indebtedness*. Create, incur, assume or suffer to exist any post-petition indebtedness other than: (i) the DIP Financing and any subsequent indebtedness to the DIP Lender, unless otherwise permitted in writing by the DIP Lender; (ii) open account trade debt incurred in the ordinary course of business after the Petition Date and not past due by more than thirty (30) days; (iii) debt incurred as a result of netting services, overdraft protections, and deposit and checking accounts, each of which is incurred in the ordinary course of business; (iv) liabilities and obligations related to Court-approved insurance premium financing agreements, if any; and (v) liabilities and obligations under any new Court-approved lease agreement. For the avoidance of doubt, any payments to be made in connection with such debt incurred is subject to the Budget prior to the DIP Obligations being Paid in Full.

b. *Merger or Transfer of Assets*. Liquidate or dissolve, or merge or consolidate with or into any person, firm, corporation or other entity, or sell, lease, transfer or otherwise dispose of all or any substantial part of its property, assets, operations or business, whether now owned or hereafter acquired unless agreed to in writing by the DIP Lender.

c. *Change in Business, Management or Ownership*. Make or permit any change in its form of organization, or any material change in the nature of its business as carried on as of the date hereof, in the composition of its current executive management without written consent of the DIP Lender.

d. *Bankruptcy Matters*

    i. The Borrower will not seek, consent to or suffer to exist at any time any modification, stay, vacation or amendment of the DIP Orders, except for modifications and amendments joined in or agreed to in writing by the DIP Lender in its sole discretion.

    ii. The Borrower shall not obtain, or seek to obtain, any stay on the exercise of the remedies of the DIP Lender, whether under any DIP Loan Document, the DIP Orders or otherwise, provided that the Borrower may raise with the Bankruptcy Court during any applicable grace period the issue of whether an Event of Default has occurred.

    iii. The Borrower shall not pay any prepetition indebtedness, except as expressly permitted in the Budget and approved by court order.

**7. Events of Default; Remedies.**

a. *Events of Default*. The occurrence of any of the following will be deemed to be an "Event of Default" under this Agreement:

    i. the Borrower (a) fails to pay any payment (whether principal, interest, or otherwise) when such amount becomes due and payable under this Agreement or (b) defaults in the due performance or observance of any other term, covenant, or agreement contained in this Agreement or the DIP Orders, which shall include the failure to comply with the terms of the DIP Orders and this Agreement;

    ii. any representation, warranty, or statement made by the Borrower herein or in any certificate delivered in connection with this Agreement proves to be untrue in any material respect on the date on which made or deemed made;

    iii. this Agreement is or becomes invalid, ineffective, or unenforceable against the Borrower, in whole or in part, or the Borrower so asserts or at any time denies the liability or the DIP Obligations under this Agreement;

iv.    the Bankruptcy Court enters an order dismissing the Bankruptcy Case or converting it to a case under Chapter 7 or any other chapter of the Bankruptcy Code, or appointing a trustee or other responsible officer or an examiner with enlarged powers relating to the operation of the Borrower's business (beyond those set forth in Bankruptcy Code section 1106(a)(3) or (4)) under Bankruptcy Code section 1104, in each case, without the consent of the DIP Lender in its sole discretion;

v.    the Borrower seeks to, advocates, or otherwise supports any other person's motion to disallow, in whole or in part, the DIP Obligations or to challenge the validity, priority, or enforceability of the superpriority claims hereunder;

vi.    a debtor in possession financing order is entered in form and substance that is not acceptable to the DIP Lender in its sole discretion or from and after the date of entry thereof, the Interim DIP Order or the Final DIP Order, as applicable, ceases to be in full force and effect or is vacated, stayed, reversed, modified, or amended (or the Borrower takes any step to accomplish any of the foregoing) without the consent of the DIP Lender in its sole discretion;

vii.    the Borrower makes any payments on any indebtedness that arose before the Petition Date other than as approved by the Bankruptcy Court and provided in the Budget or otherwise consented to by the DIP Lender in its sole discretion;

viii.    the DIP Orders are stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the DIP Lender in its sole discretion;

ix.    the Borrower files an application or motion for the approval of post-petition financing from any party other than the DIP Lender, including financing that provides for superpriority claims or priming liens on any of the DIP Lender's collateral without the written consent of the DIP Lender in its sole and absolute discretion;

x.    the Bankruptcy Court enters an order terminating the right of the Borrower to use the DIP Financing;

xi.    an event, circumstance or change shall have occurred that has caused or evidences, either in any case or in the aggregate, a material adverse occurrence;

xii.    the Borrower fails to comply with the Budget and any variances permitted pursuant to the order permitting use of cash collateral;

xiii.    Reversal, vacatur, amendment, or modification (without the consent of the DIP Lender) for a period in excess of five (5) days of the DIP Orders;

xiv. Dismissal or conversion of the Bankruptcy Case or the appointment of a chapter 11 trustee or an examiner or responsible officer (in any such case with expanded powers relating to the operation of the business) and the relevant order therefor shall not be reversed or vacated within ten (10) days; or

xv. Unless otherwise approved by the DIP Lender, the entry of an order providing for a change of venue with respect to the Bankruptcy Case and such order shall not be reversed or vacated within ten (10) days.

b. *Remedies*. No remedy herein conferred upon the DIP Lender is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law. Upon five (5) business days' written notice from the DIP Lender to the Debtor of the occurrence and continuance of an Event of Default (following the expiration of any grace period the automatic stay shall terminate (the extent necessary) and the DIP Lender shall be permitted to exercise any remedies permitted by law, including any of the following actions, without application or motion to, or further orders from, the Bankruptcy Court or any other court, and without interference from the Borrower or any other party in interest:

   i. declare all or any portion of the outstanding DIP Obligations due and payable, whereupon the same shall become forthwith due and payable without presentment, demand, protest or notice of any kind, all of which are hereby waived by the Borrower;

   ii. institute proceedings to enforce payment of such DIP Obligations;

   iii. terminate the obligation of the DIP Lender to make Loans; and

   iv. exercise any other remedies and take any other actions available to it at law, in equity, under the Agreement, the Bankruptcy Code, other applicable law or pursuant to the DIP Orders, including, without limitation, exercising any and all rights and remedies with respect to the Collateral or any portion thereof.

c. *Termination Event*. The Debtor's authorization to use the DIP Facility shall immediately terminate upon the earliest to occur of the following, each of which constitutes a Termination Event:

   i. The Debtor fails to comply with material obligations under this Agreement;

   ii. The expiration of any applicable grace or cure period following the DIP Lender's written notice of an Event of Default to the Debtor (with a copy of such notice being provided concurrently to any committee and the U.S. Trustee) and the Event of Default not having been cured, unless the

Bankruptcy Court determines that no such Event of Default has occurred or is continuing;

iii. The occurrence of the Maturity Date; and

iv. The date on which the DIP Orders cease to be in full force and effect.

8. **Collateral; Grant of Interests**.
   a. [Intentionally deleted]

   b. DIP Lenders are granted an allowed superiority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code (the "DIP Lenders Superpriority Claim"), having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, whether now in existence or incurred by the Debtors after the Petition Date, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, sections 105, 326, 328, 331, 503(b), 507(a), 364(c)(1), 564(c), 726 or 1114 of the Bankruptcy Code, provided, however, that the Superiority DIP Claim shall be *pari-passu* with any superpriority claim granted to Debtors' prepetition secured creditors as adequate protection for the Debtors' use of Cash Collateral and subordinate to the Carve-Out.

   *9.* **Expenses**. *[intentionally omitted]*

10. **Carve-Out**. The terms of the Carve Out are defined and contained in the Final DIP Order.

11. **Equity Conversion**. The funds extended under the DIP Facility shall be convertible into newly issued securities by FCIH (or its successor if merged or consolidated) which shall be accomplished either as part of the bankruptcy plan of FCIH or as otherwise permitted by law. The conversion feature terms are set forth on **Schedule 1** to this Agreement. The FCIH agrees to incorporate these terms in a form agreeable to the DIP Lender into any bankruptcy plan proposed by FCIH and include with the bankruptcy plan any documents requested by DIP Lender to accomplish the issuance necessarily securities, approvals, notices, conversions, and any other requirements reasonably necessary to effectuate the terms of the equity conversion feature. Exercise by the DIP Lender of the equity conversion feature shall be at the sole and absolute discretion of the DIP Lender.

12. **No Rights of Setoff as Against the DIP Lender**. The Borrower acknowledges and agrees that it shall retain no right of setoff as against the DIP Lender with respect to amounts owed, or to be owed by the Borrower to the DIP Lender.

13. **Miscellaneous**.

   a. *Not a Revolving Line of Credit*. The DIP Facility shall have no revolving feature. Any funds repaid to DIP Lender shall not be subject to any future advances or borrowing.

Any obligation to fund the DIP Facility shall never exceed in the aggregate the Maximum Commitment.

b. *Notices*. All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth on the signature pages hereto (or to such other address that may be designated by the receiving party from time to time in accordance with this Section). All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), facsimile or email (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage pre-paid). Except as otherwise provided in this Agreement, a Notice is effective only (i) upon receipt by the receiving party, and (ii) if the party giving the Notice has complied with the requirements of this Section. If a Notice is sent to (a) the Debtor, a copy shall be sent contemporaneously to the Debtor's counsel via email correspondence to Joe F. Postnikoff, jpostnkoff@romclaw.com; and (b) the DIP Lender, a notice shall be sent contemporaneously to the DIP Lender's counsel via email correspondence to: Jason T. Rodriguez, jrodriguez@higierallen.com.

c. *Preservation of Rights*. No delay or omission on the DIP Lender's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the DIP Lender s action or inaction impair any such right or power. The DIP Lender's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the DIP Lender may have under other agreements, at law or in equity.

d. *Joint and Several Obligation*. The indebtedness described in this Agreement shall be a joint and several obligation of G. Randall Andrews and David Sharbutt

e. *Illegality*. If any provision contained in this Agreement should be invalid, illegal or unenforceable in any respect, it shall not affect or impair the validity, legality and enforceability of the remaining provisions of this Agreement.

f. *Changes in Writing*. No modification, amendment or waiver of, or consent to any departure by the Borrower from, any provision of this Agreement will be effective unless made in a writing signed by the DIP Lender, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Borrower will entitle the Borrower to any other or further notice or demand in the same, similar or other circumstance.

g. *Entire Agreement*. This Agreement (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

h. *Counterparts*. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the

same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

i.  *Successors and Assigns; Participations; No Third Party Beneficiaries*. This Agreement will be binding upon and inure to the benefit of the Borrower and the DIP Lender and their respective heirs, executors, administrators, successors and assigns; provided, however, that the Borrower may not assign this Agreement in whole or in part without the DIP Lender's prior written consent. At any time, without any notice to the Borrower or any consent of the Borrower, the DIP Lender may sell, assign, transfer, negotiate, grant participations in, or otherwise dispose of all or any part of the DIP Lender's interest in the Loans, provided that the DIP Lender shall provide the Borrower with notice (which shall include the name and address of the buyer) of any sale of the Loans or any part thereof concurrently with such sale. The Borrower hereby authorizes the DIP Lender to provide, without any notice to the Borrower, any information concerning the Borrower, including information pertaining to the Borrower's financial condition, business operations or general creditworthiness, to any person or entity which may succeed to or participate in all or any part of the DIP Lender's interest in the DIP Financing, provided that any non-public information shall be subject to a customary confidentiality agreement between the recipient of such information and the DIP Lender. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

j.  *Interpretation*. In this Agreement, unless the DIP Lender and the Borrower otherwise agree in writing, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to statutes are to be construed as including all statutory provisions consolidating amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or," the words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation;" references to articles, sections (or subdivisions of sections) or exhibits are to those of this Agreement; and references to agreements and other contractual instruments shall be deemed to include all subsequent amendments and other modifications to such instruments, but only to the extent such amendments and other modifications are not prohibited by the terms of this Agreement. Section headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

k.  *No Consequential Damages, Etc*. The DIP Lender will not be responsible for any damages, consequential, incidental, special, punitive or otherwise, that may be incurred or alleged by any person or entity as a result of this Agreement, the transactions contemplated hereby or thereby, or the use of the proceeds of the DIP Financing.

DIP LOAN AGREEMENT                                                    PAGE 13 OF 14

l.  *Governing Law and Jurisdiction*. This Agreement has been delivered to and accepted by the DIP Lender and will be deemed to be made in the State of Texas. This Agreement will be interpreted and the rights and liabilities of the parties hereto determined in accordance with the laws of the State of Texas, excluding its conflict of laws rules. The parties hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or, to the extent the Bankruptcy Court does not have jurisdiction or otherwise declines to exercise its jurisdiction, any federal or state court sitting in Fort Worth, Texas, for any proceeding related to this Agreement. The DIP Lender and the Borrower agree that the venue provided above is the most convenient forum for both the DIP Lender and the Borrower. The Borrower waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Agreement.

m.  **WAIVER OF JURY TRIAL. EACH OF THE BORROWER AND THE DIP LENDER IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS AGREEMENT, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. THE BORROWER AND THE DIP LENDER ACKNOWLEDGE THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.**

WITNESS the due execution hereof as a document under seal, as of the date first written above.

**Schedule 1**
*Debtor in Possession Credit Agreement*

| | |
|---|---|
| **Conversion Features:** | $1 million of principle amount convertible into 50 shares of Series A Super Voting Preferred Stock of Food Concepts International Holdings, Inc. |

- *Liquidation Preference:* None. On sale or liquidation, the same consideration as 40,000 shares of Common Stock of Food Concepts Holding, Inc. per share
- *Voting rights:* 120,000 votes/share, votes with Common Stock
- *Dividends:* Same as 40,000 shares of Common Stock per share

$500,000.00 of principle amount convertible into 10 shares of Series B Non-Voting 8.5% PIK (pay in kind) Preferred Stock of Food Concepts International Holdings, Inc.

- *Liquidation Preference:* $60,000 per share
- *Voting rights.* None
- *Dividends:* Same as 100,000 shares of Common Stock per share
- *PIK Dividends:* 8.5% PIK dividends cumulating quarterly at 2.125%
- *Call:* Callable after 3 years.  If not called, PIK Dividend Rate increases by 1% beginning year 4 with further 1% increases annually.  The maximum rate will be 12%.

| | |
|---|---|
| **Preemptive Rights:** | At time of conversion, Common Stock owners of Food Concepts International Holdings, Inc. will be given *pro rata* rights to subscribe for both Series of Preferred Stock based upon their current shareholdings. Fractional shares of Preferred Stock will be offered.  Any subscriber to the Series A Super voting preferred stock shall be required to indemnify the guarantor(s) of the bank debt in an amount of $100,000 per share or fraction of a share. |

## PROMISSORY NOTE

Original Principal Amount: $1,500,000.00                                    *DATE*

FOR VALUE RECEIVED, the undersigned, Food Concepts International, L.P., Abuelo's International, L.P. and Food Concepts International Holdings, Inc. (whether one or more, "Maker"), hereby unconditionally promises to pay to the order of G. Randall Andrews and David Sharbutt (together with successors and assigns and any subsequent holder of this Promissory Note, "Payee"), as hereinafter provided, the principal sum of $1,500,000.00, or so much thereof as may be advanced by Payee from time to time hereunder to or for the benefit or account of Maker, together with interest thereon at the rate of interest hereinafter provided, without right of offset and otherwise in strict accordance with the terms and provisions hereof.

1.      **Interest.**   Provided no default exists, interest shall accrue on the principal balance from day to day outstanding under this Promissory Note (this "Note") at a rate of 0.00%.

Interest on the indebtedness evidenced by this Note shall be computed on the basis of a three hundred sixty (360) day year and shall accrue on the actual number of days elapsed for any whole or partial month in which interest is being calculated.

2.      **Payment.**   This Note shall be due and as follows:

(a)      On the "Maturity Date" as defined in the *Debtor in Possession Credit Agreement* by and between Maker and Payee (the "DIP Loan Agreement").

All payments under this Note made to Payee shall be made at Payee's office at [address], or at such other place as the Payee may from time to time designate in writing, in lawful money of the United States of America which shall be legal tender in payment of all debts at the time of payment.   Maker hereby agrees to accept Payee's calculation of interest payable hereunder absent manifest mathematical error.   If any payment on this Note shall become due on a Saturday, Sunday or any other day which is a banking holiday, such payment shall be made on the next succeeding business day which is not a banking holiday, and such extension of time shall in each such case be included in computing interest due hereunder.   The indebtedness evidenced by this Note is not a revolving credit, and principal borrowed hereunder and repaid may not be reborrowed.

3.      **Loan Documents; Security.**   This Note evidences, among other indebtedness, the loan governed by that certain DIP Loan Agreement of even date herewith (the "Loan Agreement"), by and between Maker and Payee, among others.   This Note, the Loan Agreement, and all of the other agreements, documents and instruments now or hereafter evidencing, governing, securing or guaranteeing any portion of the indebtedness evidenced by this Note or the performance and discharge of the obligations related hereto or thereto, together with any and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, extensions and supplements hereof or thereof, are collectively referred to herein as the "Loan Documents".

4.      **Default and Remedies.**   Upon the occurrence of any "Event of Default" (herein so called), as such term is defined in the Loan Agreement, Payee shall have the immediate right, at the sole discretion of Payee and without notice or demand (a) to declare the entire unpaid balance of this Note and all accrued but unpaid interest at once immediately due and payable (and the same shall be at once immediately due and payable and the same may be collected forthwith) and (b) to exercise any of Payee's other rights, powers, recourses and remedies under this Note or any of the other Loan Documents, or at law or in equity.

5.      **Attorneys' Fees and Costs.**   If Payee retains an attorney-at-law in connection with any default or at maturity or to collect, enforce or defend this Note or any part hereof, or any of the other Loan Documents, in any lawsuit or in any probate, reorganization, bankruptcy or other proceeding, or otherwise, Maker agrees to pay all costs and expenses of enforcement, including but not limited to, Payee's reasonable attorneys' fees, whether or not any legal action shall be instituted.

6.      **[Intentionally Deleted]**.

**PROMISSORY NOTE – Page  1**                                    Initials: _____

7.    **Default Interest Rate.**    During the existence of any default hereunder, the entire unpaid principal balance shall bear interest at the Maximum Lawful Rate, or if no Maximum Lawful Rate is applicable hereto, then at the rate of twelve percent (12%) per annum.

8.    **Usury Savings Provisions.**    It is expressly stipulated and agreed to be the intent of Maker and Payee at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the Indebtedness (as hereinafter defined), or applicable United States federal law to the extent that such law permits Payee to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law. For purposes of this provision, "Indebtedness" shall mean all indebtedness evidenced by this Note, and all amounts payable in the performance of any covenant or obligation in any of the other Loan Documents or any other communication or writing by or between Maker and Payee related to the transaction or transactions that are the subject matter of the Loan Documents, or any part of such indebtedness.    If the applicable law is ever judicially interpreted so as to render usurious any amount contracted for, charged, taken, reserved or received in respect of the Indebtedness, including by reason of the acceleration of the maturity or the prepayment thereof, then it is Maker's and Payee's express intent that all amounts charged in excess of the Maximum Lawful Rate shall be automatically canceled, *ab initio,* and all amounts in excess of the Maximum Lawful Rate theretofore collected by Payee shall be credited on the principal balance of the Indebtedness (or, if the Indebtedness has been or would thereby be paid in full, refunded to Maker), and the provisions of this Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable laws, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if this Note has been paid in full before the end of the stated term hereof, then Maker and Payee agree that Payee shall, with reasonable promptness after Payee discovers or is advised by Maker that interest was received in an amount in excess of the Maximum Lawful Rate, either credit such excess interest against the Indebtedness then owing by Maker to Payee and/or refund such excess interest to Maker.    Maker hereby agrees that as a condition precedent to any claim seeking usury penalties against Payee, Maker will provide written notice to Payee, advising Payee in reasonable detail of the nature and amount of the violation, and Payee shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Maker or crediting such excess interest against the Indebtedness then owing by Maker to Payee. All sums contracted for, charged, taken, reserved or received by Payee for the use, forbearance or detention of the Indebtedness shall, to the extent permitted by applicable law, be amortized, prorated, allocated or spread, using the actuarial method, throughout the stated term of this Note (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of the Indebtedness does not exceed the Maximum Lawful Rate from time to time in effect and applicable to the Indebtedness for so long as debt is outstanding.    In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to this Note or any other part of the Indebtedness.    Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Payee to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.    The terms and provisions of this paragraph shall control and supersede every other term, covenant or provision contained herein, in any of the other Loan Documents or in any other document or instrument pertaining to the Indebtedness.

9.    **Maximum Lawful Rate; Ceiling Election.**    As used herein, the term "Maximum Lawful Rate" shall mean the maximum lawful rate of interest which may be contracted for, charged, taken, received or reserved by Payee in accordance with the applicable laws of the State of Texas (or applicable United States federal law to the extent that such law permits Payee to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law), taking into account all fees, charges and any other value whatsoever made in connection with the transaction evidenced by this Note and the other Loan Documents.    To the extent that Payee is relying on Chapter 303 of the Texas Finance Code to determine the Maximum Lawful Rate payable on the Note or any other part of the Indebtedness, Payee will utilize the weekly ceiling from time to time in effect as provided in such Chapter 303, as amended.    To the extent United States federal law permits Payee to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law, Payee will rely on United States federal law instead of such Chapter 303 for the purpose of determining the Maximum Lawful Rate.    Additionally, to the extent permitted by applicable law now or hereafter in effect, Payee may, at its option and from time to time, utilize any other method of establishing

**PROMISSORY NOTE – Page  2**                                                    Initials: _____

the Maximum Lawful Rate under such Chapter 303, or under other applicable law by giving notice, if required, to Maker as provided by such applicable law now or hereafter in effect.

10. **Waiver.** EXCEPT AS SPECIFICALLY PROVIDED IN THE LOAN DOCUMENTS TO THE CONTRARY, MAKER AND ANY SURETY, ENDORSER OR GUARANTOR OF THIS NOTE SEVERALLY AND EXPRESSLY (A) WAIVE AND RELINQUISH PRESENTMENT FOR PAYMENT, DEMAND, NOTICE OF NONPAYMENT OR NONPERFORMANCE, PROTEST, NOTICE OF PROTEST, NOTICE OF INTENT TO ACCELERATE, NOTICE OF ACCELERATION, GRACE, DILIGENCE IN COLLECTING THIS NOTE OR ENFORCING ANY SECURITY THEREFOR, OR ANY OTHER NOTICES OR ANY OTHER ACTION, AND (B) CONSENT TO ALL RENEWALS, EXTENSIONS, REARRANGEMENTS AND MODIFICATIONS WHICH FROM TIME TO TIME MAY BE GRANTED BY PAYEE WITHOUT NOTICE AND TO ALL PARTIAL PAYMENTS HEREON, WHETHER BEFORE OR AFTER MATURITY, WITHOUT PREJUDICE TO PAYEE. PAYEE SHALL SIMILARLY HAVE THE RIGHT TO DEAL IN ANY WAY, AT ANY TIME, WITH ONE OR MORE OF THE FOREGOING PARTIES WITHOUT NOTICE TO ANY OTHER PARTY, AND TO GRANT ANY SUCH PARTY ANY EXTENSIONS OF TIME FOR PAYMENT OF ANY OF SAID INDEBTEDNESS, OR TO GRANT ANY OTHER INDULGENCES OR FORBEARANCES WHATSOEVER, WITHOUT NOTICE TO ANY OTHER PARTY AND WITHOUT IN ANY WAY AFFECTING THE PERSONAL LIABILITY OF ANY PARTY HEREUNDER.

11. **Governing Law and Venue.** THIS NOTE IS EXECUTED AND DELIVERED IN CONNECTION WITH A LENDING TRANSACTION NEGOTIATED AND CONSUMMATED IN TARRANT COUNTY, TEXAS, AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. MAKER, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, HEREBY IRREVOCABLY (A) SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS IN TEXAS, (B) WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR IN THE FUTURE HAVE TO THE LAYING OF VENUE OF ANY LITIGATION ARISING OUT OF OR IN CONNECTION WITH THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS BROUGHT IN THE DISTRICT COURT OF TARRANT COUNTY, TEXAS, OR IN THE UNITED STATES DISTRICT COURT FOR EITHER THE EASTERN DISTRICT OF TEXAS, SHERMAN DIVISION OR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION, (C) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING BROUGHT IN SUCH COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM, AND (D) AGREES THAT ANY LEGAL PROCEEDING AGAINST ANY PARTY TO ANY OF THE LOAN DOCUMENTS ARISING OUT OF OR IN CONNECTION WITH ANY OF THE LOAN DOCUMENTS MAY BE BROUGHT IN ONE OF THE FOREGOING COURTS.

12. **Waiver of Jury Trial.** MAKER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS NOTE OR ANY OF THE LOAN DOCUMENTS, OR ANY CONDUCT, ACT OR OMISSION OF PAYEE OR MAKER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH PAYEE OR MAKER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH PAYEE OR MAKER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. ***[OPTION: IN THE EVENT MAKER IS A LIMITED PARTNERSHIP, BY ITS SIGNATURE BELOW, MAKER'S GENERAL PARTNER AGREES TO THE FOREGOING WAIVER OF JURY TRIAL ON ITS OWN BEHALF AS WELL AS ON BEHALF OF THE LIMITED PARTNERSHIP.]

13. **Notices.** Any notice or demand required hereunder shall be deemed to be delivered when deposited in the United States mail, postage prepaid, certified mail, return receipt requested, addressed to Maker or Payee, as the case may be, at the address set out hereinbelow, or at such other address as such party may hereafter deliver in accordance herewith. Any other method of delivery or demand shall be effective only when actually received by the recipient thereof. If and when included within the term "Maker" or "Payee" there is more than one

**PROMISSORY NOTE** – Page 3                                                    Initials: _____

person, all shall jointly arrange among themselves for their joint execution and delivery of a notice to the other specifying some person at some specific address for the receipt of all notices, demands, payments or other documents. All persons included within the terms "Maker" or "Payee," respectively, shall be bound by notices, demands, payments and documents given in accordance with the provisions of this paragraph to the same extent as if each had received such notice, demand, payment or document.

14.     **Successors and Assigns.**   This Note and all the covenants, promises and agreements contained herein shall be binding upon and shall inure to the benefit of Maker and Payee, and their respective successors and assigns.

15.     **Time is of the Essence.**   Time is of the essence with respect to all provisions of this Note and the other Loan Documents.

16.     **Joint and Several Liability.**   Should this Note be signed or endorsed by more than one person and/or entity, all of the obligations herein contained shall be considered the joint and several obligations of each maker and endorser hereof.

17.     **Termination.**   This Note may not be terminated orally, but only by a discharge in writing signed by Payee at the time such discharge is sought.

**PROMISSORY NOTE – Page  4**                                                           Initials: _____

EXECUTED effective as of the day and year first written above.

**MAKER:**

[signature blocks]