# EXHIBIT 3

**LEASE AGREEMENT**

**By and Between**

**FREDDY'S LAND, LLC,**
**as Landlord**

**and**

**FOOD CONCEPTS INTERNATIONAL, LP,**
**as Tenant**

i

## TABLE OF CONTENTS

Page

1. Basic Lease Provisions and Definitions.................................................1
2. Premises and Term..........................................................................4
3. Condition of the Premises, Delivery and Tenant Allowance.............................5
4. Rent...........................................................................................7
5. Holding Over by Tenant. ...................................................................11
6. Tenant's Contingencies. ...................................................................11
7. Uses..........................................................................................11
8. Representations and Covenants of Landlord. ...........................................14
9. Utilities......................................................................................15
10. Taxes, Assessments and other Governmental Impositions.............................16
11. Insurance....................................................................................18
12. Common Area; Parking. ..................................................................19
13. Maintenance and Repairs.................................................................23
14. Improvements; Alterations; Signage.....................................................24
15. Title to Improvements; Removal. ........................................................27
16. Damage by Fire or Other Casualty. .....................................................27
17. Condemnation..............................................................................29
18. Liability and Indemnification. ............................................................31
19. Right of Inspection.........................................................................33
20. Warranty of Title and Quiet Enjoyment. ...............................................33
21. Waiver of Subrogation.....................................................................33
22. Force Majeure. .............................................................................34
23. Commissions................................................................................34
24. Landlord-Tenant Relationship. ...........................................................34
25. Assignment and Subletting. ...............................................................34
26. Memorandum of Lease; Commencement and Termination Agreement..............36
27. Notices and Payments.....................................................................36
28. Default.......................................................................................37
29. Co-Tenancy Requirements.................................................................38
30. Reasonable Cooperation. .................................................................38
31. Miscellaneous. .............................................................................39

## TABLE OF EXHIBITS

Exhibit A    -   Center (legal description and site plan)

Exhibit A-1  -   Permitted Restaurant Area

Exhibit A-2  -   Critical Area

Exhibit B    -   Premises (including patio area and dumpster location)

Exhibit B-1  -   Required Common Areas

Exhibit B-2  -   No Build Area

Exhibit C    -   Work Letter

Exhibit D    -   Employee Parking Area

Exhibit E    -   Subordination, Attornment and Non-Disturbance Agreement

Exhibit F    -   Memorandum of Lease

Exhibit G    -   Commencement and Termination Agreement

Exhibit H    -   Additional Parcel

Exhibit I    -   Rules and Regulations (including Attachment 1 thereto)

## LEASE AGREEMENT

This Lease Agreement (the "Lease") is by and between Freddy's Land, LLC, a Kansas limited liability company ("Landlord"), and Food Concepts International, LP, a Texas limited partnership ("Tenant"), and is dated as of the latest of the dates set forth beneath the signatures of the parties hereto (the "Effective Date").

## WITNESSETH:

In consideration of the obligation of Tenant to pay Rent as hereinafter provided and in consideration of the other terms, provisions and covenants hereof, Landlord hereby leases, grants and conveys to Tenant and Tenant hereby accepts from Landlord the Premises (defined below), all in accordance with and subject to the terms and conditions hereinafter set forth in this Lease

1.   **Basic Lease Provisions and Definitions.**

   (a)   Center:

The land and retail shopping center known as Ridge 400, located at the northeast corner of Ridge Road and Taft, in Wichita, Sedgwick County, Kansas, all as further legally described and depicted on Exhibit A attached hereto and made a part hereof by this reference. Notwithstanding anything shown on Exhibit A, Tenant acknowledges and agrees that the location of the retail shops to the north of the Premises may change and Tenant expressly consents to such move if the retail stores are moved further north and the total parking is not materially reduced The parties agree to amend the Lease to replace Exhibit A if desired by Landlord once the location of the retail shops is finally determined.

   (b)   Premises:

Approximately 7722 square feet of retail space within the Center, which space is labeled "Premises" on Exhibit B attached hereto and made a part hereof. Tenant will also have the right, subject to the terms of this Lease, to utilize an area adjacent to the Premises for outdoor seating (the "Patio Area"). The Patio Area contains approximately 1,000 square feet and is shown cross-hatched and labeled "Patio Area" on Exhibit B.

   (c)   Floor Area:

Approximately 7,722 square feet of rentable retail area, not including any remote storage areas, the service yard or the Patio Area.

   (d)   Rent Commencement

Date:

The earlier of: (i) the date upon which Tenant opens for business to the public from the Premises, or (ii) the date which is one hundred fifty (150) days following the date that is the last to occur of: (A) Landlord's approval of Tenant's Plans (defined below), (B) the expiration of the Conditions Period, (C) the completion of Landlord's Work, or (D) Tenant's receipt of its building permit for the improvements to be constructed by Tenant within the Premises (and Tenant agrees to submit for its building permits within thirty (30) days following Landlord's approval of Tenant's Plans). If the Rent Commencement Date would occur during the period from November 10th of 2014 – January 15th of 2015, the Rent Commencement date shall be delayed until the earlier of (i) the day Tenant opens for business, or (ii) January 16th, 2015. As compensation to Landlord for this delay, Tenant shall pay to Landlord an amount equal to 7.5% of the Base Rent payments which would otherwise be due and payable from the original Rent Commencement Date until the delayed Rent Commencement Date as contemplated herein.

(e)    Primary Term:

An initial period of fifteen (15) years commencing on the Effective Date and continuing through, and including, the last day of the calendar month in which the fifteenth (15th) anniversary of the Rent Commencement Date occurs.

(f)    Renewal Terms:

Three (3) consecutive renewal terms of five (5) years each.

(g)    Base Rent (Initial Term):

| Lease Year | $/SF | Annual Base Rent | Monthly Installment |
|---|---|---|---|
| 1-5 | $21.43 | $165,480.00 | $13,790.00 |
| 6-10 | $23.36 | $180,384.00 | $15,032.00 |
| 11-15 | $25.46 | $196,596.00 | $16,383.00 |

(h)    Base Rent (Renewal Terms):

| Lease Year | $/SF | Annual Base Rent | Monthly Installment |
|---|---|---|---|

**LEASE AGREEMENT** – **Page 2**

| 16-20 | $27.75 | $214,284.00 | $17,857.00 |
| 21-25 | $30.25 | $233,592.00 | $19,466.00 |
| 26-30 | $32.97 | $254,592.00 | $21,216.00 |

(i)    Percentage Rent: An amount equal to the product of five and 88/100 percent (5.88%) multiplied by the amount by which Non-Alcohol Gross Sales (hereinafter defined) derived from the Premises during each such calendar year exceeds the amounts set forth below (each, a "Break Point"):

| Term | Break Point |
| --- | --- |
| Primary Term (Years 1-5) | $2,813,014.00 |
| Primary Term (Years 6-10) | $3,066,186.00 |
| Primary Term (Years 11-15) | $3,342,142.00 |
| 1st Renewal Term (Years 16-20) | $3,642,935.00 |
| 2nd Renewal Term (Years 21-25) | $3,970,799.00 |
| 3rd Renewal Term (Years 26-30) | $4,328,171.00 |

(j)    Tenant Allowance: $330,943.00.

(k)    Premises Delivery Date: The date on which Landlord substantially completes Landlord's Work which is anticipated to be 120 days after the expiration of the Conditions Period (as defined in Paragraph 6 below).

(l)    Tenant's Proportionate Share: The ratio, expressed as a percentage, the numerator of which is the Floor Area of the Premises and the denominator of which is the total leasable area of the Center (as determined by the same commercially customary measurement method used by Landlord to determine the Floor Area of the Premises), which is, as of the Effective Date of this Lease, 7,722 square feet.

(m)    Permitted Use: Tenant shall use the Premises for the operation of a Mexican restaurant (including an outdoor seating, dining or bar area), a related bar and/or cocktail lounge and such other uses as are incidental to the operation thereof (including, but not limited to, the preparation of food for off-site catering and the retail sale of general merchandise bearing the logo of the business operated by Tenant) or for any other

**LEASE AGREEMENT – Page 3**

lawful retail purpose (but subject to the REA, to any then-existing restrictions or exclusive uses affecting the Center and to all applicable Government statutes, regulations and ordinances). For purposes hereof, the term "retail use" shall mean the sale of goods or services to be used solely by the consumer end user.

| | | |
|---|---|---|
| (n) | Tenant's Notice Address: | Food Concepts International, LP<br>2575 S. Loop 289<br>Lubbock, Texas 79464<br>Attention: Robert Lin |
| | | With a copy to: |
| | | KG Law, PLLC<br>601 Rustic Ridge Court<br>Southlake, Texas 76092<br>Attn: Kim Goff |
| | Landlord's Notice Address: | Freddy's Land, LLC<br>260 N. Rock Road, Suite 200_<br>Wichita, KS 67206<br>Attention: William Simon |
| | Tax ID No.: | 27-4064943 |
| | With a copy to: | Randy Simon<br>302 N. Rock Road, Suite 200<br>Wichita, KS 67206 |
| (o) | Brokers: | Landmark Commercial Real Estate [Bradly Saville] |

## 2.   **Premises and Term.**

(a)   <u>Demise and Primary Term</u>. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises, together with the non-exclusive use of all rights, privileges, easements and appurtenances belonging or in any way pertaining to the Premises, TO HAVE AND TO HOLD the same for the Primary Term, as the same may be hereafter extended or renewed.

(b)   <u>Renewal Terms</u>. Provided Tenant is not in default hereunder beyond any applicable cure period as of the date on which Tenant seeks to exercise its rights hereunder, Landlord hereby grants to Tenant the right and option to extend the term of

<u>LEASE AGREEMENT</u> – **Page 4**

this Lease for any and/or all of the Renewal Term(s), the Renewal Term(s) to begin upon the expiration of the Primary Term or prior Renewal Term. All of the terms, provisions and covenants of this Lease shall apply to each of the Renewal Term(s). Tenant shall exercise each such option by delivering to Landlord written notice of its election to renew no later than one hundred eighty (180) days prior to the expiration of the Primary Term or Renewal Term, as is applicable.

3.      **Condition of the Premises, Delivery and Tenant Allowance.**

(a)      Site Information. Within ten (10) days of the Effective Date, Landlord shall deliver to Tenant a legible copy of Landlord's then current policy of title insurance, if available, or, if not, other evidence of ownership, a copy of the current tax bill, and a land survey, whether they are applicable solely to the Premises and the Center or to a larger parcel of which the Premises and the Center are a part. In addition, Landlord shall deliver to Tenant any other information concerning the Premises which Tenant may reasonably request, including, without limitation any available "as-built" plans describing the Premises and the mechanical systems contained therein, any REA's, Declarations or similar public or private documents governing the development, use, occupancy and operations of the Center, or any other information relating to the Premises or the Center which may facilitate Tenant's preparation of plans and specifications.

(b)      Landlord's Shell Construction Plans. As of the Effective Date, Tenant has provided Landlord with all of Tenant's drawings and specifications as required in order for Landlord to prepare its final construction drawings describing Landlord's Work, including floor plans, exterior elevations and a full size, scaled and engineered site plan (the "Landlord Construction Drawings"). Landlord anticipates that it will deliver the Landlord Construction Drawings to Tenant on or before sixty (60) days from the Effective Date. Tenant shall have a period of fifteen (15) days to review and approve the Landlord Construction Drawings, or provide Landlord with comments to the same. If Tenant shall provide comments, Landlord and Tenant shall collaborate, in good faith, to resolve all Tenant comments and to agree on the final form of the Landlord Construction Drawings. The Landlord Construction Drawings, as approved by each of Landlord and Tenant, shall be herein called the "Landlord's Plans".

(c)      Condition of the Premises. Except for any and all systems, structural elements or other improvements constructed by Tenant which are specifically excluded from any and all representations and warranties made by Landlord, Landlord represents and warrants, that as of the Premises Delivery Date, all areas within the Premises, including, without limitation, all structural elements, the foundation, roof, roof membrane and roof system, exterior walls, (i) shall meet and comply with all federal, state and local laws, ordinances and regulations and all handicapped accessibility standards for the disabled, including, without limitation, those promulgated under the Americans with Disabilities Act (the "ADA"), (ii) shall be free of asbestos and any asbestos containing materials, and (iii) shall be structurally sound and in good, working and sanitary order and condition and repair. Landlord shall deliver the Premises free of all liens and encumbrances. Landlord represents and warrants that is has disclosed to Tenant any conditions or restrictions (including, without limitation, environmental contamination,

<u>**LEASE AGREEMENT**</u> – **Page 5**

restrictions on utilities or exclusive use restrictions) within Landlord's knowledge that would adversely affect Tenant's store design, permitting, construction and use, as contemplated by this Lease. Landlord further represents and warrants that, as of the Tenant's opening date, all Required Common Areas (hereinafter defined) shall meet and comply with all federal, state and local laws, ordinances and regulations.

(d)     Landlord's Work. Landlord shall, at its sole cost and expense, complete all of the work items more particularly described in the work letter attached hereto as Exhibit C and made a part hereof by this reference (the "Work Letter") on or before the Premises Delivery Date. The work to be completed by Landlord pursuant to the Work Letter is hereinafter referred to as the "Landlord's Work". Landlord shall perform the Landlord's Work in a good and workmanlike manner and shall use its best efforts to notify Tenant in writing at least 30 days prior to Landlord's actual completion of Landlord's Work to allow Tenant to prepare to commence Tenant's work within the Premises. Promptly thereafter, Tenant shall arrange for an inspection of the Premises. During the inspection, Landlord shall demonstrate to Tenant that all of Landlord's Work has been Substantially Completed (defined below). Following the inspection, Tenant shall deliver to Landlord a written punchlist of all incomplete or faulty items of Landlord's Work and any necessary mechanical adjustments or finish work required to bring the Premises into the condition required by this Lease. Landlord acknowledges and agrees that Tenant may conduct a secondary inspection with regard to mechanical systems at the time power is supplied to the Premises and the systems connected to Tenant's power supply. Landlord shall correct any deficiencies noted in Tenant's second inspection. If the Premises are Substantially Complete, Tenant shall accept the Premises, subject to Paragraph 6 below, and Landlord shall repair all punchlist items within thirty (30) days of the day Tenant accepts the Premises. If Landlord fails to correct all punchlist items within such thirty (30) day period, Tenant may complete all work as may be necessary to correct the same. In such event, Landlord shall pay to Tenant, within thirty (30) days after written demand (which demand shall be supported by reasonable back-up evidence detailing the costs so incurred by Tenant such as paid invoices and the like) all such costs incurred by Tenant together with interest thereon at an interest rate equal to 3% over the then current "Prime Rate" as published in the Wall Street Journal (the "Default Rate") from the date Tenant incurs such costs until paid in full. As used herein, the term "Substantially Complete" shall mean that all of Landlord's Work is complete in the manner required by this Lease excepting only minor cosmetic items which are capable of being completed within thirty (30) days. As to the Required Common Areas, "Substantially Complete" means that all Landlord's Work is substantially complete in the manner required by this Lease so as to permit and provide Tenant reasonably convenient access to the Premises to perform Tenant's Work therein, with all final improvements to the Required Common Areas (i.e., landscaping, signage, striping and similar cosmetic items and convenience amenities) to be completed no later than Tenant's opening date).

Landlord shall assign to Tenant all warranties and guarantees with respect to any elements of Landlord's Work for which Tenant shall have the duty and obligation of maintenance from and after the Premises Delivery Date pursuant to the terms of this

<u>**LEASE AGREEMENT**</u> – **Page 6**

Lease and, to the extent of any such warranties and guarantees are not assignable, Landlord agrees to enforce the same for the benefit of Tenant.

(e)    <u>Landlord's Failure to Deliver the Premises</u>.    If Landlord has not Substantially Completed the Landlord's Work and delivered the Premises to Tenant within fifteen (15) days after the Premises Delivery Date, Tenant may (A) wait for Landlord to complete the Landlord's Work; or (B) complete all or any portions of Landlord's Work as is necessary to bring the Premises into the condition required by this Lease on behalf of Landlord as soon as feasibly possible.    In the event Tenant elects option (B) above, Landlord shall pay to Tenant, within thirty (30) days after written demand (which demand shall be supported by reasonable back-up evidence detailing the costs so incurred by Tenant such as paid invoices and the like) all such costs incurred by Tenant together within interest thereon at the Default Rate from the date Tenant incurs such costs until paid in full.    In the event Tenant elects option (A) above and Landlord's Work is not Substantially Complete on or before the date that is the last day of the tenth (10th) month after the expiration (or Tenant's earlier waiver in writing) of the Conditions Period (as defined in Paragraph 6 below), Tenant may terminate this Lease by delivering not less than ninety (90) days' advance written notice of such election to Landlord with such termination to be effective as of the date that is the ninety-first 91st day thereafter if Landlord has not then completed such work.

(f)    <u>Tenant Allowance</u>.    In addition to Landlord's obligation to complete the Landlord's Work, Landlord shall provide Tenant with the Tenant Allowance.    The Tenant Allowance shall be paid by Landlord to Tenant in two (2) installments as follows:    (i) an amount equal to fifty percent (50%) of the Tenant Allowance shall be paid by Landlord to Tenant within thirty (30) days after the date on which Tenant demonstrates, through paid invoices or other evidence reasonably satisfactory to Landlord, that Tenant has contributed at least $550,000.00 toward the cost of Tenant's Work and delivered partial lien waivers for all such work, and (ii) an amount equal to the remaining balance of the Tenant Allowance shall be paid by Landlord to Tenant within thirty (30) days following the date on which Tenant has completed Tenant's Work (as defined in the Work Letter) and has delivered to Landlord a final lien waiver from Tenant's general contractor.    If Landlord has not paid Tenant the Tenant Allowance as required herein, Tenant shall be entitled to pursue a claim against Landlord for any unpaid amount, plus interest thereon at the Default Rate from the date the payment was due until the date the payment is received, or may elect to pay Alternate Base Rent (as calculated and provided for in <u>Paragraph 4(a)</u> below) in lieu of Base Rent.

## 4.    <u>Rent</u>.

(a)    <u>Rents Payable; Net Rental</u>.    Commencing on the Rent Commencement Date and continuing throughout the term of this Lease, Tenant agrees to pay Landlord without deduction, offset or counterclaim as rental for the Premises the following (collectively, the "Rent"):

(i)    An annual sum equal to the Base Rent; plus

<u>LEASE AGREEMENT</u> – **Page 7**

(ii)    An annual sum equal to the Percentage Rent; plus

(iii)    All additional sums, charges or amounts to be paid by Tenant to Landlord under the terms of this Lease ("Additional Rent").

Base Rent in the amount set forth in Paragraphs 1(g) and (h) above (as the case may be) shall be due and payable to Landlord, in twelve (12) equal monthly installments, in advance, on or before the first day of each calendar month during the Primary Term and any Renewal Term. Base Rent for any fractional month at the beginning or the end of the term hereof shall be prorated.

Notwithstanding anything contained herein to the contrary, if Landlord fails to pay the Tenant Allowance to Tenant as and when the same is otherwise due hereunder, Tenant may notify Landlord in writing that Tenant elects to pay Alternate Base Rent (as calculated below). Thereafter, Landlord shall have a period of thirty (30) days to pay the Tenant Allowance to Tenant failing which Tenant may, without further notice, commence to pay, in lieu of Base Rent, the Alternate Base Rent. The Alternate Base Rent for any Lease Year occurring during the first 5 years of the Term shall be equal to the Annual Base Rent set forth in Paragraph 1(g) above less an amount equal to 7.5% of the total amount of the then unpaid Tenant Allowance. Tenant shall pay one-twelfth (1/12) of that amount each calendar month as monthly Alternate Base Rent. Payment of Rent for the first month of Alternate Base Rent shall include an adjustment for any amount of Rent that Tenant paid in excess of the Alternate Base Rent for prior period(s). Alternate Base Rent for each succeeding five year Term(s), including any Renewal Term(s) shall increase by nine percent (9%) over the Alternate Base Rent for the preceding five year Term. The Break Points shall not be adjusted. By way of example, if Tenant fails to pay the Tenant Allowance as and when required, Base Rent for the first Lease Year shall be reduced by $24,820.73 per annum ($330,943 x 7.5% = $24,820.73) for a resulting annual Alternate Base Rent of $140,651.00 during each year of such five year period. The annual Alternate Base Rent for Years 6-10 shall be $153,309.00 (i.e., $140,651.00 x 1.09 = $153,309.00).

(b)    <u>Remeasurement</u>. Within ninety (90) days after the date on which Landlord actually delivers possession of the Premises to Tenant in the condition required by the Lease, Tenant may determine whether the "as built" leasable square footage of the Premises differs from the Floor Area as established in Paragraph 1(c) above. If the "as built" leasable square footage of the Premises is more than 3% different than the Floor Area established in Paragraph 1(c) above, Landlord and Tenant agree to amend this Lease to reflect the correct Floor Area in Paragraph 1(c) and any calculation based upon the Floor Area of the Premises shall be adjusted accordingly.

(c)    <u>Percentage Rent</u>. The Percentage Rent shall be computed in accordance with the provisions of this Paragraph 4(c).

In computing the Percentage Rent for the first Lease Year or the last Lease Year, as the case may be, if such Lease Year shall contain more or less than three hundred

<u>**LEASE AGREEMENT**</u> – **Page 8**

sixty-five (365) days, then the Break Point shall be multiplied by a fraction, the numerator of which shall be the number of days in such shorter calendar year, and the denominator of which shall be three hundred sixty-five (365). For purposes hereof, the first Lease Year of the Term of this Lease shall be determined as follows: (i) if the Rent Commencement Date occurs prior to the 15th day of any calendar month, then the first Lease Year shall begin with the first day of the month in which the Rent Commencement Date occurs and shall continue until the last day of the 11th month thereafter, or (ii) if the Rent Commencement Date shall occur on or after the 15th day of any calendar month, then the first Lease Year shall begin as of the Rent Commencement Date and shall continue until the last day of the 12th month thereafter. Each Lease Year thereafter shall be for a period of twelve (12) months commencing as of the first day of the month following the expiration of the immediately preceding Lease Year.

The term "Non-Alcohol Gross Sales" shall mean the aggregate amount of all sales (whether for cash, on credit or otherwise) of food, non-alcoholic beverages (but in no event shall there be included any revenue from the sale of alcoholic beverages), goods, articles and any other merchandise, and the aggregate of all charges for services performed (whether for cash, on credit or otherwise) made and rendered in, about or in connection with the Premises (whether or not through a private club) by Tenant and its assignees, sublessees and licensees, including sales derived from the redemption of gift cards or certificates, off-premises sales and monies derived at or away from the Premises so long as they are in connection with the business operation conducted on the Premises, but shall not include any Federal, State, municipal or other sales, value added or retailer's excise taxes paid or accrued by Tenant, regardless of whether such taxes are collected from customers or absorbed by Tenant, tips or gratuities, the discounted portion of sales to employees, complimentary sales to employees, complimentary sales to customers, discounts afforded customers from the redemption of coupons, condemnation proceeds, proceeds of insurance policies received by Tenant, bulk and/or intercompany transfers of food and/or inventory (provided no such transfer is made to avoid liability for Percentage Rent), proceeds from the sale of used restaurant equipment or other trade fixtures, alcohol beverage commission fees charged for private club memberships, if any, proceeds from the on-premises sale of gift cards or certificates, any receipts generated from tabletop devices (except that the amount of any net proceeds received by Tenant from such devices shall be included within the meaning of Non-Alcohol Gross Sales and Tenant shall deliver a computer generated report of such receipts and net proceeds together with its statement of Non-Alcohol Gross Sales), or revenue generated from the sale of alcoholic beverages of any type.

Within sixty (60) days after the end of each Lease Year, Tenant shall deliver to Landlord a written statement setting forth the amount of Tenant's Non-Alcoholic Gross Sales for the preceding Lease Year. Simultaneously with the delivery of such statement, Tenant shall pay to Landlord the Percentage Rent shown by such statement to be then due and owing.

Tenant shall maintain and preserve, or cause to be maintained and preserved, at the principal office of Tenant in accordance with generally accepted accounting practices

LEASE AGREEMENT – Page 9

for the type of business conducted by Tenant on the Premises, full, complete, accurate and detailed books, records and accounts of its daily Non-Alcoholic Gross Sales, both for cash and on credit, derived from the business operation conducted on the Premises; provided, however, Tenant shall not be required to preserve any sales checks or cash register tapes for more than ninety (90) days following delivery of the written statement provided for hereinabove, or other books, records and accounts for a period of more than two (2) years after the end of the Lease Year covered thereby. Landlord or its agents may inspect any and all records in Tenant's possession which relate to Non-Alcoholic Gross Sales from the Premises at Tenant's principal business office at any time during normal business hours and normal working days upon prior reasonable notice. Such examination shall be conducted in a manner which will not interfere unreasonably with the business conducted at Tenant's principal office. Landlord may once in any Lease Year cause an audit of the Non-Alcoholic Gross Sales from the business operation conducted by Tenant on the Premises for the immediately two (2) preceding Lease Years to be made by an independent certified public accountant of Landlord's selection, and if the written statement of Non-Alcoholic Gross Sales previously delivered to Landlord shall be found to be inaccurate, Landlord and Tenant shall make appropriate adjustments so that Landlord shall receive the full Percentage Rent to which it is entitled, and only such amount. Landlord shall pay for the cost of such audit unless the audit shall disclose Non-Alcoholic Gross Sales of one per cent (1%) or more in excess of the Non-Alcoholic Gross Sales theretofore reported by Tenant for that particular Lease Year, in which case Tenant shall promptly pay to Landlord the reasonable cost of said audit in addition to the deficiency in Percentage Rent.

(d)     No Additional Fees or Expenses.     Tenant shall not be obligated to contribute any sums to promotional or advertising programs pertaining to the Center, to join any merchant's or development association of the Center and pay fees or dues, or to pay any other miscellaneous fees or expenses or common area maintenance and repair charges in connection with the Center except as may be expressly set forth in this Lease. Tenant shall have no obligation to pay any additional Base Rent for the Patio Area or other outside areas utilized by Tenant for the conduct of its business.

(e)     Place of Payment.     All payments of Base Rent and other monetary amounts under this Lease shall be made to Landlord as the same shall become due in lawful money of the United States of America at the address specified in Paragraph 1(n) of this Lease, or to such other party or at such other address as hereinafter may be designated by Landlord by written notice delivered to Tenant at least ten (10) days prior to the next ensuing monthly rental payment date.

(f)     Late Charge.     If Tenant shall fail to pay any installment of rent or any other charges due under the Lease, within ten (10) days after the date due more than two (2) times in any calendar year, then for the third and each subsequent failure to pay any installment of rent or other charges due under the Lease within ten (10) days after the date due during the remainder of the calendar year, in addition to the installment of rent or other charges due under this Lease, Tenant shall pay to Landlord a late payment charge

equal to One Hundred and no/100 Dollars ($100.00) per day up to a maximum late charge of $1,000 in any single calendar month.

5.     **Holding Over by Tenant.** Should Tenant or any assignee, sublessee or licensee of Tenant fail to vacate the Premises or any part thereof after the expiration of the Primary Term or any Renewal Term hereof, then unless otherwise agreed in writing, such failure to vacate shall constitute and be construed as a tenancy from month-to-month upon the same terms and conditions as set forth in this Lease, provided that monthly Base Rent and Percentage Rent shall be increased to an amount equal to one hundred fifty percent (150%) of the monthly Base Rent and Percentage Rent payable hereunder during the last month of the immediately preceding term.

6.     **Tenant's Contingencies.** Anything herein to the contrary notwithstanding, it is expressly understood and agreed that Tenant shall be entitled to terminate this Lease by written notice delivered to Landlord on or before the date that is one hundred twenty (120) days after the Effective Date (the "Conditions Period"), in the event any of the following conditions shall remain unsatisfied:

(a)     Tenant, after exercise of reasonable diligence, shall have obtained, or received evidence satisfactory to it that it will be able to obtain, from the appropriate governmental authorities, all permits and licenses necessary for the construction and operation of the Improvements, including any conditional or special use permits required under applicable zoning ordinances and acceptable prototypical building and freestanding signage for an Abuelo's restaurant (Tenant hereby agrees to proceed with its plans and submit the same to the permitting authority simultaneously with Landlord's submittal of Landlord's plans, shall thereafter diligently and in good faith pursue receipt of all permits and shall keep Landlord advised of Tenant's progress in obtaining its permits);

(b)     Tenant, after exercise of reasonable diligence, shall be satisfied that it will be able to obtain, from the appropriate governmental authorities, all permits and licenses necessary for the on-premises sale and consumption of wine, beer, cocktails and other alcoholic beverages on the Premises (Landlord agrees to cooperate with Tenant, at no out-of-pocket expense to Landlord, in obtaining such permits and licenses, including, without limitation, providing the appropriate governmental authorities with required background information on Landlord and its principals to the extent required by law, any such information to be held confidential by Tenant and used only for the purposes of obtaining such permits and licenses).

7.     **Uses.**

(a)     <u>Permitted Use</u>. Tenant shall use the Premises for the Permitted Use.

(b)     <u>Center Use Restrictions</u>. During the term of this Lease, including any Renewal Terms, Landlord covenants and agrees that all portions of the Center, except for the Premises, shall be used solely for retail purposes. The following uses shall be specifically prohibited within the Center: a health club, gym, yoga studio, theater of any kind, bowling alley, skating rink, amusement park, carnival or circus, meeting hall, place of instruction, sporting event or other sports facility, auditorium or any other like place of

<u>**LEASE AGREEMENT**</u> – **Page 11**

public assembly, mortuary or funeral parlor, establishment selling cars or other motor vehicles, motor vehicle maintenance or repair shop or gas station, any establishment selling trailers, a billiard parlor, any tavern, pub or bar (however, such tavern, pub or bar shall be permitted so long as not less than 50% of all gross sales are from the sale of food for on-site consumption), a pawn shop, amusement center, flea market, massage parlor, "disco" or other dance hall, tattoo or body piercing parlor, casino, gaming room or "off track betting" operation, any business operation which dispenses or sells paraphernalia for use with illicit drugs or for the sale of marijuana (whether medicinal or otherwise), any business operation which sells, rents or displays pornographic materials. The foregoing restrictions may be included within the REA.

In addition to the foregoing, Landlord covenants and agrees that it shall not permit the operation of any other restaurant within the Center except that one (1) restaurant, in addition to the Premises, may be operated within the Center subject to satisfaction of all of the following requirements: (i) such restaurant shall be limited or counter service and shall not operate with any waiters or waitresses, (ii) the menu of such restaurant shall not contain more than thirty percent (30%) of its total menu offerings from Mexican, Tex-Mex or Southwestern food items, (iii) the space occupied by such restaurant shall not exceed 2,800 square feet in total aggregate space (with no deductions of any kind), and (iv) such restaurant shall be located only within the area marked as the "Permitted Restaurant Area" on Exhibit A-1 attached hereto and made a part hereof. Should Landlord be permanently estopped by any governmental or judicial authority from performing under this subparagraph, then this subparagraph shall be modified to such an extent as to take into account the parties' original intent and to permit Landlord the ability to enforce the same under applicable law.

If Landlord (or any entity which either controls, is controlled by, or is under common control with Landlord or which is otherwise an affiliate of Landlord) shall at any time acquire the "Additional Parcel" as the same is labeled on Exhibit H attached hereto and made a part hereof, then the Additional Parcel shall be subject to the REA and shall be included within the meaning of the Center for all purposes of this Paragraph 7(b). Landlord agrees that the Additional Parcel shall be further subject to height restrictions which protect the visibility of the Premises. Landlord acknowledges that Tenant is relying on the covenants and agreements set forth in this Paragraph 7 and would not have entered into this Lease in the absence of such covenants and agreements, therefore, any violation of the same will be a material breach by Landlord.

If any of the foregoing covenants, agreements or restrictions set forth in this Paragraph 7(b) are violated, and if Landlord has not cured the same within sixty (60) days after notice of the violation from Tenant, then Tenant may abate fifty percent (50%) of the Rent (and all other payments required to be made by Tenant) due hereunder for so long as the violation continues. The total sums thus abated shall be partial liquidated damages for such breach and not a penalty therefor, the parties agreeing that it will be very difficult, if not impossible, to ascertain the amount of such damage. In addition to this remedy, Tenant shall be entitled to injunctive, and other appropriate relief, whether under the provisions of this Lease or otherwise.

LEASE AGREEMENT – Page 12

(c)  <u>Go Dark and Recapture</u>.  Notwithstanding anything to the contrary contained herein, Tenant shall not be required to continuously operate its business in the Premises or keep the same open to the public; provided that, Tenant shall at all times continue to pay Base Rent and other monetary obligations which become due and payable pursuant to the terms and provisions of this Lease.  Whenever Tenant is open for business, Tenant shall operate and staff the business so as to produce the maximum profitable and practical Non-Alcoholic Gross Sales which may be produced by such manner of operation and at a minimum, Tenant shall remain open on the same days and for the same number of hours per day as is typical of the majority of all other Abuelo's restaurants in the states of Texas, Oklahoma, Kansas and Missouri (the "Region").  If Tenant ceases operations at the Premises any time (excluding temporary closures due to casualty, condemnation or remodeling), then during the period of Tenant's closure, monthly Base Rent payable by Tenant under this Lease shall be increased to an amount (the "Adjusted Rent") equal to the sum of (i) the monthly minimum Base Rent which Tenant is scheduled to pay for each such month, plus (ii) one-twelfth (1/12th) of the yearly average of the Percentage Rent paid by Tenant to Landlord for the twelve (12) months immediately preceding the month in which Tenant ceases operations at the Premises.  If Tenant ceases to operate its business in the Premises for a period in excess of one hundred eighty (180) consecutive days (or three hundred sixty five (365) days if Tenant's cessation of operations is due to remodeling, renovating, or reconstructing the improvements as a result of an assignment, sublease, casualty, condemnation or otherwise) (each of the foregoing, together with Tenant's right hereunder to be closed for one hundred eighty (180) or for three hundred sixty five (365)  consecutive days are referred to as a "Permitted Closure"), then following the end of such one hundred eighty (180) or three hundred sixty five (365) consecutive day period, Landlord shall have the right to terminate this Lease and recapture the Premises by delivering thirty (30) days prior written notice to Tenant.  If the Term of this Lease is so terminated, the parties hereto shall be released from all obligations which would first accrue after the effective date of termination and Tenant shall reimburse Landlord for the unamortized cost of any Construction Allowance actually paid by Landlord pursuant to this Lease, such costs having been amortized on a straight-line basis over the Term of this Lease (exclusive of any renewal options).  Tenant's obligation to reimburse such amounts and any other obligations or liabilities first accruing during the Term of this Lease shall survive the termination of the Term of this Lease.

(d)  <u>Compliance with Law</u>.  Landlord covenants and warrants that upon completion of Landlord's Work, all improvements constructed by Landlord as part of Landlord's Work shall be in compliance with all applicable laws, and regulations, including, but not limited to, those applying to accessibility for the disabled or handicapped.  During the term of this Lease, Tenant, at its sole cost and expense, shall comply promptly with all laws, rules and regulations made by any governmental authority having jurisdiction over Tenant's use of the Premises pertaining to (i) the physical condition of any improvements constructed by Tenant in the Premises, and (ii) Tenant's specific business operations in the Premises.

<u>**LEASE AGREEMENT**</u> – **Page 13**

(e) <u>Radius Restriction</u>. Tenant agrees (insofar as and to the extent lawful) that during the Term, neither Tenant nor any affiliated or subsidiary companies, directly or indirectly, will own, lease or operate another Abuelo's restaurant (or other full service Mexican food restaurant) within five (5) miles of the Premises.

**8.     <u>Representations and Covenants of Landlord</u>.** As of the Effective Date of this Lease, Landlord represents, warrants and covenants to Tenant as follows:

(a)     That Landlord has good and marketable fee simple title to the Premises and the Center, possesses full power and authority to deal therewith in all respects and no other party has any right or option thereto or in connection therewith;

(b)     That there are no pending or, to the knowledge of Landlord, threatened condemnation proceedings or actions affecting the Premises;

(c)     That there are no pending or, to the knowledge of Landlord, threatened actions or legal proceedings affecting the Premises or Landlord's interest therein;

(d)     That there are no delinquent special assessments for sewer, sidewalk, water, paving, electrical or power improvements or other capital expenditures or improvements, matured or unmatured;

(e)     That Landlord is not aware of any facts or circumstances which would materially adversely affect the use or value of the Premises;

(f)     That this Lease and the consummation of the transactions contemplated hereby shall be valid and binding upon Landlord and shall not constitute a default (or an event which with notice or passage of time or both will constitute a default) under any contract to which Landlord is a party or by which it is bound;

(g)     That Landlord has not received notice nor has Landlord any knowledge of any violation of any law, regulation, ordinance, order or other requirement of any governmental authority having jurisdiction over or affecting any part of the Premises;

(h)     That Landlord is not obligated on any contract, lease or other agreement, written or oral, with respect to the ownership, use, operation or maintenance of the Premises, other than normal maintenance and landscaping contracts and contracts, leases and agreements which have been disclosed to Tenant in writing;

(i)     That the use of the Premises in accordance with Paragraph 7 hereof, including the sale of all items currently on the Abuelo's menu, will not violate the terms and provisions of any other lease for space in the Center or any restriction affecting the Premises.

(j)     That, except as set forth in that certain Phase I Environmental Site Investigation, dated December 22, 2009, prepared by Environmental Management, Inc.

<u>LEASE AGREEMENT</u> – **Page 14**

(the "Phase I"), a copy of which has been provided by Landlord to Tenant, Landlord has no knowledge that the Premises contains any underground storage tanks, asbestos, polychlorinated biphenyls (pcb's), radon, urea formaldehyde, substantial amounts of waste or debris, or contamination, including without limitation: (x) any "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976, as amended from time to time, and regulations promulgated thereunder; (y) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, and regulations promulgated thereunder; and (z) any substance, the presence of which on the Premises is prohibited or regulated in any manner, including, without limitation, special handling or notification of any governmental entity in its collection, storage, treatment or disposal, by any federal, state, or local law, ruling, code, rule, or regulation.

8A. **Representations and Covenants of Tenant**. As of the Effective Date, Tenant represents, warrants and covenants to Landlord as follows:

(a) Tenant is a duly formed and validly existing limited partnership in good standing under the laws of the State of Texas, has been duly qualified and is in good standing in the State of Kansas and has been duly authorized to execute this Lease and to consummate the transactions contemplated hereby;

(b) The person executing this Lease has been duly authorized to execute the Lease and to bind Tenant thereby;

(c) There are no pending or, to the knowledge of Tenant, threatened actions or legal proceeding which would affect Tenant's ability to fulfill its obligations under the Lease; and

(d) This Lease and the consummation of the transactions contemplated hereby shall be valid and binding upon Tenant and shall not constitute a default (or an event which with notice or passage of time or both would constitute a default) under any contract to which Tenant is a party or by which Tenant is bound.

9. **Utilities.**

(a) <u>Utility Service</u>. Tenant shall pay all charges incurred for the use of utility services at the Premises including, without limitation, gas, electricity, water, cable television, and telephone, each of which shall be separately metered to the Premises by proper and sufficient meters accessible to Tenant and installed by Landlord. The cost of the water meter shall be shared equally between the parties and Tenant shall reimburse Landlord for 50% of the cost thereof within fifteen (15) days after Landlord requests the same (such request to be accompanied by an invoice for the meter). Tenant shall be responsible for the electricity usage for all of Tenant's building signage and the operation of the Patio Area, and the same shall be connected to Tenant's electrical meter. Landlord shall never charge Tenant a rate for any utility in excess of the rate Landlord pays the supplier of the service. Tenant shall be entitled to solicit bids from competing utility providers in order to secure utility services for Tenant's business operations and, in connection therewith, Tenant shall be entitled to enter into such contracts with such

<u>**LEASE AGREEMENT**</u> – **Page 15**

providers as Tenant deems appropriate for the purpose of securing such utility services. Tenant and Landlord shall equally share in all utility connection fees, sewer connection fees, impact fees, tap fees and other similar fees associated with Tenant's initial occupancy of the Premises (the "Connection Costs"). The party that ultimately makes payment to the applicable utility company or governmental authority (as the case may be) for any or all Connection Costs shall notify the other and request reimbursement for 50% of the total amount of all such Connection Costs (such reimbursement request to be accompanied by invoices, paid receipts or other appropriate back-up information). The reimbursing party shall make payment within fifteen (15) days following receipt of the request for the same.

(b)      Interruption of Services. Landlord shall not interrupt any utility services to the Premises unless (i) such interruption is necessitated by the need to make emergency repairs, or (ii) Landlord schedules any necessary repair work with Tenant's general manager at the Premises at least seventy two (72) hours in advance. Such repairs shall, to the extent possible, be made only during hours when Tenant is not open for business to the public. Landlord shall immediately give notice to Tenant of an impending interruption of any utility services to the Premises of which Landlord is aware. Landlord shall use its best efforts to minimize and promptly cure all utility interruptions that are caused by Landlord or subject to Landlord's control. Notwithstanding anything to the contrary contained in this Lease, subject to force majeure, if Landlord fails to cure a utility interruption within forty-eight (48) hours after it occurs, and if such interruption is caused by Landlord or is subject to Landlord's direct control, Tenant may, at its sole option, take such steps as are necessary to cure such interruption, in which event Tenant shall be entitled to recover from Landlord the amounts reasonably expended by Tenant for said purposes, together with interest thereon at the Default Rate. If Tenant is required to close for business as a result of a utility interruption which is caused by or subject to Landlord's direct control, then all Base Rent due from Tenant to Landlord shall be abated from the date that Tenant closes for business as a result of such utility interruption until such utility service is restored.

10.      Taxes, Assessments and other Governmental Impositions.

(a)      Definition of "Taxes". For purposes of this Lease, the term "Taxes" shall mean and refer to all real estate taxes (both real and personal), assessments (both general and special) and other governmental impositions lawfully created and assessed against the land, buildings and other improvements within the Center, together with reasonable costs of any negotiation, contest or appeal pursued by Landlord in an effort to reduce the same. In no event shall Taxes include (nor shall Tenant be liable hereunder for or required to pay) any income, profit, excise, inheritance, estate, gift or franchise taxes, or upon the right of Landlord to do business, or any tax, assessment or governmental imposition in replacement or substitution of the foregoing or of a similar character. Notwithstanding the foregoing, Tenant shall pay any true sales tax on rent if required by the laws of the State of Kansas.

Landlord agrees that all Taxes shall be prorated and divided into the maximum number of installments permitted by law and only the current portion shall be included in

LEASE AGREEMENT – Page 16

Taxes for any calendar year during the term of this Lease. Any Taxes created, levied, or arising prior to the Rent Commencement Date of this Lease, any installment of any such Taxes created prior to the Rent Commencement Date or any Taxes applicable to a period of time prior to the Rent Commencement Date, but assessed or otherwise imposed during the term hereof, shall be paid by Landlord. Similarly, at the expiration of the term of this Lease, taxes, impositions, assessments, or other similar expenses required to be paid by Tenant hereunder shall be apportioned in the same manner as such taxes were apportioned prior to the Rent Commencement Date, and Landlord shall pay that portion thereof applicable to the period after the expiration of the term of this Lease.

(b)     Payment of Taxes.   As of the Rent Commencement Date, Landlord represents and warrants that (i) Landlord has paid in full all currently due Taxes, and (ii) Landlord shall pay when due all future Taxes. During the term of this Lease, Tenant will pay Landlord as Additional Rent, an amount equal to Tenant's Proportionate Share of all Taxes.  Tenant's Proportionate Share of Taxes shall be paid monthly and shall be calculated and estimated using the real estate tax bill for the immediately preceding calendar year. On or about the Premises Delivery Date, Landlord shall provide Tenant with a copy of the tax bill applicable to the Center for the calendar year immediately preceding the year in which the Rent Commencement Date will occur, together with a detailed calculation setting forth the estimated amount of Tenant's Proportionate Share of such Taxes. Within sixty (60) days after the end of each calendar year, Landlord shall furnish Tenant with a written statement setting forth the total Taxes for said calendar year (together with a copy of the paid tax bill), the calculation of Tenant's Proportionate Share thereof and the amount paid by Tenant during such calendar year. Any deficiency shall be paid by Tenant to Landlord within thirty (30) days after the end of each applicable annual period. Similarly, any overpayment by Tenant shall be refunded to Tenant by Landlord within thirty (30) days after the end of each applicable annual period.

Notwithstanding anything to the contrary contained in this Lease, Landlord and Tenant hereby agree as follows: (i) the responsibility for the payment of all Taxes shall be upon Landlord and Landlord agrees to pay the same as required by law, and in any event, so as to assure that Tenant's right to occupy the Premises and use the Common Areas shall not be disturbed or threatened; (ii) Tenant shall not be required to share in any penalties, interest, late payments or the like resulting from Landlord's late payment of Taxes; (iii) Landlord shall provide Tenant with (A) copies of all tax paid bills and a detailed computation of Tenant's Proportionate Share, and (B) such other documents and information necessary for Tenant to ascertain the accuracy of Landlords computation; (iv) Landlord shall pay to Tenant, promptly upon receipt of the same, Tenant's Proportionate Share of any refund or rebate of Taxes received by Landlord and applicable to the term hereof; (v) in the event any special assessments are assessed and payable, Tenant's Proportionate Share of the same shall be calculated as if such assessments were being paid by Landlord over the longest period of time permitted by applicable law; and (vi) Tenant, by and through its own employees, shall have the right to audit the applicable records of Landlord to confirm that the Taxes billed to Tenant are proper and conform to the provisions of this Paragraph. Such audit right shall be exercisable by Tenant within three (3) years of Tenant's receipt of Landlord's annual statement of such charges.

LEASE AGREEMENT – Page 17

Should any such audit disclose that Tenant has overpaid the Taxes, Landlord shall promptly refund the amount of the overpayment to Tenant. There shall be no requirement that Tenant use an independent auditor or CPA.

 (c) <u>Tax Contest</u>. Tenant, at its sole cost and expense, may dispute and contest the Taxes (in its own name or in the name of Landlord, or in the name of both, as it may deem appropriate). Landlord agrees to provide any Tax Appraisal Notice to tenant in reasonable time for Tenant to decide whether to contest any such appraisal. In deciding whether to contest any appraisal, Tenant shall consult with Landlord to make certain any contest regarding other parcels in the Center are coordinated. If at any time, in the judgment of Landlord reasonably exercised, it shall become necessary to do so, Landlord, after written notice to Tenant, may pay any taxes due under protest in accordance with procedures established under applicable law. Any amount paid under protest shall become immediately due and payable by Tenant to Landlord and shall constitute Additional Rent hereunder. Landlord shall refund Tenant's Proportional Share of any refunds received applicable to the Premises. Tenant shall pay any and all increases resulting from Tenants efforts to contest any appraisal or any payment under protest at Tenant's request.

 (d) <u>Personal Property Taxes</u>. Tenant shall pay, prior to delinquency, all personal property taxes assessed against Tenant directly and applicable to its personal property located on or within the Premises.

## 11.  <u>Insurance.</u>

 (a) Tenant shall maintain so called "all risk" commercial property insurance with a special form endorsement providing coverage on a replacement cost basis for Tenant's fixtures, equipment and inventory in the Premises. During the term, Tenant shall use the proceeds from any such policy or policies of insurance for the repair or replacement of the insured property unless Tenant elects to terminate the Lease under Paragraph 16 hereof. Landlord shall have no interest in any insurance proceeds Tenant receives for Tenant's property and Landlord shall sign all commercially reasonable and customary documents which are required by the insurance company in connection with the settlement of any claim or loss by Tenant. Tenant's policies shall not be contributing with or in excess of any coverage which Landlord shall carry on the Center or the building of which the Premises are a part.

 (b) Tenant shall also insure against property damage and public liability arising by reason of occurrences on or about the Premises by maintaining a policy or policies of commercial general liability insurance including contractual liability coverage insuring against the tort liabilities assumed under this Lease in the amount of not less than TWO MILLION AND NO/100 DOLLARS ($2,000,000) in respect of any one occurrence.

 (c) Landlord shall maintain so called "all risk" fire and extended coverage insurance (including vandalism and malicious mischief insurance, earthquake insurance, and flood insurance) on the Center, including specifically, but without limitation, the

<u>LEASE AGREEMENT</u> – **Page 18**

building of which the Premises are a part (but excluding any property which Tenant is obligated to insure hereunder), with a limit of or in an amount not less than the replacement value thereof. Payments for losses thereunder shall be made solely to Landlord or the mortgagees of Landlord as their interests shall appear.

(d)     Landlord shall also insure against property damage and public liability arising by reason of occurrences on or about the Center by maintaining a policy or policies of commercial general liability insurance including contractual liability coverage insuring against the liabilities assumed under this Lease with respect to its activities at the Center (including, without limitation, Landlord's activities within the Premises), in the amount of not less than TWO MILLION AND NO/100 DOLLARS ($2,000,000) in respect of any one occurrence.

(e)     Tenant shall subscribe to the workers' compensation law in the state in which the Premises are located and shall maintain (at its sole cost and expense) workers' compensation and employers' liability insurance covering all of its employees as required of a subscriber to the relevant statutes in the state in which the Premises are located. Notwithstanding the foregoing, if the laws of the State of Kansas will permit the same, Tenant shall have the right to non-subscribe to worker's compensation insurance programs and may "self-insure" for the same.

(f)     It is agreed that the insurance coverages provided for herein may be maintained pursuant to master policies of insurance covering other business locations of Tenant and/or its corporate affiliates or other commercial developments of Landlord and/or its corporate affiliates. All insurance policies required to be maintained by Tenant and Landlord hereunder shall be with responsible insurance companies, authorized to do business in the state in which the Premises are located if required by law, and except for property insurance policies and workers' compensation policies, shall name Landlord or Tenant as an additional insured (as applicable), as their interests may appear, and shall provide for cancellation only upon ten (10) days prior written notice to Landlord and Tenant. Each party shall evidence such insurance coverage by delivering to the other party certificates issued by the insurance companies underwriting such risks. Tenant shall contribute toward the cost of Landlord's insurance policies in the manner specified in Paragraph 12 below and such costs shall be included as a part of CAM Charges. Notwithstanding anything contained in this Lease to the contrary.

## 12.    **Common Area; Parking.**

(a)     Defined. The "Common Area" is the part of the Center designated by Landlord for the common use of all occupants, including parking areas, access drives, drive aisles, sidewalks, landscaping, curbs, loading areas servicing more than one tenant, private streets and alleys, retention basin(s), utility lines and connections, lighting facilities, hallways, exterior malls, restrooms, and other similar areas and improvements.

(b)     Use of Common Area; Parking. Tenant and its employees, representatives, customers, invitees, subtenants, licensees and concessionaires shall have the non-exclusive right and easement to use the Common Area as constituted from time

**LEASE AGREEMENT – Page 19**

to time, such use to be in common with Landlord, other occupants of the Center and other persons permitted to use the same. At no time during the term of this Lease shall Landlord be permitted to impose on Tenant, its employees, customers, or invitees any monetary fee for the right to park vehicles in the Common Area. Landlord will not impose unreasonable restrictions upon Tenant's parking rights as set forth herein; provided, however, Tenant agrees that Landlord may impose reasonable and non-discriminatory rules and regulations which may include rules regarding parking. Landlord shall apply for and obtain all parking permits needed to meet code and permitting requirements for Tenant's anticipated use of the Premises both as of the Premises Delivery Date and throughout the term of this Lease, at no cost or expense to Tenant. Tenant shall have the right to designate up to six (6) parking spaces in the immediate vicinity of the Improvements for the use of its "To Go" customers and shall also have the right to self-enforce its rights with respect to any designated "To Go" parking spaces. Tenant shall issue rules to all of its employees which rules shall require that such employees (i) avoid parking within the area marked as the "Customer Parking Area" on Exhibit D, and (ii) park only within those parking areas designated as "Employee Parking Area" on Exhibit D. Landlord shall not materially reduce the parking spaces in such areas unless alternative parking is made available to employees in a location within reasonable proximity to the Premises, taking into consideration distance and safety.

Tenant agrees that it shall comply with all rules and regulations attached hereto as Exhibit I (the "Rules and Regulations"), with those specific modifications for Tenant as are provided in Attachment 1 to Exhibit I. Landlord may from time to time add to, modify or amend such rules or regulations provided that no such additional, changes or modifications shall materially change Tenant's rights hereunder and all such rules shall be non-discriminatory and uniformly enforced. Landlord shall use reasonable efforts to cause all tenants of the Center to comply with the Rules and Regulations as the same may be reasonably modified to accommodate such tenants' particular use or operation.

(c)     Required Common Areas; No Build Area. During the Term of this Lease, Landlord shall provide Tenant with use of the parking areas (the "Required Parking Area") and the access drives (the "Required Access Drives") which are situated within the area labeled on Exhibit B-1 attached hereto and made a part hereof (collectively, the "Required Common Areas"). During the term of this Lease, Landlord agrees that it shall not (nor consent to allow any other party to) relocate, modify, alter or otherwise make changes to the Required Common Areas. Additionally, Landlord agrees that it shall not (nor consent to allow any other party to) erect, construct or install any subsequent signage, buildings, or other improvements in the area labeled "No Build Area" on Exhibit B-2 attached hereto. In the event of a breach of the foregoing, the Base Rent shall be equitably abated based on the degree of damage to Tenant's business.

(d)     Modifications, Changes and Additions to the Center. Outside of the Required Common Areas and the No Build Area, Landlord reserves the right, at any time and from time to time, to make such changes, modifications, alterations, additions and replacements to the Center (including the Common Areas) as Landlord may deem

**LEASE AGREEMENT – Page 20**

necessary or appropriate. All such changes, modifications, alterations, additions and replacements shall be completed by Landlord in a good and workmanlike manner, as expeditiously as possible, and in a manner which causes as little disruption to Tenant's use of the Premises as is reasonably possible and shall in any event be consistent with first class retail shopping centers in the metropolitan area in which the Premises is located. Notwithstanding the right of Landlord as provided herein, Landlord acknowledges and agrees that in no event shall any changes, modifications, alterations, additions and/or replacements to the Center (i) impair the access to or the frontage of the Premises, (ii) materially affect the conduct of Tenant's customary business in the Premises, or (iii) detract from Tenant's signage or adversely affect the presentation of Tenant's storefront. In the event of any breach of the foregoing, the Base Rent shall be equitably abated based on the degree of damage to Tenant's business.

(e)     Common Area Maintenance. Landlord shall maintain and operate (or cause to be maintained and operated) the Common Area at its cost and expense, in a first-class manner and condition, and otherwise in compliance with all laws, rules, regulations, and ordinances. Landlord agrees that all maintenance of the Common Area shall be performed in a manner which will cause as little disruption of and interference with Tenant's use of the remainder of the Common Area and the Premises as is reasonably possible. Notwithstanding the foregoing, however, Tenant shall be solely responsible for maintenance of the Patio Area and all costs associated therewith. Landlord shall keep the Common Area properly lighted and secure until two (2) hours after Tenant's normal close of business each day.

Landlord shall use reasonable efforts and due diligence to minimize the cost of managing, operating, maintaining and repairing the Common Area in a manner consistent with prudent shopping center practices.

(f)     Tenant to Pay Proportionate Share of CAM Charges. Tenant agrees to pay as Additional Rent each month on the same day as Base Rent is due, Tenant's Proportionate Share of the costs actually incurred by Landlord for operating, maintaining and repairing the Common Area, including, among other costs, those incurred for lighting, sewer services, painting, cleaning, policing, inspecting, landscaping, snow removing, replacing, insuring, guarding and protecting, which costs may be incurred by Landlord in its reasonable discretion together with an administrative fee for Landlord equal to ten percent (10%) thereof however, such administrative fee shall not exceed $5,000, which shall be adjusted annually based on the inflation rate for the previous year (collectively, the "CAM Charges"). Landscape maintenance and repair shall include trimming of trees, shrubs and bushes such that the visibility of Tenant's building and signage (either building signage or free standing signage, if applicable) is not materially impaired. The CAM Charges payable by Tenant during the first (1st) Lease Year shall initially be $4.00 per square foot of Floor Area of the Premises. This estimate includes estimated general common area maintenance of $3.00 per square foot of Floor Area in the Premises and estimated insurance costs (pursuant to Paragraph 11 above) of $1.00 per square foot of Floor Area within the Premises. The first year CAM Charges are subject to adjustment based upon the actual amount thereof pursuant to the following paragraph.

Once the CAM Charges for the first Lease Year are finally determined, Landlord shall notify Tenant of the same.

Landlord may assess CAM Charges based upon the estimated annual cost of operation and maintenance of the Common Area, payable in advance but subject to adjustment after the end of each calendar year on the basis of the actual costs for such year. Within sixty (60) days after the end of each calendar year, Landlord shall furnish Tenant with a written statement setting forth the total CAM Charges for said calendar year, the calculation of Tenant's proportionate share thereof and payments theretofore made by Tenant during such calendar year. If Landlord has not furnished Tenant with a reconciliation of CAM Charges for the previous calendar year within one hundred twenty (120) days after the end of a calendar year, then, until such time as Landlord furnishes Tenant with a reconciliation statement, Tenant shall not be required to pay any increase in CAM Charges until such time as the reconciliation statement is delivered (at which time, Tenant shall forward any unpaid CAM amounts to Landlord), Any overpayment by Tenant shall be refunded to Tenant by Landlord within sixty (60) days after the end of each applicable annual period. Tenant shall have the right, at Tenant's sole cost and expense, to audit Landlord's books and records with respect to CAM Charges once per annum, during normal business hours on reasonable prior written notice. Tenant shall pay for the cost of such audit unless the audit shall disclose CAM Charges paid by Tenant were more than $10,000.00 or more in excess of actual CAM Charges in which case Landlord shall promptly pay to Tenant the reasonable cost of such audit in addition to the overpayment in CAM Charges.

Notwithstanding any provisions to the contrary contained herein, the following items are specifically excluded from Tenant's proportionate share of CAM Charges: except for the 10% administrative fee referenced above, any other administrative expenses of Landlord, Landlord's general off-site overhead, initial construction and landscaping, other initial capital improvements and expenditures (but the cost of all subsequent capital items may be included in CAM Charges but shall be amortized over the useful life of such item on a straight line basis and only the portion of the capital cost attributable to the year in question shall be included in CAM Charges for such year) ), advertising expenses, real estate commissions, leasing salaries and expenses, bonuses to employees, Landlord's legal fees attributable to any matters concerning any tenant in the Center, charges relating to leases other than this Lease (including, without limitation, any such tenant's failure to pay its proportionate share of Common Area charges), expenses for which Landlord is or will be reimbursed by another source (including, but not limited to, repair or replacement of any item covered by warranty), structural repairs or replacements, depreciation and amortization of the Center (or the buildings therein) or financing costs (including interest and principal amortization of debts), any amounts expended by Landlord to comply with Environmental Laws, costs to correct defects in the design, construction or equipment of the Center (or the buildings therein), any repair, rebuilding or other work necessitated by condemnation, fire, windstorm or other insured casualty, and any expenses incurred to cause the Common Area to comply with any governmental regulations and rules, including, without limitation, the Americans with Disabilities Act. However, if Tenant's alteration of the Premises causes the necessity of

**LEASE AGREEMENT – Page 22**

changes to the Common Area for the Common Area to be in compliance with such governmental rules and regulations, including the American with Disabilities Act, Tenant shall be responsible for Landlord's reasonable cost of compliance.

**13.** **Maintenance and Repairs.**

(a)   Tenant's Obligations.

(i)   General Obligations of Tenant.   Subject to the provisions of Paragraphs 13(b) and 13(c), and except for damage caused by fire or other casualty, whether or not insured or insurable, Tenant, at Tenant's expense, shall keep the Premises and Patio Area in good order and repair, including maintaining all plumbing, HVAC, electrical and lighting facilities and equipment within the Premises and exclusively serving the Premises, and the store front, doors, and plate glass of the Premises.  At Tenant's request, Landlord shall transfer or assign to Tenant all warranties, express or implied, under any contract or subcontracts relating to any improvements or equipment Landlord built or installed within the Premises to serve the Premises exclusively,   Notwithstanding any provision to the contrary, Tenant's obligations under this Paragraph shall not include making (i) any repair or improvement necessitated by the negligence or willful misconduct of Landlord, its agents, employees or servants; (ii) any repair or improvement caused by Landlord's failure to perform its obligations hereunder or under any other agreement between Landlord and Tenant; or (iii) any structural repairs, improvements or alterations to the Premises or the Center.

(ii)   Trash Removal. Landlord shall provide a mutually agreed upon location for an adequately screened trash dumpster or compactor to be located in the general area depicted on Exhibit B, which shall, in any event, be located within  reasonable proximity of the rear or service entrance of the Premises. Tenant shall be solely responsible for trash and garbage removal from the Premises, including contracting for trash removal services and the placing of all trash and garbage in containers.

(iii)   Cleaning Services.   Tenant shall, at its expense, provide the Premises (including, without limitation, exterior plate glass, exterior doors and framing, exterior walls, exterior signs, the sidewalks immediately adjacent to the Premises and the Patio Area, if any, and the service entrance) with those janitorial, window cleaning, pest and vermin control, repainting and other services required to maintain the Premises in a clean, sanitary, safe, and attractive condition in accordance with the standards of comparable retail establishments, but in any event, not less than the reasonable standards established by Landlord for the Common Areas and other retail tenants.

(b)   Landlord's Obligations.   Except for repairs and replacements to the Premises that Tenant must make under Paragraph 13(a) above and except for repairs and replacement that must be made due to Tenant's negligence (but subject to the waiver of subrogation provisions of Paragraph 21 below), Landlord shall pay for and make all other

repairs and/or replacements to the Premises and the Center (including the Common Areas) so that the Center remains in good order and repair consistent with similarly situated centers containing first class restaurants in the Wichita, Kansas area. Landlord shall, complete such repairs so that the Center repairs and replacements necessary to maintain the Center in a condition comparable to other shopping centers in the metropolitan area where the Premises are located containing first-class restaurants. Such repairs, replacements and maintenance shall include the upkeep of the roof, roof membrane and roof systems (gutters, downspouts and the like), foundation, exterior walls, interior structural walls, and all structural components of the Center. Landlord shall also repair and maintain all parking areas, sidewalks, landscaping and drainage systems within the Center and all utility systems and plumbing systems which serve the Center as a whole and not a particular tenant's premises, and Landlord may allocate the cost of such maintenance equitably among all tenants pursuant to Paragraph 12. Landlord shall not be required to maintain the interior surface of exterior walls, windows, doors or plate glass and store fronts (except where maintenance of the same is caused by Landlord's negligence or failure to perform its obligations under this Paragraph). Landlord shall make all repairs under this Paragraph promptly after Landlord learns of the need for such repairs.

(c)     Surrender.  At the expiration or earlier termination of this Lease, Tenant shall deliver the Premises to Landlord in good repair and condition, loss by fire or other casualty, act of God, ordinary wear and tear, depreciation and obsolescence being excepted.

## 14.     Improvements; Alterations; Signage.

(a)     Initial Improvements.  Tenant, at Tenant's cost, shall install in the Premises such fixtures, finishes and other initial improvements which are consistent with its then-current trade dress as Tenant deems necessary or desirable for the conduct of Tenant's business therein (the "Initial Improvements"). Landlord acknowledges that it is familiar with Tenant's prototypical store front and exterior elevation and will permit Tenant to construct the Initial Improvements in a manner consistent with its prototype. Not later than ten (10) business days after the Landlord and Tenant agree on Landlord's Plans, Tenant shall submit Tenant's final construction drawings ("Tenant's Plans") for the Initial Improvements to Landlord for Landlord's review and approval of (i) the structural elements, and (ii) any changes to the prototypical storefront and/or exterior elevations. Landlord shall have a period of fifteen (15) days (the "Review Period") to review and approve Tenant's Plans, which approval shall not be unreasonably withheld, conditioned or delayed (and shall be deemed given if not specifically withheld on or before the end of the Review Period). If Landlord objects to all or any portion of Tenant's Plans, Landlord shall provide Tenant with a written description of the specific structural or exterior store front or elevation items in Tenant's Plans that are not acceptable and a description of the specific changes that must be made to Tenant's Plans to secure Landlord's approval. Tenant shall either (a) submit modified plans for approval, or (b) terminate this Lease if Landlord's requested revisions are not acceptable to Tenant in its sole discretion. The review and approval process described above shall continue until such time as Landlord has approved Tenant's Plans in writing or until the Lease is terminated.

On the Premises Delivery Date (or on such earlier date as may be agreed to in writing by Landlord), Tenant may enter the Premises upon prior written notice to Landlord for the purpose of completing the construction of the Initial Improvements. During such time, all of the provisions of this Lease shall apply to Tenant (except that Tenant shall not be required to pay Base Rent or other charges due under this Lease, other than charges for all utilities used by Tenant in connection with Tenant's work in the Premises). Further, Tenant agrees to indemnify, defend and hold Landlord harmless from all liability which arises out of Tenant's use, possession and work within the Premises (except to the extent caused by the negligence or willful misconduct of Landlord). As of the date of Tenant's entry onto the Premises for the purpose of constructing the Initial Improvements, Tenant shall deliver to Landlord certificates of insurance evidencing that the coverages required under Paragraph 11 above are in place.

(b)      Subsequent Improvements.  Tenant shall have the unrestricted right to make any interior non-structural alterations, additions or improvements to the Premises deemed necessary or appropriate in connection with the requirements of its business, without the necessity of obtaining the prior written consent of Landlord and without the payment of any additional rent.  Notwithstanding the foregoing, but subject to the following sentence, Tenant shall not make any alterations, improvements, additions or repairs to any part of the Premises which (i) affect the structure, the integrity of the roof, or the mechanical systems of the Premises or the building of which they are a part, or (ii) affect the store front or exterior elevations of the Premises.  No consent of Landlord shall be required for exterior modifications which are in keeping with a national brand re-imaging program affecting at least 50% of Tenant's corporately owned locations either on a national basis or within the Region provided that the same shall comply with all code and legal requirements, and are aesthetically harmonious with the architectural standards for the balance of the Center and are in any event consistent with first class restaurants.

(c)      Signage.  Subject to governmental approval, Landlord agrees that Tenant shall be entitled to erect the maximum amount of its prototype building signage on the exterior of the Premises.  Landlord shall not allow any signage other than Tenant's to be erected on the exterior walls of the Premises.  Tenant shall also have the right to install its two-sided sign panel in the topmost location on each of two multi-tenant monument signs (the Center Signs").  The Center Signs are anticipated to be not less than 25-feet in height.  Tenant shall be afforded fifty percent (50%) of the surface area of each of the Center Signs.  The parties acknowledge that as of the date hereof, only one (1) sign is allowed under local regulations. Tenant shall be responsible for obtaining any required governmental approval of its signage.  The parties hereto shall share equally in the costs of the construction and erection of the monument sign(s). Provided the same are not included in CAM Charges, Tenant agrees to pay Landlord within thirty (30) days after demand, Tenant's proportionate share (using a ratio based on the sign area coverage of Tenant's sign panels on the Center Signs divided by the sign area coverage of all available sign panels on the applicable Center Signs) of all costs associated with the operation, illumination, repair and maintenance of the Center Signs, provided that Landlord shall perform any and all such activities.  In addition, Tenant shall, within thirty

LEASE AGREEMENT – Page 25

(30) days following its receipt of Landlord's invoice for the same, reimburse Landlord for the costs incurred by Landlord for the initial fabrication and installation of the Center Signs.

(d)    Patio Area. Tenant shall have the right to use the Patio Area and such area shall be included within the meaning of the "Premises" as utilized in this Lease for all purposes except for the payment of Base Rent and Tenant's Proportionate Share of Taxes and CAM Charges. It is the intention of the parties hereto that Tenant shall not pay Base Rent, CAM Charges or Taxes in connection with the Patio Area and as such, the floor space within the Patio Area shall not be added to the Floor Area of the Premises for purposes of calculating Base Rent or Tenant's Proportionate Share. Tenant may add, remove or modify features and equipment within the Patio Area, including, without limitation, railings, planters, tables, chairs, televisions, umbrellas, serving stations, and bussing stations in Tenant's reasonable discretion, without the necessity of obtaining Landlord's consent thereto. Tenant may add exterior trellises and or awnings at its expense subject to Landlord's approval, which shall not be unreasonably withheld. Tenant may play music (recorded or live) in the Patio.

(e)    Antennae. Provided there are no regulatory restrictions, Tenant shall have the right to use space on the roof of the Premises for the purpose of installing, operating and maintaining not more than two (2) satellite dishes and/or antennae for the conduct of its business in the Premises. Each such antenna shall be of a size and height approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed. Tenant shall be solely responsible for insuring that any penetrations of the roof as a result of this provision do not result in any leaks or that such leaks are promptly repaired.

(f)    Liens. In the event any mechanic's or other lien shall at any time be filed against the Premises by reason of work, labor, services or materials performed or furnished, or alleged to be performed or furnished, to Tenant or to any one holding the Premises through or under Tenant, Tenant, within thirty (30) days of filing, shall cause the same to be discharged of record or bonded. If Tenant shall fail to cause such lien to be so discharged or bonded after being notified of the filing thereof, then, in addition to any other right or remedy of Landlord, Landlord may cause the same to be bonded, and the amount so paid by Landlord, including reasonable attorney fees incurred by Landlord in either defending against such lien or procuring the bonding of such lien, shall be due and payable by Tenant to Landlord, as Additional Rental, upon demand. Similarly, in the event any mechanic's or other lien shall at any time be filed against the Premises by reason of work, labor, services or materials performed or furnished, or alleged to be performed or furnished, to Landlord or to any one holding the Premises through or under Landlord, and if Tenant determines, in its commercially reasonable business judgment, that the filing of such lien will materially adversely affect the quiet enjoyment of the Premises by Tenant or otherwise legally threatens Tenant's interest in the leasehold, then Landlord, within thirty (30) days of notice from Tenant, shall use its best efforts to cause the same to be discharged of record or bonded.  In connection with Tenant's ability to obtain payment of the Tenant Allowance from Landlord, if Landlord requires a particular lien release form or other affidavit related to payment of contractors, Landlord will

**LEASE AGREEMENT** – **Page 26**

provide the same to Tenant within thirty (30) days after the Effective Date of this Lease, failing which Tenant may use any commercially reasonable form it elects and Landlord may not deny payment of the Tenant Allowance based on Tenant's form of lien waiver and/or contractor's affidavit.

(g)    Construction and Hiring Trailer. In connection with Tenant's completion of the Initial Improvements and its initial opening for business at the Premises, Tenant shall have the right to place a construction and hiring trailer adjacent to the Premises, which trailer shall be removed as of the date on which Tenant opens for business to the public at the Premises.

**15.    Title to Improvements; Removal.** All furniture, trade fixtures and equipment, inventory, personal property and any other improvements owned by Tenant and installed in the Premises (other than HVAC or other building systems), shall remain the property of Tenant and shall be removable by Tenant at any time, including upon the expiration or earlier termination of this Lease. If Tenant removes such equipment, fixtures or personal property during the Term of this Lease, Tenant shall cause the same to be replaced in the ordinary course of business so that the Premises at all times operated as a functional restaurant. In the event Tenant, its subtenants or assigns acquires or leases personal property to be installed and used upon the Premises subject to retained title, conditional sale contract, chattel mortgage or other security agreement or lease, Landlord agrees to execute and deliver to any such secured creditor a waiver of any lien Landlord may have upon such personal property. Such waiver will be on a form provided by Tenant authorizing the secured creditor to enter upon the Premises and remove such personal property in the event of default under the terms of the security agreement or lease.

At the expiration or sooner termination of this Lease, and in addition to the foregoing rights of Tenant to remove its personal property and improvements from the Premises, Tenant may additionally remove from the Premises all items and structural characteristics installed by Tenant that are indicative of Tenant's business and may otherwise "de-identify" the Premises as Tenant reasonably believes necessary or appropriate for the protection of Tenant's interest in Tenant's trademarks, trade names or copyrights. Tenant shall repair any damage to the Premises or the building of which they are a part that may be caused by such removal, including, without limitation, patching or filling holes. In no event shall Tenant be required to remove any restrooms, flooring, ceilings or utility or electrical components located inside the walls or HVAC systems. All other utility systems will, at Landlord's option, be transferred to Landlord's account, the account of any new tenant or assignee Landlord may designate or be capped and returned to a condition compatible with code requirements. Upon removal of Tenant's personal property and the "de-identification" of the Premises, Landlord's use restrictions set forth in Paragraph 7(b) shall automatically terminate.

**16.    Damage by Fire or Other Casualty.**

(a)    Partial Damage. Subject to Tenant's right to discontinue operations at the Premises as set forth in Paragraph 16(c) below, if during the Term there shall be partial damage to the Premises by fire or other casualty, Landlord shall, at its cost, promptly proceed to restore the Premises to the condition in which it was immediately prior to the

occurrence of such damage, including the restoration of all items described on <u>Exhibit C</u> of this Lease.

(b)   <u>Material Damage</u>.   If the Premises or the Center is damaged by fire or other casualty and Landlord cannot, despite diligent, good faith efforts, restore the same to the condition in which it was immediately prior to the occurrence of such damage (including the restoration of all items described on <u>Exhibit C</u> of this Lease) within one hundred eighty (180) days following the date of such casualty, then Tenant may elect to terminate this Lease by delivering thirty (30) days prior written notice to Landlord upon the earlier to occur of: (a) the date on which it becomes apparent that such repairs or restoration cannot be completed within such one hundred eighty (180) day period; or (b) upon the expiration of such one hundred eighty (180) day period, if such repairs or restoration have not been commenced by such date.

(c)   <u>Damage Prior to Final Two Years</u>.   If all or a substantial portion of the Premises (as determined by Tenant in its reasonable business judgment) should be damaged by fire or other casualty at any time before the final two years of the Primary Term or at any time during a Renewal Term, then Tenant may elect, by delivering written notice to Landlord within fifteen (15) days of the casualty event (the "Discontinuance Notice"), to discontinue operations at the Premises; provided, however, if the casualty shall occur during the initial five (5) years of the Primary Term of this Lease, Tenant shall be obligated to rebuild the improvements on the Premises.  Where Tenant elects (or is obligated) to restore, the restoration shall be commenced as soon as reasonably possible following the damage and prosecuted to completion with due diligence and in good faith.  If Tenant elects not to rebuild as permitted herein, then (i) effective as of the date of the casualty, Base Rent payable by Tenant shall be adjusted to the Adjusted Base Rent, and Tenant shall continue to pay Adjusted Base Rent as and when due hereunder, (ii) Tenant shall be deemed to have waived and released any right or option to extend the Term of Lease beyond its then-scheduled expiration date, and (iii) Landlord shall have the right at any time thereafter to terminate the Lease and recapture the Premises by delivering at least thirty (30) days advance written notice of such election to Tenant (the "Termination Notice") and following such termination, Tenant shall reimburse Landlord for the unamortized cost of any Construction Allowance actually paid by Landlord pursuant to this Lease, such costs having been amortized on a straight-line basis over the Term of this Lease (exclusive of any renewal options).  If Tenant fails to deliver the Discontinuance Notice to Landlord as and when required, then Tenant's right to discontinue operations at the Premises shall lapse and Landlord shall commence to restore the Premise as provided in Paragraph 16(a) above.

(d)   <u>Damage During Final Two Years</u>.   If or a substantial portion of the Premises (as determined by Tenant in its reasonable business judgment) shall be damaged by fire or other casualty during the final two (2) years of the Initial Term or at any time during a Renewal Term, either Landlord or Tenant may terminate this Lease by delivering thirty (30) days prior written notice of such election to the other party; provided, however, that if Landlord so notifies Tenant that it wishes to terminate this Lease, then Tenant may, if it has not already done so, exercise its right to extend the term

<u>LEASE AGREEMENT</u> – **Page 28**

of this Lease whereupon Landlord's election to terminate shall be null and void. In the event Tenant elects to so terminate this Lease, insurance proceeds shall be paid as follows: first, to Tenant, the reasonable out-of-pocket third-party costs of razing the improvements in accordance with the requirements of this Lease and applicable law and placing the Premises in a safe and sightly condition; second, with any remaining proceeds: (i) to Landlord, an amount equal to the unamortized cost of any Construction Allowance actually paid by Landlord pursuant to this Lease, such costs having been amortized on a straight-line basis over the Term of this Lease (exclusive of any renewal options), and (ii) to Tenant, the balance of such proceeds. Tenant covenants and agrees that if the insurance proceeds received by Tenant are not adequate to reimburse Landlord for the unamortized cost of any Construction Allowance actually paid by Landlord pursuant to this Lease (as provided in (ii) above), then Tenant shall be responsible to pay any deficiency in such amount to Landlord as a condition to Tenant's right to terminate this Lease as set forth herein.

(e)     Landlord's Termination Right. If the building of which the Premises are a part is substantially damaged and Landlord decides to demolish the building, then Landlord may terminate this Lease if it also terminates the leases of all other tenants within the building or buildings similarly affected by such casualty.

(f)     Abatement of Rent. If the Premises or the Center shall be damaged by fire or other casualty, and if such damage shall materially interfere with Tenant's use of the Premises as contemplated by this Lease, a just proportion of the Base Rent and other charges payable by Tenant hereunder shall abate proportionately for the period ending the earlier of (i) Tenant's reopening for business and (ii) one hundred twenty (120) days after Landlord shall have completed its restoration work and provided further that at Tenant's election, the term of the lease then in effect shall be extended for a period equal to the period of rent abatement.

17.     **Condemnation.**

(a)     Condemnation of the Premises.

(i)     Total Taking. If substantially all of the Premises shall be acquired by the right of condemnation or eminent domain for any public or quasi-public use or purpose, or sold to a condemning authority under threat of condemnation or in lieu thereof (collectively, a "Taking"), then the term shall cease and terminate as of the date of title vesting in such proceeding (or sale), and all Base Rent shall be paid up to that date (such termination to be otherwise in accordance with Paragraph 31[a]). Base Rent and Additional Rent for the last month of Tenant's possession of the Premises shall be prorated and any deposits and amounts paid in advance shall be refunded to Tenant within thirty (30) days of such date.

(ii)     Partial Taking. If only a portion of the Premises shall be acquired by a Taking, and Tenant determines, in its reasonable business judgment, that the remaining portion will still permit Tenant to operate its business on the Premises then this Lease shall remain in full force and effect as to the portion of the

**LEASE AGREEMENT – Page 29**

Premises remaining, provided the Base Rent and all other charges payable hereunder shall be reduced in the same proportion that the area taken bears to the total area of the Premises prior to the Taking. In such event Landlord shall restore the Premises, as soon as reasonably possible, to a complete unit of the same quality and character existing prior to the Taking. Notwithstanding anything contained herein to the contrary, if the restoration of the Premises is not commenced within one hundred twenty (120) days of the date of the Taking, or is not completed within one hundred eighty (180) days of the date of the Taking, then Tenant may terminate this Lease at any time before Landlord completes the restoration. If this Lease is terminated, Landlord shall return any deposits, all prepaid Base Rent and other prepaid sums to Tenant within thirty (30) days of the date of termination of this Lease.

(b)      Condemnation of the Center.

(i)      Termination by Tenant. If there is a Taking of all or any portion of the Center within the Critical Area (as shown on Exhibit A-2 attached hereto) (whether or not the Premises are physically affected) and as a result of such Taking (i) Tenant determines that the Premises will no longer be suitable for the conduct of Tenant's business thereon, or (ii) the number of parking spaces within the Critical Area will  be reduced by more than ten percent (10%), then Tenant may terminate this Lease by delivering written notice of such election to Landlord within ninety (90) days of Tenant's receipt of the notice of the proposed Taking. In such event, this Lease shall cease and terminate as of the date of the Taking, and all Base Rent shall be paid up to that date (such termination to be otherwise in accordance with Paragraph 31[a]). Base Rent and Additional Rent for the last month of Tenant's possession of the Premises shall be prorated and any deposits and amounts paid in advance shall be refunded to Tenant within thirty (30) days of such date.

(ii)      Termination by Landlord. If there is a Taking of all or any portion of the Center (whether or not the Premises are physically affected) and as a result of such Taking Landlord determines in its commercially reasonable business judgment that the Center is rendered unsuitable for use as a retail shopping center, then Landlord may terminate this Lease by delivering written notice of such election to Tenant within ninety (90) days of Landlord's receipt of the notice of the proposed Taking. Notwithstanding the foregoing, Landlord may only exercise its right to terminate under this Paragraph if Landlord terminates the leases of all other similarly situated tenants in the Center. Base Rent and Additional Rent for the last month of Tenant's possession of the Premises shall be prorated and any deposits and amounts paid in advance shall be refunded to Tenant within thirty (30) days of such date of termination.

(iii)      Restoration. In the event of a Taking of all or any part of the Center and if this Lease is not terminated as provided above, then Landlord shall use the condemnation award to restore the Center as soon as reasonably possible

**LEASE AGREEMENT – Page 30**

to a complete unit of the same quality, character and utility for Tenant's purposes existing prior to the condemnation. Notwithstanding anything contained herein to the contrary, if the restoration of the Center is not commenced within one hundred twenty (120) days of the date of the Taking or is not completed within one hundred eighty (180) days of the date of the Taking, then Tenant may terminate this Lease at any time before Landlord completes the restoration. If this Lease is terminated, Landlord shall return any deposits, all prepaid Base Rent and other prepaid sums to Tenant within thirty (30) days of the date of termination of this Lease.

(c)     Temporary Taking.  If, at any time during the Term, Tenant's possessory or occupancy rights in the Premises or the Center (or, any part thereof) shall be taken on a temporary basis for any public or quasi-public use or purpose, and Tenant determines, in its reasonable business judgment, that the remaining portion will not permit Tenant to operate its business in the Premises for the permitted use of the Premises, then (i) Tenant shall not be required to operate its business in the Premises during the period of such temporary Taking and, if Tenant elects not to operate, then (during any such period of inoperation) all Base Rent and other charges payable hereunder shall be abated; and (ii) if such temporary taking continues for a period in excess of one hundred eighty (180) days, then Tenant may terminate this Lease by written notice to Landlord (such termination to be otherwise in accordance with Paragraph 31[a]). Base Rent and any Additional Rent for the last month of Tenant's possession of the Premises shall be prorated and any deposits and amounts paid in advance shall be refunded to Tenant within thirty (30) days of such date of termination.

(d)     Condemnation Notice and Award.   The party who receives the condemnor's notice of intention to pursue a Taking shall immediately give a copy of such notice to the other party.   Landlord shall have and hereby reserves and excepts, and Tenant hereby grants and assigns to Landlord, all rights to recover for damages to the Center, the land on which the Center is located, the Premises, and the leasehold interest hereby created, and the compensation accrued or hereafter to accrue by reason of such taking or damage, as aforesaid. Tenant covenants to deliver such further assignments and assurances thereof as Landlord may from time to time request. Nothing contained herein shall be construed to prevent Tenant from prosecuting in any condemnation proceedings a claim for the value of any of Tenant's trade fixtures installed in the Premises by Tenant at Tenant's expense, the unamortized cost of Tenant's Improvements, relocation expenses, and any other claim or right Tenant may have by law.

## 18.     Liability and Indemnification.

(a)     Indemnification by Tenant.  Tenant agrees to protect, defend, indemnify and save Landlord harmless from and against any and all liability, injuries, liens, claims, damages, expenses, costs, fees, fines, penalties, suits, proceedings, actions and causes of action of any kind and nature (including reasonable attorneys' fees) arising out of (i) injuries occurring within the Premises, including the Patio area being used by Tenant (except as may be caused by Landlord, Landlord's employees, agents, invitees or guests), (ii) injuries occurring within the Common Areas caused by the intentional acts or

<u>**LEASE AGREEMENT**</u> – **Page 31**

negligence of Tenant, its employees, its agents or contractors, (iii) any intentional acts or negligence of Tenant, its employees, agents or contractors, (iv) any breach, violation or non-performance of any covenant, condition or agreement contained in the Lease by Tenant, and (d) the failure of any representation or warranty made by Tenant herein to be true in all material respects when made. This indemnity does not include the intentional or negligent acts or omissions of Landlord or its agents, officers, contractors or employees. This indemnity shall survive termination of this Lease only as to claims arising out of events that occur prior to termination of this Lease.

(b)     Indemnification by Landlord.    Landlord agrees to protect, defend, indemnify and save Tenant harmless from and against any and all liability, injuries, liens, claims, damages, expenses, costs, fees, fines, penalties, suits, proceedings, actions and causes of action of any kind and nature (including reasonable attorneys' fees) arising out of (i) injuries occurring within the Common Areas, except the Patio area being used by Tenant, or any other portion of the Center outside of the Premises (except as may be caused by Tenant, Tenant's employees, agents or contractors), (ii) any intentional acts or negligence of Landlord or Landlord's agents, employees or independent contractors, (iii) any breach, violation or non-performance of any covenant, condition or agreement contained in the Lease by Landlord, and (d) the failure of any representation or warranty made by Landlord herein to be true in all material respects when made. This indemnity does not include the intentional or negligent acts or omissions of Tenant or its agents, officers, contractors or employees. This indemnity shall survive termination of this Lease only as to claims arising out of events that occur prior to termination of this Lease.

(c)     Environmental Indemnification by Landlord.    Notwithstanding any other provision of this Lease, Landlord shall, and hereby does agree to, indemnify, protect, defend, and hold harmless Tenant and its partners, directors, officers, employees, shareholders, agents, contractors, and each of their respective successors and assigns, from and against any and all claims, judgments, damages, penalties, fines, taxes, costs, liabilities (including attorney's fees), losses, and expenses arising at any time after the Effective Date as a result of, or in connection with, the presence of hazardous materials on, under, or about the Premises or the Center which are existing on the Premises as of the Effective Date or otherwise caused by Landlord or Landlord's agents, employees, or contractors and were not set forth in the Phase I. This indemnity shall survive the termination of this Lease.

(d)     Environmental Indemnification by Tenant.    Notwithstanding any other provision of this Lease, Tenant shall, and hereby does agree to, indemnify, protect, defend, and hold harmless Landlord and its partners, directors, officers, employees, shareholders, agents, contractors, and each of their respective successors and assigns, from and against any and all claims, judgments, damages, penalties, fines, taxes, costs, liabilities (including attorney's fees), losses, and expenses arising at any time after the Effective Date as a result of, or in connection with, the presence of hazardous materials on, under, or about the Premises or the Center which are introduced to the Premises by Tenant after the Effective Date or otherwise caused by Tenant or Tenant agents, employees, or contractors. This indemnity shall survive the termination of this Lease.

**LEASE AGREEMENT – Page 32**

19.   **Right of Inspection.**  Landlord and its agents and representatives shall be entitled to enter upon and inspect the Premises at any time in the event of emergency and otherwise during normal business hours upon prior reasonable notice, provided that Landlord shall make reasonable efforts that such inspection not interfere with Tenant's business, and not occur during Tenant's peak business hours.

20.   **Warranty of Title and Quiet Enjoyment.**

(a)   Landlord represents and warrants that it is the owner in fee simple of all of the land comprising the Center and that it alone will have full right to lease the Premises for the term set out herein.  Landlord further represents and warrants that Tenant, on paying the rent and performing its obligations hereunder, shall peaceably and quietly hold and enjoy the Premises for the term of this Lease, including any Renewal Term.

(b)   Landlord represents and warrants that it has not granted nor created and covenants that it will not grant, create or suffer any claim, lien, encumbrance, easement, restriction or other charge or exception to title that will not disturb or interfere with Tenant's use or possession of the Premises without the prior written consent of Tenant; provided, however, that it is expressly agreed that Landlord may subject its interest in the Premises to a first mortgage lien, and Tenant will subordinate its interest in the Premises to such lien, if Landlord's lender shall agree for itself, its successors and assigns (by written instrument in substantially the recordable form attached hereto as Exhibit E or in such other form which is mutually acceptable to the parties thereto): (i) to be bound by the terms of this Lease; (ii) not to disturb Tenant's use or possession of the Premises in the event of a foreclosure of such lien or encumbrance so long as Tenant is not in default hereunder; (iii) not to join Tenant as a party defendant in any foreclosure proceeding relating to Landlord's interest in the Center or any part thereof; and (iv) to permit application of all insurance proceeds to the restoration and repair of the Premises pursuant to Paragraph 16 of this Lease.

(c)   For each lien existing of record on the Effective Date against the Premises, Landlord agrees to deliver to Tenant within thirty (30) days after the Effective Date, a Subordination, Attornment and Non-Disturbance Agreement executed by any such lienholder in a commercially reasonable form acceptable to the parties thereto.  If Landlord shall fail to provide such Subordination, Attornment and Non-Disturbance Agreement within the time period allotted, Tenant shall not be required to accept Landlord's delivery of the Premises nor shall Tenant be required to commence construction or commence the payment of Rent under this Lease.

21.   **Waiver of Subrogation.**  Landlord and Tenant severally waive any and every claim which arises or may arise in its favor and against the other during the term of this Lease for any and all loss of, or damage to, any of its property located within or upon, or constituting a part of, the Premises, the building of which the Premises are a part (as the case may be) and/or the Center, which loss or damage is covered by valid and collectible fire and extended coverage, general liability, liquor liability or worker's compensation insurance policies, to the extent that such loss or damage is recoverable thereunder.  Inasmuch as the above mutual waivers will preclude the assignment of any aforesaid claim by way of subrogation (or otherwise) to an

**LEASE AGREEMENT – Page 33**

insurance company (or any other person), Landlord and Tenant severally agree immediately to give to each insurance company which has issued to it policies of insurance, written notice of the terms of said mutual waivers, and to have said insurance policies properly endorsed, if necessary, to prevent the invalidation of said insurance coverages by reason of said waivers.

22.     **Force Majeure.** The time for performance by Landlord or Tenant of any term, provision or covenant of this Lease shall be deemed extended by time lost due to delays resulting from acts of God, strikes, unavailability of building materials, civil riots, floods, material or labor restrictions by governmental authority, enforcement of governmental regulations or requirements, and any other cause not within the control of Landlord or Tenant, as the case may be; provided, however, lack of financial resources to perform hereunder shall not be deemed an event of force majeure. The party claiming an extension based upon a force majeure event must advise the other party, in writing, of the circumstances supporting such claim within fifteen (15) business days of the event. Failure to timely provide written notice of a "force majeure" delay shall be deemed a waiver of the additional time claim.

23.     **Commissions.** Landlord and Tenant each represent and warrant to the other that other than the Brokers identified in Paragraph 1(o) above, neither party has engaged or employed any real estate broker, agent or other intermediary in connection with this Lease. Landlord hereby covenants and agrees that it shall be solely responsible for the payment of any commissions or fees owed to the Brokers by reason of the creation or procurement of this Lease. Landlord shall and does hereby indemnify, defend and hold Tenant harmless from and against any and all claims, demands, actions, and judgments of any and all broker's, agents, and other intermediaries alleging a commission, fee or other payment to be owing by reason of Landlord's dealings, negotiations or communications in connection with this Lease or the demise of the Premises, including any claims by the Brokers. Tenant shall and does hereby indemnify, defend and hold Landlord harmless from and against any claims, defenses, actions and judgments of any brokers, agents, and intermediaries alleging a commission, fee or other payment to be owing by reason of Tenant's dealings, negotiations, or communications in connection with this Lease or the demise of the Premises; provided, however, the foregoing indemnity shall not extend to any claims by the Brokers which shall be the responsibility of Landlord as set forth herein. This Paragraph 23 shall survive the termination or expiration of this Lease.

24.     **Landlord-Tenant Relationship.** It is further understood and agreed that Landlord shall in no event be construed or held to be a partner, joint venturer or associate of Tenant in the conduct of Tenant's business, nor shall Landlord be liable for any debts incurred by Tenant in Tenant's business; but it is understood and agreed that the relationship is and at all times shall remain that of landlord and tenant.

25.     **Assignment and Subletting.**

(a)     Tenant shall not assign this Lease or sublet the whole or any part of the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed, provided (i) no Tenant Event of Default (hereinafter defined) has occurred and is continuing at the time of the request for consent to the assignment or sublease, (ii) the use to be made of the Premises is permitted by Paragraph 7 above and is in any event a first class use, (iii) the assignee or subtenant has

<u>**LEASE AGREEMENT**</u> – **Page 34**

not less than three (3) years prior operations experience in the retail or restaurant business and shall assume in writing the performance of all of the terms, provisions and covenants of this Lease on the part of Tenant to be kept and performed, (iv) the use will not result in modifications or alterations to the Premises which would materially detract from the residual value of the Premises or would otherwise be of less than comparable aesthetic quality of Tenant's finish out within the Premises, and (v) Tenant shall deliver to Landlord within fifteen (15) days (or as soon thereafter as is reasonably practicable) after the assignment or subletting an executed duplicate of such agreement, together with a duly executed assumption agreement. In lieu of granting consent to a proposed assignment or sublease, Landlord may elect, by delivering written notice of such election to Tenant within thirty (30) days of Tenant's request for such consent, to terminate this Lease. If Landlord shall elect to terminate this Lease, such termination shall become effective as of the date that is thirty (30) days after Tenant's receipt of such notice.

(b) Notwithstanding anything herein to the contrary, Tenant, without Landlord's prior written consent but otherwise subject to the conditions set forth in the preceding sentence, (i) may assign this Lease or sublet the whole of the Premises to a legal entity which (x) is the successor, by merger or otherwise, to all or substantially all of Tenant's assets and liabilities, (y) controls or is controlled by or is under common control with Tenant, directly or indirectly, or (z) is a franchisee of an entity that controls, is controlled by or is under common control with Tenant, directly or indirectly, , and (ii) may sublet a portion of the Premises to a legal entity under the control of Tenant solely for the purpose of such entity obtaining a liquor license for the Premises. Any such assignment or subletting shall be otherwise subject to and upon all of the terms, provisions and covenants of this Lease. Landlord agrees to enter into a non-disturbance agreement and give an estoppel letter to any assignee or subtenant to which Landlord consents or for which Landlord's consent is not required, upon written request for such assignee or subtenant, the form of which shall be commercially reasonable and acceptable to both Landlord and such assignee or subtenant.

(c) No assignment or subletting or collection of rent from the assignee or subtenant shall be deemed to constitute a novation or in any way release Tenant from further performance of its obligations under this Lease, and Tenant shall continue to be liable under this Lease for the balance of the Primary Term and any Renewal Term with the same force and effect as if no such assignment had been made; provided, however, and subject at all times to Landlord's right of termination as set forth in this Paragraph 25 above, that Landlord shall be deemed to have released Tenant from all obligations under this Lease if Tenant's assignee (or its parent entity if it is a co-signee or guarantor) (i) has a tangible net worth as of the date of the assignment greater than or equal to 110% of Tenant's then tangible net worth, but in no event less than TWENTY MILLION AND NO/100 DOLLARS ($20,000,000), and (ii) has had an operating profit in excess of ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) in each of its two prior fiscal years, all as evidenced by an audited financial statement of such assignee (or its parent entity). It is agreed that the audited financial statement evidencing net worth shall be the year-end financial statement from the year immediately prior to the year in which the assignment occurs.

**LEASE AGREEMENT – Page 35**

(d)    Tenant shall have the right to mortgage and pledge this Lease to any institutional lender or financial entity (provided such mortgage and pledge specifically provides that it is subordinate to the fee simple interest of Landlord or any security interest of any senior lender to the Landlord encumbering the Center and the Premises), and Landlord agrees to enter into a non-disturbance agreement in a commercially reasonable form acceptable to both Landlord and the lender. Nothing contained herein shall be construed as a subordination, waiver or relinquishment by Landlord of Landlord's interest in and to the Premises.

(e)    The provisions of this Paragraph 25 shall not apply in the event Tenant offers its shares to the public pursuant to a registered securities offering or for the transfer of stock on a public stock exchange, and such transfers shall not be deemed to be an assignment and no consent of Landlord shall be required.

**26.    Memorandum of Lease; Commencement and Termination Agreement.** A short-form memorandum of this Lease, in the form attached hereto as Exhibit F, shall be executed by Landlord and Tenant contemporaneously with the execution of this Lease and shall be filed of record. Landlord and Tenant agree that promptly after the Rent Commencement Date of this Lease, a Commencement and Termination Agreement, substantially in the form attached hereto as Exhibit G, shall be executed by each party in order to establish the Rent Commencement Date and the date of termination of the Primary Term of this Lease.

**27.    Notices and Payments.** Any notice, document or payment required or permitted to be delivered or remitted hereunder or by law shall be deemed to be delivered or remitted, whether actually received or not, (a) when delivered in person, (b) two (2) business days after such item is deposited in the United States mail, postage prepaid, certified or registered, return receipt requested (except for any payment of rent or other monetary amounts required to be paid by Tenant pursuant to the terms of this Lease which shall be deemed to be remitted, whether actually received or not, two (2) business days after such item is deposited in the United States mail, first class postage prepaid), or (c) one (1) business day after such item is deposited for overnight delivery or two (2) business days after such item is deposited for second day delivery with Federal Express or other generally recognized overnight courier, shipping charges prepaid, addressed to the appropriate party hereto at its address set forth in Paragraph 1(n) above, or at such other address as it shall have theretofore specified by written notice delivered in accordance herewith.

If and when included within the term "Landlord" there is more than one person or legal entity, all shall jointly arrange among themselves for one among their numbers to receive at one specified address all such notices and payments; all parties included within the term "Landlord" shall be bound by notices delivered by Tenant in accordance with the provisions of this Paragraph 27 as if each had received such notice. Nothing herein shall negate the obligation of Tenant to provide a copy of any notice to the party specified in Paragraph 1 above.

28.   **Default.**

(a)   Each of the following events shall be a "Tenant Event of Default" under this Lease:

(i)   Tenant shall fail to pay any installment of Rent hereby reserved as and when the same shall become due and shall not cure such default within ten (10) days after written notice thereof is given by Landlord to Tenant;

(ii)   Tenant shall fail to comply with any term, provision or covenant of this Lease, other than the payment of Rent, and shall not cure such failure within thirty (30) days after written notice thereof is given by Landlord to Tenant (provided that if such default cannot reasonably be cured within thirty (30) days, then Tenant shall have an additional reasonable period of time within which to cure such default);

(iii)   Tenant shall be adjudged insolvent, make a transfer in fraud of creditors or make an assignment for the benefit of creditors;

(iv)   Tenant shall file a petition under any section or chapter of the Bankruptcy Reform Act of 1978, as amended, or under any similar law or statute of the United States or any state thereof, or Tenant shall be adjudged bankrupt or insolvent in proceedings filed against Tenant thereunder; or

(v)   A receiver or trustee shall be appointed for all or substantially all of the assets of Tenant and Tenant shall not have had such appointment discharged within thirty (30) days after Tenant receives written notice of such appointment.

(b)   Upon the occurrence of any Tenant Event of Default, Landlord shall have the option to pursue any one or more of the following remedies without any further notice or demand whatsoever:

(i)   Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails so to do, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises, or any part thereof, by force if necessary, without being liable to prosecution or for any claim for damages; and Tenant agrees to pay to Landlord on demand the amount of all loss and damage which Landlord may suffer by reason of such termination, whether through inability to relet the Premises on satisfactory terms or otherwise;

(ii)   Enter upon and take possession of the Premises and expel or remove Tenant and other persons who may be occupying the Premises, or any part thereof, by force if necessary, without being liable to prosecution or for any claim for damages, and relet the Premises, as Tenant's agent, and receive the rent

LEASE AGREEMENT – Page 37

therefor; and Tenant agrees to pay Landlord on demand any deficiency that may arise by reason of such reletting; or

(iii) Enter upon the Premises, without being liable to prosecution or for any claim for damages, and do whatever Tenant is obligated to do under the terms of this Lease; and Tenant agrees to reimburse Landlord on demand for any reasonable and necessary expenses which Landlord may incur in thus effecting compliance with Tenant's obligations hereunder.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any rent due to Landlord hereunder or of any damage accruing to Landlord by reason of the violation of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon the occurrence of a Tenant Event of Default shall not be deemed or construed to constitute a waiver of such default.

(c) It shall be a "Landlord Event of Default" under this Lease if Landlord shall fail or refuse to comply with any term, provision, or covenant of this Lease and does not cure the failure or refusal within thirty (30) days after written notice thereof is given by Tenant to Landlord (provided that if such default cannot reasonably be cured within thirty (30) days, then Landlord shall have an additional reasonable period of time within which to cure such default).

(d) Upon the occurrence of any Landlord Event of Default, Tenant shall have the option to cure the Landlord Event of Default and in connection therewith pay or incur reasonable expenses. Notwithstanding the foregoing, Tenant shall not have such right to cure a Landlord Event of Default set forth in Paragraph 28(c)(ii) in the event Landlord or its mortgagee takes action to cure such default within the cure period therein provided, but is unable, by reason of the nature of the work involved, to cure the same within such period, provided Landlord or its mortgagee (whoever commences such work) continues such work thereafter diligently and without unnecessary delays. All sums so expended or obligations incurred by Tenant in connection with the foregoing, plus interest thereon at the Default Rate from the date such expenses are incurred until repayment, shall be paid by Landlord to Tenant upon demand.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law or in equity.

29. **Omitted.**

30. **Reasonable Cooperation.** During the term of this Lease, Landlord agrees to reasonably cooperate in a timely manner with Tenant in connection with the obtaining and renewal of all licenses and permits which Tenant may need to operate its intended business on the Premises. Such cooperation may include the disclosure of information regarding Landlord and its business principals. Tenant agrees to hold any such information confidential and to use the same only for the purposes of obtaining or renewing the license or permit for which such

LEASE AGREEMENT – Page 38

information is required.  All costs associated with the obtaining or renewal of licenses and permits shall be borne by Tenant.

### 31. **Miscellaneous.**

(a)   In the event this Lease is terminated pursuant to a right to do so herein contained, neither Landlord nor Tenant hereto shall thereafter have any further obligation or liability one to the other, other than those obligations which either expressly survive termination of this Lease or have accrued prior to termination, and this Lease shall be of no further force or effect.

(b)   The captions used in this Lease are for convenience only and shall not be deemed to amplify, modify or limit the provisions hereof.

(c)   Words of any gender used in this Lease shall be construed to include any other gender, and words in the singular shall include the plural and vice versa, unless the context otherwise requires.

(d)   This Lease shall be binding upon and shall inure to the benefit of Landlord and Tenant and their respective heirs, legal representatives, successors and assigns.

(e)   The Exhibits annexed to this Lease are hereby incorporated by reference in their entirety with the same force and effect as if they were set forth in this Lease in their entirety.  This Lease contains the entire agreement of Landlord and Tenant with respect to the subject matter hereof and can be altered, amended or modified only by written instrument executed by both of such parties.

(f)   It is expressly agreed by Landlord and Tenant that time is of the essence with respect to this Lease.  In the event the date for performance of an obligation or delivery of any notice hereunder falls on a day other than a business day, then the date for such performance or delivery of such notice shall be postponed until the next ensuing business day.  Any references to "business days" contained herein are references to normal working business days (i.e., Monday through Friday of each calendar week, exclusive of Federal holidays).

(g)   If any term or provision, or any portion thereof, of this Lease, or application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

(h)   This Lease may be signed in counterparts with the same force and effect as if all required signatures were contained in a single, original instrument.

(i)   In the event of litigation between the parties to enforce this Lease, the prevailing party in any such action shall be entitled to recover reasonable costs and

expenses of suit, including, without limitation, court costs, attorneys' fees, and discovery costs.

(j)     This Lease shall be construed, interpreted, and enforced pursuant to the applicable laws of the State of Kansas.

(k)     If either Landlord or Tenant is a business entity each individual executing this Lease on behalf of the business entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of the business entity, and that this Lease is binding upon the business entity.  If either Landlord or Tenant is a business entity, the persons executing this Lease on behalf of Landlord or Tenant hereby covenant and warrant that (a) Landlord or Tenant, as applicable, is a duly qualified business entity and all steps have been taken prior to the Effective Date to qualify Landlord or Tenant to do business in the State in which the Premises are located.

(l)     Should Landlord sell, exchange or assign this Lease (other than a conditional assignment as security for a loan), then Landlord, as transferor, shall be relieved of any and all obligations on the part of Landlord accruing under this Lease from and after the date of such transfer, provided that Landlord's successor in interest shall assume in writing the performance of all of the terms, provisions and covenants of this Lease on the part of Landlord to be kept and performed from and after such date.  Written notice of any such transfer, together with a duly executed assumption agreement, shall be given to Tenant.  Notwithstanding the foregoing to the contrary, Landlord shall not be entitled to effectuate any such transfer prior to the time that it completes the Landlord's Work as set forth in Paragraph 3(c) above.

(m)     Each party agrees, at any time and from time to time, on or prior to the thirtieth (30th) day following a written request by the other party, to execute and deliver to the other a statement certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), certifying the Rent Commencement Date and the expiration date of the Lease term and the dates to which the Base Rent and other charges have been paid in advance, if any, stating whether or not, to the best knowledge of the signer, the other party is in default in performance of any of its obligations under this Lease, and, if so, specifying each such default of which the signer shall have knowledge and stating whether or not, to the best knowledge of the signer, any event has occurred which with the giving of notice or passage of time, or both, would constitute such a default, and, if so, specifying each such event, it being intended that any such statement delivered pursuant hereto shall be deemed a representation and warranty to be relied upon by the party requesting the certificate and by others with whom such party may be dealing, regardless of independent investigation.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

LEASE AGREEMENT – Page 40

IN WITNESS WHEREOF, the parties hereto have executed this Lease to be effective as of the Effective Date.

LANDLORD:

**Freddy's Land, LLC,**
a Kansas limited liability company

By: _____

Name: ~~Randy Simon~~ Scott Redler

Its:    Member

Date: 7/18/14

TENANT:

**FOOD CONCEPTS INTERNATIONAL, L.P.,**
a Texas limited partnership

By:    Food Concepts GPH, L. L. C.,
       a Delaware limited liability company
       its General Partner

By: _____
       Robert Lin, Executive Vice President

Date: 7/16/14

**LEASE AGREEMENT** – **Page 41**



EXHIBIT A
CENTER SITE PLAN

THE CENTER



EXHIBIT A-1

PERMITTED RESTAURANT AREA

▨ - Permitted Restaurant Area



EXHIBIT A-2
CRITICAL AREA

▨ CRITICAL AREA

SITE LAYOUT PLAN
Scale 1" = 30'-0"

# EXHIBIT B

## PREMISES

Trash/Dumpster

Front Facade

SITE LAYOUT PLAN
Scale 1"= 30'-0"

WESTERLEA VILLAGE

WESTERLEA VILLAGE

MID CONTINENT ROAD

⊠ - Patio Area



EXHIBIT B1
REQUIRED COMMON AREA

REQUIRED
COMMON AREA



EXHIBIT B-2
NO BUILD AREA

☒ NO BUILD AREA

## EXHIBIT C

## CONSTRUCTION WORK LETTER

### *[Abuelo's, Wichita, Kansas]*

This Work Letter shall be attached as <u>Exhibit C</u> to the Lease between Landlord and Tenant. It allocates the responsibilities of Landlord and Tenant with respect to the development of the Premises and any parking areas and related improvements required in connection with the development of the Premises (whether on or off site).

**I.    SCOPE OF WORK**

**A.  <u>Landlord's Work</u>.** "Landlord's Work" means the work to be performed by Landlord: (i) with respect to Tenant's building, (ii) with respect to the delivery utilities to Tenant's building, and (iii) with respect to the construction of required parking areas, access drives, landscaping, irrigation and other improvements within the Common Areas located within the Center, all as specified below.

1. ***Tenant's Building:*** On or before the Delivery Date, Landlord will prepare Tenant's building as a "cold, dark shell" in accordance with the requirements set forth on <u>Attachment 1</u> to this Work Letter and in accordance with the Landlord's Plans (as defined in Paragraph 3(b) of the Lease).

2. ***Permanent Utilities:*** On or before the Delivery Date, Landlord will deliver the utilities described in <u>Attachment 1</u> to this Work Letter to the point delineated in the Landlord's Plans.

3. ***Required Common Area:*** On or before the Delivery Date, Landlord shall complete the parking area, curb cuts, access drives, traffic islands, curbing, gutters, striping, landscaping, irrigation systems, detention or retention systems, sidewalks, and lighting all up to the perimeter of Tenant's building footprint, all in accordance with the Landlord's Plans in the areas identified on the Site Plan attached as <u>Attachment 2</u> (collectively, the "Required Common Area"). Landlord's scope of work includes all grading and compaction associated with the Required Common Area work. Landlord acknowledges that the Employee Parking Area as shown on <u>Exhibit D</u> of the Lease is not included within the Required Common Area. As such, if the Employee Parking Area is not installed on or before the Delivery Date, Tenant's employees may park within any portion of the Required Common Area (but not in the Customer Parking Area as labeled on <u>Exhibit D</u>) until the Employee Parking Area is completed by Landlord.

**B.  <u>Tenant's Work</u>.** Tenant shall begin construction of Tenant's building and related improvements ("Tenant's Work") within 5 business days after all of the following events have occurred:  (i) Landlord approves Tenant's Plans, (ii) the Inspection Period has expired (without termination of the Lease by Tenant), (iii) Landlord completes

<u>EXHIBIT C – Work Letter</u> **– Page 1**

Landlord's Work, (iv) Tenant receives all required approvals from private third parties (if applicable), and (v) the applicable governmental authorities actually issue a building permit to Tenant.

C. **Selection of Architect and General Contractor**. Selection of an architect and general contractor, as well as all other persons to be employed in connection therewith, shall be at the sole discretion of Tenant. Any architect shall be a member in good standing of the American Institute of Architects or of another organization having comparable accreditation. In lieu of the foregoing, the architect may be an employee of Tenant or an affiliate of Tenant. The general contractor's financial condition and responsibility shall be such as to enable Landlord to obtain a performance bond, if desired. However, it is expressly understood and agreed that Tenant, or any affiliate of Tenant, may act as general contractor for purposes of constructing the Improvements, regardless of the foregoing requirements.

## II. GENERAL

A.   **Cost of Work**. Unless a reimbursement or contribution is specified either in this Work Letter or in the Lease, all items in this Work Letter which are Landlord's Work are to be performed by Landlord at Landlord's sole cost, and all items in this Work Letter which are Tenant's Work are to be performed by Tenant at Tenant's sole cost.

B.   **Impact Fees**. Except for the Connection Costs (as defined in Paragraph 9 of the Lease) Landlord shall pay impact fees associated with Landlord's Work. Tenant shall pay impact fees associated with Tenant's building permit and Tenant's Work.

C.   **Compliance with Laws**. All work to be performed by either Landlord or Tenant shall comply with all applicable Federal and State laws, municipal codes, building, fire, health and sanitary codes and regulations and any other applicable codes, rules, or regulations.

D.   **Applications**. Each of Landlord and Tenant shall apply to the appropriate governmental authorities for all permits and approvals necessary for its work. All applications shall be made in a timely manner so that the necessary permits and approvals may be obtained by a date that will allow all required work to be performed and completed prior to the deadlines in this Work Letter.

E.   **Third Party Approvals**. If any approvals are required under a public or private document governing the development, construction, use and/or operations at the retail center, or any waivers or amendments of such a document are necessary for the construction and operation of the Improvements as a restaurant with related bar, Landlord shall be responsible to obtain them. Landlord shall hold Tenant harmless from Landlord's failure to obtain required third party approvals of Tenant's Improvements and intended business operation.

EXHIBIT C – Work Letter – Page 2

F. **Permissions**. Tenant may hang "NOW HIRING" banners during its construction and "NOW OPEN" banners for a reasonable period of time following opening for business. Tenant may post notices as necessary for obtaining permits required to operate its business.

**EXHIBIT C – Work Letter – Page 3**

## Attachment 1

## Scope of Work

Landlord will provide a building encompassing approximately 7,722 square feet, such building to constitute a cold shell. The Landlord will provide the following:

1. A one (1) foot concrete ribbon around perimeter of building
2. Footings and slab for an outdoor cooler and freezer
3. Wood framing of exterior walls along with two (2) coats of STO Gold roll-on waterproofing
4. Roof*
5. Exterior doors and windows
6. One (1) pass-thru window
7. Sidewalks around the building
8. Paved parking lot and lights
9. Trash enclosure
10. Concrete perimeter fence to east of property
11. Sanitary sewer to point of connection as shown on building plans
12. 1,500 gallon grease trap or as required to meet governmental requirements
13. Two (2) inch water line and meter stubbed up as shown on building plans
14. 800 Amp electrical service delivered to point of connection
15. Two (2) inch 5,000 CFH gas line to building
16. Three (3) communication conduits three (3) inches in diameter
17. Fire line turned up inside building
18. Connection to storm sewer

The following will NOT be provided by Landlord and must be provided by Tenant:

1. Architectural and engineering fees for Tenant's scope of work
2. Skylights*
3. Fence and Pergola
4. Patio Slab**
5. Interior vestibule framing and doors
6. Insulation of exterior walls
7. Sheetrock on exterior walls
8. Interior finishes
9. Fire sprinkler system
10. Under slab interior plumbing
11. Exterior façade work
12. Landscaping immediately adjacent to building in areas which are not located in common area

\*      Tenant may elect to have Landlord's general contractor perform all work needed on roof, including installation of skylights so that roof warranty will not be invalidated. All

**EXHIBIT C – Work Letter – Page 4**

expenses for this work can be deducted from the Tenant Allowance to be provided by Landlord to Tenant.

**       Tenant may elect to have Landlord's general contractor install. All expenses for this work can be deducted from the Tenant Allowance to be provided by Landlord to Tenant.

EXHIBIT C – Work Letter – Page 5

# ATTACHMENT 2 -
## REQUIRED COMMON AREA

SITE LAYOUT PLAN
Scale 1" = 30'-0"

▨ – Required Common Area



EXHIBIT D

EMPLOYEE PARKING AREA

## EXHIBIT E

Prepared by:   Kim Goff, Esq.


RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

KG Law, PLLC
601 Rustic Ridge Court
Southlake, Texas 76092

SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS   SUBORDINATION,   NON-DISTURBANCE   AND   ATTORNMENT AGREEMENT (the "Agreement") is made as of this _____ day of _____, 2014, by and between INTRUST Bank, N.A., a national banking association, with its principal place of business at 105 N. Main, Wichita, Kansas 67202 ("Lender"); FOOD CONCEPTS INTERNATIONAL, LP, a Texas limited partnership with its principal place of business at 2575 S. Loop 289, Lubbock, Texas 79464 ("Tenant"); and FREDDY'S LAND, LLC, a Kansas limited liability company, with its principal place of business at 260 N. rock Road, suite 200, Wichita, Kansas, 67207 ("Landlord").

## RECITALS

A. Landlord is the owner of those certain premises commonly known as Ridge 400, as more particularly described in Exhibit A attached hereto (together with the improvements located thereon, the "Property");

B. Under the terms of a certain Lease (the "Lease") dated _____, Landlord leased to Tenant all or a portion of the Property, as more particularly described in the Lease;

C. Lender has made a loan to Landlord secured by a Mortgage encumbering the Property, which includes an assignment of Landlord's interest in the Lease (the "Mortgage").

D. The Mortgage constitutes a lien upon the Property;

E. Tenant desires to be assured of Tenant's rights under the terms of its Lease and is willing to enter into this Agreement to induce Lender to recognize Tenant's rights under

EXHIBIT E – Subordination, Attornment and Non-Disturbance Agreement – Page 1

the Lease; and

F.   .Lender is willing to enter into this Agreement on the terms and conditions hereinafter provided.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender, Tenant and Landlord hereby agree as follows:

1.   The Lease is and shall be subject and subordinate in all respects to the Mortgage and to all the terms, conditions and provisions thereof and to all advances made or to be made thereunder and all amounts secured thereby and to any amendment, renewal, modification, replacement or extension hereafter made.

2.   In the event of the foreclosure of the Mortgage or a sale of the Property under a power of sale in the Mortgage, or the acquisition of a deed to the Property in lieu of foreclosure by Lender prior to the expiration of the Lease, including any extensions and renewals of the Lease, and subject to the observance and performance by Tenant of all of the monetary obligations thereunder, and all material terms, covenants and conditions of the Lease on its part to be observed and performed, Lender does hereby agree as follows:

(a)   Tenant's occupancy of the Premises shall not be disturbed by Lender;

(b)   The Lease shall continue in full force and effect and Lender shall not interfere with Tenant's rights and privileges thereunder and will thereby establish direct privity of estate and contract as between Lender and Tenant with the same force and effect and relative priority in time and right as though the Lease were originally made directly from Lender to Tenant (but subject to the provisions of this Agreement); and

(c)   Lender shall not join Tenant as a party defendant in any action for the purpose of terminating Tenant's interest under the Lease due to any default by Landlord or its successors under the Mortgage;

provided, however, Lender shall have no further obligations to Tenant under the Lease or otherwise from and after such time as Lender ceases to be the owner of the Property; and provided further, Lender shall not in any way or to any extent be liable to Tenant:

(i)   For any past act or omission to act or default on the part of the original or any prior landlord under the Lease and Tenant shall have no right to assert any damages arising therefrom against Lender except for damages, offsets, defenses, claims or counterclaims expressly provided for under the Lease; and provided, however, that such absence of liability or unavailability of claims for damages, offsets, defenses, claims or counterclaims shall not be deemed to permit the repetition or continuation of any such act or omission (or the continuation of a condition from a past act or omission) not otherwise permitted under the Lease; and

**EXHIBIT E – Subordination, Attornment and Non-Disturbance Agreement – Page 2**

(ii)    For any prepayment of rent or deposit, rental security or any other sums deposited with the original or any prior landlord (unless paid pursuant to the express terms of the Lease), and not delivered to Lender.

3.    Provided that the conditions and agreements set forth herein, including non-disturbance, are complied with, in the event of the foreclosure of the Mortgage or a judicial sale of the Property, or the acquisition of a deed to the Property in lieu of foreclosure by Lender prior to the expiration date of the Lease, including any extensions and renewals of the Lease, Tenant hereby covenants and agrees to make full and complete attornment to Lender for the balance of the term of the Lease, including any extensions and renewals thereof (to the extent elected by Tenant from time to time), upon the same terms, covenants and conditions as therein provided, so as to establish direct privity of estate and contract as between Lender and Tenant with the same force and effect and relative priority in time and right as though the Lease were originally made directly from Lender to Tenant (but subject to the provisions of this Agreement), and Tenant will thereafter make all rent payments directly to Lender. Notwithstanding the foregoing, Tenant shall be under no obligation to pay rent to Lender until Tenant receives written notice from Lender that it has succeeded to the interest of Landlord under the Lease. Landlord hereby irrevocably authorizes and directs Tenant to make all rent payments directly to Lender upon receipt of such notice from Lender.

4.    It is understood and agreed that until Lender shall become the owner of the Property, Lender shall not have any responsibility as owner of the Property or as landlord under the Lease. Tenant hereby acknowledges and agrees that in the event Lender or its affiliate, successor, designee or assignee shall become the owner of the Property, that any liability or obligation of the landlord under the Lease shall be limited to the landlord's interest in the Property and no recourse shall be had to any other assets of Lender or its affiliate, successor, designee or assignee. Subject to the foregoing limitation as to landlord's interest in the Property, during such time as Lender or its affiliate, successor, designee or assignee shall be the owner of the Property, Tenant may exercise any right or remedy provided in the Lease or by law in the event of any failure to perform any obligation of the landlord under the Lease.

5.    Tenant agrees to use its reasonable efforts to send a copy of any notice or statement under the Lease to Lender (at Lender's address as given herein or the last address of Lender furnished to Tenant in writing as described in paragraph 6) at the same time as such notice or statement is sent to the Landlord under the Lease, whenever any such notice or statement alleges a default by, or failure on the part of, the Landlord to perform its duties under the Lease. Notwithstanding anything contained herein to the contrary, failure to send such notice shall not impair the validity of Tenant's notice to Landlord.

6.    Tenant hereby agrees that, from and after the date hereof, in the event of any act or omission by the Landlord under the Lease which would give Tenant the right, either immediately or after the lapse of a period of time, to terminate the Lease, or to claim a partial or total eviction, Tenant will not exercise any such right (a) until it has given written notice of such act or omission, by registered or certified mail, return receipt requested, addressed to Lender, at Lender's address as given herein or at the last address of Lender furnished to Tenant in writing (by registered or certified mail addressed to Tenant at Tenant's address as given herein or the last

__EXHIBIT E – Subordination, Attornment and Non-Disturbance Agreement__ – **Page 3**

address of Tenant furnished to Lender by written notice in the manner above specified), and (b) if the default by Landlord is of a nature which can be cured by Lender, and if Lender is proceeding with diligence to cure such default, until expiration of Landlord's time period for cure under the Lease after the receipt of written notice from Tenant (provided that Tenant has not been materially deprived of the effective use and occupancy of the Premises for the normal operation of Tenant's business). Lender is under no obligation to cure Landlord's default; provided, that if Lender elects to do so, Landlord agrees to hold harmless and indemnify Lender for all claims, losses, expenses, and liabilities of any nature arising out of any such cure (including, without limitation, reasonable attorneys' fees and legal expenses).

7. The terms, covenants and conditions hereof shall inure to the benefit of and be binding upon the respective parties hereto, and their respective successors and assigns. For the purposes hereof, any purchaser at a sale foreclosing the Mortgage or at a sale conducted under a power of sale in the Mortgage or otherwise acquiring the Property (for the purposes hereof, acquisition of title to the Property by deed in lieu of foreclosure, shall be deemed a purchase at a sale) shall be deemed a successor to Lender.

8. Landlord under the Lease and Grantor under the Mortgage hereby agree for themselves and their successors and assigns, that (i) the foregoing Agreement does not (a) constitute a waiver by Lender of any of its rights against the Grantor under the Mortgage or any other loan document and/or (b) in any way release the Grantor from its obligation to comply with the terms, provisions, conditions, covenants, agreements and clauses of the Mortgage and the other loan documents, (ii) the provisions of the Mortgage and the other loan documents remain in full force and effect and must be complied with by the Grantor, (iii) upon receipt from Lender of notice that Grantor has defaulted under the Mortgage and has failed to cure the default within any applicable grace period set forth in the Mortgage, Tenant may pay the rent and all other sums due under the Lease to Lender, and (iv) Grantor has requested Tenant to execute and deliver the foregoing Agreement.

**EXHIBIT E – Subordination, Attornment and Non-Disturbance Agreement – Page 4**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed and delivered in their respective names and behalf, by its officers duly authorized, the date and year first written above.

.

LENDER:
INTRUST Bank, N.A.

By:_____
Name:_____
Title:_____


TENANT:

FOOD CONCEPTS INTERNATIONAL, L.P.,
a Texas limited partnership


By:    Food Concepts GPH, L. L. C.,
       a Delaware limited liability company
       its General Partner


       By: _____
            Robert Lin, Executive Vice President

       Date:_____


LANDLORD:

FREDDY'S LAND, LLC


By:_____
Name:_____
Title:_____


Date:_____


EXHIBIT E – Subordination, Attornment and Non-Disturbance Agreement – Page 5

LENDER'S NOTARY

STATE OF _____ )
                       ) SS
COUNTY OF_____ )

       I, the undersigned, a Notary Public in and for said County, in the State aforesaid, do hereby certify that _____, _____ of _____ _____, a(n)_____ _____, personally known to me to be the same persons whose name is subscribed to the foregoing instrument as such _____ appeared before me this day in person and acknowledged that (s)he signed and delivered the said instrument as their own free and voluntary act, and as the free and voluntary act of said corporation/association, for the uses and purposes therein set forth.

       Given under my hand and notarial seal this ____ day of _____, 2014.

                              _____
                              Notary Public

                              My Commission Expires:_____

TENANT'S NOTARY

STATE OF _____ )
                      ) SS
COUNTY OF _____ )


I, the undersigned, a Notary Public in and for said County, in the State aforesaid, do hereby certify that _____, _____ of _____ _____, a(n)_____ _____, personally known to me to be the same person whose name is subscribed to the foregoing instrument as such _____ appeared before me this day in person and acknowledged that (s)he signed and delivered the said instrument as their own free and voluntary act, and as the free and voluntary act of said corporation/association, for the uses and purposes therein set forth.


Given under my hand and notarial seal this ____ day of _____, 2014.


_____
Notary Public

My Commission Expires:_____

EXHIBIT E – Subordination, Attornment and Non-Disturbance Agreement – Page 7

LANDLORD'S NOTARY

STATE OF _____)
                          ) SS
COUNTY OF _____)

       I, the undersigned, a Notary Public in and for said County, in the State aforesaid, do hereby certify that _____, _____ of _____ _____, a(n)_____ _____, personally known to me to be the same person whose name is subscribed to the foregoing instrument as such _____ appeared before me this day in person and acknowledged that (s)he signed and delivered the said instrument as their own free and voluntary act, and as the free and voluntary act of said corporation/association, for the uses and purposes therein set forth.

       Given under my hand and notarial seal this ____ day of _____, 2014.

                     _____
                     Notary Public

                     My Commission Expires:_____

## EXHIBIT F

Prepared by:   Kim Goff, Esq.

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

KG Law, PLLC
601 Rustic Ridge Court
Southlake, Texas 76092

_____

SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

## MEMORANDUM OF LEASE

**STATE OF** _____     §
§
**COUNTY OF** _____     §

**THIS MEMORANDUM OF LEASE** is made and entered into by and between _____, a _____ ("Landlord"),     and _____, a _____ ("Tenant").

## W I T N E S S E T H:

By that certain Lease Agreement dated _____, 20__ (the "Lease") by and between Landlord and Tenant, Landlord leased to Tenant, and Tenant leased from Landlord, approximately _____ square feet of retail space situated within that certain retail shopping center owned by Landlord and commonly known as _____, located in the City of _____, County of _____, State of _____, the same being more particularly described on <u>Exhibit A</u> attached hereto and made a part hereof (the "Center"), together with the non-exclusive use of all rights, privileges, easements, and appurtenances belonging or in any way pertaining thereto (the "Premises"), TO HAVE AND TO HOLD the same for a primary term of _____ (__) years (commencing as provided in the Lease), with _____ (__) renewal terms of _____ (__) years each, all pursuant and subject to the terms, conditions, and stipulations contained in the Lease to which reference is made for all purposes of which it is intended hereby to give notice. The location of the Premises is more particularly shown on <u>Exhibit B</u> attached hereto and made a part hereof.

**[INSERT ALL APPLICABLE LEASE CLAUSES HERE UPON FULL NEGOTIATION – EASEMENTS, PARKING RIGHTS, USE RESTRICTIONS, NO BUILD, ETC.]**

<u>**LEASE AGREEMENT**</u> **– Page 1**

This Memorandum of Lease is not intended to alter or supersede the Lease, and in the event of any conflict between this Memorandum of Lease and the Lease, the provisions of the Lease shall control.

**[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]**

<u>**LEASE AGREEMENT**</u> **– Page 2**

IN WITNESS WHEREOF, Landlord and Tenant have executed this Memorandum of Lease to be effective as of the latest of the dates set forth below.

LANDLORD:

_____,

a _____

By:_____
Name:_____
Its:_____

Date:_____


TENANT:

**FOOD CONCEPTS INTERNATIONAL, L.P.,**
a Texas limited partnership


By:    Food Concepts GPH, L. L. C.,
       a Delaware limited liability company
       its General Partner


       By: _____
           Robert Lin, Executive Vice President

       Date:_____


**LEASE AGREEMENT** – Page 3

## ACKNOWLEDGMENT

STATE OF _____     §
                                       §
COUNTY OF _____         §
                                       §

This instrument was acknowledged before me on this _____ day of _____,
20__, by _____, _____
of _____, a _____, on behalf of said
_____.


_____
NOTARY PUBLIC, STATE OF _____

My Commission Expires:


_____


## ACKNOWLEDGMENT

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

This instrument was acknowledged before me on this _____ day of
_____, 20__, by _____, _____ of _____, a
_____, on behalf of said _____.


_____
NOTARY PUBLIC, STATE OF TEXAS

My Commission Expires:


_____


EXHIBIT F – Memorandum of Lease – Page 1

LANDLORD'S ADDRESS:

_____

_____

_____

_____

TENANT'S ADDRESS:

_____

**EXHIBIT F – Memorandum of Lease – Page 2**

## EXHIBIT G

## COMMENCEMENT AND TERMINATION AGREEMENT

THIS AGREEMENT (the "Agreement") is entered into this _____ day of _____, 20__, by and between _____, a _____ ("Landlord"), and _____, a _____ ("Tenant").

## W I T N E S S E T H:

WHEREAS, Landlord and Tenant entered into a Lease Agreement dated _____, 20__, for approximately _____ square feet of retail space (the "Premises") located within that certain retail shopping center commonly known as _____ located in the City of _____, County of _____, State of _____ (the "Center"). The lease, together with any amendments thereto, is herein referred to as the "Lease"; and

WHEREAS, it is the desire and intent of Landlord and Tenant to clearly define the terms of said Lease.

NOW, THEREFORE, it is agreed by and between Landlord and Tenant that:

1.    The Rent Commencement Date of the Lease is _____, 20__.

2.    The Primary Term of the Lease commenced on _____, 20__, and shall terminate at 11:59 p.m., local time of the state in which the Premises are located, on _____, 20__.

3.    The Lease provides for _____ (__) Renewal Terms of _____ (__) years each.

4.    Tenant has the right to exercise each option by providing Landlord with written notice of its election to renew no later than _____ prior to the expiration of the Primary Term or prior Renewal Term, as applicable.

5.    The Lease is now in full force and effect and all terms and conditions of the Lease are hereby ratified and confirmed.

Landlord and Tenant agree that this document will not be recorded in any public records including the real estate records of the county where the Premises are located.

**LEASE AGREEMENT – Page 1**

IN WITNESS WHEREOF, Landlord and Tenant have executed this Agreement as of the day and year first above written.

LANDLORD:

_____,
a _____

By:_____
Name:_____
Its:_____

Date:_____


TENANT:

**FOOD CONCEPTS INTERNATIONAL, L.P.,**
a Texas limited partnership

By:   Food Concepts GPH, L. L. C.,
      a Delaware limited liability company
      its General Partner


By: _____
      Robert Lin, Executive Vice President

Date:_____


LEASE AGREEMENT – Page 2

EXHIBIT H
ADDITIONAL PARCEL



▨ ADDITIONAL PARCEL

## EXHIBIT I

**RIDGE 400**

**Rules and Regulations**

1.    All deliveries or shipments of any kind to and from the Premises, including loading and uploading of goods, shall be made only by way of the rear of the Premises or at any other locations designated by Landlord, and only at such times designated for such purpose by Landlord.

2.    Garbage and refuse shall be kept in the kind of container approved by Landlord and shall be placed at the location designated by Landlord, for collection at the times specified by Landlord; Tenant to pay the cost of removal.

3.    No radio, television, phonograph or other similar devices, or aerial attached thereto (inside or outside) shall be installed without first obtaining in each instance Landlord's consent in writing, and if such consent is given, no such device shall be used in a manner so as to be heard or seen outside the Premises.

4.    Tenant shall keep the Premises at a temperature sufficiently high to prevent freezing of water in pipes and fixtures.

5.    The outside area immediately adjoining the Premises, including the sidewalk and loading area, shall be kept clean and free from snow, ice, dirt and rubbish by Tenant, and Tenant shall not place, suffer or permit any obstructions or merchandise in such areas.

6.    Tenant shall not use the public or Common Areas in the Center for business purposes, except to the extent specifically provided in the body of any lease pertaining to an outdoor patio area.

7.    Tenant and Tenant's employees shall park their cars only in those portions of the parking area designated for that purpose by Landlord; upon written request from Landlord, Tenant shall furnish Landlord with Tenant's and Tenant's employees' automobile license numbers within five days after Landlord's request.

8.    Plumbing facilities shall not be used for any other purpose than that for which they are constructed, and no foreign substance of any kind shall be permitted therein.

9.    Tenant shall keep the Premises free of pests and insects and Tenant shall use, at Tenant's cost, a pest extermination contractor at such intervals as Landlord may require.

10.    Tenant shall keep all trash, refuse and the like in covered trash receptacles.  Tenant shall not burn trash or garbage in or about the Premises, the Center or within one mile of the outside radius of the Center.

11.    Tenant shall not place, suffer or permit displays, decorations or shopping carts on the sidewalks in front of the Premises or on or upon any of the Common Areas of the Center.

## Exhibit I, Attachment 1

### Modifications to the Rules and Regulations

1. Rule #1 shall be modified to read as follows: All deliveries or shipments of any kind to and from the Premises, including loading and unloading of goods, shall be made only by way of the rear of the Premises. Tenant shall use commercially reasonable efforts to schedule deliveries at such times as will not materially interfere with the business operations of Landlord or other tenants at the Center.

2. Rule #2 shall be modified to read as follows: Garbage and refuse shall be kept in the kind of container approved by Landlord and shall be placed at the location designated by Landlord. Tenant to pay the cost of removal and Tenant shall arrange for collection at regular intervals in keeping with Tenant's standard business practices but in all events so as not to allow accumulation of trash.

3. Rule #3 shall be modified to read as follows: No radio, television, phonograph or other similar devices, or aerial attached thereto (inside or outside) shall be installed without first obtaining in each instance Landlord's consent in writing, and if such consent is given, no such device shall be used in a manner so as to be heard or seen outside the Premises. The foregoing shall not be construed so as to require Landlord's consent to the installation and use of typical televisions in Tenant's bar area or within Tenant's patio area.

4. Rule #7 shall be modified to read as follows: Tenant and Tenant's employees shall park their cars only in those portions of the parking area designated for that purpose by Landlord; within five (5) days after receipt of written request from Landlord (which request shall not be made more often than once each calendar quarter), Tenant shall furnish Landlord with Tenant's and Tenant's employees' automobile license numbers.

5. Rule #9 shall be modified to read as follows: Tenant shall keep the Premises free of pests and insects and Tenant shall use, at Tenant's cost, a pest extermination contractor at such intervals as Landlord may require but not more often than once per month unless there is a pest or insect infestation within the Premises.

6. Rule #11 shall be modified to read as follows: Tenant shall not place, suffer or permit displays, decorations or shopping carts on the sidewalks in front of the Premises or on or upon any of the Common Areas of the Center except that Tenant may, from time to time place sidewalk placards not to exceed 4-feet in height by 3-feet in width in front of the Premises which promote happy hour, menu specials, gift card offerings and similar items.

## COMMENCEMENT AND TERMINATION AGREEMENT

THIS AGREEMENT (the "Agreement") is entered into this 26th day of May, 2015, by and between Freddy's Land, LLC, a Kansas limited liability company ("Landlord"), and Food Concepts International, LP, a Texas limited partnership ("Tenant").

## W I T N E S S E T H:

WHEREAS, Landlord and Tenant entered into a Lease Agreement dated July 18, 2014, for approximately 7,722 square feet of retail space (the "Premises") located within that certain retail shopping center commonly known as Ridge 400 located in the City of Wichita, County of Sedgwick, State of Kansas (the "Center"). The lease, together with any amendments thereto, is herein referred to as the "Lease"; and

WHEREAS, it is the desire and intent of Landlord and Tenant to clearly define the terms of said Lease.

NOW, THEREFORE, it is agreed by and between Landlord and Tenant that:

1. The Rent Commencement Date of the Lease is May 26, 2015.

2. The Primary Term of the Lease commenced on July 18, 2014, and shall terminate at 11:59 p.m., **local time of the state in which the Premises are located,** on July 17, 2029.

3. The Lease provides for three (3) Renewal Terms of five (5) years each.

4. Tenant has the right to exercise each option by providing Landlord with written notice of its election to renew no later than one hundred eighty (180) days prior to the expiration of the Primary Term or prior Renewal Term, as applicable.

5. The Lease is now in full force and effect and all terms and conditions of the Lease are hereby ratified and confirmed.

Landlord and Tenant agree that this document will not be recorded in any public records including the real estate records of the county where the Premises are located.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Agreement as of the day and year first above written.

LANDLORD:

Freddy's Land, LLC, a Kansas limited liability company

By: _____

Name: Scott Redler
Its: Member

Date: _____5-26-15_____

TENANT:

**FOOD CONCEPTS INTERNATIONAL, L.P.,**
a Texas limited partnership

By:    Food Concepts GPH, L. L. C.,
a Delaware limited liability company
its General Partner

By: _____

Robert Lin, Executive Vice President

Date: _____5/26/15_____

<u>FIRST ADDENDUM TO LEASE AGREEMENT</u>

THIS FIRST ADDENDUM TO LEASE AGREEMENT (this "<u>Addendum</u>"), by and between Freddy's Land, LLC, a Kansas limited liability company ("<u>Landlord</u>"), and Food Concepts International, LP, a Texas limited partnership ("Tenant"), is entered into as of July 31, 2020 (the "<u>Effective Date</u>").

WITNESSETH:

WHEREAS, Landlord and Tenant have entered into a certain Lease Agreement, dated July 18, 2014 (the "<u>Lease</u>");

WHEREAS, Landlord sent Tenant a letter on April 24, 2020 advising that Tenant had not paid Base Rent for the month of April 2020; however Tenant paid all Additional Rent, including CAM Charges, for April 2020 (such unpaid Base Rent for the month of April, 2020 is herein called "April Base Rent") and as of the date hereof the April Base Rent remains unpaid;

WHEREAS, Tenant paid Rent to Landlord for the month of May 2020;

WHEREAS, Tenant has not paid Base Rent or CAM Charges to Landlord for the month of June 2020 (such unpaid Rent for the month of June, 2020 is herein called the "June Rent"); and

WHEREAS, the total amount of the April Base Rent and the June Rent is equal to $34,396.00 (the "Deferred Rental"); and

WHEREAS, as a result of Tenant's decision to not pay the April Base Rent and the June Rent, Landlord declared the Tenant to be in Default in accordance with the provisions of the Lease;

WHEREAS, Landlord and Tenant desire to amend the Lease as more fully set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant affirm the recitals above and agree as follows:

1.      <u>Definitions</u>. Capitalized terms used herein and not otherwise defined shall have the same meaning as defined in the Lease.

2.      <u>Waiver of Tenant Default</u>. Landlord agrees to waive Landlord's claim of a Tenant Default as of the Effective Date so long as Tenant fully complies with the terms and conditions of this Amendment. Landlord and Tenant acknowledge and agree that said waiver (i) shall not be deemed to be a waiver of any subsequent or breach of the same or any other term, condition, or covenant contained in the Lease and (ii) shall not be construed to be a modification of the terms and conditions of the Lease.

3.      <u>Past Due Amounts</u>. In addition to the monthly Base Rent and CAM Charges for each month occurring from September 2020 through April 2021, Tenant will make the additional payments listed on Exhibit A (the "Past Due Amounts") The parties agree that the Past Due Amounts are in full settlement of any claim by Landlord of a Tenant Default. Landlord has no

1

obligation to provide notice or right to cure for any missed payments under the Lease or this Addendum until Tenant has paid is paid all Past Due Amounts.

     4.     <u>Continued in Full Force and Effect</u>.  Except as herein specifically modified, supplemented and/or amended, all of the terms, covenants and conditions of the Lease shall continue and remain in full force and effect, and together with the terms and conditions of this Addendum, shall be binding upon and inure to the benefit of the respective successors, heirs, administrators, executors, personal representatives, trustees, and assigns of Landlord and Tenant.

     5.     <u>Entire Agreement, Governing Law and Miscellaneous</u>.  This Addendum and the documents provided for herein contain the entire agreement of the parties hereto with respect to the subject matter hereof and supersede all prior negotiations, agreements, and understandings with respect thereto.  This Addendum shall be governed by and construed in accordance with the laws of the State of Kansas.  This Addendum may only be amended by a written document duly executed by all parties hereto.  This Addendum may be executed in multiple counterparts, each considered an original, but all of which shall constitute but one Addendum.  Electronic copies of any signed original Addendum shall be deemed the same as delivery of an original.

[ signatures begin on next page ]

2

IN WITNESS WHEREOF, the parties hereto have executed this Addendum as of the Effective Date.

Freddy's Land, LLC

By: _____

Name: Andrew P. Thenjwall

Title: SVP

"Landlord"

Food Concepts International, L.P.,
a Texas limited partnership

By:　Food Concepts GPF, L.L.C.,
　　a Delaware limited liability company,
　　its General Partner

By: _____

Name: Robert Lin

Title: President

"Tenant"

3

## Exhibit A

### Extra Payment Due

| | |
|---|---|
| September 1, 2020 | $4,299.50 |
| October 1, 2020 | $4,299.50 |
| November 1, 2020 | $4,299.50 |
| December 1, 2020 | $4,299.50 |
| January 1, 2021 | $4,299.50 |
| February 1, 2021 | $4,299.50 |
| March 1, 2021 | $4,299.50 |
| April 1, 2021 | $4,299.50 |