# EXHIBIT 4

**LEASE AGREEMENT**

**By and Between**

**TYLER BROADWAY/CENTENNIAL LP,**

**as Landlord**

**and**

**FOOD CONCEPTS INTERNATIONAL, L.P.,**

**as Tenant**

2286858 v12 (43470.00041.023)

# TABLE OF CONTENTS

Page

1.   Basic Lease Provisions and Definitions............................................................................ 1

2.   Premises and Term.......................................................................................................... 5

3.   Condition of the Premises, Delivery and Tenant Allowance............................................ 6

4.   Rent................................................................................................................................ 10

5.   Holding Over by Tenant ................................................................................................. 13

6.   [Intentionally Deleted] ................................................................................................... 14

7.   Uses................................................................................................................................ 14

8.   Representations and Covenants of Landlord ................................................................... 17

9.   Utilities........................................................................................................................... 18

10.  Taxes, Assessments and other Governmental Impositions.............................................. 18

11.  Insurance ........................................................................................................................ 20

12.  Common Area; Parking .................................................................................................. 21

13.  Maintenance and Repairs ............................................................................................... 26

14.  Improvements; Alterations; Signage............................................................................... 28

15.  Title to Improvements; Removal .................................................................................... 30

16.  Damage by Fire or Other Casualty ................................................................................. 31

17.  Condemnation................................................................................................................. 32

18.  Liability and Indemnification ......................................................................................... 34

19.  Right of Inspection......................................................................................................... 35

20.  Warranty of Title and Quiet Enjoyment ......................................................................... 35

21.  Waiver of Subrogation.................................................................................................... 36

22.  Force Majeure ................................................................................................................ 36

23.  Commissions................................................................................................................... 36

24.  Landlord-Tenant Relationship ........................................................................................ 37

25.  Assignment and Subletting ............................................................................................. 37

26.  Memorandum of Lease; Commencement and Termination Agreement............................ 38

27.  Notices and Payments .................................................................................................... 38

28.  Default............................................................................................................................ 39

29.  Co-Tenancy Requirements.............................................................................................. 43

30.  Reasonable Cooperation ................................................................................................. 44

2286858 v12 (43470.00041.023)

31.     Miscellaneous ................................................................................................ 45

32.     Security Deposit............................................................................................. 47

33.     Tax Incentives and Waiver ............................................................................ 47

34.     ECR................................................................................................................ 48

35.     Grand Opening Charge .................................................................................. 48

36.     Attorney's Fees.............................................................................................. 49

## TABLE OF EXHIBITS

Exhibit A    -    Center (legal description)

Exhibit A-1 -    Site Plan of Center

Exhibit B    -    Site Plan of Premises (including Patio Area)

Exhibit C    -    Work Letter

Exhibit D    -    Omitted

Exhibit E    -    Subordination, Attornment and Non-Disturbance Agreement

Exhibit F    -    Memorandum of Lease

Exhibit G    -    Commencement and Termination Agreement

Exhibit H    -    Existing Exclusives

Exhibit I    -    Prohibited Uses

Exhibit J    -    Rules and Regulations

Exhibit K    -    Permitted Encumbrances

2286858 v12 (43470.00041.023)

## LEASE AGREEMENT

This Lease Agreement (the "Lease") is by and between TYLER BROADWAY/CENTENNIAL LP, a Texas limited partnership ("Landlord"), and FOOD CONCEPTS INTERNATIONAL, LP, a Texas limited partnership ("Tenant"), and is dated as of the latest of the dates set forth beneath the signatures of the parties hereto (the "Effective Date").

## W I T N E S S E T H:

In consideration of the obligation of Tenant to pay Rent as hereinafter provided and in consideration of the other terms, provisions and covenants hereof, Landlord hereby leases, grants and conveys to Tenant and Tenant hereby accepts from Landlord the Premises (defined below), all in accordance with and subject to the terms and conditions hereinafter set forth in this Lease

1.    **Basic Lease Provisions and Definitions**.

    (a)    Center:    The land and retail shopping center known as The Village at Cumberland Park, located at the northeast corner of South Broadway Avenue (SH 69) and Market Square Boulevard, in Tyler, Smith County, Texas, all as further legally described on Exhibit A and depicted on Exhibit A-1, each attached hereto and made a part hereof by this reference.

    (b)    Premises:    Approximately 6,800 square feet of retail space within the Center, with a present address of 8926 S. Broadway Avenue, Suite 192, Tyler, Texas 75703, all as further shown cross-hatched and labeled "Premises" on Exhibit B attached hereto and made a part hereof. Tenant will also have the right, subject to the terms of this Lease, to utilize an area adjacent to the Premises for outdoor seating (the "Patio Area"). The Patio Area contains approximately 1,500 square feet and is shown slant-hatched and labeled "Patio Area" on Exhibit B.

    (c)    Floor Area:    Approximately 6,800 square feet of enclosed rentable retail area, not including the Patio Area.

    (d)    Rent Commencement    The earlier of: (i) the date upon which Tenant opens for business to the public from the

1

Date: Premises, or (ii) the date which is one hundred sixty (160) days following the date that is the last to occur of: (A) Landlord's approval of Tenant's Plans (defined below) (provided that Tenant has timely submitted the Tenant's Plans to Landlord for approval as provided in Paragraph 14(a) below; but if Tenant shall fail to timely submit the Tenant's Plans to Landlord for approval and if such failure is not due to a Landlord failure or default or a matter included within the meaning of force majeure, then this provision (A) shall not be applicable), (B) the date Landlord's Work is Substantially Complete (as hereinafter defined), (C) Tenant's receipt of its building permit for the improvements to be constructed by Tenant within the Premises (and Tenant agrees to submit for its building permits within thirty (30) days following Landlord's approval of Tenant's Plans, and to diligently and continuously pursue issuance of such permits, but if Tenant has failed timely to submit the required application(s) or has been unsuccessful in obtaining such permits upon the expiration of sixty (60) days from initial application, then in either such event Landlord shall be entitled to attempt to obtain such permit(s) on Tenant's behalf; provided, however, Landlord shall not make any revisions to Tenant's Plans or incur any expenses to be paid by Tenant in connection with such effort [except customary permit fees]), or (D) satisfaction of the Opening Co-Tenancy Requirement in Paragraph 29(a) ("Opening Co-Tenancy Requirement").

(e)     Primary Term: An initial period of ten (10) years commencing on the Premises Delivery Date and continuing through, and including, the last day of the calendar month in which the tenth (10th) anniversary of the Rent Commencement Date occurs.

(f)     Renewal Terms: Two (2) consecutive renewal terms of five (5) years each.

2

(g)    Base Rent (Initial Term):

| Lease Year | $/SF | Annual Base Rent | Monthly Installment |
|---|---|---|---|
| 1-2 | $26.00 | $176,800.00 | $14,733.33 |
| 3-5 | $27.00 | $183,600.00 | $15,300.00 |
| 6-10 | $29.00 | $197,200.00 | $16,433.33 |

Tenant shall be entitled to two (2) months of free rent during the first year of the term of the Lease.

(h)    Base Rent (Renewal Terms):

| Lease Year | $/SF | Annual Base Rent | Monthly Installment |
|---|---|---|---|
| 11-15 | $31.90 | $216,920.00 | $18,076.67 |
| 16-20 | $35.09 | $238,612.00 | $19,884.33 |

(i)    Percentage Rent:

An amount equal to the product of three percent (3%) multiplied by the amount by which Gross Sales (hereinafter defined) derived from the Premises during each such calendar year exceeds the amounts set forth below (each, a "Break Point"):

| Term | Break Point |
|---|---|
| Primary Term (Years 1-2) | $3,250,000.00 |
| Primary Term (Years 3-5) | $3,375,000.00 |
| Primary Term (Years 6-10) | $3,625,000.00 |
| 1st Renewal Term | $3,987,500.00 |

3

|  | 2nd Renewal Term | $4,386,250.00 |
|--|--|--|

(j) Tenant Allowance: $55.00 per square foot of the Premises (approximately $374,000).

(k) Premises Delivery Date: September 1, 2014 (subject to extension by Landlord due to force majeure delays, as per Paragraph 22 of this Lease, or, at Landlord's option, upon written notice given by Landlord not later than May 1, 2014, designating an alternate delivery date, which date shall be no later than April 15, 2015).

(l) Tenant's Proportionate Share: The ratio, expressed as a percentage, the numerator of which is the Floor Area of the Premises and the denominator of which is the total leasable area of constructed buildings in the Center (as determined by the same commercially customary measurement method used by Landlord to determine the Floor Area of the Premises); provided that in no event shall Tenant's Proportionate Share of the Center ever exceed two and 75/100 percent (2.75%). (Tenant understands that although as of the Effective Date Landlord's plan for the Center includes up to 700,000 square feet of Floor Area, the Center will be built-out over time.)

(m) Permitted Use: Tenant may use the Premises for the operation of a Mexican food restaurant (including an outdoor seating, dining or bar area), a related bar and/or cocktail lounge and such other uses as are directly related and incidental to the operation thereof (including, but not limited to, the preparation of food for off-site catering and the retail sale of general merchandise bearing the logo of the business operated by Tenant); and for no other use or purpose without Landlord's prior written consent not to be unreasonably withheld, conditioned or delayed. The use of the Premises shall in all events comply with the ECR, and shall be subject to the Existing Exclusives. Tenant shall initially open to the

4

2286858 v12 (43470.00041.023)

public, fully stocked and staffed, as an Abuelo's Mexican Restaurant and shall operate for such use for not less than one (1) business day.

|  |  |  |
|---|---|---|
| (n) | Tenant's Notice Address: | Food Concepts International, L.P.<br>2575 S. Loop 289<br>Lubbock, Texas 79464<br>Attention: Robert Lin |

With a copy to:

KG Law, PLLC
601 Rustic Ridge Court
Southlake, Texas 76092
Attn: Kim Goff

|  |  |  |
|---|---|---|
|  | Landlord's Notice Address: | Tyler Broadway/Centennial LP<br>2525 McKinnon Street, Suite 700<br>Dallas, Texas 75201<br>Attn: David C. Wilson |
|  | Tax ID No.: | 38-3911248 |
|  | With a copy to: | Kane Russell Coleman & Logan PC<br>3700 Thanksgiving Tower<br>1601 Elm Street<br>Dallas, Texas 75201<br>Attn: Raymond J. Kane |
| (o) | Brokers: | Edge Realty Partners and The Retail Connection, LP |
| (p) | Security Deposit: | An amount equal to one (1) month of gross Rent payable when the Opening Co-Tenancy Requirement is satisfied. |

2. **Premises and Term**.

(a) <u>Demise and Primary Term</u>. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises, together with the non-exclusive use of all rights, privileges, easements and appurtenances belonging or in any way pertaining to the Premises, TO HAVE AND TO HOLD the same for the Primary Term, as the same may be hereafter extended or renewed, all upon and subject to the terms, provisions and conditions of this Lease.

2286858 v12 (43470.00041.023)

(b)    Renewal Terms. Provided Tenant is not in default hereunder beyond any applicable cure period as of the date on which Tenant seeks to exercise its rights hereunder, Landlord hereby grants to Tenant the right and option to extend the term of this Lease for any and/or all of the Renewal Term(s), the first Renewal Term to begin upon the expiration of the Primary Term and the second Renewal Term to being upon the expiration of the first Renewal Term (provided that Tenant shall have previously exercised its first Renewal Term option). All of the terms, provisions and covenants of this Lease shall apply to each of the Renewal Term(s), except that there will be no Landlord's Work to be performed or Tenant Allowance to be paid at that time, no free rent period, and no additional Renewal Terms beyond the two initial Renewal Terms described above in this Paragraph 2(b). Tenant shall exercise each such option by delivering to Landlord written notice of its election to renew no later than one hundred eighty (180) days prior to the expiration of the Primary Term or Renewal Term, as is applicable. It is the intention of the parties to avoid forfeiture of Tenant's rights to extend the term of this Lease under any of the options set forth in this Lease through inadvertent failure to give notice of such exercise thereof within the prescribed time limits. Accordingly, if Landlord does not receive notice from Tenant of Tenant's election to extend the term of this Lease for any of the respective Renewal Terms, Landlord shall notify Tenant in writing thereof ("Landlord's Renewal Notice"). Tenant's right to extend for any of the Renewal Terms shall not expire unless (i) Tenant fails to give Landlord notice of the extension within thirty (30) days of receipt of Landlord's Renewal Notice, or (ii) Tenant advises Landlord in writing that Tenant has elected not to extend the term of this Lease.

**3.      Condition of the Premises, Delivery and Tenant Allowance.**

(a)    Site Information. Within ten (10) days of the Effective Date, Landlord shall deliver to Tenant a legible copy of Landlord's then current commitment for title insurance, and a land survey, whether they are applicable solely to the Premises and the Center or to a larger parcel of which the Premises and the Center are a part. In addition, Landlord shall deliver to Tenant any other information concerning the Premises which Tenant may reasonably request, including, without limitation any title exception documents referenced in the title commitment, any REA's, Declarations or similar public or private documents governing the development, use, occupancy and operations of the Center, or any other information relating to the Premises or the Center which may facilitate Tenant's preparation of plans and specifications.

(b)    Acquisition and Financing Contingencies. Tenant acknowledges that Landlord is a contract purchaser and not the current owner of the Land (the "Project Site") on which the Premises and the Center are to be constructed. Landlord shall use commercially reasonable efforts to acquire the Project Site on or before August 1, 2013. Upon Landlord's acquisition of the Project Site (the "Acquisition Date"), Landlord shall provide Tenant written notice (the "Acquisition Notice") of the date on which Landlord acquired title to the Project Site. If despite the use of commercially reasonable efforts Landlord has not acquired the Project Site by December 31, 2013, each of Landlord and Tenant shall thereafter be entitled to terminate this Lease by delivering written notice of termination to the other party prior to the date on which Landlord acquires title to the Project Site. If either of Landlord or Tenant terminates this Lease as provided above, neither party will thereafter have any liability to the other by reason of this Lease or such termination, except for any surviving obligations expressly set forth in this Lease. Additionally, all covenants, warranties, obligations, terms and conditions of Landlord in this

6                                    2286858 v12 (43470.00041.023)

Lease are expressly conditioned upon Landlord obtaining suitable financing in Landlord's sole discretion for the acquisition and/or construction of the Center. If this Lease remains in effect through March 1, 2014, but Landlord has not obtained suitable financing by March 1, 2014, then at Landlord's option and election and upon written notice to Tenant given by Landlord on or before March 1, 2014, this Lease shall be null and void and neither party shall have any further obligations to the other hereunder. If this Lease is terminated pursuant to this Paragraph 3(b), Landlord shall reimburse Tenant for Tenant's actual and documented out-of-pocket costs incurred in connection with the negotiation of this Lease, not to exceed Ten Thousand Dollars and No/100 ($10,000.00), such obligation to survive termination of this Lease.

(c)    Landlord's Construction Plans.    Landlord shall deliver to Tenant a preliminary lease outline drawing and preliminary elevations for the Premises (the "Preliminary Plans"). Tenant shall review the Preliminary Plans and provide its approval or comment to the same within fifteen (15) days after Tenant's receipt of the Preliminary Plans from Landlord. If Tenant shall comment on the Preliminary Plans, Landlord shall revise the same to include those of Tenant's comments as are acceptable to Landlord and shall resubmit the Preliminary Plans, as revised, to Tenant. Tenant shall review the revised Preliminary Plans within ten (10) days after receipt of the same. This process shall continue until the parties have agreed upon the Preliminary Plans. Following mutual approval of the Preliminary Plans, Landlord shall proceed with final construction drawings describing Landlord's Work, including floor plans, exterior elevations and a full size, scaled and engineered site plan (the "Landlord Construction Drawings"). Landlord anticipates that it will deliver the Landlord Construction Drawings to Tenant approximately ninety (90) days after the date on which the Preliminary Plans are approved by Landlord and Tenant. Tenant shall have a period of thirty (30) days to review and approve the Landlord Construction Drawings, or provide Landlord with comments to the same. If Tenant shall provide comments, Landlord and Tenant shall collaborate, in good faith, to resolve all Tenant comments and to agree on the final form of the Landlord Construction Drawings. If Landlord and Tenant have not agreed upon the final form of the Landlord Construction Drawings within one hundred fifty (150) days after mutual approval of the Preliminary Plans, then either party may terminate this Lease upon written notice given to the other prior to mutual approval of the Landlord Construction Drawings. The Landlord Construction Drawings, as approved by each of Landlord and Tenant, shall be herein called the "Landlord's Plans".

(d)    Condition of the Premises.    Landlord represents and warrants that, as of the Premises Delivery Date, Landlord's Work (as defined below) and all areas within the Premises, including, without limitation, all structural elements, the foundation, roof, roof membrane and roof system, exterior walls, plumbing, electrical and other mechanical systems (i) shall meet and comply with all federal, state and local laws, ordinances and regulations and all handicapped accessibility standards for the disabled, including, without limitation, those promulgated under the Americans with Disabilities Act (the "ADA") and also the Standards for Architectural Design ("SAD"), (ii) shall be free of asbestos and any asbestos containing materials, and (iii) shall be structurally sound and in good, working and sanitary order and condition and repair. Landlord shall deliver the Premises free of all liens and encumbrances relating to Landlord's Work, other than liens and security interests in favor of Landlord's mortgage lender. Landlord represents and warrants that is has disclosed to Tenant any conditions or restrictions (including, without limitation, environmental contamination,

7

2286858 v12 (43470.00041.023)

restrictions on utilities or exclusive use restrictions) within Landlord's knowledge that would adversely affect Tenant's store design, permitting, construction and use, as contemplated by this Lease. Landlord represents and warrants that, as of the Tenant's opening date, all Required Common Areas (hereinafter defined) shall meet and comply with all federal, state and local laws, ordinances and regulations.

(e)     Landlord's Work. On or before the Premises Delivery Date, Landlord shall, at its sole cost and expense, complete all of the work items more particularly described in the work letter attached hereto as Exhibit C and made a part hereof by this reference (the "Work Letter"). The work to be completed by Landlord pursuant to the Work Letter is hereinafter referred to as the "Landlord's Work". Landlord shall perform the Landlord's Work in a good and workmanlike manner and shall notify Tenant in writing at least twenty (20) days prior to Landlord's actual completion of the Landlord's Work. Promptly thereafter, Tenant shall arrange for an inspection of the Premises. During the inspection, Landlord shall demonstrate to Tenant that all of Landlord's Work has been Substantially Completed (defined below) and shall specifically demonstrate (to the extent possible at that time) that all mechanical systems within the Premises are in good working order. Following the inspection, Tenant shall deliver to Landlord a written punchlist of all incomplete or faulty items of Landlord's Work and any necessary mechanical adjustments or finish work, if any, required to bring the Premises into the condition required by this Lease. Landlord acknowledges and agrees that Tenant may conduct a secondary inspection with regard to mechanical systems at the time power is supplied to the Premises and the systems connected to Tenant's power supply. Landlord shall correct any deficiencies noted in Tenant's second inspection. If the Premises are Substantially Complete, Tenant shall accept the Premises and Landlord shall repair all punchlist items within seventy-five (75) days of the day Tenant accepts the Premises. If Landlord fails to correct all punchlist items within such 75-day period, Tenant may complete all work as may be necessary to correct the same and in such event, all reasonable costs incurred by Tenant in completing Landlord's Work (plus interest thereon at the Default Rate (as hereinafter defined) from the date Tenant incurs such reasonable expense until repayment), may be offset against all Rent and other payments due under this Lease until Tenant has recouped 100% of its costs. As used herein, the term "Substantially Complete" shall mean that all of Landlord's Work is substantially complete in the manner required by this Lease excepting only minor cosmetic items which are capable of being completed within thirty (30) days and which do not (i) delay Tenant's ability to perform Tenant's work within the Premises, or (ii) cause any cost increase to Tenant's construction. As to the Required Common Areas, "Substantially Complete" means that all Landlord's Work is substantially complete in the manner required by this Lease so as to permit and provide Tenant reasonably convenient access to the Premises to perform Tenant's Work therein, with all final improvements to the Required Common Areas (i.e., landscaping, signage, striping and similar cosmetic items and convenience amenities) to be completed not later than Tenant's opening date).

Landlord hereby warrants and guarantees Landlord's Work to be free from defects in workmanship and materials for a period of one (1) year from the Premises Delivery Date. During such time, Landlord shall repair any latent defects in Landlord's Work promptly upon receipt of written request by Tenant. Upon the expiration of such one (1) year period, Landlord shall assign to Tenant all warranties and guarantees with respect to any portion of Landlord's Work for which Tenant shall have the duty and obligation of maintenance from and after the

2286858 v12 (43470.00041.023)

Premises Delivery Date pursuant to the terms of this Lease and, to the extent of any such warranties and guarantees are not assignable, Landlord agrees to enforce the same for the benefit of Tenant.

(f)    Landlord's Failure to Deliver the Premises.

(i)    Tenant's Liquidated Damages.  If the Premises and/or the Required Common Areas are not Substantially Completed or are not in the condition required herein and in the Work Letter on the Premises Delivery Date and if Tenant has obtained its building permit by such time or at any time thereafter (or if Tenant could have obtained its building permit by such time or at any time thereafter except for Landlord's fault) and the Opening Co-Tenancy Requirement is then or is thereafter met, then from and after the date on which the foregoing conditions are met (the "Penalty Start Date") and continuing until Landlord completes the Landlord's Work, Tenant shall receive a credit against any Base Rent or other payments which become due hereunder of $450.00 per day (as liquidated damages) for each day after the Penalty Start Date that Landlord fails to complete Landlord's Work as required by this Lease.  The parties agree that Tenant will be damaged by not having possession of the Premises (in the required condition) by the Penalty Start Date, and that the foregoing amount is a reasonable estimate of the amount of Tenant's damages, the precise amount not being susceptible to exact proof.

(ii)    Tenant's Additional Remedies.  If Landlord has not Substantially Completed the Landlord's Work and delivered the Premises to Tenant within sixty (60) days after the occurrence of both the Premises Delivery Date (as such Premises Delivery Date may be extended as provided in Paragraph 1(k) above) and the Penalty Start Date, Tenant may (A) wait for Landlord to complete the Landlord's Work and continue to recover liquidated damages as provided in subparagraph (i) above; or (B) upon the expiration of thirty (30) days after written notice to Landlord of Tenant's intent to complete the work itself, provided that Landlord's Work is not Substantially Complete on or before the expiration of such 30-day period, complete all or any portions of Landlord's Work as is necessary to bring the Premises into the condition required by this Lease on behalf of Landlord as soon as feasibly possible and continue to recover liquidated damages as provided in subparagraph (i) above.  All reasonable amounts expended by Tenant to complete the Landlord's Work on behalf of Landlord, plus interest thereon at a rate per annum equal to the lesser of (x) the highest lawful rate or (y) the Prime Rate as set forth in The Wall Street Journal from time-to-time, plus four percent (4%) (as the case may be, the "Default Rate"), from the date Tenant incurs such reasonable expense until repayment, shall be paid by Landlord to Tenant within thirty (30) days of Tenant's demand, together with invoices substantiating Tenant's reasonable expenses, or, at the election of Tenant, Tenant may deduct such amount from subsequent installments of any Base Rent or other payments which become due to Landlord hereunder.  Landlord agrees that the determination of Tenant or its contractor as to the reasonable and necessary costs incurred by Tenant in connection with its exercise of option (B) above shall be final and binding upon Landlord and Landlord acknowledges that it can control such costs by performing the Landlord's Work as required hereunder in a timely manner.  If Landlord has not Substantially Completed the Landlord's Work by the date which is one hundred

9                                                    2286858 v12 (43470.00041.023)

eighty (180) days after the Premises Delivery Date, Tenant may, at its option, upon the expiration of thirty (30) days after written notice to Landlord of Tenant's intent to complete the work itself, provided that Landlord's Work is not Substantially Complete on or before the expiration of such 30-day period, terminate this Lease at any time prior to the date of completion of Landlord's Work by giving written notice to Landlord, in which event Landlord shall reimburse Tenant upon demand for the sum of (x) the cumulative amount of liquidated damages as of the termination date, plus (y) Tenant's actual, out-of-pocket, third-party development costs incurred in connection with this Lease, including, without limitation, any and all legal, architectural, engineering and permitting costs, not to exceed $85,000.00 in the aggregate.

(g)    Tenant Allowance. In addition to Landlord's obligation to complete the Landlord's Work, Landlord shall provide Tenant with the Tenant Allowance. The Tenant Allowance shall be paid by Landlord to Tenant in two (2) installments as follows: (i) an amount equal to fifty percent (50%) of the Tenant Allowance shall be paid by Landlord to Tenant within forty-five (45) days after the date on which Tenant demonstrates, through paid invoices or other evidence reasonably satisfactory to Landlord, that Tenant has contributed at least $500,000.00 toward the cost of Tenant's Work and delivered partial lien waivers for all such work, and (ii) an amount equal to the remaining balance of the Tenant Allowance shall be paid by Landlord to Tenant within forty-five (45) days following the date on which Tenant (A) has completed Tenant's Work (as defined in the Work Letter), lien-free and to Landlord's reasonable satisfaction, (B) has delivered to Landlord a final lien waiver and all bills paid affidavit from Tenant's general contractor, (C) has delivered to Landlord a copy of Tenant's certificate of occupancy, and (D) has opened for business in the Premises in compliance with Paragraph 7(c) of this Lease and has made its first payment of Rent. If Landlord has not paid Tenant the Tenant Allowance as required herein, Tenant may, in addition to other remedies, offset the unpaid amount (together with interest thereon at the Default Rate from the date due until fully paid or recouped) against Base Rent and any other amounts that may become due hereunder until Tenant has recouped the full amount of the Tenant Allowance.

**4.    Rent**.

(a)    Rents Payable; Net Rental. Commencing on the Rent Commencement Date and continuing throughout the term of this Lease, Tenant agrees to pay Landlord as rental for the Premises the following (collectively, the "Rent"):

(i)    An annual sum equal to the Base Rent; plus

(ii)    An annual sum equal to the Percentage Rent; plus

(iii)    All additional sums, charges or amounts to be paid by Tenant to Landlord under the terms of this Lease ("Additional Rent").

Base Rent in the amount set forth in Paragraphs 1(g) and (h) above (as the case may be) shall be due and payable to Landlord, in twelve (12) equal monthly installments, in advance, on or before the first day of each calendar month during the Primary Term and any Renewal Term. Base Rent for any fractional month at the beginning or the end of the term hereof shall be

10

prorated. Tenant is entitled to two (2) months of free rent during the first year of the term of this Lease.

Notwithstanding anything contained herein to the contrary, if Landlord fails to pay the Tenant Allowance to Tenant as and when the same is otherwise due hereunder and if at any time thereafter while any portion of the Tenant Allowance remains unpaid Tenant is unable to exercise the offset right afforded to Tenant as contemplated in Paragraph 3(g) above, then for as long as Tenant is unable to exercise the offset right, and provided that Tenant has made its first payment of monthly Rent as required by the terms of this Lease, Tenant may thereafter, in lieu of the offset right, elect to pay an alternative Base Rent (the "Alternate Base Rent"). The Alternate Base Rent for any Lease Year shall be calculated by deducting $50,000.00 from the amount of annual Base Rent otherwise due and payable for that Lease Year during the Primary Term (as set forth in Paragraph 1(g) above). The resulting amount shall be the Alternate Base Rent for such Lease Year and Tenant shall pay one-twelfth of that amount each calendar month as Base Rent for that Lease Year or the remainder thereof. Tenant shall be permitted to continue paying Alternate Base Rent in lieu of Base Rent until Tenant has recovered the full amount of the Tenant Allowance, either by cash payments from Landlord, credits against Base Rent (at the rate of $4,166.67 per month) by means of payments of reduced Base Rent at the Alternate Base Rent rate as provided above, or any combination of such cash payments and credits. Upon written notice from Landlord that Tenant has thus recovered the full amount of the Tenant Allowance (supported by appropriate documentary evidence), Tenant shall recommence payment of Base Rent in the full amount stipulated in Paragraph 1(g) above.

(b)    Remeasurement. Within ninety (90) days after the date on which Landlord actually delivers possession of the Premises to Tenant in the condition required by the Lease, Tenant may determine whether the "as built" leasable square footage of the Premises differs from the Floor Area as established in Paragraph 1(c) above. If the "as built" leasable square footage of the Premises is different than the Floor Area established in Paragraph 1(c) above, Landlord and Tenant agree to amend this Lease to reflect the correct Floor Area in Paragraph 1(c) and Base Rent, Additional Rent, the Tenant Allowance and any other calculation based upon the Floor Area of the Premises shall be adjusted accordingly. Notwithstanding the foregoing, if the "as built" leasable square footage of the Premises has decreased by ten percent (10%) or more of the Floor Area of the Premises stated in Paragraph 1(c) of this Lease, Tenant shall have the right to terminate the Lease by delivering written notice thereof to Landlord within ninety (90) days after the date on which Landlord actually delivers possession of the Premises to Tenant.

(c)    Percentage Rent. The Percentage Rent shall be computed in accordance with the provisions of this Paragraph 4(c).

In computing the Percentage Rent for the first Lease Year or the last Lease Year, as the case may be, if such Lease Year shall contain more or less than three hundred sixty-five (365) days, then the Break Point shall be multiplied by a fraction, the numerator of which shall be the number of days in such shorter calendar year, and the denominator of which shall be three hundred sixty-five (365). For purposes hereof, the first Lease Year of the Term of this Lease shall be determined as follows: (i) if the Rent Commencement Date occurs prior to the 15th day of any calendar month, then the first Lease Year shall begin with the first day of the month in

11                                                      2286858 v12 (43470.00041.023)

which the Rent Commencement Date occurs and shall continue until the last day of the 11th month thereafter, or (ii) if the Rent Commencement Date shall occur on or after the 15th day of any calendar month, then the first Lease Year shall begin as of the Rent Commencement Date and shall continue until the last day of the 12th month thereafter.  Each Lease Year thereafter shall be for a period of twelve (12) months commencing as of the first day of the month following the expiration of the immediately preceding Lease Year.

The term "Gross Sales" shall mean the aggregate amount of all sales (whether for cash, on credit or otherwise) of food, beverages, goods, articles and any other merchandise, and the aggregate of all charges for services performed (whether for cash, on credit or otherwise) made and rendered in, about or in connection with the Premises (whether or not through a private club) by Tenant and its assignees, sublessees and licensees, including sales derived from the redemption of gift cards or certificates, off-premises sales and monies derived at or away from the Premises so long as they are in connection with the business operation conducted on the Premises, and the aggregate amount of all receipts of Tenant with respect to all sales made or performed by means of mechanical or electronic games or devices, but shall not include any Federal, State, municipal or other sales, value added or retailer's excise taxes paid or accrued by Tenant, regardless of whether such taxes are collected from customers or absorbed by Tenant, the discounted portion of sales to employees or complimentary sales to employees and customers not to exceed four percent (4%) of total Gross Sales, discounts afforded customers from the redemption of coupons, fees paid by Tenant to credit card issuers and processors, condemnation proceeds, proceeds of insurance policies received by Tenant, bulk and/or intercompany transfers of food and/or inventory (provided no such transfer is made to avoid liability for Percentage Rent), proceeds from the sale of used restaurant equipment, alcohol beverage commission fees charged for private club memberships, if any, proceeds from the on-premises sale of gift cards or certificates or receipts from cigarette vending machines or pay telephones.

Within sixty (60) days after the end of each Lease Year, Tenant shall deliver to Landlord a written statement setting forth the amount of Tenant's Gross Sales for the preceding Lease Year.  Simultaneously with the delivery of such statement, Tenant shall pay to Landlord the Percentage Rent shown by such statement to be then due and owing.

Tenant shall maintain and preserve, or cause to be maintained and preserved, at the principal office of Tenant in accordance with generally accepted accounting practices for the type of business conducted by Tenant on the Premises, full, complete, accurate and detailed books, records and accounts of its daily Gross Sales, both for cash and on credit, derived from the business operation conducted on the Premises; provided, however, Tenant shall not be required to preserve any sales checks or cash register tapes for more than one hundred eighty (180) days following delivery of the written statement provided for hereinabove, or other books, records and accounts for a period of more than two (2) years after the end of the Lease Year covered thereby.  Landlord or its agents may inspect any and all records in Tenant's possession which relate to Gross Sales from the Premises at Tenant's principal business office at any time during normal business hours and normal working days upon prior reasonable notice.  Such examination shall be conducted in a manner which will not interfere unreasonably with the business conducted at Tenant's principal office.  Landlord may once in any Lease Year cause an audit of the Gross Sales from the business operation conducted by Tenant on the Premises for the immediately two (2) preceding Lease Years to be made by an independent certified public

12

accountant of Landlord's selection, and if the written statement of Gross Sales previously delivered to Landlord shall be found to be inaccurate, Landlord and Tenant shall make appropriate adjustments so that Landlord shall receive the full Percentage Rent to which it is entitled, and only such amount. Landlord shall pay for the cost of such audit unless the audit shall disclose Gross Sales of three per cent (3%) or more in excess of the Gross Sales theretofore reported by Tenant for that particular Lease Year, in which case Tenant shall promptly pay to Landlord the reasonable cost of said audit in addition to the deficiency in Percentage Rent.

(d)   No Additional Fees or Expenses.   Except with respect to the Grand Opening Charge described in Paragraph 35 of this Lease, Tenant shall not be obligated to contribute any sums to promotional or advertising programs pertaining to the Center, to join any merchant's or development association of the Center and pay fees or dues, or to pay any other miscellaneous fees or expenses or common area maintenance and repair charges in connection with the Center except as may be expressly set forth in this Lease. Tenant shall have no obligation to pay any additional Base Rent for the Patio Area or other outside areas utilized by Tenant for the conduct of its business.

(e)   Place of Payment.   All payments of Base Rent and other monetary amounts under this Lease shall be made to Landlord as the same shall become due in lawful money of the United States of America at the address specified in Paragraph 1(n) of this Lease, or to such other party or at such other address as hereinafter may be designated by Landlord by written notice delivered to Tenant at least ten (10) days prior to the next ensuing monthly rental payment date.

(f)   Late Charge.   If Tenant shall fail to pay any installment of rent or any other charges due under the Lease, within ten (10) days after the date then in addition to the installment of rent or other charges due under this Lease, Tenant shall pay to Landlord a late payment charge equal to Two Hundred Fifty and No/100 Dollars ($250.00), in order to compensate Landlord for its administrative and other overhead expenses, and interest on the Rent then due at the lesser of the maximum rate allowed by law or one and one-half percent (1½%) per month, such interest to accrue continuously on any unpaid balance due to Landlord by Tenant during the period commencing with the Rent due date and terminating with the date on which Tenant makes full payment of all amounts owing to Landlord at the time of said payment (collectively, the "Late Charge"). Any such Late Charge shall be payable as Additional Rent under this Lease, shall not be considered as a deduction from Percentage Rent, and shall be payable immediately on demand. If any Rent is paid by check which is returned for insufficient funds, Tenant shall immediately make the required payment to Landlord in good funds; moreover, Tenant shall also pay Landlord the amounts specified above in this Paragraph 4(f), plus an additional fee of One Hundred and No/100 Dollars ($100.00) to compensate Landlord for its expense and effort in connection with the dishonored check.

5.   **Holding Over by Tenant**. Should Tenant or any assignee, sublessee or licensee of Tenant fail to vacate the Premises or any part thereof after the expiration of the Primary Term or any Renewal Term hereof, then unless otherwise agreed in writing, such failure to vacate shall constitute and be construed as a tenancy from month-to-month upon the same terms and conditions as set forth in this Lease, provided that monthly Base Rent shall be increased to an

2286858 v12 (43470.00041.023)

amount equal to one hundred fifty percent (150%) of the monthly Base Rent payable hereunder during the last month of the immediately preceding term.

**6.** **[Intentionally Deleted]**

**7.** **Uses.**

(a)     Permitted Use. Tenant may use the Premises for the Permitted Use. In no event shall the Premises be used or occupied in violation of any "Existing Exclusives" set forth in Exhibit H attached hereto and made a part hereof by this reference or the "Prohibited Uses" set forth in Exhibit I attached hereto and made a part hereof by this reference. Notwithstanding the content of Exhibit H, however, nothing contained in this Lease shall prevent Landlord from leasing or permitting the use of any portion of the Center for any use or purpose set forth in Exhibit H, it being the intent of Landlord and Tenant that such provisions are solely binding on the Tenant and not Landlord. In no event shall Landlord permit any party to use any portion of the Center for any of the Prohibited Uses set forth in Exhibit I. Landlord will in good faith and in its commercially reasonable judgment enforce the Prohibited Uses and the Rules and Regulations as fairly, uniformly and judiciously as reasonably possible as to all tenants, occupants and users of the Center.

(b)     Exclusive Use. During the term of this Lease, including any Renewal Terms, and provided that Tenant is not in monetary default under this Lease beyond all applicable notice and cure periods and is open in the Premises for the Permitted Use (or is otherwise closed for either a Permitted Closure [as hereinafter defined] or pursuant to an express right to be closed as set forth in Paragraph 7(c) of this Lease), Landlord shall not allow to operate within the Center a restaurant other than Tenant which is a full service, sit-down, Mexican food restaurant. Tenant expressly agrees that a Chili's Bar & Grill restaurant is not a Mexican food restaurant. Tenant further agrees that the foregoing restriction shall not serve to prohibit so-called counter-service restaurants serving Mexican food, such as, for example purposes only, Fuzzy's Taco Shop, Velvet Taco, Freebirds, Chipotle, and Tin Star, so long as the space occupied by such so-called counter-service tenant does not exceed 2,750 square feet. Landlord shall not allow to operate within the Center any so-called counter-service restaurants which exceed 2,750 square feet of space if such restaurant serves primarily Mexican food, such as burritos, enchiladas, fajitas, wraps and tacos. Should Landlord be permanently estopped by any governmental or judicial authority from performing under this subparagraph, then this subparagraph shall be modified to such an extent as to take into account the parties' original intent and to permit Landlord the ability to enforce the same under applicable law.

If the exclusive use restriction set forth herein is violated, Tenant may, at its sole option, abate by fifty percent (50%) of Base Rent for so long as the violation continues, and if such violation continues for more than one (1) year, then Tenant shall be entitled to terminate this Lease by delivering thirty (30) days advance notice to Landlord, such termination to become effective as of the 30th day following such termination notice. If Tenant has not given notice of termination within thirty (30) days after the end of the 1-year period, then Tenant shall be deemed to have waived the violation and its right of termination and shall re-commence payment of full Rent. If Tenant shall terminate this Lease, Landlord shall pay to Tenant (except in the context of a Renegade Tenant, as described below in this Paragraph 7(b)), on or before the

2286858 v12 (43470.00041.023)

effective date of such termination, an amount equal to the then unamortized value of Tenant's improvements (less then amount of any Tenant Allowance actually received by Tenant) such amount to be depreciated on a straight-line basis over twenty (20) years. The total sums thus abated shall be partial liquidated damages for such breach and not a penalty therefor, the parties agreeing that it will be very difficult, if not impossible, to ascertain the amount of such damage. In addition to this remedy, Tenant shall be entitled to injunctive, and other appropriate relief, whether under the provisions of this Lease or otherwise. Landlord acknowledges that Tenant is relying upon these covenants in executing this Lease.

Notwithstanding anything contained herein appearing to the contrary, if a tenant or occupant of the Center violates the exclusive use rights granted herein to Tenant in violation of such other tenant's or occupant's lease or the ECR (such tenant or occupant being herein known as a "Renegade Tenant"), then Landlord shall not be in violation of the covenants in this Paragraph 7 as a result thereof (and Tenant shall not be entitled to abate Rent) so long as Landlord (x) commences action to cure or eliminate such violation by the Renegade Tenant within thirty (30) days of Landlord's receipt of written notice from Tenant of the existence of such violation (the "Violation Notice") and (y) if such violation continues, commences court action to cure or eliminate such violation by the Renegade Tenant within ninety (90) days of its receipt of the Violation Notice and diligently and in good faith pursues the actions in both (x) and (y), as applicable, to completion to cause the Renegade Tenant to cease and desist from violating the covenants of this Paragraph 7(b).

Additionally, and notwithstanding the foregoing, even if Landlord is pursuing remedies against a Renegade Tenant, if Landlord is unable to stop any such violation within six (6) months after Tenant's delivery of the Violation Notice, then Tenant, as its sole and exclusive remedy, shall have the right to abate Base Rent by fifty percent (50%) until said violation(s) ceases. If the violation(s) continues for eighteen (18) months following the date of the Violation Notice, then Tenant shall either terminate this Lease, as its sole and exclusive remedy, upon ninety (90) days' prior written notice delivered to Landlord within thirty (30) days after the expiration of the eighteen (18) month period (the "Renegade Tenant Termination Window"), or resume the payment of full Base Rent. If the option to terminate is not exercised, or if Tenant fails to timely exercise such option to terminate, then, from and after the expiration of the Renegade Tenant Termination Window, Tenant shall be obligated to pay Base Rent at the rates otherwise set forth in this Lease.

(c)    Go Dark; Right of Recapture. Tenant shall, subject to satisfaction of the Opening Co-Tenancy Requirement, open for business in the Premises, fully staffed and fully operational for the Permitted Use, for at least one (1) day, which day shall be no later than ninety (90) days after the Rent Commencement Date subject to delays resulting from acts of Landlord or matters included within the meaning of force majeure. If Tenant shall fail to open as and when required by foregoing sentence, Landlord may, as its sole and exclusive remedy, require Tenant to pay Base Rent equal to One Hundred Twenty Five percent (125%) of the amount otherwise due for each day of delay. If Tenant has not opened by the date that is ninety (90) days from the date otherwise required hereunder, Landlord may terminate this Lease. After Tenant has opened for at least one day as provided above, and notwithstanding anything to the contrary contained herein, Tenant shall not be required to continuously operate its business in the

15                                                     2286858 v12 (43470.00041.023)

Premises or keep the same open to the public; provided that, Tenant shall at all times continue to pay all Rent as it becomes due and payable pursuant to the terms and provisions of this Lease.

Notwithstanding Tenant's right to "go dark" after opening, if at any time Tenant shall have failed to operate or cause to be operated any retail business in the Premises (other than prior to the Rent Commencement Date or during any Permitted Closure) for a period of more than ninety (90) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by not later than the thirtieth (30th) day after the date on which said 90-day period expires, and whereupon this Lease shall terminate upon the sixtieth (60th) day (the "Recapture Date") after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date were originally set forth herein as the expiration date of the Term.  Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date. Operation by Tenant in less than fifty percent (50%) of the Premises (assuming that there is no subtenant operating in all or a majority of the balance of the Premises), or with less than the usual and customary amount of fixtures and stock for the operation of a typical Tenant's and/or said subtenant's store, shall not be deemed to be "operating or conducting a retail business" in the Premises.  Similarly, if Tenant opens and operates a short term or temporary seasonal business in the Premises (for purposes of example only, a "Halloween shop") the operation of such a temporary business shall not be deemed to void or toll the running of the 90-consecutive day period for the ripening of Landlord's recapture right.  For purposes of this Paragraph, the term "Permitted Closure" means any closure of the Premises which is necessitated by: (x) alterations or renovations being performed in and to the Premises, (y) damage or destruction, eminent domain proceedings or actions, or force majeure events, or (z) any act or omission of Landlord, or its employees, agents, or contractors.

(d)    Compliance with Law.    Landlord covenants and warrants that upon delivery of the Premises to Tenant, all improvements constructed by Landlord as part of Landlord's Work shall be in compliance with all applicable laws, and regulations, including, but not limited to, those applying to accessibility for the disabled or handicapped.  During the term of this Lease, Tenant, at its sole cost and expense, shall comply promptly with all laws, rules and regulations made by any governmental authority having jurisdiction over Tenant's use of the Premises pertaining to (i) the physical condition of any improvements constructed by Tenant in the Premises, and (ii) Tenant's specific business operations in the Premises.  Tenant shall not be required to make any structural upgrades, repairs, improvements or alterations to the Premises or to the Center to comply with this requirement, except to extent pertaining to Tenant's specific use of the Premises.  Landlord, at its sole cost and expense, shall comply with all other laws, rules and regulations made by any governmental authority and affecting the Premises or the Center, not required by Tenant's specific use of the Premises, or for which Landlord is otherwise responsible pursuant to Paragraph 13(b) of this Lease.

2286858 v12 (43470.00041.023)

**8.      Representations and Covenants of Landlord**. As of the Effective Date of this Lease, Landlord represents, warrants and covenants to Tenant as follows:

(a)      That from and after the Acquisition Date, Landlord shall have good and insurable fee simple title to the Premises and the Center;

(b)      That Landlord possesses full power and authority to enter into and perform its obligations under and with respect to this Lease;

(c)      That there are no pending or, to the knowledge of Landlord, threatened condemnation proceedings or actions affecting the Premises;

(d)      That there are no unpaid special assessments for sewer, sidewalk, water, paving, electrical or power improvements or other capital expenditures or improvements, matured or unmatured;

(e)      That there are no pending or, to the knowledge of Landlord, threatened actions or legal proceedings affecting the Premises or Landlord's interest therein;

(f)      That this Lease and the consummation of the transactions contemplated hereby shall be valid and binding upon Landlord and shall not constitute a default (or an event which with notice or passage of time or both will constitute a default) under any contract to which Landlord is a party or by which it is bound;

(g)      That Landlord has not received notice nor has Landlord any knowledge of any violation of any law, regulation, ordinance, order or other requirement of any governmental authority having jurisdiction over or affecting any part of the Premises;

(h)      That the use of the Premises in accordance with Paragraph 7 hereof, including the sale of all items currently on the Abuelo's Mexican Food Embassy menu, will not violate the terms and provisions of any other lease for space in the Center or any restriction affecting the Premises; and

(i)      That except as set forth in the Phase I Environmental Site Assessment dated October 2012 prepared by Reed Engineering Group and the Limited Subsurface Investigation dated November 21, 2012, also prepared by Reed Engineering Group, to the best of Landlord's knowledge, the land for the Center does not contain any underground storage tanks, asbestos, polychlorinated biphenyls (pcb's), radon, urea formaldehyde, substantial amounts of waste or debris, or contamination, including without limitation: (x) any "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976, and regulations promulgated thereunder; (y) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, and regulations promulgated thereunder; and (z) any substance, the presence of which on the land or the Premises is prohibited or regulated in any manner, including, without limitation, special handling or notification of any governmental entity in its collection, storage, treatment or disposal, by any federal, state, or local law, ruling, code, rule, or regulation, similar or dissimilar to those set forth in this Paragraph 8(i).

      2286858 v12 (43470.00041.023)

9.      **Utilities**.

(a)     Utility Service. Tenant shall pay all security deposits and charges incurred for the use of utility services at the Premises including, without limitation, gas, electricity, water, cable television, and telephone, each of which shall be separately metered to the Premises by proper and sufficient meters accessible to Tenant and installed at Landlord's sole cost and expense. Tenant shall be responsible for the electricity usage for all of Tenant's building signage and the operation of the Patio Area, and the same shall be connected to Tenant's electrical meter. Landlord shall never charge Tenant a rate for any utility in excess of the rate Landlord pays the supplier of the service. Tenant shall be entitled to solicit bids from competing utility providers in order to secure utility services for Tenant's business operations and, in connection therewith, Tenant shall be entitled to enter into such contracts with such providers as Tenant deems appropriate for the purpose of securing such utility services. Landlord shall pay all utility connection fees, sewer connection fees, impact fees, tap fees and other similar fees associated with Tenant's initial occupancy of the Premises.

(b)     Interruption of Services. Landlord shall not interrupt any utility services to the Premises unless (i) such interruption is necessitated by the need to make emergency repairs, or (ii) Landlord schedules any necessary repair work with Tenant's general manager at the Premises at least seventy two (72) hours in advance. Such repairs shall, to the extent possible, be made only during hours when Tenant is not open for business to the public. Landlord shall immediately give notice to Tenant of an impending interruption of any utility services to the Premises. Landlord shall use its best efforts to minimize and promptly cure all utility interruptions that are caused by Landlord or subject to Landlord's control. Notwithstanding anything to the contrary contained in this Lease, if Landlord fails to cure a utility interruption within twenty-four (24) hours after it occurs, and if such interruption is caused by Landlord or subject to Landlord's control, Tenant may, at its sole option, take such steps as are necessary to cure such interruption, in which event Tenant shall be entitled to recover from Landlord or deduct from subsequent rent payments the amounts reasonably expended by Tenant for said purposes, together with interest thereon at the Default Rate. All Base Rent due from Tenant to Landlord shall be abated from the date that Tenant closes for business as a result of a utility interruption caused by Landlord as described in this subparagraph until such utility service is restored.

10.     **Taxes, Assessments and other Governmental Impositions**.

(a)     Definition of "Taxes". For purposes of this Lease, the term "Taxes" shall mean and refer to all real estate taxes (both real and personal), assessments (both general and special) and other governmental impositions lawfully created and assessed against the land, buildings and other improvements within the Center, together with reasonable costs of any negotiation, contest or appeal pursued by Landlord in an effort to reduce the same. In no event shall Taxes include (nor shall Tenant be liable hereunder for or required to pay) any income, profit, excise, inheritance, estate, gift or franchise taxes, or taxes with respect to the rent received by Landlord under this Lease, or upon the right of Landlord to receive such rent or to do business, or any tax, assessment or governmental imposition in replacement or substitution of the foregoing or of a similar character.

18

Any Taxes created, levied, or arising prior to the Rent Commencement Date of this Lease, any installment of any such Taxes created prior to the Rent Commencement Date or any Taxes applicable to a period of time prior to the Rent Commencement Date, but assessed or otherwise imposed during the term hereof, shall be paid by Landlord.  Similarly, at the expiration of the term of this Lease, taxes, impositions, assessments, or other similar expenses required to be paid by Tenant hereunder shall be apportioned in the same manner as such taxes were apportioned prior to the Rent Commencement Date, and Landlord shall pay that portion thereof applicable to the period after the expiration of the term of this Lease.

(b)      Payment of Taxes.   As of the Rent Commencement Date, Landlord represents and warrants that (i) Landlord has paid in full all currently due Taxes, and (ii) Landlord shall pay when due all future Taxes.  During the term of this Lease, Tenant will pay Landlord as Additional Rent, an amount equal to Tenant's Proportionate Share of all Taxes. Tenant's Proportionate Share of Taxes shall be paid monthly, at the same time Base Rent is due, in the amount per month equal to one-twelfth of the annual amount determined by Landlord in its commercially reasonable business judgment using the tax bill for the prior year as guidance.  On or about the Premises Delivery Date, Landlord shall provide Tenant with a copy of the tax bill applicable to the Center for the calendar year immediately preceding the year in which the Rent Commencement Date will occur, together with a detailed calculation setting forth the estimated amount of Tenant's Proportionate Share of such Taxes.  Landlord estimates that Taxes for the first year of the term of this Lease will not exceed $2.50 per square foot of Floor Area within the Premises.  Within sixty (60) days after the end of each calendar year, Landlord shall furnish Tenant with a written statement setting forth the total Taxes for said calendar year (together with a copy of the paid tax bill), the calculation of Tenant's Proportionate Share thereof and the amount paid by Tenant during such calendar year.  Any deficiency shall be paid by Tenant to Landlord within thirty (30) days after the end of each applicable annual period.  Similarly, any overpayment by Tenant shall be refunded to Tenant by Landlord within thirty (30) days after the end of each applicable annual period.

Notwithstanding anything to the contrary contained in this Lease, Landlord and Tenant hereby agree as follows: (i) the responsibility for the payment of all Taxes shall be upon Landlord and Landlord agrees to pay the same as required by law, and in any event, so as to assure that Tenant's right to occupy the Premises and use the Common Areas shall not be disturbed or threatened; (ii) Tenant shall not be required to share in any penalties, interest, late payments or the like resulting from Landlord's late payment of Taxes, unless such late payment is caused by late payment from Tenant; (iii) Landlord shall provide Tenant with (A) copies of all tax paid bills and a detailed computation of Tenant's Proportionate Share, and (B) such other documents and information necessary for Tenant to ascertain the accuracy of Landlords computation; (iv) Landlord shall pay to Tenant, promptly upon receipt of the same, Tenant's Proportionate Share of any refund or rebate of Taxes received by Landlord and applicable to the term hereof; (v) in the event any special assessments are assessed and payable, Tenant's Proportionate Share of the same shall be calculated as if such assessments were being paid by Landlord over the longest period of time permitted by applicable law; and (vi) Tenant shall have the right to audit the applicable records of Landlord to confirm that the Taxes billed to Tenant are proper and conform to the provisions of this Paragraph.  Such audit right shall be exercisable by Tenant within three (3) years of Tenant's receipt of Landlord's annual statement of such charges, and must be performed by a qualified employee of Tenant or by an independent

2286858 v12 (43470.00041.023)

certified public accounting firm that is not contingent-fee based. Should any such audit disclose that Tenant has overpaid the Taxes, Landlord shall promptly refund the amount of the overpayment to Tenant. Should any such audit disclose that Tenant overpaid the Taxes by four percent (4%) or more, Landlord shall promptly pay for the cost of such audit and interest at the Default Rate on such overpayment, accruing from the date such overpayment first occurred.

(c) Tax Contest. Tenant agrees that, as between Tenant and Landlord, Landlord has the sole and exclusive absolute right to contest taxes levied against the Premises and the Center (other than taxes levied directly against Tenant's personal property within the Premises). Accordingly, Tenant, to the maximum extent permitted by law, irrevocably waives any and all rights that Tenant may have to receive from Landlord a copy of notices received by Landlord regarding the appraisal or reappraisal, for tax purposes, of all or any portion of the Premises or the Center (including, without limitation, any rights set forth in §41.413 of the Texas Property Tax Code, as such section may be amended and/or supplemented from time to time). Additionally, Tenant, to the maximum extent permitted by law, hereby assigns to Landlord any and all rights of Tenant to protest or appeal any governmental appraisal or reappraisal of the value of all or any portion of the Premises or the Center (including, without limitation, any rights set forth in §41.413 and §42.015 of the Texas Property Tax Code, as such sections may be amended and/or supplemented from time to time). To the maximum extent permitted by law, Tenant agrees that it will not protest or appeal any such appraisal or reappraisal before a governmental taxing authority without the express written authorization of Landlord. Unless Landlord reasonably determines that the appraised value of the Center will be increased as a result of such protest, each year Landlord shall promptly and diligently protest the appraised value of the Center determined by any appraisal review board or other taxing entity authority to determine tax rates and/or appraised values.

(d) Personal Property Taxes. Tenant shall pay, prior to delinquency, all personal property taxes assessed against Tenant directly and applicable to its personal property located within the Premises.

## 11. Insurance.

(a) Tenant shall maintain so called "all risk" commercial property insurance with a special form endorsement providing coverage on a replacement cost basis for Tenant's fixtures, equipment and inventory in the Premises. During the term, Tenant shall use the proceeds from any such policy or policies of insurance for the repair or replacement of the insured property unless Tenant elects to terminate the Lease under Paragraph 16 hereof. Landlord shall have no interest in any insurance proceeds Tenant receives for Tenant's property and Landlord shall sign all documents which are necessary or appropriate in connection with the settlement of any claim or loss by Tenant. Tenant's policies shall not be contributing with or in excess of any coverage which Landlord shall carry on the Center or the building of which the Premises are a part.

(b) Tenant shall also insure against property damage and public liability arising by reason of occurrences on or about the Premises by maintaining a policy or policies of commercial general liability insurance including contractual liability coverage insuring against

2286858 v12 (43470.00041.023)

the tort liabilities assumed under this Lease in the amount of not less than TWO MILLION AND NO/100 DOLLARS ($2,000,000) in respect of any one occurrence.

(c) Landlord shall maintain so called "all risk" fire and extended coverage insurance (including vandalism and malicious mischief insurance, earthquake insurance, and flood insurance) on the Center, including specifically, but without limitation, the building of which the Premises are a part (but excluding any property which Tenant is obligated to insure hereunder), with a limit of or in an amount not less than the replacement value thereof. Payments for losses thereunder shall be made solely to Landlord or the mortgagees of Landlord as their interests shall appear.

(d) Landlord shall also insure against property damage and public liability arising by reason of occurrences on or about the Center by maintaining a policy or policies of commercial general liability insurance including contractual liability coverage insuring against the liabilities assumed under this Lease with respect to its activities at the Center (including, without limitation, Landlord's activities within the Premises), in the amount of not less than TWO MILLION AND NO/100 DOLLARS ($2,000,000) in respect of any one occurrence.

(e) Landlord and Tenant shall each subscribe to the workers' compensation law in the state in which the Premises are located and shall each maintain (at its sole cost and expense) workers' compensation and employers' liability insurance covering all of its employees as required of a subscriber to the relevant statutes in the state in which the Premises are located.

(f) It is agreed that the insurance coverages provided for herein may be maintained pursuant to master policies of insurance covering other business locations of Tenant and/or its corporate affiliates or other commercial developments of Landlord and/or its corporate affiliates. All insurance policies required to be maintained by Tenant and Landlord hereunder shall be with responsible insurance companies, authorized to do business in the state in which the Premises are located if required by law, and except for property insurance policies and workers' compensation policies, shall name Landlord or Tenant as an additional insured (as applicable), as their interests may appear, and shall provide for cancellation only upon ten (10) days prior written notice to Landlord and Tenant. Each party shall evidence such insurance coverage by delivering to the other party certificates issued by the insurance companies underwriting such risks. Tenant shall contribute toward the cost of Landlord's insurance policies in the manner specified in Paragraph 12 below and such costs shall be included as a part of CAM Charges. Notwithstanding anything contained in this Lease to the contrary, Tenant may elect to non-subscribe, if applicable, and/or to provide coverage for any of the foregoing risks within this Paragraph 11 by maintaining such deductibles as it may elect or by a plan of self-insurance through Tenant.

12. **Common Area; Parking**.

(a) Defined. The "Common Area" is the part of the Center designated by Landlord for the common use of all occupants, including parking areas, access drives, drive aisles, sidewalks, landscaping, curbs, loading areas servicing more than one tenant, private streets and alleys, retention basin(s), utility lines and connections, lighting facilities, hallways, exterior malls, restrooms, and other similar areas and improvements.

2286858 v12 (43470.00041.023)

(b)      Use of Common Area; Parking.      Tenant and its employees, representatives, customers, invitees, subtenants, licensees and concessionaires shall have the non-exclusive right and easement to use the Common Area as constituted from time to time, such use to be in common with Landlord, other occupants of the Center and other persons permitted to use the same.  At no time during the term of this Lease shall Landlord be permitted to impose on Tenant, its employees, customers, invitees or any other party, any restriction on, or monetary fee for, the right to park vehicles in the Common Area.  Landlord shall apply for and obtain all parking permits needed to meet code and permitting requirements for Tenant's anticipated use of the Premises both as of the Premises Delivery Date and throughout the term of this Lease, at no cost or expense to Tenant.

(c)      Required Common Areas; No Build Area.  During the Term of this Lease, Landlord shall provide for Tenant's use (i) the parking area more generally as shown and labeled "Required Parking Area" on Exhibit A-1 attached hereto and made a part hereof, and (ii) the access drives generally as shown and labeled "Required Access Drives" on Exhibit A-1 (collectively, the "Required Common Areas").  During the Term of this Lease, Landlord agrees that it shall not (nor consent to allow any other party to) materially relocate, modify, alter or otherwise change the Required Common Areas; provided, however, that (A) minor modifications such as, for example, the possible addition of cart corrals in the Required Parking Area, and minor adjustments to landscaping features, curb cuts and drives shall be permitted, and (B) other modifications permitted by the ECR shall be permitted, provided such other modifications shall not: (I) adversely affect Tenant's operations in the Premises or the Patio Area, (II) materially and adversely affect the visibility of the Premises or the Patio Area, and (III) adversely affect Tenant's access to the Premises or materially and adversely affect parking in the immediate vicinity of the Premises.  Additionally, Landlord agrees that it shall not (nor consent to allow any other party to) erect, construct or install any subsequent signage (other than traffic control, directional, parking, safety and similar signs), permanent buildings, kiosks or roofed structures in the area labeled "No Build Area" on Exhibit A-1 attached hereto.  Although it is not part of the No-Build Area, Landlord agrees that no permanent commercial or residential structures will be built or permitted by Landlord in the portion of the area labeled "Lifestyle Park" on Exhibit A-1 from the eastern-most exterior wall of the Premises westward towards South Broadway Boulevard, except that Landlord reserves the right to build, place, install or permit temporary structures in that area for special events, including for temporary commercial uses such as, for example but not limitation, for the sale of ice cream, and to build one or more permanent kiosks or structures in the area of the Lifestyle Park east of the Premises for the same or similar purposes.

(d)      Modifications, Changes and Additions to the Center.  Outside of the Required Common Areas and the No Build Area, Landlord reserves the right, at any time and from time to time, to make such changes, modifications, alterations, additions and replacements to the Center (including the Common Areas) as Landlord may deem necessary or appropriate.  All such changes, modifications, alterations, additions and replacements shall be completed by Landlord in a good and workmanlike manner, as expeditiously as possible, and in a manner which causes as little disruption to Tenant's use of the Premises as is reasonably possible and shall in any event be consistent with first class retail shopping centers in the metropolitan area in which the Premises is located.  Notwithstanding the right of Landlord as provided herein, Landlord acknowledges and agrees that in no event shall any changes, modifications, alterations,

22                                           2286858 v12 (43470.00041.023)

additions and/or replacements to the Center (i) impair the access to or the frontage of the Premises, or materially impair the visibility of the Premises, (ii) materially affect the conduct of Tenant's customary business in the Premises, or (iii) detract from Tenant's signage or materially adversely affect the presentation of Tenant's storefront.  In the event of any such interference, Tenant shall notify Landlord of same in writing, and if Landlord shall fail to remedy such interference within forty-five (45) days thereafter, the Base Rent shall be equitably abated based on the degree of interference with Tenant's business.

(e)  <u>Common Area Maintenance</u>.  Landlord shall maintain and operate (or cause to be maintained and operated) the Common Area at its cost and expense, in a first class manner and condition, and otherwise in compliance with all laws, rules, regulations, and ordinances.  Notwithstanding the foregoing, however, Tenant shall be solely responsible for maintenance of the Patio Area and all costs associated therewith.  Landlord agrees that all maintenance of the Common Area shall be performed in a manner which will cause as little disruption of and interference with Tenant's use of the remainder of the Common Area and the Premises as is reasonably possible.  Landlord shall keep the Common Area properly lighted and secure until two (2) hours after Tenant's normal close of business each day.  Landlord's failure to fulfill its obligation to maintain the Common Area as described above in this paragraph, shall constitute a Landlord Event of Default after the passage of time set forth in Paragraph 28(c)(ii) hereof.  Landlord shall use all reasonable efforts and due diligence to minimize the cost of managing, operating, maintaining and repairing the Common Area in a manner consistent with prudent shopping center practices.

In connection with its obligations hereunder, Landlord will have the right to establish, modify and enforce reasonable rules and regulations with respect to the Common Areas, provided that (i) a copy of the same are provided to Tenant, and (ii) the same are uniformly applied and enforced and do not materially affect Tenant's rights hereunder.  Attached to this Lease as <u>Exhibit J</u> and made a part hereof are Landlord's initial Rules and Regulations for the Center.  Landlord may make changes or additions to the Rules and Regulations as long as the same do not conflict with the terms and conditions of this Lease, increase Tenant's obligations hereunder, diminish Tenant's rights hereunder and are otherwise uniformly applied to all tenants of the Center.   To the extent the Rules and Regulations or any future modification or addition to the same shall conflict with any express term of the Lease to which they are attached, the terms and conditions of the Lease shall control as between Landlord and Tenant

Notwithstanding the Rules and Regulations attached to this Lease as <u>Exhibit J</u>:  (i) Landlord agrees to allow Tenant to place, from time to time, temporary movable signage on the sidewalk immediately adjacent to and in front of the Premises and in the Patio Area and relating to the Tenant's business at the Premises, subject to Landlord's prior review and approval, which approval Landlord shall not unreasonably condition, withhold or delay, and provided in any event that the size and/or placement of such signage will not interfere with the reasonable flow of pedestrian traffic (item 1), (ii) Landlord agrees that Tenant need only keep the building façade (including building signage) lighted from dusk till dawn, or for such time period that other tenants in the Lifestyle Center are required to keep their building façade lit (item 9), (iii) Landlord agrees to allow Tenant to place temporary "coming soon", "now hiring" and opening date banners at or upon the exterior of the Premises prior to opening for business, and temporary "happy hour" banners on the patio, from time to time,  subject to Landlord's prior review and

23

approval (including, without limitation, as to how and where the same will be attached or installed), which approval Landlord shall not unreasonably condition, withhold or delay (item 9), and (iv) Landlord agrees to permit televisions in the Patio Area, subject to any requirements or restrictions of the ECR or applicable law, subject to Landlord's prior review and approval (including, without limitation, as to how and where the same will be attached or installed and how required electrical and/or satellite, cable or other service is to be provided), which approval Landlord shall not unreasonably condition, withhold or delay (item 17).

(f)    Tenant to Pay Proportionate Share of CAM Charges. Tenant agrees to pay as Additional Rent each month on the same day that Base Rent is due Tenant's Proportionate Share of the costs actually incurred by Landlord for operating, maintaining and repairing the Common Area, including, among other costs, those incurred for lighting, sewer services, painting, cleaning, policing, inspecting, landscaping, snow removing, replacing, insuring, guarding and protecting, which costs may be incurred by Landlord in its reasonable discretion (collectively, the "CAM Charges"). Landscape maintenance and repair shall include trimming of trees, shrubs and bushes such that the visibility of Tenant's building and signage (either building signage or free standing signage, if applicable) is not materially impaired. The CAM Charges payable by Tenant during the first (1st) full calendar year of the Primary Term of this Lease are estimated to be $4.25 per square foot of Floor Area of the Premises. This estimate includes estimated general common area maintenance, Lifestyle Center CAM Charges, charges for trash removal and grease trap cleaning and all other elements and costs incurred as a part of common areas maintenance in the total amount of $4.00 per square foot of Floor Area in the Premises and estimated insurance costs (pursuant to Paragraph 11 above) of $0.25 per square foot of Floor Area within the Premises. Of the $4.00 estimated first year overall CAM Charge, Landlord anticipates that Two and No/100 Dollars ($2.00) per square foot of the Premises shall be allocated to Lifestyle Center CAM Charges.

Although such facilities are not technically a part of the Center and therefore not included within the defined term "Common Areas", CAM Charges shall also include Landlord's actual annual cost of operating and maintaining any offsite drainage and related facilities, including but not limited to offsite detention ponds and related facilities, serving the Center that are operated or maintained by Landlord or for which Landlord is required to provide contribution.

Notwithstanding anything in the above appearing to the contrary, the cost to resurface parking areas (no more than once every 15 years) and the cost of roof replacement (no more than once every 20 years) shall be included as CAM Charges, provided the same are amortized on a straight line basis over the useful life thereof (as determined in accordance with GAAP).

Tenant acknowledges and agrees that the Premises is part of the "Lifestyle" portion of the Center as shown on Exhibit A-1 (the "Lifestyle Center"), which will not be enlarged, nor any of Tenant's obligations with respect thereto modified, in a manner, either by increasing the size thereof or otherwise, that would increase Tenant's proportionate share or actual responsibility for costs related to CAM applicable to the Lifestyle Center without Tenant's consent, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant further acknowledges and agrees that the Lifestyle Center was constructed and designed for occupancy by restaurants, theaters and other users requiring more intensive Common Area maintenance. The Lifestyle Center has, among other things, decorative fixtures, landscaping and design details in excess of

24                                                    2286858 v12 (43470.00041.023)

that constructed in and provided to the remainder of the Center (the "Lifestyle Elements"). As a result, Tenant shall be obligated to pay with and as a portion of its CAM Charges those additional costs of operating the Common Areas of the Lifestyle Center, including but not limited to maintenance of decorative pavers, water features and other architectural and aesthetic elements, additional trash pickup, sweeping, lighting, landscaping, maintenance and other charges unique to the Lifestyle Center (the "Lifestyle Center CAM Charges").  Such charges shall be allocated to all Center tenants located in the Lifestyle Center on a pro rata basis, which may be adjusted from time to time depending on the occupancy of the Lifestyle Center; provided, however, in no event shall Tenant's proportionate share of the Lifestyle Center be more than 6.9%.

Notwithstanding any provisions to the contrary contained herein, the following items are specifically excluded from Tenant's proportionate share of CAM Charges and Lifestyle Center CAM Charges (collectively, the "CAM Exclusions"): administrative expenses of Landlord, including Landlord's personnel salaries such as secretarial and executive salaries (other than on-site managers and personnel below the management level used in direct Common Area or Lifestyle Center maintenance activities and then only to the extent such personnel spend time on such activities), Landlord's general off-site overhead, initial construction and landscaping, other capital improvements and expenditures (including parking lot resurfacing and any other improvements or expenditures required to comply with any governmental law or regulation), advertising expenses, real estate commissions, leasing salaries and expenses, bonuses to employees, Landlord's legal fees attributable to any matters concerning any tenant in the Center, charges relating to leases other than this Lease (including, without limitation, any such tenant's failure to pay its proportionate share of CAM Charges or Lifestyle Center CAM Charges), expenses for which Landlord is or will be reimbursed by another source (including, but not limited to, repair or replacement of any item covered by warranty), structural repairs or replacements, depreciation and amortization of the Center (or the buildings therein) or financing costs (including interest and principal amortization of debts), any amounts expended by Landlord to comply with Environmental Laws, costs to correct defects in the design, construction or equipment of the Center (or the buildings therein), any repair, rebuilding or other work necessitated by condemnation, fire, windstorm or other insured casualty.

Landlord may assess CAM Charges, including the Lifestyle Center CAM Charges, based upon the estimated annual cost of operation and maintenance of the Common Area and the Lifestyle Center, payable in advance but subject to adjustment after the end of each calendar year on the basis of the actual costs for such year.  Within one hundred ninety (90) days after the end of each calendar year, Landlord shall furnish Tenant with a written statement setting forth the total CAM Charges for said calendar year which statement shall identify the portion of the same allocable to the Lifestyle Center CAM Charge.  Landlord shall further identify within the statement the line items within the overall CAM Charge which are allocable to trash removal and grease trap cleaning as provided below.  The statement shall include a detailed calculation of Tenant's proportionate share of overall CAM Charges and Lifestyle Center CAM Charges and shall include an accounting of all payments theretofore made by Tenant during such calendar year.  Any overpayment by Tenant shall be refunded to Tenant by Landlord within sixty (60) days after the end of each applicable annual period.  If Landlord has not furnished Tenant with a reconciliation of CAM Charges and/or Lifestyle Center CAM Charges for the previous calendar year within one hundred eighty (180) days after the end of a calendar year, then, until such time

2286858 v12 (43470.00041.023)

as Landlord furnishes Tenant with a reconciliation statement, Tenant shall not be required to continue paying estimated CAM Charges, including estimated Lifestyle Center CAM Charges, in advance on a monthly basis. Tenant shall have the right to audit Landlord's books and records with respect to CAM Charges, including the Lifestyle Center CAM Charges once per annum, during normal business hours on reasonable prior written notice, and must be performed by a qualified employee of Tenant of by an independent certified accounting firm that is not contingent-fee based. Tenant shall pay for the cost of such audit unless the audit shall disclose that CAM Charges, including Lifestyle Center CAM Charges (or the aggregate of both), paid by Tenant were four percent (4%) or more in excess of actual CAM Charges, including Lifestyle Center CAM Charges (or the aggregate of both), in which case Landlord shall promptly pay to Tenant the reasonable cost of such in addition to any overpayment made by Tenant.

13. **Maintenance and Repairs**.

(a) Tenant's Obligations.

(i) General Obligations of Tenant. Subject to the provisions of Paragraphs 13(b) and 13(c), and except for damage caused by fire or other casualty, whether or not insured or insurable, Tenant, at Tenant's expense, shall keep the Premises and the Patio Area in good order and repair, including maintaining all plumbing, HVAC, electrical and lighting facilities and equipment within the Premises and exclusively serving the Premises, and the store front, doors, and plate glass of the Premises. At Tenant's request, Landlord shall transfer or assign to Tenant all warranties, express or implied, under any contract or subcontracts relating to any improvements or equipment Landlord built or installed within the Premises or Patio Area to serve the Premises or Patio Area exclusively, including, without limitation, the warranty for the HVAC system. Notwithstanding any provision to the contrary, Tenant's obligations under this Paragraph shall not include making (i) any repair or improvement necessitated by the negligence or willful misconduct of Landlord, its agents, employees or servants; (ii) any repair or improvement caused by Landlord's failure to perform its obligations hereunder or under any other agreement between Landlord and Tenant; or (iii) any structural repairs, improvements or alterations to the Premises, the Patio Area, or the Center (except to the extent required by a change in applicable laws that relates to Tenant's specific use of the Premises).

(ii) Trash Removal/Grease Traps. Landlord shall provide an adequately screened trash dumpster or compactor to be located in the general area depicted on Exhibit A-1. Landlord shall also provide a grease trap serving the Premises in the same general area. The dumpster shall be adequately sized to meet Tenant's needs and shall not be relocated out of the service area depicted on Exhibit A-1 except with Tenant's prior written approval. Tenant shall be solely responsible for trash and garbage removal from the Premises to the dumpster, including the placing of all trash and garbage in containers. Landlord shall contract with a trash removal service and with a grease trap cleaning company and shall provide such services to Tenant. Tenant shall pay for such service monthly, as Additional Rent, in accordance with a uniform exhibit of charges to be established by Landlord; provided, however, the charge for trash removal and grease

2286858 v12 (43470.00041.023)

trap cleaning is included within the annual CAM Charge as stipulated in Paragraph 12(f) above.

(iii)   <u>Cleaning Services</u>.   Tenant shall, at its expense, provide the Premises (including, without limitation, exterior plate glass, exterior doors and framing, exterior walls, exterior signs, the sidewalks immediately adjacent to the Premises and the Patio Area, if any, and the service entrance) with those janitorial, window cleaning, pest and vermin control, repainting and other services required to maintain the Premises in a clean, sanitary, safe, and attractive condition in accordance with the standards of comparable retail establishments, but in any event, not less than the reasonable standards established by Landlord for the Common Areas and other retail tenants.

(b)   <u>Landlord's Obligations</u>.   Except for repairs and replacements to the Premises that Tenant must make under Paragraph 13(a) above, Landlord shall pay for and make all other repairs and/or replacements to the Premises and the Center (including the Common Areas).   Landlord shall, at its sole cost and expense, make the repairs and replacements necessary to maintain the Center in a condition comparable to other first-class buildings/shopping centers in the metropolitan area where the Premises are located.   Such repairs, replacements and maintenance shall include the upkeep of the roof, roof membrane and roof systems (gutters, downspouts and the like), foundation, exterior walls, interior structural walls, and all structural components of the Center.   Landlord shall also repair and maintain all parking areas, sidewalks, landscaping and drainage systems within the Center and all utility systems (including mechanical, electrical, and HVAC systems) and plumbing systems which serve the Center as a whole and not a particular tenant's premises, and Landlord may allocate the cost of such maintenance equitably among all tenants pursuant to Paragraph 12.   Notwithstanding anything herein appearing to the contrary, Tenant shall reimburse Landlord within ten (10) days of demand all reasonable costs incurred by Landlord in making repairs to the roof of the Premises resulting from the negligence or willful misconduct of Tenant, its employees, agents or contractors (as opposed to roof replacement).   Landlord shall not be required to maintain the interior surface of exterior walls, windows, doors or plate glass and store fronts (except where maintenance of the same is caused by Landlord's negligence or failure to perform its obligations under this Paragraph).   Landlord shall make all repairs under this Paragraph promptly after Landlord learns of the need for such repairs but in any event within thirty (30) days after Tenant notifies Landlord of the need for such repairs.   If Landlord fails to make such repairs within thirty (30) days after Tenant's notice (except when the repairs require more than thirty (30) days for performance and Landlord commences the repair within thirty (30) days and diligently pursues the repair to completion), Tenant may, at its option, upon fifteen (15) days' prior written notice to Landlord of Tenant's intention to do so, undertake such repairs and deduct the cost thereof from the installments of Base Rent, Additional Rent and all other charges next falling due.   Notwithstanding the foregoing, in the event of an emergency, Tenant may give Landlord such shorter notice as is practicable under the circumstances, and if Landlord fails to make such repairs in such period of time as is reasonable under the circumstances, Tenant may immediately undertake such repairs and deduct the cost thereof from the installments of Base Rent, Additional Rent and all other charges next falling due.

27

(c)     Surrender.  At the expiration or earlier termination of this Lease, Tenant shall deliver the Premises to Landlord in good repair and condition, loss by fire or other casualty, act of God, ordinary wear and tear, depreciation and obsolescence being excepted.

**14.     Improvements; Alterations; Signage.**

(a)     Initial Improvements.  Tenant, at Tenant's cost, may install in the Premises such fixtures, finishes and other initial improvements which are consistent with its then-current trade dress as Tenant deems necessary or desirable for the conduct of Tenant's business therein (the "Initial Improvements").  Landlord acknowledges that it is familiar with Tenant's prototypical store front and exterior elevation and will permit Tenant to construct the Initial Improvements in a manner consistent with its prototype.  Not later than the date that is ninety (90) days after last to occur of: (i) date on which Landlord and Tenant agree upon Landlord's Plans, or (ii) date on which Landlord's Acquisition and Financing Contingencies are satisfied, Tenant shall submit Tenant's final construction drawings ("Tenant's Plans") for the Initial Improvements to Landlord for Landlord's review and approval of (i) the structural elements, and (ii) changes to the prototypical storefront and/or exterior elevations.  Landlord shall have a period of fifteen (15) days (the "Review Period") to review and approve Tenant's Plans, which approval shall not be unreasonably withheld, conditioned or delayed (and shall be deemed given if not specifically withheld on or before the end of the Review Period).  If Landlord objects to all or any portion of Tenant's Plans, Landlord shall provide Tenant with a written description of the specific structural or exterior store front or elevation items in Tenant's Plans that are not acceptable and a description of the specific changes that must be made to Tenant's Plans to secure Landlord's approval.  Tenant shall either (a) submit modified plans for approval, or (b) terminate this Lease if Landlord's requested revisions are not acceptable to Tenant in its sole discretion.  The review and approval process described above shall continue until such time as Landlord has approved Tenant's Plans in writing or until the Lease is terminated.

On the Premises Delivery Date (or on such earlier date as may be agreed to in writing by Landlord), Tenant may enter the Premises upon prior written notice to Landlord for the purpose of completing the construction of the Initial Improvements.  During such time, all of the provisions of this Lease shall apply to Tenant (except that Tenant shall not be required to pay Base Rent or other charges due under this Lease, other than charges for all utilities used by Tenant in connection with Tenant's work in the Premises).  Further, Tenant agrees to indemnify, defend and hold Landlord harmless from all liability which arises out of Tenant's use, possession and work within the Premises (except to the extent caused by the negligence or willful misconduct of Landlord).  As of the date of Tenant's entry onto the Premises for the purpose of constructing the Initial Improvements, Tenant shall deliver to Landlord certificates of insurance evidencing that the coverages required under Paragraph 11 above are in place.

(b)     Subsequent Improvements.  Tenant shall have the unrestricted right to make any interior non-structural alterations, additions or improvements to the Premises deemed necessary or appropriate in connection with the requirements of its business, without the necessity of obtaining the prior written consent of Landlord and without the payment of any additional rent.  Notwithstanding the foregoing, Tenant shall not make any alterations, improvements, additions or repairs to any part of the Premises which (i) affect the structure or

28                                                                    2286858 v12 (43470.00041.023)

the mechanical systems of the Premises or the building of which they are a part, or (ii) affect the store front or exterior elevations of the Premises, in each case, without obtaining Landlord's prior written consent, not to be unreasonably withheld, conditioned or delayed (and deemed given if no response is made within thirty (30) days following request for the same).

(c)     Signage.   Subject to governmental approval, compliance with the ECR, and Landlord's signage criteria, Landlord agrees that Tenant shall be entitled to erect the maximum amount of its prototype building signage on the exterior of the Premises.   Landlord shall not allow any signage other than Tenant's to be erected on the exterior walls of the Premises.

(d)     Patio Area.   Tenant shall have the right to use the Patio Area and such area shall be included within the meaning of the "Premises" as utilized in this Lease for all purposes, except that Tenant shall not pay Base Rent, CAM Charges or Taxes in connection with the Patio Area; provided, however, that if Tenant defaults in its obligation to properly maintain the Patio Area which default continues beyond all applicable cure periods, and if Landlord at any time thereafter and while Tenant remains in default elects to take over the duty of maintaining the Patio Area, then for as long as maintenance of the Patio Area is being performed by Landlord instead of Tenant the term "Premises" shall be understood to mean and include the Patio Area for purposes of Tenant's Proportionate Share of CAM Charges (but not for the payment of Base Rent or Tenant's Proportionate Share of Taxes).   Tenant may add, remove, modify and replace tables, chairs, serving stations, and bussing stations within the Patio Area in Tenant's reasonable discretion, without the necessity of obtaining Landlord's prior consent or approval, so long as such features and equipment are in keeping with a first class appearance and standard.   Tenant may add, remove, modify and replace other features and equipment within the Patio Area in Tenant's reasonable discretion, including, without limitation, planters, railings and umbrellas, without the necessity of obtaining Landlord's prior consent or approval, so long as such features and equipment are in keeping with a first class appearance and standard; provided, however, that if Landlord reasonably objects to anything installed or placed in the Patio Area (including, without limitation, railings, planters, tables, chairs, umbrellas, serving stations, or bussing stations)(but not anything included in Tenant's Plans approved by Landlord), then Tenant shall remove the item objected to by Landlord, or will replace the item objected to with something to which Landlord does not reasonably object, within ten (10) days of written notice received from Landlord.   Tenant may not add exterior trellises or awnings to the Patio Area or to the Premises except upon Landlord's prior written approval, which Landlord may withhold in its reasonable discretion.   Tenant may play music (recorded or live) in the Patio, provided the same shall not create an actionable nuisance and shall otherwise remain subject to requirements of the ECR, the Rules and Regulations and applicable law.   All sales generated from the Patio Area shall be included in the computation of Percentage Rent, and the operation of the Patio Area shall be subject to all requirements of the ECR, the Rules and Regulations, Landlord's signage criteria and applicable governmental laws, codes, ordinances, and regulations.

(e)     Antennae.   Tenant shall have the right to use space on the roof of the Premises for the purpose of installing, operating and maintaining not more than two (2) satellite dishes and/or antennae (or only one of each) for the conduct of its business in the Premises and each such antenna shall be of a size and height approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.   The location and method of attachment of

29

any such satellite dish or antenna shall be subject to Landlord's approval, and Tenant shall be required to use Landlord's warranty roofer in connection with any such work.

(f)     Liens.  In the event any mechanic's or other lien shall at any time be filed against the Premises by reason of work, labor, services or materials performed or furnished, or alleged to be performed or furnished, to Tenant or to any one holding the Premises through or under Tenant, Tenant, within thirty (30) days of filing, shall cause the same to be discharged of record or bonded.  If Tenant shall fail to cause such lien to be so discharged or bonded after being notified of the filing thereof, then, in addition to any other right or remedy of Landlord, Landlord may cause the same to be bonded, and the amount so paid by Landlord, including reasonable attorney fees incurred by Landlord in either defending against such lien or procuring the bonding of such lien, shall be due and payable by Tenant to Landlord, as Additional Rent, upon demand.  Similarly, in the event any mechanics' or other lien shall at any time be filed against the Premises by reason of work, labor, services or materials performed or furnished, or alleged to be performed or furnished, to Landlord or to any one holding the Premises through or under Landlord, Landlord, within thirty (30) days of filing, shall cause the same to be discharged of record or bonded.  In connection with Tenant's ability to obtain payment of the Tenant Allowance from Landlord, if Landlord or Landlord's lender requires a particular lien release form or other affidavit related to payment of contractors, Landlord will provide the same to Tenant within fifteen (15) days after receipt of written request from Tenant (which request Tenant shall make no sooner than the date which is thirty (30) days prior to the date on which Tenant intends to commence construction at the Premises), but if Landlord fails to timely provide a designated lien release form or other affidavit then Tenant may use any commercially reasonable form it elects and Landlord may not deny payment of the Tenant Allowance based on Tenant's form of lien waiver and/or contractor's affidavit.

(g)     Construction and Hiring Trailer.  In connection with Tenant's completion of the Initial Improvements and its initial opening for business at the Premises, Tenant shall have the right to place a construction and hiring trailer adjacent to the Premises, which trailer shall be removed as of the date on which Tenant opens for business to the public at the Premises, the location and appearance of which trailer shall be subject to Landlord approval, not to be unreasonably withheld, conditioned or delayed.  As an alternative to a trailer, Tenant may be required by Landlord to make use of temporary space in any nearby building in the Shopping Center made available by Landlord for such purposes.

**15.     Title to Improvements; Removal**.  All furniture, fixtures and equipment, inventory, personal property and any other improvements owned by Tenant and installed in the Premises (other than HVAC or other building systems), shall remain the property of Tenant and shall be removable by Tenant at any time, including upon the expiration or earlier termination of this Lease.  In the event Tenant, its subtenants or assigns acquires or leases personal property to be installed and used upon the Premises subject to retained title, conditional sale contract, chattel mortgage or other security agreement or lease, Landlord agrees to execute and deliver to any such secured creditor a waiver of any lien Landlord may have upon such personal property.  Such waiver will be on a form provided by Tenant authorizing the secured creditor to enter upon the Premises and remove such personal property in the event of default under the terms of the security agreement or lease, provided such secured creditor expressly acknowledges that it shall be liable for any damage done to the Premises caused by its entry and/or removal of property.

30                                                    2286858 v12 (43470.00041.023)

At the expiration or sooner termination of this Lease, and in addition to the foregoing rights of Tenant to remove its personal property and improvements from the Premises, Tenant may additionally remove from the Premises all items and structural characteristics installed by Tenant that are indicative of Tenant's business and may otherwise "de-identify" the Premises as Tenant reasonably believes necessary or appropriate for the protection of Tenant's interest in Tenant's trademarks, trade names or copyrights. Tenant shall repair any damage to the Premises or the building of which they are a part that may be caused by such removal, including, without limitation, patching or filling holes. In no event shall Tenant be required to remove any restrooms, flooring, ceilings or utility or electrical components located inside the walls or HVAC systems. All other utility systems will be capped and returned to a condition compatible with code requirements.

16.    **Damage by Fire or Other Casualty**.

(a)    <u>Partial Damage</u>. Subject to Tenant's right to discontinue operations at the Premises as set forth in Paragraph 16(c) below, if during the Term there shall be partial damage to the Premises by fire or other casualty, and provided that insurance proceeds are available to Landlord to do so (or that would have been available to Landlord if Landlord had maintained the insurance policies required by this Lease), Landlord shall, at its cost, promptly proceed to restore the Premises to the condition in which it was immediately prior to the occurrence of such damage, including the restoration of all items described on <u>Exhibit C</u> of this Lease.

(b)    <u>Material Damage</u>. If the Premises or the Center is damaged by fire or other casualty and Landlord cannot, despite diligent, good faith efforts, restore the same to the condition in which it was immediately prior to the occurrence of such damage (including the restoration of all items described on <u>Exhibit C</u> of this Lease) within one hundred eighty (180) days following the date of such casualty, then Tenant may elect to terminate this Lease by delivering thirty (30) days prior written notice to Landlord upon the earlier to occur of: (a) the date on which it becomes apparent that such repairs or restoration cannot be completed within such one hundred eighty (180) day period; or (b) upon the expiration of such one hundred eighty (180) day period, if such repairs or restoration have not been substantially completed by such date. In any event, such termination shall be effective as of the date of the casualty and Landlord shall return any prepaid Base Rent and other prepaid amounts to Tenant within thirty (30) days from the date of termination of this Lease.

(c)    <u>Damage Prior to Final Two Years</u>. If all or a substantial portion of the Premises should be damaged by fire or other casualty at any time before the final two years of the Primary Term or any Renewal Term, then Tenant may elect, by delivering written notice to Landlord within fifteen (15) days of the casualty event (the "Discontinuance Notice"), to discontinue operations at the Premises, but at all times continue to pay Base Rent and Additional Rent due and payable pursuant to the terms and provisions of this Lease. If Tenant fails to deliver the Discontinuance Notice to Landlord as and when required, then Tenant's right to discontinue operations at the Premises shall lapse and Landlord shall commence to restore the Premise as provided in Paragraph 16(a) above.

(d)    <u>Damage During Final Two Years</u>. If all or a substantial portion of the Premises should be damaged by fire or other casualty during the final two (2) years of the Initial

31                                              2286858 v12 (43470.00041.023)

Term or any Renewal Term, either Landlord or Tenant may terminate this Lease by delivering thirty (30) days prior written notice of such election to the other party; provided, however, that if Landlord so notifies Tenant that it wishes to terminate this Lease, then Tenant may, if it has not already done so, exercise its right to extend the term of this Lease whereupon Landlord's election to terminate shall be null and void

(e)    Landlord's Termination Right.  If the building of which the Premises is a part is substantially damaged and Landlord decides to demolish the building, then Landlord may terminate this Lease if it also terminates the leases of all other tenants within the building.

(f)    Abatement of Rent.  If the Premises or the Center shall be damaged by fire or other casualty, and if such damage shall materially interfere with Tenant's use of the Premises as contemplated by this Lease, a just proportion of the Base Rent payable by Tenant hereunder shall abate proportionately for the period ending the earlier of (i) Tenant's reopening for business and (ii) ninety (90) days after Landlord shall have completed its restoration work and provided further that at Tenant's election, the term of the lease then in effect shall be extended for a period equal to the period of rent abatement.

## 17.    **Condemnation**.

(a)    Condemnation of the Premises.

(i)    Total Taking.  If substantially all of the Premises shall be acquired by the right of condemnation or eminent domain for any public or quasi-public use or purpose, or sold to a condemning authority under threat of condemnation or in lieu thereof (collectively, a "Taking"), then the term shall cease and terminate as of the date of title vesting in such proceeding (or sale), and all Rent shall be paid up to that date (such termination to be otherwise in accordance with Paragraph 31[a]).  Base Rent and Additional Rent for the last month of Tenant's possession of the Premises shall be prorated and any deposits and amounts paid in advance shall be refunded to Tenant within thirty (30) days of such date.

(ii)    Partial Taking.  If only a portion of the Premises shall be acquired by a Taking, and Tenant determines in its reasonable business judgment, that the remaining portion will still permit Tenant to operate its business on the Premises then this Lease shall remain in full force and effect as to the portion of the Premises remaining, provided the Base Rent and all other charges payable hereunder shall be reduced in the same proportion that the area taken bears to the total area of the Premises prior to the Taking.  In such event Landlord shall use the condemnation award to restore the Premises, as soon as reasonably possible, to a complete unit of the same quality and character existing prior to the Taking.  Notwithstanding anything contained herein to the contrary, if the restoration of the Premises is not commenced within one hundred twenty (120) days of the date of the Taking or is not completed within one hundred eighty (180) days of the date of the Taking, then Tenant may terminate this Lease at any time before Landlord completes the restoration.  If this Lease is terminated, Landlord shall return any deposits, all prepaid Base Rent and other prepaid sums to Tenant within thirty (30) days of the date of termination of this Lease.

2286858 v12 (43470.00041.023)

(b)     Condemnation of the Center.

(i)     Termination by Tenant.  If there is a Taking of all or any material portion of the Center (whether or not the Premises are physically affected) and as a result of such Taking (i) the Premises are rendered unsuitable for the conduct of Tenant's business therein substantially as such business had been operated therein by Tenant prior to such Taking (as determined by Tenant in its reasonable business judgment), or (ii) the number of parking spaces within the Center and located within seventy-five (75) feet of the Premises will be reduced by more than ten percent (10%), then Tenant may terminate this Lease by delivering written notice of such election to Landlord within ninety (90) days of Tenant's receipt of the notice of the proposed Taking.  In such event, this Lease shall cease and terminate as of the date of the Taking, and all Rent shall be paid up to that date (such termination to be otherwise in accordance with Paragraph 31(a)).  Base Rent and Additional Rent for the last month of Tenant's possession of the Premises shall be prorated and any deposits and amounts paid in advance shall be refunded to Tenant within thirty (30) days of such date.

(ii)     Termination by Landlord.  If there is a Taking of all or any material portion of the Center (whether or not the Premises are physically affected) and as a result of such Taking Landlord determines in its commercially reasonable business judgment that the Center is rendered unsuitable for use as a retail shopping center, then Landlord may terminate this Lease by delivering written notice of such election to Tenant within ninety (90) days of Landlord's receipt of the notice of the proposed Taking.  Notwithstanding the foregoing, Landlord may only exercise its right to terminate under this Paragraph if Landlord terminates the leases of all other similarly situated tenants in the Center.  Base Rent and Additional Rent for the last month of Tenant's possession of the Premises shall be prorated and any deposits and amounts paid in advance shall be refunded to Tenant within thirty (30) days of such date of termination.

(iii)     Restoration.  In the event of a material Taking of all or any part of the Center and if this Lease is not terminated as provided above, then Landlord shall use the condemnation award to restore the Center as soon as reasonably possible to a complete unit of the same quality, character and utility for Tenant's purposes existing prior to the condemnation.  Notwithstanding anything contained herein to the contrary, if the restoration of the Center is not commenced within one hundred twenty (120) days of the date of the Taking or is not completed within one hundred eighty (180) days of the date of the Taking, and such Taking has had a material adverse impact on Tenant's business at the Premises, then Tenant may terminate this Lease at any time before Landlord completes the restoration.  If this Lease is terminated, Landlord shall return any deposits, any prepaid Base Rent and other prepaid sums to Tenant within thirty (30) days of the date of the later of the effective date termination of this Lease and the date of the election to terminate.

(c)     Temporary Taking.  If, at any time during the Term, Tenant's possessory or occupancy rights in the Premises or the Center (or, any part thereof) shall be taken on a temporary basis for any public or quasi-public use or purpose, and Tenant determines, in its reasonable business judgment, that the remaining portion will not permit Tenant to operate its

2286858 v12 (43470.00041.023)

business in the Premises (with specifically, among other required attributes, sufficient parking within seventy-five (75) feet of the Premises for the permitted use of the Premises), then (i) Tenant shall not be required to operate its business in the Premises during the period of such temporary Taking and, if Tenant elects not to operate, then (during any such period of inoperation) all Base Rent and other charges payable hereunder shall be abated; and (ii) if such temporary taking continues for a period in excess of ninety (90) days, then Tenant may terminate this Lease by written notice to Landlord (such termination to be otherwise in accordance with Paragraph 31(a)). Base Rent and any Additional Rent for the last month of Tenant's possession of the Premises shall be prorated and any deposits and amounts paid in advance shall be refunded to Tenant within thirty (30) days of such date of termination.

(d)    Condemnation Notice and Award.    The party who receives the condemnor's notice of intention to pursue a Taking shall immediately give a copy of such notice to the other party.  Landlord shall have and hereby reserves and excepts, and Tenant hereby grants and assigns to Landlord, all rights to recover for damages to the Center, the land on which the Center is located, the Premises, and the leasehold interest hereby created, and the compensation accrued or hereafter to accrue by reason of such taking or damage, as aforesaid. Tenant covenants to deliver such further assignments and assurances thereof as Landlord may from time to time request.  Nothing contained herein shall be construed to prevent Tenant from prosecuting in any condemnation proceedings a claim for the value of any of Tenant's trade fixtures installed in the Premises by Tenant at Tenant's expense, the unamortized cost of Tenant's Improvements, relocation expenses, and any other claim or right Tenant may have by law, provided that prosecuting such claim will have no impact on or diminish the award payable to Landlord for Landlord's fee interest in the land on which the Premises is located.

## 18.    **Liability and Indemnification**.

(a)    Indemnification by Tenant.  Tenant agrees to protect, defend, indemnify and save Landlord harmless from and against any and all liability, injuries, liens, claims, damages, expenses, costs, fees, fines, penalties, suits, proceedings, actions and causes of action of any kind and nature (including reasonable attorneys' fees) arising out of (i) injuries occurring within the Premises (except as may be caused by Landlord, Landlord's employees, agents, invitees or guests), (ii) any intentional acts or negligence of Tenant, its employees or agents, or Tenant's invitees and/or guests, (iii) any breach, violation or non-performance of any covenant, condition or agreement contained in the Lease by Tenant, and (d) the failure of any representation or warranty made by Tenant herein to be true in all material respects when made. This indemnity does not include the intentional or negligent acts or omissions of Landlord or its agents, officers, contractors or employees.  This indemnity shall survive termination of this Lease only as to claims arising out of events that occur prior to termination of this Lease.

(b)    Indemnification by Landlord.  Landlord agrees to protect, defend, indemnify and save Tenant harmless from and against any and all liability, injuries, liens, claims, damages, expenses, costs, fees, fines, penalties, suits, proceedings, actions and causes of action of any kind and nature (including reasonable attorneys' fees) arising out of (i) injuries occurring within the Common Areas or any other portion of the Center outside of the Premises (except as may be caused by Tenant, Tenant's employees, agents, invitees or guests), (ii) any intentional acts or negligence of Landlord or Landlord's agents, employees or independent contractors, (iii)

34                                2286858 v12 (43470.00041.023)

any breach, violation or non-performance of any covenant, condition or agreement contained in the Lease by Landlord, and (d) the failure of any representation or warranty made by Landlord herein to be true in all material respects when made.  This indemnity does not include the intentional or negligent acts or omissions of Tenant or its agents, officers, contractors, employees, invitees or guests.  This indemnity shall survive termination of this Lease only as to claims arising out of events that occur prior to termination of this Lease.

(c) Environmental Indemnification by Landlord.  Notwithstanding any other provision of this Lease, Landlord shall, and hereby does agree to, indemnify, protect, defend, and hold harmless Tenant and its partners, directors, officers, employees, shareholders, agents, contractors, and each of their respective successors and assigns, from and against any and all claims, judgments, damages, penalties, fines, taxes, costs, liabilities (including attorney's fees), losses, and expenses arising at any time after the Effective Date as a result of, or in connection with, the presence of hazardous materials on, under, or about the Premises or the Center which are existing on the Premises as of the Effective Date or otherwise caused by Landlord or Landlord's agents, employees, or contractors.  This indemnity shall survive the termination of this Lease.

(d) Environmental Indemnification by Tenant.  Notwithstanding any other provision of this Lease, Tenant shall, and hereby does agree to, indemnify, protect, defend, and hold harmless Landlord and its partners, directors, officers, employees, shareholders, agents, contractors, and each of their respective successors and assigns, from and against any and all claims, judgments, damages, penalties, fines, taxes, costs, liabilities (including attorney's fees), losses, and expenses arising at any time after the Effective Date as a result of, or in connection with, the presence of hazardous materials on, under, or about the Premises or the Center which are introduced to the Premises by Tenant after the Effective Date or otherwise caused by Tenant or Tenant agents, employees or contractors.  This indemnity shall survive the termination of this Lease.

19. **Right of Inspection**.  Landlord and its agents and representatives shall be entitled to enter upon and inspect the Premises at any time in the event of emergency and otherwise during normal business hours upon prior reasonable notice, provided that such inspection shall not unreasonably interfere with Tenant's business, and shall in no event occur during Tenant's peak business hours.

20. **Warranty of Title and Quiet Enjoyment**.

(a) Landlord represents and warrants that from and after the Acquisition Date it will be the owner in fee simple of all of the land comprising the Center and that it alone will have full right to lease the Premises for the term set out herein.  Landlord further represents and warrants that Tenant, on paying the Rent and performing its obligations hereunder, shall peaceably and quietly hold and enjoy the Premises for the term of this Lease, including any Renewal Term.

(b) It is expressly agreed that Landlord may subject its interest in the Premises to a first mortgage lien, and Tenant will subordinate its interest in the Premises to such lien, if Landlord's lender shall agree for itself, its successors and assigns (by written instrument in

35

substantially the recordable form attached hereto as <u>Exhibit E</u> or in such other form which is mutually acceptable to the parties thereto): (i) to be bound by the terms of this Lease; (ii) not to disturb Tenant's use or possession of the Premises in the event of a foreclosure of such lien or encumbrance so long as Tenant is not in default hereunder; (iii) not to join Tenant as a party defendant in any foreclosure proceeding relating to Landlord's interest in the Center or any part thereof; and (iv) to permit application of all insurance proceeds to the restoration and repair of the Premises pursuant to Paragraph 16 of this Lease. Further, Landlord's lender will be requested to agree for itself that should it succeed Landlord as the landlord hereunder, and Tenant has earned the right to payment of the Tenant Allowance but Landlord has failed to pay it to Tenant, then lender will either fund the Tenant Allowance or permit Tenant's right to offset such amount against future installments of Rent due hereunder.

21.     <u>Waiver of Subrogation</u>. Landlord and Tenant severally waive any and every claim which arises or may arise in its favor and against the other during the term of this Lease for any and all loss of, or damage to, any of its property located within or upon, or constituting a part of, the Premises or the building of which the Premises are a part or the Center (as the case may be), which loss or damage is covered by valid and collectible fire and extended coverage, general liability, liquor liability or worker's compensation insurance policies, to the extent that such loss or damage is recoverable thereunder. Inasmuch as the above mutual waivers will preclude the assignment of any aforesaid claim by way of subrogation (or otherwise) to an insurance company (or any other person), Landlord and Tenant severally agree immediately to give to each insurance company which has issued to it policies of insurance, written notice of the terms of said mutual waivers, and to have said insurance policies properly endorsed, if necessary, to prevent the invalidation of said insurance coverages by reason of said waivers.

22.     <u>Force Majeure</u>. The time for performance by Landlord or Tenant of any term, provision or covenant of this Lease shall be deemed extended by time lost due to delays resulting from acts of God, strikes, unavailability of building materials, civil riots, floods, material or labor restrictions by governmental authority, enforcement of governmental regulations or requirements, and any other cause not within the control of Landlord or Tenant, as the case may be; provided, however, lack of financial resources to perform hereunder shall not be deemed an event of force majeure. The party claiming an extension based upon a force majeure event must advise the other party, in writing, of the circumstances supporting such claim within fifteen (15) business days of the event. Failure to timely provide written notice of a "force majeure" delay shall be deemed a waiver of the additional time claim.

23.     <u>Commissions</u>. Landlord and Tenant each represent and warrant to the other that other than the Brokers identified in Paragraph 1(o) above, neither party has engaged or employed any real estate broker, agent or other intermediary in connection with this Lease. Landlord hereby covenants and agrees that it shall be solely responsible for the payment of any commissions or fees owed to the Brokers by reason of the creation or procurement of this Lease. Landlord shall and does hereby indemnify, defend and hold Tenant harmless from and against any and all claims, demands, actions, and judgments of any and all broker's, agents, and other intermediaries alleging a commission, fee or other payment to be owing by reason of Landlord's dealings, negotiations or communications in connection with this Lease or the demise of the Premises, including any claims by the Brokers. Tenant shall and does hereby indemnify, defend and hold Landlord harmless from and against any claims, defenses, actions and judgments of any

                      2286858 v12 (43470.00041.023)

brokers, agents, and intermediaries alleging a commission, fee or other payment to be owing by reason of Tenant's dealings, negotiations, or communications in connection with this Lease or the demise of the Premises; provided, however, the foregoing indemnity shall not extend to any claims by the Brokers which shall be the responsibility of Landlord as set forth herein. This Paragraph 23 shall survive the termination or expiration of this Lease.

**24.** **Landlord-Tenant Relationship**. It is further understood and agreed that Landlord shall in no event be construed or held to be a partner, joint venturer or associate of Tenant in the conduct of Tenant's business, nor shall Landlord be liable for any debts incurred by Tenant in Tenant's business; but it is understood and agreed that the relationship is and at all times shall remain that of landlord and tenant.

**25.** **Assignment and Subletting**.

(a) Tenant shall not assign this Lease or sublet the whole or any part of the Premises without the prior written consent of Landlord, which consent Landlord shall not unreasonably withhold, condition or delay provided that (i) no Tenant Event of Default (hereinafter defined) has occurred and is continuing at the time of the request for consent to the assignment or sublease, (ii) the use to be made of the Premises by the assignee or subtenant is not prohibited under any document affecting the Center, (iii) the assignee or subtenant shall assume in writing the performance of all of the terms, provisions and covenants of this Lease on the part of Tenant to be kept and performed, and (iv) Tenant shall deliver to Landlord no later than thirty (30) days prior to the proposed effective date of such proposed assignment or subletting a copy of the form of each document by which the assignment or subletting is to be accomplished.

(b) Notwithstanding the foregoing, but subject to the requirements of Paragraph 25(a) above, Tenant may, without the necessity of obtaining Landlord's consent, (i) assign this Lease or sublet the whole of the Premises to a legal entity which (y) is the successor, by merger or otherwise, to all or substantially all of Tenant's assets and liabilities, or (z) controls or is controlled by or is under common control with Tenant, directly or indirectly (each of the foregoing being herein called a "Permitted Assignee"), and (ii) sublet a portion of the Premises to a legal entity under the control of Tenant solely for the purpose of such entity obtaining a liquor license for the Premises.

(c) Any such assignment or subletting to which Landlord has consented (or for which Landlord's consent is not required) shall be otherwise subject to and upon all of the terms, provisions and covenants of this Lease. Landlord agrees to enter into a non-disturbance agreement and give an estoppel letter to any assignee or subtenant to which Landlord consents (or for which Landlord's consent is not required), the form of which shall be commercially reasonable and acceptable to both Landlord and such assignee or subtenant.

(d) No assignment or subletting or collection of rent from the assignee or subtenant shall be deemed to constitute a novation or in any way release Tenant from further performance of its obligations under this Lease, and Tenant shall continue to be liable under this Lease for the balance of the Primary Term and any Renewal Term with the same force and effect as if no such assignment had been made; provided, however, that Landlord shall be deemed to

2286858 v12 (43470.00041.023)

have released Tenant from all obligations under this Lease if any Permitted Assignee or other third party assignee approved in writing by Landlord (or the parent entity of any such assignee which provides a guaranty of assignee's liabilities under this Lease) has a tangible net worth greater than or equal to FIFTEEN MILLION AND NO/100 DOLLARS ($15,000,000.00) as measured on the date of such release (which may be the date of the assignment or upon such later date when the net worth is achieved). Tenant shall provide adequate financial statements and other evidence required to demonstrate the net worth of any assignee to Landlord's reasonable satisfaction.

(e)     Tenant shall have the right to mortgage and pledge this Lease to any institutional lender or financial entity, and Landlord agrees to enter into a non-disturbance agreement in a commercially reasonable form acceptable to both Landlord and the lender. Nothing contained herein shall be construed as a subordination, waiver or relinquishment by Landlord of Landlord's interest in and to the Premises.

(f)     The provisions of this Paragraph 25 shall not apply in the event Tenant offers its shares to the public pursuant to a registered securities offering or for the transfer of stock on a public stock exchange, and such transfers shall not be deemed to be an assignment and no consent of Landlord shall be required.

**26.     Memorandum of Lease; Commencement and Termination Agreement**. A short-form memorandum of this Lease, in the form attached hereto as Exhibit F, shall be executed by Landlord and Tenant contemporaneously with the execution of this Lease, but shall not be filed of record unless and until Landlord has acquired title to the Project Site. Landlord and Tenant agree that promptly after the Rent Commencement Date of this Lease, a Commencement and Termination Agreement, substantially in the form attached hereto as Exhibit G, shall be executed by each party in order to establish the Rent Commencement Date and the date of termination of the Primary Term of this Lease.

**27.     Notices and Payments**. Any notice, document or payment required or permitted to be delivered or remitted hereunder or by law shall be deemed to be delivered or remitted, whether actually received or not, (a) when delivered in person, (b) two (2) business days after such item is deposited in the United States mail, postage prepaid, certified or registered, return receipt requested (except for any payment of rent or other monetary amounts required to be paid by Tenant pursuant to the terms of this Lease which shall be deemed to be remitted, whether actually received or not, two (2) business days after such item is deposited in the United States mail, first class postage prepaid), or (c) one (1) business day after such item is deposited for overnight delivery or two (2) business days after such item is deposited for second day delivery with Federal Express or other generally recognized overnight courier, shipping charges prepaid, addressed to the appropriate party hereto at its address set forth in Paragraph 1(n) above, or at such other address as it shall have theretofore specified by written notice delivered in accordance herewith.

If and when included within the term "Landlord" there is more than one person or legal entity, all shall jointly arrange among themselves for one among their numbers to receive at one specified address all such notices and payments; all parties included within the term "Landlord"

2286858 v12 (43470.00041.023)

shall be bound by notices delivered by Tenant in accordance with the provisions of this Paragraph 27 as if each had received such notice.

28.    **Default**.

(a)    Each of the following events shall be a "Tenant Event of Default" under this Lease:

(i)    Tenant shall fail to pay any installment of Rent hereby reserved as and when the same shall become due and shall not cure such default within ten (10) days after written notice thereof is given by Landlord to Tenant;

(ii)    Tenant shall fail to comply with any term, provision or covenant of this Lease, other than the payment of Rent, and shall not cure such failure within thirty (30) days after written notice thereof is given by Landlord to Tenant (provided that if such default cannot reasonably be cured within thirty (30) days, then Tenant shall have an additional reasonable period of time within which to cure such default);

(iii)    Tenant shall be adjudged insolvent, make a transfer in fraud of creditors or make an assignment for the benefit of creditors;

(iv)    Tenant shall file a petition under any section or chapter of the Bankruptcy Reform Act of 1978, as amended, or under any similar law or statute of the United States or any state thereof, or Tenant shall be adjudged bankrupt or insolvent in proceedings filed against Tenant thereunder; or

(v)    A receiver or trustee shall be appointed for all or substantially all of the assets of Tenant and Tenant shall not have had such appointment discharged within thirty (30) days after Tenant receives written notice of such appointment.

(b)    Upon the occurrence of any Tenant Event of Default, Landlord shall have the option to pursue any one or more of the following remedies without any further notice or demand whatsoever:

(i)    Without any further notice or demand whatsoever, Landlord may take any one or more of the actions permissible at law to ensure performance by Tenant of Tenant's covenants and obligations under this Lease. In this regard, and without limiting the generality of the immediately preceding sentence, it is agreed that if Tenant fails to open for business as required in this Lease, Landlord may enter upon and take possession of the Premises in order to protect them from deterioration and continue to demand from Tenant the monthly rentals and other charges provided in this Lease, and in such event Landlord shall use all commercially reasonable efforts to re-let the Premises in order to mitigate Tenant's damages. Any such re-letting by Landlord shall not be deemed as an acceptance of Tenant's surrender of the Premises unless Landlord expressly notifies Tenant of such acceptance in writing pursuant to this paragraph (b)(i), Tenant hereby acknowledging that Landlord shall otherwise be reletting as Tenant's agent and Tenant furthermore hereby agreeing to pay to Landlord on demand any deficiency that may arise between the monthly rentals and other charges provided in this Lease and those

                    2286858 v12 (43470.00041.023)

rentals and charges actually collected by Landlord. It is further agreed in this regard that in the event of any default described in Paragraph 28(a)(ii) of this Lease, Landlord shall have the right to enter upon the Premises by force if necessary without being liable for prosecution or any claim for damages therefor, and do whatever Tenant is obligated to do under the terms of this Lease; and Tenant agrees to reimburse Landlord on demand for any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease, and Tenant further agrees that Landlord shall not be liable for any damages resulting to Tenant from such action.   Notwithstanding anything contained herein to the contrary, Landlord shall in no event be permitted to operate the business of Tenant from the Premises.

(ii)    Landlord may terminate Tenant's right to possession under this Lease by written notice to Tenant, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which Landlord may have for possession or arrearages in rent (including any Late Charges and interest which may have accrued pursuant to this Lease), enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, by force if necessary, without being liable for prosecution or any claim for damages therefor.   Tenant hereby waives any statutory requirement of prior written notice for filing eviction or damage suits for nonpayment of Rent.   In addition, Tenant agrees to pay to Landlord on demand the amount of all loss and damage which Landlord may suffer by reason of any termination effected pursuant to this paragraph (b)(ii), said loss and damages to be determined by either of the following alternative measures of damages:

(A)    Until Landlord is able, through commercially reasonable efforts, to relet the Premises under terms satisfactory to Landlord, in its commercially reasonable discretion, Tenant shall pay to Landlord on or before the first day of each calendar month, the Rent.   If and after the Premises have been relet by Landlord, Tenant shall pay Landlord on the twentieth (20th) day of each calendar month the difference between the Rent for such calendar month and the amount that is actually collected by Landlord for such month. If it is necessary for Landlord to bring suit in order to collect any deficiency, Landlord shall have a right to allow such deficiencies to accumulate and to bring an action on several or all of the accrued deficiencies at one time.   Any such suit shall not prejudice in any way the right of Landlord to bring a similar action for any subsequent deficiency or deficiencies. Any amount collected by Landlord from subsequent tenants for any calendar month in excess of the monthly rentals and other charges provided in this Lease, shall be credited to Tenant in reduction of Tenant's liability for any calendar month for which the amount collected by Landlord will be less than the monthly rentals and other charges provided in this Lease; but Tenant shall have no right to such excess other than the above-described credit.

(B)    When Landlord desires, Landlord may demand a final settlement. Upon demand for a final settlement, Landlord shall have a right to, and Tenant thereby agrees to pay, the difference between the total of all monthly rentals, and other charges provided in this Lease for the remainder of the term of

2286858 v12 (43470.00041.023)

this Lease and the reasonable rental value of the Premises for such period, such difference to be discounted to present value at a rate equal to six percent (6%) per annum. Upon such payment by Tenant to Landlord, this Lease shall automatically terminate and Tenant shall have no further obligation to Landlord hereunder (except to the extent of any obligations that are expressly intended by the terms of this Lease to survive the expiration or earlier termination of this Lease).

(iii)    Landlord shall use reasonable efforts to mitigate damages following any Tenant Event of Default.

(iv)    It is further agreed that, in addition to payment required pursuant to Paragraphs 28(b)(i) and (ii) above, Tenant shall compensate Landlord for all commercially reasonable expenses incurred by Landlord in repossession (including, among other expenses, attorney's fees, and increases in insurance premiums (if any) caused by the vacancy of the Premises), all expenses incurred by Landlord in reletting (including, without limitation, commercially reasonable repairs, remodeling, replacements, advertisements and brokerage fees), all commercially reasonable concessions granted to the new tenant upon reletting, and all damages awarded by a court of competent jurisdiction as a direct or indirect result of Tenant's default.

(v)    Landlord may restrain or enjoin any breach or threatened breach of any covenant, duty or obligation of Tenant contained in this Lease without the necessity of proving the inadequacy of any legal remedy or irreparable harm. The remedies of Landlord under this Lease shall be deemed cumulative and not exclusive of each other.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law, including, without limitation, Landlord's right to terminate this Lease upon a Tenant Event of Default, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any rent due to Landlord hereunder or of any damage accruing to Landlord by reason of the violation of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon the occurrence of a Tenant Event of Default shall not be deemed or construed to constitute a waiver of such default. If Landlord elects to exercise the remedy prescribed in Paragraph 28(b)(i) above, this election shall in no way prejudice Landlord's right at any time thereafter to cancel said election in favor of the remedy prescribed in Paragraph 28(b)(ii)above, provided that at the time of such cancellation Tenant is still in default. Similarly, if Landlord elects to compute damages in the manner prescribed by Paragraph 28(b)(ii)(A) above, this election shall in no way prejudice Landlord's right at any time thereafter to demand a final settlement in accordance with Paragraph 28(b)(ii)(B) above however, upon payment of the Final Settlement, this Lease shall automatically terminate and from and after such date, Tenant shall have no liability to Landlord hereunder (except to the extent of any obligations that are expressly intended by the terms of this Lease to survive the expiration or earlier termination of this Lease). Pursuit of any of the above remedies shall not preclude pursuit of any other remedies prescribed in other sections of this Lease and any other remedies provided by law. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default.

2286858 v12 (43470.00041.023)

(c)     Each of the following events shall be a "Landlord Event of Default" under this Lease:

(i)     Landlord shall fail or refuse to pay any sum of money payable hereunder when due, and the same remains unpaid upon the expiration of any cure periods provided to Landlord in this Lease and applicable to such circumstance, and the failure or refusal continues thereafter for ten (10) days after written notice thereof is given by Tenant to Landlord; or

(ii)    Landlord shall fail or refuse to comply with any term, provision, or covenant of this Lease, other than provisions for the payment of money, and does not cure the failure or refusal within thirty (30) days after written notice thereof is given by Tenant to Landlord (provided that if such default cannot reasonably be cured within thirty (30) days, then Landlord shall have an additional reasonable period of time within which to cure such default).

(d)     Upon the occurrence of any Landlord Event of Default, Tenant shall have the option to pursue any one or more of the following remedies without any further notice or demand whatsoever:

(i)     Cure the Landlord Event of Default and in connection therewith pay or incur reasonable expenses. Notwithstanding the foregoing, Tenant shall not have such right to cure a Landlord Event of Default set forth in Paragraph 28(c)(ii) in the event Landlord or its mortgagee takes action to cure such default within the cure period therein provided, but is unable, by reason of the nature of the work involved, to cure the same within such period, provided Landlord or its mortgagee (whoever commences such work) continues such work thereafter diligently and without unnecessary delays. Additionally, Tenant shall have the right to remedy any default of an emergency nature, in the event Landlord or its mortgagee fails to commence to cure any default creating an emergency situation promptly upon being given notice which is reasonable under the circumstances, and Tenant shall have the right to remedy such a default without notice (if the giving of notice is not reasonably practicable) in the event of an emergency. All sums so expended or obligations incurred by Tenant in connection with the foregoing, plus interest thereon at a rate per annum equal to the highest lawful rate from the date such expenses are incurred until repayment, shall be paid by Landlord to Tenant upon demand, and if Landlord fails to reimburse Tenant, Tenant may, in addition to any other right or remedy that Tenant may have, deduct such amount from subsequent installments of any rent or other payments hereunder which become due to Landlord; or

(ii)    In the context only of the occurrence of a Landlord Event of Default under Paragraph 28(c)(ii) that materially and adversely affects Tenant's operations in the Premises or the Patio Area, Tenant shall have the right to terminate this Lease, provided that all of the following conditions to such right of termination shall have been met: (I) no Tenant Event of Default shall have occurred and then remain uncured, (II) the Landlord Event of Default is not reasonably capable of being cured or being rendered irrelevant by any actions of Tenant despite commercially reasonable efforts made by Tenant in good faith, (III) Tenant shall have given both Landlord and Landlord's

2286858 v12 (43470.00041.023)

first lien mortgage lender ninety (90) days' prior written notice of Tenant's intention to terminate this Lease if such Landlord Event of Default remains uncured at the end of such 90-day period (which notice to Landlord's mortgage lender Tenant shall send to the most recent address for Landlord's mortgage lender in Tenant's files), and (IV) upon the expiration of ninety (90) days after the 90-day notice given by Tenant described in (III) above, the Landlord Event of Default remains uncured. If all such conditions have been satisfied, Tenant shall have the right to Terminate this Lease by giving written notice to Landlord, after which Tenant shall have no further liabilities or obligations hereunder, except as to any Tenant obligations that accrued prior to the date of termination of this Lease and any obligations that by the terms of this Lease are expressly intended to survive the expiration or earlier termination of this Lease, for which Tenant shall remain liable.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any damage accruing to Tenant by reason of the violation of any of the terms, provisions, and covenants herein contained. Forbearance by Tenant to enforce one or more of the remedies herein provided upon the occurrence of a Landlord Event of Default shall not be deemed or construed to constitute a waiver of such default.

## 29.    Co-Tenancy Requirements.

(a)    Opening Co-Tenancy Requirement. Tenant's obligations under this Lease (including, but not limited to the obligation to accept Landlord's delivery of the Premises and to commence construction and/or begin paying Rent) shall be expressly conditioned upon (i) at least 70% of the constructed Floor Area (but a minimum of 140,000 square feet of Floor Area in any event) located within the portions of the Center labeled as R1, L1, L4 and R6 on Exhibit A-1 attached hereto then being leased, (ii) Landlord demonstrating that it has leased not less than 160,000 square feet of Floor Area within the area of the Center which is located outside of the portions of the Center labeled as R1, L1, L4 and R6 on Exhibit A-1 attached hereto, (iii) Landlord demonstrating that it has a fully executed lease with at least six (6) of the following tenants: Bed, Bath & Beyond, Dress Barn, Total Wine, TJ Maxx, World Market, Ross, Jo-Ann, Studio Movie Grill, Main Event or Dave & Busters, Gordman's and Petco for space within the Center, (iv) Landlord demonstrating that it has a fully executed lease with at least three (3) full service restaurants, two (2) of which shall be either nationally or regionally recognized chain restaurant concepts. In order to be considered a regionally recognized restaurant chain, the restaurant concept must have a minimum of seven (7) locations in the State of Texas, four (4) of which must be within a major metropolitan market. The foregoing condition (the "Opening Co-Tenancy Requirement") shall be deemed satisfied only upon three (3) of the above listed retail tenants (each with a leasable building area of not less than 20,000 square feet) being either (A) open for business to the public, or (B) under construction (defined to mean that Landlord has delivered shell space to such tenant and the tenant is then performing tenant's work within the premises), and (iii) one of the nationally or regionally recognized restaurants being either (Y) open for business to the public within the Center, or (Z) under construction within the Center as of the date upon which Tenant would otherwise be obligated to accept delivery of the Premises pursuant to Paragraph 3(d) above. If the Opening Co-Tenancy Requirement has not been

2286858 v12 (43470.00041.023)

satisfied on or before six (6) months from the Premises Delivery Date, Tenant shall have the right, by delivering written notice thereof to Landlord, to terminate this Lease; but if Tenant does not so terminate this Lease within thirty (30) days after the expiration of such 6-month period, this right of termination shall be deemed waived and void, and Tenant shall accept delivery of the Premises and proceed with Tenant's Plans and thereafter diligently submit for and pursue receipt of its permits and proceed with construction and open for business in the Premises as otherwise required herein.  Upon Tenant's acceptance of delivery of the Premises as provided in the immediately preceding sentence, this Paragraph 29 shall thereafter be null and void.

(b)     Operating Co-Tenancy Requirement.  Notwithstanding anything contained in this Lease to the contrary, upon the expiration of eighteen (18) months from the Premises Delivery Date (the "Trigger Date"), if (A) no Tenant Event of Default has occurred and remains uncured at that time, AND (B) either (i) less than eighty percent (80%) of the constructed Floor Area (but a minimum of 160,000 square feet of Floor Area in any event) included within the "Tenant Phase" of the Center (as shown on Exhibit A-1, but excluding buildings L-2 and L-3) is open for business, OR (ii) less than seventy-five percent (75%) of the constructed Floor Area (but a minimum of 210,000 square feet of Floor Area in any event) included within the entire Center (but excluding buildings L-2 and L-3) is open for business, AND (C) although Tenant has opened for business in the Premises, fully staffed and fully operational for the Permitted Use and in compliance with this Lease, and has thereafter continuously operated its business in the Premises and kept the same open to the public during those hours and on those days as are typical for an Abuelo's restaurant, the Gross Sales from the Premises were less than $3,000,000.00 for the trailing twelve (12) month period preceding the Trigger Date (provided, however, that if the Premises are closed at any time due to casualty, the calculation of Gross Sales will be grossed up by an amount per diem to include the days of closure due to casualty on the basis of actual Gross Sales divided the number of days the Premises were not closed due to casualty during that period), then Tenant shall have the right to commence payment, in lieu of Rent required to be paid by Tenant under this Lease, in an amount (the "Alternate Rent") each month equal to five percent (5%) of Gross Sales from the Premises for the prior calendar month -- UNTIL the earlier to occur of either (W) a Tenant Event of Default occurs, OR (X) more than 80% of the constructed Floor Area (but a minimum of 160,000 square feet of Floor Area in any event) included within the "Tenant Phase" of the Center (as shown on Exhibit A-1, but excluding buildings L-2 and L-3) is open for business, OR (Y) more than 75% of the constructed Floor Area (but a minimum of 210,000 square feet of Floor Area in any event) included within that portion of the entire Center (excluding buildings L-2 and L-3) is open for business, OR (Z) the Gross Sales from the Premises equals or exceeds $3,000,000.00 for any trailing period of twelve (12) consecutive months, at which time (i.e., upon the occurrence of either of (W), (X), (Y) or (Z)), Tenant shall re-commence payment of Rent in the full amount.  The Alternate Rent shall be payable by Tenant in arrears, on or before the date that is 15 days following the end of each month for which Tenant is so entitled to pay Alternate Rent.

**30.     Reasonable Cooperation**.  During the term of this Lease, Landlord agrees to reasonably cooperate in a timely manner with Tenant in connection with the obtaining and renewal of all licenses and permits which Tenant may need to operate its intended business on the Premises.  Such cooperation may include the disclosure of information regarding Landlord and its business principals.  Tenant agrees to hold any such information confidential and to use the same only for the purposes of obtaining or renewing the license or permit for which such

2286858 v12 (43470.00041.023)

information is required.  All costs associated with the obtaining or renewal of licenses and permits shall be borne by Tenant.

**31.** **Miscellaneous**.

(a)    In the event this Lease is terminated pursuant to a right to do so herein contained, neither Landlord nor Tenant hereto shall thereafter have any further obligation or liability one to the other, other than those obligations which either expressly survive termination of this Lease or have accrued prior to termination, and this Lease shall be of no further force or effect; provided, however, that all obligations of each party already accrued hereunder but not fully performed as of the expiration or earlier termination of the lease term shall survive the expiration or earlier termination of this Lease, including, without limitation, all payment obligations with respect to all unpaid Rent and all obligations concerning the condition of the Demised Premises.

(b)    The captions used in this Lease are for convenience only and shall not be deemed to amplify, modify or limit the provisions hereof.

(c)    Words of any gender used in this Lease shall be construed to include any other gender, and words in the singular shall include the plural and vice versa, unless the context otherwise requires.

(d)    This Lease shall be binding upon and shall inure to the benefit of Landlord and Tenant and their respective heirs, legal representatives, successors and assigns.

(e)    The Exhibits annexed to this Lease are hereby incorporated by reference in their entirety with the same force and effect as if they were set forth in this Lease in their entirety.  This Lease contains the entire agreement of Landlord and Tenant with respect to the subject matter hereof and can be altered, amended or modified only by written instrument executed by both of such parties.

(f)    It is expressly agreed by Landlord and Tenant that time is of the essence with respect to this Lease.  In the event the date for performance of an obligation or delivery of any notice hereunder falls on a day other than a business day, then the date for such performance or delivery of such notice shall be postponed until the next ensuing business day.  Any references to "business days" contained herein are references to normal working business days (i.e., Monday through Friday of each calendar week, exclusive of Federal holidays).

(g)    If any term or provision, or any portion thereof, of this Lease, or application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

(h)    This Lease may be signed in counterparts with the same force and effect as if all required signatures were contained in a single, original instrument.

2286858 v12 (43470.00041.023)

(i)     In the event of litigation between the parties to enforce this Lease, the prevailing party in any such action shall be entitled to recover reasonable costs and expenses of suit, including, without limitation, court costs, attorneys' fees, and discovery costs.  Any claim by either party under this Lease for damages shall be limited to actual economic loss, and neither of Landlord nor Tenant shall be liable to the other under any circumstances relating to this Lease or the tenancy created hereby for speculative, consequential, punitive, exemplary, special or damages other than actual economic loss.

(j)     This Lease shall be construed, interpreted, and enforced pursuant to the applicable laws of the state in which the Premises are located.

(k)     If either Landlord or Tenant is a business entity each individual executing this Lease on behalf of the business entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of the business entity, and that this Lease is binding upon the business entity.  If either Landlord or Tenant is a business entity, the persons executing this Lease on behalf of Landlord or Tenant hereby covenant and warrant that (a) Landlord or Tenant, as applicable, is a duly qualified business entity and all steps have been taken prior to the Effective Date to qualify Landlord or Tenant to do business in the State in which the Premises are located; (b) all franchise and corporate taxes have been paid to date; and (c) all future forms, reports, fees and other documents necessary to comply with applicable laws will be filed when due.

(l)     Should Landlord sell, exchange or assign this Lease (other than a conditional assignment as security for a loan), then Landlord, as transferor, shall be relieved of any and all obligations on the part of Landlord accruing under this Lease from and after the date of such transfer, provided that Landlord's successor in interest shall assume in writing the performance of all of the terms, provisions and covenants of this Lease on the part of Landlord to be kept and performed from and after such date.  Written notice of any such transfer, together with a duly executed assumption agreement, shall be given to Tenant.  Notwithstanding the foregoing to the contrary, Landlord shall not be entitled to effectuate any such transfer prior to the time that it completes the Landlord's Work as set forth in Paragraph 3(c) above.

(m)     Each party agrees, at any time and from time to time, on or prior to the thirtieth (30th) day following a written request by the other party, to execute and deliver to the other a statement certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), certifying the Rent Commencement Date and the expiration date of the Lease term and the dates to which the Base Rent and other charges have been paid in advance, if any, stating whether or not, to the best knowledge of the signer, the other party is in default in performance of any of its obligations under this Lease, and, if so, specifying each such default of which the signer shall have knowledge and stating whether or not, to the best knowledge of the signer, any event has occurred which with the giving of notice or passage of time, or both, would constitute such a default, and, if so, specifying each such event, it being intended that any such statement delivered pursuant hereto shall be deemed a representation and warranty to be relied upon by the party requesting the certificate and by others with whom such party may be dealing, regardless of independent investigation.

2286858 v12 (43470.00041.023)

(n)    Notwithstanding any other provision of this Lease, Landlord shall not have any personal liability hereunder; and for any claim against Landlord, Tenant agrees to look solely to the equity or interest then owned by Landlord in the Center. In no event shall any deficiency judgment or any money judgment of any kind be sought or obtained against Landlord, except to be satisfied from Landlord's interest in the Center as set forth above.

**32.    Security Deposit**. The Security Deposit shall be held by Landlord to secure the performance by Tenant of Tenant's covenants and obligations under this Lease, it being expressly understood that such deposit shall not be considered an advance payment of rents or a measure of Landlord's damages in case of default of Tenant. Upon the occurrence of any Event of Default of Tenant which continues beyond any applicable notice and cure period, Landlord may, from time to time, without prejudice to any other remedy and without any obligation to do so, use such Security Deposit to the extent necessary to make good any arrears of rent and any other damage, injury, expense or liability caused to Landlord by such event of default. Following any such application of the Security Deposit, Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount. If Tenant is not in default hereunder at the expiration or earlier termination of the Lease, any remaining balance of the Security Deposit shall be returned by Landlord to Tenant within thirty (30) days of the later of the effective date of such termination of this Lease or the date the election to terminate is made.

**33.    Tax Incentives and Waiver**. Tenant acknowledges that Landlord may receive certain sales tax rebates ("Incentives") pursuant to certain existing or contemplated agreements (collectively, and as the same may be amended, the "Incentive Agreement") with respect to the Center. Notwithstanding anything to the contrary contained in this Lease, by its execution of this Lease, Tenant also acknowledges that it does not have and is not entitled to, and hereby expressly disclaims, any right to or interest in such Incentives. By its execution of this Lease, Tenant also waives (but only for the benefit of Landlord, its mortgage lender and any governmental or quasi-governmental authority, agency or department in connection with the Incentive Agreement) Tenant's right of confidentiality with respect to sales tax paid from Tenant's operations and business at the Premises, and agrees to execute and deliver a Waiver of Sales Tax Confidentiality (the "Waiver"), together with any other reasonably necessary documents, upon request of either Landlord, its mortgage lender or any governmental or quasi-governmental authority, agency or department, by which Tenant (and any party affiliated with Tenant whose waiver may all be required) waives its right of confidentiality with respect to sales tax paid from Tenant's operations and business at the Premises, so that such sales tax information may be obtained from the Comptroller of Public Accounts of the State of Texas by Landlord, its mortgage lender or any governmental or quasi-governmental authority, agency or department, all as may be required by the Incentive Agreement or as may otherwise be required under applicable law so as to give full effect to the Incentive Agreement. Tenant's failure to comply with the terms and conditions of this covenant in any material respect, which failure continues upon the expiration of thirty (30) days after written notice from Landlord to Tenant of such failure and demand that Tenant cure the same, shall constitute an Event of Default under this Lease. Tenant confirms that it has received, reviewed and approved the form of the Waiver, and that it shall execute the Waiver prior to taking occupancy of the Premises.

2286858 v12 (43470.00041.023)

**34.   ECR**.  The Center will be subject to the terms, conditions, provisions, restrictions and limitations of the Permitted Exceptions (herein so called) listed on Exhibit K attached hereto and incorporated by this reference, including, without limitation, that certain Declaration of Easements, Covenants and Restrictions (the "ECR") for The Village at Cumberland Park, which ECR shall be filed of record in the Official Public Records of Smith County, Texas on or after the Acquisition Date.  Landlord represents and warrants that it has reviewed the ECR, and any Existing Exclusives and other agreed uses of other proposed tenants in the Center existing as of the Effective Date, and hereby warrants and represents that Tenant's Permitted Use will not violate the ECR or such other exclusives and uses.  Landlord further represents and warrants that it has provided Tenant with the most current form of the ECR and that there are no other title documents, other than the Permitted Exceptions, to which the Premises will be subject.  Tenant acknowledges that its rights under this Lease shall be subject to the terms of the ECR; provided, however, that in the event of any conflict between the ECR and this Lease, as between Landlord and Tenant, this Lease shall control, and that any obligations under the ECR imposed solely upon an "Owner" will not applicable to Tenant.  Subject to the provisions of Paragraph 20(b), all easements, covenants, conditions, restrictions or other documents affecting the Premises or Tenant's rights under this Lease and entered into by Landlord after the Effective Date shall be subject to the prior written consent of Tenant (which consent shall not be unreasonably withheld, conditioned or delayed) or, at Landlord's sole option, Tenant's consent shall not be required but in such event Tenant shall not be bound by any provision thereof nor shall any provision thereof be enforceable or applicable as against either Tenant or the Premises.  Landlord covenants to Tenant that any revisions to the ECR from the draft provided to Tenant will, among other things, (i) not prohibit or restrict the use rights, or contradict the right of Tenant to discontinue its operations, granted to Tenant by Paragraph 7 of this Lease, (ii) grant easements and restrictions and rights to use the Common Area at least as broad as those set forth in Paragraph 12 of this Lease, (iii) not contradict the extent of any restoration obligations set forth in Paragraph 16 of this Lease; (iv) not contradict the right of Tenant to self-insure set forth in Paragraph 11(f) of this Lease; and (v) protect the area on Exhibit A-1 labeled "No Build Area" such that no party shall be permitted to erect, construct or install any subsequent signage, buildings or other improvements in, or make any changes to, the portion of the Common Area situated within the No Build Area.  Landlord will use its best efforts to deliver, prior to its recordation, the final form of ECR to Tenant on or prior to the date that is thirty (30) days after the Effective Date.  If the final form of ECR does not meet the requirements as set forth in items (i) through (v) above, Tenant may, in its sole discretion, terminate this Lease.  Tenant's failure to terminate this Lease by written notice to Landlord within thirty (30) days of receipt of the final ECR shall be deemed approval by Tenant of the ECR.  Notwithstanding anything herein or in the ECR to the contrary, to the extent that the Premises (or Tenant's rights, obligations and/or interest under this Lease) would be affected, Landlord shall not consent to any proposed amendment to the ECR (or give its consent or non-consent to any proposition when it has a right to do so under the ECR) without the prior written consent of Tenant, which consent may be denied in its reasonable discretion.

**35.   Grand Opening Charge**.  Landlord has advised Tenant that Landlord will conduct a grand opening event at the Center.  Landlord shall provide Tenant with the anticipated date for the grand opening event not later than 45 days prior to the scheduled date of the grand opening.  Landlord and Tenant shall collaborate in good faith to determine Tenant's required contribution toward the grand opening event which shall either be in the form of cash or an in – kind exchange (in which case Tenant shall provide food for the grand opening event) (the "Grand

2286858 v12 (43470.00041.023)

Opening Charge"). The Grand Opening Charge, whether cash or in-kind exchange, shall be Tenant's total and one-time only contribution toward the promotional, advertising and public relations expenses that will incurred by Landlord in connection with the grand opening of the Center.

36. **Attorney's Fees**. In the case of a dispute regarding any default or breach or interpretation of any provision hereunder, each party shall pay its own attorneys' fees unless there is a prevailing party in litigation in which case the non-prevailing party shall pay all attorneys' fees incurred by the prevailing party. The payment of attorneys' fees shall be conditioned on receipt of proper documentation regarding the same.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

2286858 v12 (43470.00041.023)

IN WITNESS WHEREOF, the parties hereto have executed this Lease to be effective as of the Effective Date.

**LANDLORD:**

**TYLER BROADWAY/CENTENNIAL LP**,
a Texas limited partnership

By:   Tyler Broadway/Centennial GP LLC,
a Texas limited liability company,
its General Partner

By: _____
David C. Wilson, Manager

Date: _____9-4-2013_____

IN WITNESS WHEREOF, the parties hereto have executed this Lease to be effective as of the Effective Date.

**TENANT:**

**FOOD CONCEPTS INTERNATIONAL, L.P.,**
a Texas limited partnership

By:    Food Concepts GPH, L. L. C.,
       a Delaware limited liability company
       its General Partner

By: _____
       Robert Lin, Executive Vice President

Date: _____

2286858 v12 (43470.00041.023)

## EXHIBIT A

## CENTER

**Lots 7, 7-A, 7-B and 7-C according to Final Plat showing The Village at Cumberland Park Phase 3, containing approximately 77.652 acres, and recorded in Cabinet E, Slide 268-C of the Plat Records of Smith County, Texas.**

2286858 v12 (43470.00041.023)

## EXHIBIT A-1

## SITE PLAN OF CENTER

[see attached]

A-1 - 1



EXHIBIT A-1 (1 of 2)

THE VILLAGE AT CUMBERLAND PARK
TYLER, TX                August 8, 2013



EXHIBIT A-1 (2 of 2)

THE VILLAGE AT CUMBERLAND PARK
TYLER, TX                August 16, 2013

A-1 - 1

2286858 v12 (43470.00041.023)

## EXHIBIT B

## SITE PLAN OF PREMISES

*(including patio area)*



B - 1

## EXHIBIT C

## WORK LETTER

## CONSTRUCTION: ALLOWANCE TO TENANT FOR FINISH OUT

## ARTICLE I

## GENERAL

A.   Subject to the provisions below Landlord agrees that it will proceed to construct (or, to the extent already partially constructed will complete) a store unit upon the Premises in substantial compliance with the description of Landlord's Work in Article III below.   The Premises shall be deemed ready for occupancy when Landlord's Work has been substantially completed (except for minor finishing jobs); provided however, that if Landlord's Work is delayed because of a default of failure or both of Tenant, then the Premises shall also be deemed ready for occupancy when Landlord's Work would have been substantially completed if Tenant's default or failure or both had not occurred. When the Premises are ready for occupancy (which, unless Tenant objects and Landlord's architect or general contractor fails to certify to the date selected by Landlord, shall be the date Landlord delivers to Tenant a written or verbal statement to the effect that they are ready for occupancy), Tenant agrees to accept possession thereof and to proceed with due diligence to perform Tenant's Work as described in Article IV below, and to open for business at the Premises.   Tenant agrees that at the request of Landlord, Tenant will, following the Commencement Date, execute and deliver a written statement acknowledging that Tenant has accepted possession and reciting the exact Commencement Date and termination date of this lease.   In the event that the Commencement Date shall not have in fact occurred within two years after the date of this lease; this lease thereupon shall be automatically null and void and of no force and effect; provided however that such termination will not nullify either party's cause of action against the other party if the failure resulted from a default by the other party.

B.   In the event of any dispute as to work performed or required to be performed by Landlord or Tenant, the certificate of Landlord's architect or general contractor shall be conclusive.   By occupying the Premises, Tenant shall be deemed to have accepted the same and to have acknowledged that the same fully comply with Landlord's covenants and obligations under this lease.   Occupancy of the Premises by Tenant prior to the Commencement Date shall be subject to all of the terms and provisions of this lease expecting only those requiring the payment of rent.

C.   If Landlord should for any reason fail to complete such work prior to the estimated date set out in Section 1.1 (k) of this lease, Landlord shall not be deemed to be in default or otherwise liable in damages to Tenant nor shall the term of this lease be affected. However, if for any reason the Premises are not ready for occupancy within eighteen (18) months following such estimated date Tenant may, as its option, cancel and terminate this lease

C - 1                                                           2286858 v12 (43470.00041.023)

by written notice to Landlord delivered within thirty (30) days following the expiration of such eighteen-month period, in which event neither party shall have any other liabilities or obligations except that Landlord shall repay to Tenant any prepaid rent or security deposit.

   D. If the building in which the Premises are to be located has not been constructed as of the date of this lease, then Landlord shall not be obligated to proceed with construction on the Premises unless and until financing acceptable to Landlord has been obtained. Unless commitments for such financing satisfactory to Landlord have been obtained and all conditions to such commitments (other than the construction itself) shall have been fulfilled within twelve (12) months following the date of this lease, Landlord may so notify Tenant in writing within thirty (30) days following the expiration of such twelve-month period and this lease shall thereupon cease and terminate and each of the parties hereto shall be released and discharged from any and all liability and responsibility hereunder. If Landlord can obtain financing only upon the basis to modification of the terms and provisions of this lease, Landlord shall have the right to cancel this lease if Tenant refuses approve in writing any such modification within fifteen (15) days after Landlord's request therefore. If such right to cancel is exercised, this lease shall thereafter be null and void, any prepaid rental or security deposit hereunder shall be returned to Tenant and neither party shall have any liability to the other by reason of such cancellation.

   E. If as of the date of execution of this lease the building in which the Premises are to be located has not been constructed, or if the building has been constructed but has not been occupied by any tenants, then Tenant agrees to participate in a joint opening of the Center if requested to do so by Landlord.

**ARTICLE II**

**PRE-CONTRUCTION OBLIGATIONS**

   A. All plans, diagrams, schedules, specifications and other data relating to Tenant's preferences in connection with Tenant's Work must be furnished by Tenant to Landlord complete, sufficient to obtain a building permit, and ready for Landlord's consideration and final approval as per Section 3(c) of this Lease. Without limiting the generality of the immediately preceding sentence, Tenant's submissions must include a floor plan, electrical, plumbing, and HVAC designs, a reflected ceiling plan, elevations of walls and a fixture plan. All drawings shall be at a scale of either 1/8" or 1/4". Tenant shall reimburse Landlord for any loss or extra cost which may result to Landlord by reason of failure on the part of Tenant to submit any such plans, diagrams, schedules, specifications, and/or other data within said period of time.

   B. Tenant shall secure Landlord's written approval of all designs, plans, specifications, materials, contractors and contracts for work to be performed by Tenant before beginning the work (including following whatever work letter instructions, if any, which Landlord may deliver to Tenant in connection with the work), and shall secure all necessary licenses and permits to be used in performing the work. Tenant's finished work shall be subject to Landlord's approval and acceptance, which shall be a condition to any reimbursement hereinafter provided. If required by the applicable municipality, Landlord shall, at Landlord's

C - 2

expense, provide an asbestos report, certification or survey of the Premises from a person or company which is properly licensed to prepare such a report, certification or survey.

C.　　Should Tenant request and Landlord approve any variation in the store from and/or interior finishing of the Premises, and if such items are a part of Landlord's Work as described below, the variation shall be incorporated in the plans to be furnished by Tenant. In such event, Landlord shall reimburse Tenant for that part of the cost thereof equal to Landlord's determination of its savings for those parts of Landlord's Work described below. The amount of the reimbursement shall be determined by Landlord at the time of its approval of designs, plans, specifications and contracts, and shall be incorporated within the approval.

D.　　The insurance requirements under Article XV of the lease and the indemnity requirements under Article XVI of the lease shall during the construction contemplated in this exhibit and Tenant shall provide evidence of appropriate insurance coverage prior to beginning any of Tenant's Work. In addition, and without limiting the generality of the immediately preceding sentence, at Landlord's option, Landlord may require that prior to beginning any of Tenant's Work, Tenant shall provide Landlord with evidence of insurance covering both Tenant and Tenant's contractor against damage to their personal property, as well as against third party liability and workers' compensation claims arising out of all construction and associated activities. All policies of insurance shall be subject to Landlords' prior approval and shall be endorsed showing Landlord as an additional named insured (or, if permitted by Landlord, may provide a waiver of subrogation against Landlord).

## ARTICLE III

## DESCRIPTION OF LANDLORD'S WORK

A.　　<u>Structure</u>:

　　　　1.　　Exterior wall surfaces shall be selected by Landlord. Exterior trim and other exterior work normally requiring painting shall be painted

　　　　2.　　Roofing shall be built-up composition roofing, or other material specified by Landlord.

B.　　<u>Store Front</u>:

　　　　1.　　A standard store front with 1" insulated glass shall be provided in keeping with the overall architectural plan for the center.

　　　　2.　　If a door already exists on the premises and if such door is owned by Landlord, then Tenant may use the door for its store front. However, Landlord makes no representation or warranty in this regard, and Tenant agrees that it is ultimately responsible for providing its own door.

C.　　<u>Parking Areas and Walks</u>:

　　　　1.　　Parking areas shall be hard surfaced.

C - 3

2286858 v12 (43470.00041.023)

2.    Walks shall be surfaced with concrete, stone, brick or other hard materials as specified by Landlord.

3.    Parking areas and walks shall be provided with reasonably adequate artificial lighting.

D.    <u>Floor Slab</u>:

1.    The interior of the Premises will have a smooth concrete floor except for the "leave-out" (pour back of "leave out" will not be the responsibility of Landlord).

E.    <u>Utilities</u>:

1.    Cold water service shall be brought to the perimeter of the Premises; otherwise all plumbing fixtures and connections thereof within the Premises shall be provided by Tenant.

2.    Waste line shall be brought to the "leave-out" (see Article III D) in the Premises.

3.    Gas service shall be brought to a location at the perimeter of the shell building, at which location the gas company will set its meter.

4.    Electrical service (120/240 volt, unless instead, 277/480 volt service is provided in the area, and at Landlord's option either three phase or one –phase service) shall be brought to a location on the perimeter wall of the shell building, at which location the electric company will set Tenant's meter.

5.    Telephone service shall be brought to a location on the perimeter wall of the shell building.

F.    <u>Limitations and Conditions</u>:

1.    The work to be done by Landlord shall be limited to that described as Landlord's Work in the foregoing paragraphs of this Article III.  All work not so classified as Landlord's Work is Tenant's Work.

2.    All work performed by Landlord which is in excess of that required of Landlord by this Article III shall be undertaken only after Tenant has deposited full payment for the same with Landlord in the form of cash, money order or cashier's check; and Tenant agrees to make such deposit promptly after execution of this lease (with any delay in Tenant's making such deposit to be deemed a default under this lease, without the requirement of additional notice from Landlord, and causing Tenant's time periods for completing Tenant's work and opening for business to commence as if Tenant's delay had not occurred).

2286858 v12 (43470.00041.023)

**ARTICLE IV**

**DESCRIPTION OF TENANT'S WORK**

A. <u>Signs</u>: Tenant shall pay for all signs and the installation thereof, including electrical hook-up, subject to the provisions of Section 13.1 of this lease.

B. <u>Utilities</u>: All meters or other measuring devices including water submeters in connection with utility service shall be provided by Tenant. Tenant shall also provide all connections to the utility service provided by Landlord. All services deposits shall be made by Tenant at Tenant's expense.

C. <u>Store Front</u>: Except as maybe supplied by Landlord in accordance with Article III.B. of this Exhibit, Tenant shall be responsible for the store front, exterior doors and weatherproofing.

D. <u>Interior Work</u>: The work to be done by Tenant shall include, but not be limited to, the purchase and installation of the following:

1. Adequate electrical service, panel, wiring, and fixtures.

2. Demised partition(s) as required by existing conditions to separate the Premises from other lease space(s). Partition shall be at least one-hour fire rated gyprock wall 5/8" gypsum board and R-11 batt insulation (sealed at the roof deck) on both sides of studs. The exterior side is not to be taped and bedded. A break metal wall cap to match storefront metal shall be installed at the storefront.

3. Interior partitions, including finishing, electrical wiring, and connections within the Premises.

4. 2' x 4' lay-in lights in adequate number to provide a minimum of 70-foot candle lighting throughout the Premises; plus light covers and special hung or furred ceilings. (Or as approved in the construction drawings and/or contract documents as suitable for the restaurant design integrity.)

5. Interior painting.

6. Store fixtures and furnishings.

7. Display window enclosures.

8. Plumbing fixtures within the Premises.

9 2' x 4' drop ceiling, installed no lower then the storefront glass.

10. Heating/air conditioning and ventilation equipment (adequate to provide at least a 25-degree differential including electrical and gas hook-up ductwork and roof penetrations.

C - 5

11. Floor covering and 4" vinyl cove base.

12. All telephone equipment for the Premises.

E. All work undertaken by Tenant shall be at Tenant's expense, and shall not damage the building or any part thereof. Any roof penetration shall be performed by Landlord's roofer or, at Landlord's option, by a bonded roofer approved in advance by Landlord. The work shall be begun only after Landlord has given consent, which consent shall be conditioned upon Tenant's plans, to include materials acceptable to Landlord, in order to prevent injury to the roof and spread the weight of the equipment being installed. Tenant shall also be responsible for obtaining, and paying for, professional inspections of any structural work (including, without limitation, any roof work or concrete work).

INITIALED:

LANDLORD:_____

TENANT:_____

C - 6

**EXHIBIT D**

**OMITTED**

2286858 v12 (43470.00041.023)

## EXHIBIT E

Prepared by:    Kim Goff, Esq.

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

KG Law, PLLC
601 Rustic Ridge Court
Southlake, Texas 76092

---

SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

## SUBORDINATION, ATTORNMENT
## AND NON-DISTURBANCE AGREEMENT

**STATE OF** _____    §
                                    §
**COUNTY OF** _____    §

    **THIS AGREEMENT** is entered into this _____ day of _____, 20__, by and between _____, a _____, hereinafter called "Tenant", and _____, a _____, hereinafter called "Lender".

## RECITALS:

    **WHEREAS,** Tenant is the Tenant under that certain Lease Agreement ("Lease") dated _____, 20__ between Tenant and _____, a _____ ("Borrower"), as landlord, for a certain retail premises (the "Premises") situated within the shopping center commonly known as _____, located in the City of _____, the County of _____, State of _____ (the "Center"). The Center is owned by Borrower and is more fully described in Exhibit A attached hereto and made a part hereof. The Premises is more particularly shown on Exhibit B attached hereto and made a part hereof.

    **WHEREAS,** Borrower has requested that Lender make a mortgage loan secured by a deed of trust from Borrower to Lender (the "Mortgage"), covering the land owned by Landlord within the Center (including the Premises).

    **WHEREAS,** Lender is willing to make the requested mortgage loan, provided Tenant executes this Agreement.

2286858 v12 (43470.00041.023)

## OR

WHEREAS, Lender has made a mortgage loan to Borrower secured by a deed of trust from Borrower to Lender (the "Mortgage"), covering the Center, including the Premises.

WHEREAS, Tenant agreed to enter into the Lease provided Lender would execute this Agreement.

## AGREEMENT:

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and [in order for Lender to make the mortgage loan,] or [in order to induce Tenant to enter into the Lease,] Tenant and Lender hereby agree and covenant as follows:

1.      The Lease and the estate conveyed thereby are and shall at all times continue to be subject and subordinate in all respects to the Mortgage and to all renewals, modifications and extensions thereof, subject to the terms and conditions hereinafter set forth in this Agreement.

2.      So long as Tenant is not in default (beyond any period given Tenant to cure such default) in the payment of rent or additional rent or in the performance of any of the other terms, covenants or conditions of the Lease on Tenant's part to be performed, Tenant's possession under the Lease and Tenant's rights and privileges thereunder or under any extensions or renewals thereof which may be effected in accordance with any option therefor contained in the Lease, shall not be diminished or interfered with by Lender under any circumstances and Tenant's occupancy shall not be disturbed by Lender during the term of the Lease or any extensions or renewals thereof.  Lender will be bound by the terms of the Lease, and will not join Tenant as a party defendant in any foreclosure proceeding taken by Lender.

3.      If the interests of Borrower shall be acquired by Lender by reason of foreclosure of the Mortgage or other proceedings brought to enforce the rights of the holder of the Mortgage, by deed in lieu of foreclosure or by any other method and Lender succeeds to the interests of Borrower under the Lease, the Lease and the rights of Tenant thereunder shall continue in full force and effect and shall not be terminated or disturbed except in accordance with the terms of the Lease.  Tenant shall be bound to Lender under all of the terms, covenants and conditions of the Lease for the balance of the term thereof remaining and any extensions or renewals thereof which may be effected in accordance with any option therefor contained in the Lease, with the same force and effect as if Lender were the landlord under the Lease and Tenant does hereby attorn to Lender, as its landlord, said attornment to be effective and self-operative without the execution of any other instruments on the part of either party hereto, immediately upon Lender's succeeding to the interest of Borrower under the Lease, provided, however, that Tenant shall be under no obligation to pay rent to Lender until Tenant receives written notice from Lender that it has succeeded to the interests of Borrower under the Lease.  The respective rights and obligations of Tenant and Lender upon such attornment, to the extent of the then remaining balance of the term of the Lease and any extensions or renewals, shall be and are the same as now set forth in the Lease, it being the intention of the parties hereto for this purpose to incorporate the Lease into this Agreement by reference, with the same force and effect as if set forth at length herein.

2286858 v12 (43470.00041.023)

4. If Lender shall succeed to the interests of Borrower under the Lease, Lender shall be bound to Tenant under all of the terms, covenants and conditions of the Lease and Tenant shall have the same remedies against Lender for the breach of any agreement contained in the Lease that Tenant might have had under the Lease against Borrower if Lender had not succeeded to the interests of Borrower; provided further, however, that Lender shall not be:

(a) Liable for any act or omission of any prior landlord (including Borrower); or

(b) Bound by any rent or additional rent which Tenant might have paid for more than one (1) month in advance to any prior landlord (including Borrower); or

(c) Bound by any amendment or modification of the Lease made without Lender's consent; provided, however, that Borrower and Tenant may, without Lender's consent, make non-material amendments to the Lease, but in no event shall such amendments decrease the size or configuration of the Premises, term of the Lease, amount or frequency of rental payments or any other financial obligations of either party thereunder.

5. This Agreement may not be modified orally or in any other manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest. Tenant further agrees to send to Lender at the following address copies of those notices given to Borrower pursuant to the terms of the aforesaid Lease which relate to Borrower's or Tenant's default, insurance, casualty and condemnation matters at the same time such notice is given to Borrower:

_____

_____

_____

Attention:_____

This Agreement shall inure to the benefit of and be binding upon the parties hereto, their respective heirs, successors and assigns, it being expressly understood that all references herein to Lender shall be deemed to include not only Lender, but also its successors and assigns.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

 2286858 v12 (43470.00041.023)

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

TENANT:

_____,

a _____

By:_____
        Robert Lin, CEO

Date:_____


LENDER:

_____


By:_____
Name:_____
Its:_____

Date:_____

E - 4

## ACKNOWLEDGMENT

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

    This instrument was acknowledged before me on this _____ day of _____, 20__, by _____, _____ of _____, a _____, on behalf of said corporation.

_____
NOTARY PUBLIC, STATE OF TEXAS
My Commission Expires:_____

## ACKNOWLEDGMENT

| | |
|---|---|
| STATE OF _____ | § |
| | § |
| COUNTY OF _____ | § |

    This instrument was acknowledged before me on this _____ day of _____, 20__, by _____, _____ of _____, a _____, on behalf of said _____.

_____
NOTARY PUBLIC, STATE OF _____
My Commission Expires:_____

                            2286858 v12 (43470.00041.023)

Case 25-43339-elm11   Doc 231-4   Filed 03/26/26   Entered 03/26/26 14:43:09   Desc
Exhibit 4   Page 72 of 101

## EXHIBIT F

Prepared by:   Kim Goff, Esq.


RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

KG Law, PLLC
601 Rustic Ridge Court
Southlake, Texas 76092

SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

## MEMORANDUM OF LEASE

**STATE OF** _____    §
                                §
**COUNTY OF** _____    §

     THIS MEMORANDUM OF LEASE is made and entered into by and between _____, a _____ ("Landlord"), and _____, a _____ ("Tenant").

## W I T N E S S E T H:

     By that certain Lease Agreement dated _____, 20__ (the "Lease") by and between Landlord and Tenant, Landlord leased to Tenant, and Tenant leased from Landlord, approximately _____ square feet of retail space situated within that certain retail shopping center owned by Landlord and commonly known as _____, located in the City of _____, County of _____, State of _____, the same being more particularly described on Exhibit A attached hereto and made a part hereof (the "Center"), together with the non-exclusive use of all rights, privileges, easements, and appurtenances belonging or in any way pertaining thereto (the "Premises"), TO HAVE AND TO HOLD the same for a primary term of _____ (__) years (commencing as provided in the Lease), with _____ (__) renewal terms of _____ (__) years each, all pursuant and subject to the terms, conditions, and stipulations contained in the Lease to which reference is made for all purposes of which it is intended hereby to give notice. The location of the Premises is more particularly shown on Exhibit B attached hereto and made a part hereof.

     During the term of the Lease, including any renewal terms, and provided that Tenant is not in monetary default under the Lease beyond all applicable notice and cure periods and is open in the Premises for the Permitted Use [as hereinafter defined] (or is otherwise closed for either a Permitted Closure [as hereinafter defined] or pursuant to an express right to be closed as set forth in Paragraph 7(c) of the Lease), Landlord shall not allow to operate within the Center a restaurant other than Tenant which is a full service, sit-down, Mexican food restaurant. Tenant

F - 1
2286858 v12 (43470.00041.023)

expressly agrees that a Chili's Bar & Grill restaurant is not a Mexican food restaurant. Tenant further agrees that the foregoing restriction shall not serve to prohibit so-called counter-service restaurants serving Mexican food, such as, for example purposes only, Fuzzy's Taco Shop, Velvet Taco, Freebirds, Chipotle, and Tin Star, so long as the space occupied by such so-called counter-service tenant does not exceed 2,750 square feet. Landlord shall not allow to operate within the Center any so-called counter-service restaurants which exceed 2,750 square feet of space if such restaurant serves primarily Mexican food, such as burritos, enchiladas, fajitas, wraps and tacos.

For purposes of this Memorandum of Lease, Tenant's "Permitted Use" is: Tenant may use the Premises for the operation of a Mexican food restaurant (including an outdoor seating, dining or bar area), a related bar and/or cocktail lounge and such other uses as are directly related and incidental to the operation thereof (including, but not limited to, the preparation of food for off-site catering and the retail sale of general merchandise bearing the logo of the business operated by Tenant); and for no other use or purpose without Landlord's prior written consent not to be unreasonably withheld, conditioned or delayed. For purposes of this Memorandum of Lease, the term "Permitted Closure" means any closure of the Premises which is necessitated by: (x) alterations or renovations being performed in and to the Premises, (y) damage or destruction, eminent domain proceedings or actions, or force majeure events, or (z) any act or omission of Landlord, or its employees, agents, or contractors.

During the Term of the Lease, Landlord shall provide for Tenant's use (i) the parking area more generally as shown and labeled "Required Parking Area" on Exhibit C attached hereto and made a part hereof, and (ii) the access drives generally as shown and labeled "Required Access Drives" on Exhibit C (collectively, the "Required Common Areas"). During the Term of the Lease, Landlord agrees that it shall not (nor consent to allow any other party to) materially relocate, modify, alter or otherwise change the Required Common Areas; provided, however, that (A) minor modifications such as, for example, the possible addition of cart corrals in the Required Parking Area, and minor adjustments to landscaping features, curb cuts and drives shall be permitted, and (B) other modifications permitted by the ECR (defined below) shall be permitted, provided such other modifications shall not: (I) adversely affect Tenant's operations in the Premises or the Patio Area, (II) materially and adversely affect the visibility of the Premises or the Patio Area, and (III) adversely affect Tenant's access to the Premises or materially and adversely parking in the immediate vicinity of the Premises. Additionally, Landlord agrees that it shall not (nor consent to allow any other party to) erect, construct or install any subsequent signage (other than traffic control, directional, parking, safety and similar signs), permanent buildings, kiosks or roofed structures in the area labeled "No Build Area" on Exhibit C attached hereto. Although it is not part of the No-Build Area, Landlord agrees that no permanent commercial or residential structures will be built or permitted by Landlord in the portion of the area labeled "Lifestyle Park" from the eastern-most exterior wall of the Premises westward towards South Broadway Boulevard, except that Landlord reserves the right to build, place, install or permit temporary structures in that area for special events, including for temporary commercial uses such as, for example but not limitation, for the sale of ice cream, and to build one or more permanent kiosks or structures in the Lifestyle Park area east of the Premises for the same or similar purposes. The term "ECR" as used above means that certain Declaration of Easements, Covenants and Restrictions for The Village at Cumberland Park, which ECR has been or shall be filed of record in the Official Public Records of Smith County, Texas.

F - 2

This Memorandum of Lease is not intended to alter or supersede the Lease, and in the event of any conflict between this Memorandum of Lease and the Lease, the provisions of the Lease shall control.

Tenant agrees to execute and record a release of this Memorandum of Lease upon the expiration or earlier termination of the Lease upon the request of Landlord; but if Tenant fails to do so upon Landlord's reasonable request, Landlord shall be permitted and is hereby authorized to execute and record a release of this Memorandum of Lease and the same shall have the same effect as if it had been executed by Tenant.

**[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]**

2286858 v12 (43470.00041.023)

IN WITNESS WHEREOF, Landlord and Tenant have executed this Memorandum of Lease to be effective as of the latest of the dates set forth below.

LANDLORD:

_____,

a _____

By:_____
Name:_____
Its:_____

Date:_____

TENANT:

_____,

a _____

By:_____
    Robert Lin, CEO

Date:_____

F - 4

2286858 v12 (43470.00041.023)

## ACKNOWLEDGMENT

STATE OF _____         §
                                     §
COUNTY OF _____           §

    This instrument was acknowledged before me on this ____ day of _____,
20__,    by     _____,    _____ of
_____, a _____, on behalf of said
_____.

                                  _____

                                  NOTARY PUBLIC, STATE OF _____
                                  My Commission Expires:_____

## ACKNOWLEDGMENT

STATE OF TEXAS         §
                       §
COUNTY OF DALLAS       §

    This instrument was acknowledged before me on this _____ day of
_____, 20__, by _____, _____ of _____, a
_____, on behalf of said _____.

                                  _____

                                  NOTARY PUBLIC, STATE OF TEXAS
                                  My Commission Expires:_____

LANDLORD'S ADDRESS:

    _____

    _____

    _____

    _____

TENANT'S ADDRESS:

    _____

    _____

    _____

    _____

                                              2286858 v12 (43470.00041.023)

## EXHIBIT G

## COMMENCEMENT AND TERMINATION AGREEMENT

THIS AGREEMENT (the "Agreement") is entered into this _____ day of _____, 20__, by and between _____, a _____ ("Landlord"), and _____, a _____ ("Tenant").

## W I T N E S S E T H:

WHEREAS, Landlord and Tenant entered into a Lease Agreement dated _____, 20__, for approximately _____ square feet of retail space (the "Premises") located within that certain retail shopping center commonly known as _____ located in the City of _____, County of _____, State of _____ (the "Center"). The lease, together with any amendments thereto, is herein referred to as the "Lease"; and

WHEREAS, it is the desire and intent of Landlord and Tenant to clearly define the terms of said Lease.

NOW, THEREFORE, it is agreed by and between Landlord and Tenant that:

1.     The Rent Commencement Date of the Lease is _____, 20__.

2.     The Primary Term of the Lease commenced on _____, 20__, and shall terminate at 11:59 p.m., local time of the state in which the Premises are located, on _____, 20__.

3.     The Lease provides for _____ (__) Renewal Terms of _____ (__) years each.

4.     Tenant has the right to exercise each option by providing Landlord with written notice of its election to renew no later than _____ prior to the expiration of the Primary Term or prior Renewal Term, as applicable.

5.     The Lease is now in full force and effect and all terms and conditions of the Lease are hereby ratified and confirmed.

Landlord and Tenant agree that this document will not be recorded in any public records including the real estate records of the county where the Premises are located.

2286858 v12 (43470.00041.023)

IN WITNESS WHEREOF, Landlord and Tenant have executed this Agreement as of the day and year first above written.

LANDLORD:

_____,
a _____

By:_____
Name:_____
Its:_____

Date:_____

TENANT:

_____,
a _____

By:_____
        Robert Lin, CEO

Date:_____

G - 2

2286858 v12 (43470.00041.023)

## EXHIBIT H

## EXISTING EXCLUSIVES

Notwithstanding the provisions of Paragraph 1(a) and Paragraph 7(a) of this Lease regarding Tenant's Permitted Use, Tenant agrees that it will not operate in the Premises for any lawful use that is in violation of the following existing exclusive uses:

Studio Movie Grill Exclusive:  The following provision is contained in the Lease Agreement for the Studio Movie Grill located at the Center (defined terms as contained herein are pursuant to the Studio Movie Grill lease):

Landlord covenants and agrees that so long as no default by Tenant exists beyond any applicable cure period and Tenant is operating a movie theater at the Leased Premises during the Term, Landlord shall not use, lease or permit the use of any space within the Shopping Center, as now or hereafter existing, (i) for the operation of any movie theater and (ii) shall not use, lease or permit the use of any space within any shopping center located within three (3) miles of the Shopping Center and owned by Landlord, its assignees, or affiliates for the operation of any movie theater.

Gander Mountain Exclusive:  The following provision contained in that certain Declaration of Exclusive Use Rights (the "Declaration"), dated October 21, 2005, and recorded in Volume 7924, Page 221 of the Official Public Records of Smith County, Texas, that affects the entire Center (all terms contained in the following provision are as defined in the Declaration):

From and after the Effective Date, for so long as a Gander Mountain retail store is operated on the Gander Parcel with no cessation of business of more than 180 consecutive days [except for an initial construction period (which initial construction period will expire one (1) year after the Effective Date) for said Gander Mountain store and except for a cessation due to remodeling, reconstruction or repairs], no Occupant may use any portion of the Retained Property for any of the following purposes: (i) for the retail sales and rental of hunting (including without limitation firearms and ammunition), fishing, and camping products, equipment and related accessories; or (ii) for the purpose of engaging in retail sales, rental and service of (and outdoor sale and display of) all-terrain vehicles and related sports vehicles, retail sales and rental of (and outdoor sale and display of) canoes, kayaks, boats, boat trailers and motors and other similar vessels and other uses related thereto. Examples of retailers who presently engage in business for the foregoing purposes and who are intended to be subject to the foregoing restrictions are as follows: Cabela's, Bass Pro Shops, Sportsman's Warehouse, Dick's, REI, Oshman's and Academy Sports. Notwithstanding the foregoing or anything in the Oppidan Purchase Agreement to the contrary, the foregoing restrictions shall not apply to (i) any large discount department store such as Target, Wal-Mart, Sam's, Costco, Sears or JC Penney or (ii) to any full-line traditional team sports/athletic sporting goods store such as Sports Authority, Sportsmart or Dunham Sports that does not concentrate on the sale or rental of hunting, fishing, and camping supplies, but which may carry limited quantities of such items, or to any golf specialty store similar to Golf Galaxy or Nevada Bob's.

H - 1                                                    2286858 v12 (43470.00041.023)

## EXHIBIT I

## PROHIBITED USES

Notwithstanding the provisions of Paragraph 1(m) and Paragraph 7(a) of this Lease regarding Tenant's permitted use, Tenant agrees that it will not operate in the Premises for any lawful use that is in violation of the following prohibited uses:

(1)     a bar, pub, nightclub, music hall, or disco serving alcohol, unless operated in accordance with applicable laws, codes and ordinances, and the same has been approved by Landlord (the foregoing shall not prohibit the operation of a bar as a part of a restaurant use);

(2)     a bingo parlor;

(3)     a flea market;

(4)     a massage parlor, provided, however, that the foregoing shall not prohibit the operation of first class, therapeutic massage and holistic health and spa services, such as "Massage Envy";

(5)     a funeral home, mortuary, crematorium, or other such use;

(6)     a so called "head shop", a facility for the sale of paraphernalia for use with illicit drugs;

(7)     an adult type bookstore or other establishment selling, renting, displaying or exhibiting pornographic or obscene materials (including without limitation: magazines, books, movies, videos, photographs or so called "sexual toys") or providing adult type entertainment or activities (including, without limitation, any displays or activities of a variety involving, exhibiting or depicting sexual themes, nudity or lewd acts); provided, however, that the foregoing shall not prohibit the operation of a bookstore or video or music store which carries a broad inventory of books or videos directed toward the interest of the general public [as opposed to a specific segment thereof]);

(8)     any gambling facility or operation, including but not limited to off-track or sports betting parlor, the conduct of table games involving wagering, such as black-jack or poker, or a facility engaged in the actual use of slot machines, video poker/black-jack/keno machines, or similar devices for wagering; or a bingo hall.   Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Operator; further, the foregoing shall not prohibit a restaurant or entertainment center that features entertainment components (including, without limitation, bowling lanes, arcade games, pool tables and similar features) such as ShowBiz, Chuck E. Cheese, Dave & Buster's or a similar facility;

(9)     a carnival, amusement park or circus;

I - 1                                                          2286858 v12 (43470.00041.023)

(10)    auto repair or service or body shop; provided, however, nothing shall prohibit a national or regional electronics or appliance store such as Conn's, Car Toys, or Best Buy from installing car stereos or other mobile electronic equipment in vehicles consistent with such retailer's other stores;

(11)    the parking of motor vehicles that contain vehicle wraps, graphics, mobile billboards, or large banner advertising, if such vehicles are parked at the Center for the primary purpose of advertising an Operator's business at the Center; provided, however, the foregoing shall not prohibit a showroom for or the promotional display of Motor Vehicles (hereinafter defined) permitted under item (12) below;

(12)    the sale or rental of new or used motor vehicles, trailers, boats, recreational vehicles, or mobile homes (collectively, "Motor Vehicles"); provided, however, nothing shall prohibit the indoor or outdoor promotional display of up to five (5) new Motor Vehicles and/or a showroom for the display and sale only of up to ten (10) new Motor Vehicles, so long as the foregoing has been approved by Landlord and is consistent with the operation of a first class shopping center;

(13)    a facility for the sale or rental of used goods (including thrift shops, surplus, secondhand or consignment stores); provided, however, that the foregoing shall not prohibit (a) an Operator of a sporting goods store from selling used sporting goods, including used golf clubs, such as "Play It Again Sports" or (b) an Operator from selling used books, including a used book store such as "Half Price Books";

(14)    a gun range or gun shop; provided, however, that nothing shall prohibit a national or regional sporting goods store from selling guns for use in hunting game consistent with a majority of such retailer's other stores;

(15)    an animal clinic or facility permitting the boarding of animals; provided, however, nothing shall prohibit a national or regional pet store such as PetSmart or Petco from operating in a manner consistent with such retailer's other stores, including the boarding of animals and providing veterinary services by PetSmart and Petco;

(16)    a house of worship or church;

(17)    any unlawful use or any business or use which constitutes a public or private nuisance, or which creates a fire, explosive or other hazard, or which emits offensive odors, fumes, dust or vapors or emits loud noises or sounds; provided, however, (i) normal and customary odors from restaurants or other similar food operations or other approved uses shall be deemed not to create conditions prohibited hereunder, (ii) outdoor customer calling systems used by restaurants or other similar food operations shall be deemed not to be an obnoxious noise or sound, and (iii) the use of any radio, television, loudspeaker, amplifier or other sound system (whether indoors or outdoors) by any Operator shall be deemed to not be an obnoxious or offensive noise or sound so long as the same is permitted by law and does not constitute a nuisance or unreasonably disturb or endanger other Operators, tenants, or occupants of the Center or unreasonably interfere with their use of their respective premises;

                                            2286858 v12 (43470.00041.023)

(18)   any mobile home park, trailer court, labor camp, junkyard or stockyard except that

    (i)   this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance, provided, however, that at least one (1) day prior to the opening by the first (1st) Operator or tenant of the Center to open for business to the public, any construction trailer must be parked at the location in the Center reasonably designated by Landlord;

    (ii)   prior to an Operator or tenant's opening for business, such Operator or tenant shall have the right for a period of not more than forty-five (45) business days prior to such opening to park a trailer in the Common Area to the rear of its store (a) as permitted by law, (b) so as not to occupy any parking spaces, and (c) so as not to interfere with the ingress, egress, loading or unloading of any other Operator, tenant or user, and (d) at a location as may be determined by Landlord, to use such trailer for the purpose of interviewing and training prospective employees; and

    (iii)   an Operator or tenant may use a portion of the Common Area to the rear of its store (a) as permitted by law, (b) so as not to occupy or interfere with any parking spaces, and (c) so as not to interfere with the ingress, egress, loading or unloading of any other Operator, tenant or user, and (d) at a location as may be determined by Landlord, for the placement of a trailer or storage unit;

(19)   any dumping, transfer, disposing, incineration or reduction of garbage (exclusive of screened garbage compactors located near the rear of any building);

(20)   any laundry or dry cleaning plant or laundromat; provided, however, this prohibition shall not be applicable to on-site service oriented to drop-off, pick-up and delivery by the ultimate consumer, including nominal supporting facilities, as the same may be found in first-class shopping districts in the Tyler, Texas, metropolitan area;

(21)   any store that conducts "fire sales", bankruptcy sales (except pursuant to court order), auctions, auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event or similar sales;

(22)   any pool hall, dance hall, discotheque, skating rink or facility, game arcade, or tattoo parlor; provided, however, the foregoing shall not prohibit a restaurant or entertainment center that features entertainment components (including, without limitation, dancing, bowling lanes, arcade games, pool tables, go-cart track and similar features) such as ShowBiz, Chuck E. Cheese, Dave & Buster's or a similar facility;

(23)   any living quarters, or apartments;

(24)   for industrial or manufacturing purposes, or for any assembling, distilling, refining, smelting, agricultural, or mining operation (other than existing agricultural operations and subsurface mining operations); or

(25)   any pawn shop.

   2286858 v12 (43470.00041.023)

## EXHIBIT J

## RULES AND REGULATIONS

To the extent these Rules and Regulations shall conflict with any express term of the Lease, or if the Lease shall set forth a different standard of review, then the terms and conditions of the Lease shall control as between Landlord and Tenant.

1.      Tenants shall not obstruct the walks, service areas, passage ways, or any Common Areas with anything or in any manner whatsoever (provided that sidewalk merchandise display, outdoor seating, and activities as otherwise permitted under a lease and subject to the other requirements of the ECR which governs the Center, shall not be considered obstructions), and shall maintain any and all entrances, exits, walks, corridors, docks, and facilities serving their leased premises free and clear of any and all snow, ice, direct, accumulation of water, litter, refuse and hazardous conditions whatsoever.

2.      Intentionally deleted.

3.      Tenants shall not leave, place or dispose of any refuse, garbage or thing outside their leased premises or elsewhere in the Center other than garbage or refuse in containers or receptacles expressly designated by Landlord for that purpose as and where so designated.

4.      All refuse in and from any leased premises, and from tenants and those under its control, shall be deposited in containers reasonably acceptable to Landlord and disposed of in a manner and at times reasonably acceptable to Landlord.

5.      Receiving, shipping, loading and unloading by tenants shall not be done through the front doors of their premises, but shall at all times be done through the loading dock area at the rear of their premises.

6.      Tenants shall not conduct, advertise, or suffer the occurrence of any auction sale, fire sale, bankruptcy sale, going out of business sale, distress sale or the like at their leased premises or the Center.

7.      Tenants shall not overload the floors of their leased premises.

8.      Tenants shall keep their leased premises clean and free of refuse at all times.

9.      Tenants shall keep display windows, lights and signs lit from all hours from dusk until dawn.

10.     Tenants shall keep and maintain temperatures in their leased premises sufficiently high to prevent freezing of or interference of any flow in pipes in, at and about the premises.

11.     Except in connection with grand openings, tenants shall not attach, display, or maintain on the outer walls, doors, windows or roof of their premises or any portion of the Center any sign, awning, aerial, lettering or other matter without Landlord's prior written consent, which consent Landlord may withhold in its absolute discretion. No sign, display or

2286858 v12 (43470.00041.023)

lettering shall be employed by a tenant unless the same conforms in all respects with Landlord's and the Center's Sign Criteria. Tenants shall conform to and abide by said such Sign Criteria and shall maintain and keep any and all signs, displays and/or lettering in good repair, good appearance and good working order at all times and make all replacements thereto as and when required to keep the same in such condition.

12.     Tenants shall not permit or suffer their premises to be occupied or used in a manner which rises to the level of an actionable nuisance by reasons of noise, amplified sound, odors, or vibrations, or interfere in any way with other tenants or those having business therein, nor shall any animals or birds be kept in or about any premises.

13.     Tenants shall not do anything which may damage the personal property of any business or occupant at the Center or any part thereof or be a nuisance to other tenants of the Center.

14.     All fixtures and/or trade fixtures installed by tenants in their leased premises shall be new or thoroughly reconditioned.

15.     The plumbing facilities, drains and lines in or about any leased premises and/or the Center shall not be used for any other purpose by any tenant or anyone under their control than for the purpose for which they are constructed, nor shall any tenant put (or dispose of) any foreign substance therein of a kind other than that for which such facility was specifically designed or permit such event to occur; and all cost and expense of repairing, replacing, or restoring said facilities or equipment by reason of any breakage, stoppage, or damage resulting from a violation of this provision shall be borne by such tenant.

16.     Tenants shall not burn any trash or garbage of any kind in or about their leased premises or the Center.

17.     The use of the roof is reserved to Landlord. No radio, television, electronic game or other similar device shall be installed outside of any leased premises without first obtaining Landlord's consent in writing in each instance, which consent may be withheld by Landlord in its sole and absolute discretion. No aerial shall be erected on the roof or exterior walls of any leased premises at or about the Center without first obtaining Landlord's consent in writing in each instance, which consent may be withheld by Landlord in its sole and absolute discretion. Any aerial installed without prior written consent of Landlord shall be removable by Landlord without notice at any time and without liability of any kind to Landlord, and if Landlord consents to the installation of such an aerial, it shall be installed in accordance with any and all applicable governmental authorities.

18.     Tenants shall adhere to and obey all such parking control measures as may be placed into effect by Landlord, and the Center, through the use of signs, identifying decals, or other instructions, and shall comply with all reasonable parking rules and regulations promulgated from time to time by Landlord and the Center.

19.     Subject to the terms and conditions of the Lease, Landlord reserves the right, at any time, to rescind with prior written notice any one or more of these Rules and Regulations or to make such other and further reasonable rules and regulations as in Landlord's judgment may

2286858 v12 (43470.00041.023)

from time to time be necessary for the safety, care and cleanliness of all premises, and for the preservation of order therein.

The failure of Landlord to seek redress for violation of, or insist upon the strict performance of any covenants or conditions of this Lease or any of the Rules and Regulations set forth above or hereafter adopted by Landlord, shall not prevent a subsequent act, which would have originally constituted a violation, from having all the force and effect of an original violation. The receipt by Landlord of rent with knowledge of the breach of any covenant of this Lease or breach of these Rules and Regulations shall not be deemed a waiver of such breach. The failure of Landlord to enforce any of these Rules and Regulations as set forth above or hereafter adopted against any tenant shall not be deemed a waiver of any such Rules and Regulations.

Subject to the terms and conditions of the Lease, Landlord shall not be liable to any tenant for violation of any said Rules and Regulations or the breach of any covenant or condition in any lease by any other tenant or occupant.

No act or other thing done or omitted to be done by Landlord or Landlord's agent during the term of this Lease which is necessary to enforce these Rules and Regulations shall constitute an eviction by Landlord nor shall it be deemed an acceptance or surrender of any premises, and no agreement to accept such surrender shall be valid unless in writing signed by Landlord. No employee of Landlord or Landlord's agent shall have any power to accept the keys of any premises prior to the termination of the leasehold agreement. The delivery of keys to any employee of Landlord or Landlord's agent shall not operate as a termination of this Lease or a surrender of any premises.

These Rules and Regulations shall be binding upon heirs, successors, representatives and assigns of all tenants, and tenants' employees and visitors.

2286858 v12 (43470.00041.023)

## EXHIBIT K

## PERMITTED ENCUMBRANCES

1. Easement and Right of Way dated May 13, 1964, from Robert H. Allen and wife, Elizabeth Dee Allen, granted to Texas Power & Light Company by instrument recorded June 11, 1963, in Volume 1081, Page 147, Deed Records of Smith County, Texas.

2. Water Line Easement dated December 7, 1970, from Robert H. Allen and wife, Elizabeth D. Allen, granted to Southern Utilities Company by instrument recorded December 7, 1970, in Volume 1356, Page 601, Deed Records of Smith County, Texas.

3. Right of Way Grant dated January 20, 1938, from Mrs. W.A. Moore to Bell General Transit Corp. by instrument recorded February 3, 1938, in Volume 369, Page 282, of the Deed Records of Smith County, Texas.

4. Declaration of Exclusive Use Rights dated as of October 21, 2005, recorded October 24, 2005, in Volume 7924, Page 221, under Clerk's File No. 2005-R0053133, of the Official Records of Smith County, Texas.

5. Easement and Right of Way dated April 7, 2006, from Broadway South Development "A" No. 2, Ltd., to TXU Electric Delivery Company, recorded March 19, 2007, under Clerk's File No. 2007-R00013790 of the Official Records of Smith County, Texas.

6. Easement and Right of Way dated April 7, 2006, from Broadway South Development "A" No. 2, Ltd., to TXU Electric Delivery Company, recorded March 19, 2007, under Clerk's File No. 2007-R00013791 of the Official Records of Smith County, Texas.

7. Easement dated November 5, 2008, from Broadway South Development A No. 2 Ltd. to the City of Tyler, recorded February 10, 2009, under Clerk's File No. 2009-R00005771 of the Official Records of Smith County, Texas.

8. All leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals together with all rights, privileges and immunities relating thereto, appearing in the Public Records.

9. Declaration of Easements, Covenants, Conditions and Restrictions dated June 11, 2012, between Broadway South Development "A" No. 2, Ltd., and Halle Properties, L.L.C., recorded June 12, 2012, under Clerk's File No. 2012-00026190 of the Official Records of Smith County, Texas; as affected by Agreement for Assignment and Assumption of Declarant's Rights and Obligations dated _____, 2013, between Broadway South Development "A" No. 2, Ltd., and Tyler Broadway/Centennial LP, recorded _____, 2013, under Clerk's File No. 2013-_____ of the Official Records of Smith County, Texas.

2286858 v12 (43470.00041.023)

10. Non-Exclusive Easement and Right of Way dated February 6, 2013, Broadway South Development "A" No. 2, Ltd., to the City of Tyler, recorded March 8, 2013, under Clerk's File No. 2013-00010549 of the Official Records of Smith County, Texas.

11. Declaration of Easements, Covenants and Restrictions dated _____, 2013, executed by Tyler Broadway/Centennial LP, recorded _____, 2013, under Clerk's File No. 2013-_____ of the Official Records of Smith County, Texas.

12. Storm Water Easement and Detention Pond Agreement dated _____, 2013, among Broadway South Development "A" No. 2, Ltd.; Broadway South Development "M" No. 2, Ltd.; and Tyler Broadway/Centennial LP, recorded _____, 2013, under Clerk's File No. 2013-_____ of the Official Records of Smith County, Texas.

13. Jurisdictional Waters as shown on Jurisdictional Determination Map prepared by Adams Consulting Engineers, Inc., on 4/18/2005.

14. Easement Agreement dated _____, 2013, among Broadway South Development "A" No. 2, Ltd.; Fair Oil, Ltd.; and Tyler Broadway/Centennial LP, recorded _____, 2013, under Clerk's File No. 2013-_____ of the Official Records of Smith County, Texas.

15. Slope Easement dated June 26, 2013, executed by Robert H. Allen Testamentary Trust and Elizabeth D. Allen Family Trust in favor of Broadway South Development "A" No. 2, Ltd., and Tyler Broadway/Centennial LP, recorded _____, 2013, under Clerk's File No. 2013-_____ of the Official Records of Smith County, Texas.

16. Final Plat Showing The Village at Cumberland Park Phase 3, dated February 19, 2013, recorded July 10, 2013, in Cabinet E, Slide 268-C, in the Plat Records of Smith County, Texas.

2286858 v12 (43470.00041.023)



# FOOD CONCEPTS
## INTERNATIONAL

March 17, 2025

Tyler Broadway/Centennial LP
2525 McKinnon Street, Suite 700
Dallas, Texas  75201
Attn:   David C. Wilson

Re:  Abuelo's Renewal at Tyler Broadway

To Whom It May Concern:

Please be advised that pursuant to Section 2 (b) of the Lease dated September 4, 2013, as amended, between you and us, we hereby notify you that we will be renewing the Lease for its first 5-Year option.

Regards,

Robert Lin
President
Food Concepts International

Cc: Raymond J. Kane, Esq
      Kane Russell Coleman & Logan PC
      3700 Thanksgiving Tower
      1601 Elm Street
      Dallas, Texas 75201

4413 82nd St., Ste. 250      Lubbock, TX  79424      806.785.8686    F: 806.785.8866

## FIRST AMENDMENT TO LEASE AGREEMENT

This FIRST AMENDMENT TO LEASE AGREEMENT (this "Amendment") is entered into this **3rd** day of September, 2014, by and between **TYLER BROADWAY/CENTENNIAL LP**, a Texas limited partnership ("Landlord"), and **FOOD CONCEPTS INTERNATIONAL, L.P.**, a Texas limited partnership ("Tenant").

## PRELIMINARY STATEMENTS

A.      Landlord and Tenant are parties to that certain Lease Agreement dated September 4, 2013 (the "Lease"). All capitalized terms not defined herein shall have the meaning given in the Lease; and

B.      Landlord and Tenant desire to amend the terms and conditions of the Lease as more specifically set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      Paragraph1(b). Premises. The square footage of the Premises as set forth in Paragraph 1(b) shall be approximately 7,614 square feet.

2.      Paragraph1(c). Floor Area. Paragraph 1(c) is deleted and replaced with the following: "Approximately 7,614 square feet of enclosed rentable retail area, not including the Patio Area." Accordingly, any reference in the Lease to the Floor Area of the Premises shall mean approximately 7,614 square feet.

3.      Paragraph1(g). Base Rent (Initial Term). Paragraph 1(g) is deleted and replaced with the following:

| Lease Year | $/SF | Annual Base Rent | Monthly Installment |
| --- | --- | --- | --- |
| 1-2 | $26.00 | $197,964.00 | $16,497.00 |
| 3-5 | $27.00 | $205,578.00 | $17,131.50 |
| 6-10 | $29.00 | $220,806.00 | $18,400.50 |

Tenant shall be entitled to two (2) months of free rent during the first year of the term of the Lease.

4.      Paragraph 1(h). Base Rent (Renewal Terms). Paragraph 1(h) is deleted and replaced with the following:

1

| Lease Year | $/SF | Annual Base Rent | Monthly Installment |
|---|---|---|---|
| 11-15 | $31.90 | $242,886.60 | $20,240.55 |
| 16-20 | $35.09 | $267,175.26 | $22,264.61 |

5.     Paragraph 1(i). Percentage Rent. Paragraph 1(i) is deleted and replaced with the following:

An amount equal to the product of three percent (3%) multiplied by the amount by which Gross Sales (hereinafter defined) derived from the Premises during each such calendar year exceeds the amounts set forth below (each, a "Break Point"):

| Term | Break Point |
|---|---|
| Primary Term (Years 1-2) | $3,640,000.00 |
| Primary Term (Years 3-5) | $3,780,000.00 |
| Primary Term (Years 6-10) | $4,060,000.00 |
| 1st Renewal Term | $4,466,000.00 |
| 2nd Renewal Term | $4,912,600.00 |

6.     Paragraph 1(j). Tenant Allowance. Paragraph1(j) is deleted and replaced with the following: "$55.00 per square foot of the Premises (approximately $418,770.00)."

7.     Site Plan. The Lease is hereby amended by deleting the Site Plan of the Premises originally attached thereto as Exhibit B, and replacing it with the Site Plan of the Premises attached to this Amendment as Exhibit B and incorporated herein by this reference.

8.     Co-Tenancy Requirements. The Lease is hereby amended in Paragraph 29(a) thereof by deleting the words:

"at least 70% of the constructed Floor Area (but a minimum of 140,000 square feet of Floor Area in any event) located within the portions of the Center labeled as R1, L1, L4 and R6 on Exhibit A-1 attached hereto then being leased"

and replacing them with the following words:

2875524 v3 (43470.00041.023)

"at least 140,000 square feet of Floor Area within the portions of the Center labeled as R1, L1, L4 and R6 on <u>Exhibit A-1</u> attached hereto then being leased".

9. <u>Ratification of Lease</u>. Except as amended hereby, the Lease remains in full force and effect in accordance with its terms and is hereby ratified. In the event of a conflict between the Lease and this Amendment, this Amendment shall control.

10. <u>Entire Agreement</u>. This Amendment, together with the Lease (as amended hereby), contains all of the agreements of the parties hereto with respect to any matter covered or mentioned in this Amendment or the Lease, and no prior agreement, understanding or representation pertaining to any such matter shall be effective for any purpose.

11. <u>Severability</u>. A determination that any provision of this Amendment is unenforceable or invalid shall not affect the enforceability or validity of any other provision hereof and any determination that the application of any provision of this Amendment to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

12. <u>Successors or Assigns</u>. This Amendment applies to, inures to the benefit of, and binds Landlord and Tenant and their respective heirs, administrators, successors and permitted assigns.

13. <u>Counterparts</u>. This Amendment may be executed in any number of counterparts, each of which, when taken together, shall constitute a fully executed original document. Facsimile or electronic (email) copies of the signature pages to this Amendment shall be deemed to be originals for all purposes of this Amendment.

[SEPARATE SIGNATURE PAGES FOLLOW]

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

3

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed as of the day and year first above written.

**LANDLORD:**

**TYLER BROADWAY/CENTENNIAL LP,**
a Texas limited partnership

By:   Tyler Broadway/Centennial GP LLC,
a Texas limited liability company,
its general partner

By: _____
David C. Wilson, Manager

4

2875524 v3 (43470.00041.023)

**TENANT:**

**FOOD CONCEPTS INTERNATIONAL, L.P.,**
a Texas limited partnership

By:    Food Concepts GPH, L. L. C.,
       a Delaware limited liability company
       its General Partner

By: _____
       Robert Lin, Executive Vice President

5

2875524 v3 (43470.00041.023)

## EXHIBIT B

## SITE PLAN OF PREMISES

*(including patio area)*



B - 1

2875524 v3 (43470.00041.023)

## SECOND AMENDMENT TO LEASE AGREEMENT

This SECOND AMENDMENT TO LEASE AGREEMENT (this "Amendment") is entered into this __/st__ day of December, 2015, by and between **TYLER BROADWAY/CENTENNIAL LP**, a Texas limited partnership ("Landlord"), and **FOOD CONCEPTS INTERNATIONAL, L.P.**, a Texas limited partnership ("Tenant").

## PRELIMINARY STATEMENTS

A.      Landlord and Tenant are parties to that certain Lease Agreement dated September 4, 2013 and First Amendment dated September 3, 2014 (the "Lease"). All capitalized terms not defined herein shall have the meaning given in the Lease; and

B.      Landlord and Tenant desire to amend the terms and conditions of the Lease as more specifically set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      Paragraph1(b).  Premises. The square footage of the Premises as set forth in Paragraph 1(b) shall be approximately 7,617 square feet.

2.      Paragraph1(c).  Floor Area.  Paragraph 1(c) is deleted and replaced with the following:  "Approximately 7,617 square feet of enclosed rentable retail area, not including the Patio Area."  Accordingly, any reference in the Lease to the Floor Area of the Premises shall mean approximately 7,617 square feet.

3.      Paragraph1(g).  Base Rent (Initial Term). Paragraph 1(g) is deleted and replaced with the following:

| Lease Year | $/SF | Annual Base Rent | Monthly Installment |
|------------|-------|------------------|---------------------|
| 1-2 | $26.00 | $198,042.00 | $16,503.50 |
| 3-5 | $27.00 | $205,659.00 | $17,138.25 |
| 6-10 | $29.00 | $220,893.00 | $18,407.75 |

Tenant shall be entitled to two (2) months of free rent during the first year of the term of the Lease.

4.      Paragraph 1(h). Base Rent (Renewal Terms).  Paragraph 1(h) is deleted and replaced with the following:

| Lease Year | $/SF | Annual Base Rent | Monthly Installment |
|---|---|---|---|
| 11-15 | $31.90 | $242,982.30 | $20,248.53 |
| 16-20 | $35.09 | $267,280.53 | $22,273.38 |

5.      Paragraph 1(i). Percentage Rent. Paragraph 1(i) is deleted and replaced with the following:

An amount equal to the product of three percent (3%) multiplied by the amount by which Gross Sales (hereinafter defined) derived from the Premises during each such Lease Year exceeds the amounts set forth below (each, a "Break Point"):

| Term | Break Point |
|---|---|
| Primary Term (Years 1-2) | $3,640,477.94 |
| Primary Term (Years 3-5) | $3,780,496.32 |
| Primary Term (Years 6-10) | $4,060,533.09 |
| 1st Renewal Term | $4,466,586.40 |
| 2nd Renewal Term | $4,913,245.04 |

6.      Paragraph 1(j). Tenant Allowance. Paragraph1(j) is deleted and replaced with the following: "$55.00 per square foot of the Premises (approximately $418,935.00)."

7.      Ratification of Lease. Except as amended hereby, the Lease remains in full force and effect in accordance with its terms and is hereby ratified. In the event of a conflict between the Lease and this Amendment, this Amendment shall control.

8.      Entire Agreement. This Amendment, together with the Lease (as amended hereby), contains all of the agreements of the parties hereto with respect to any matter covered or mentioned in this Amendment or the Lease, and no prior agreement, understanding or representation pertaining to any such matter shall be effective for any purpose.

9.     Severability.   A determination that any provision of this Amendment is unenforceable or invalid shall not affect the enforceability or validity of any other provision hereof and any determination that the application of any provision of this Amendment to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

10.    Successors or Assigns.   This Amendment applies to, inures to the benefit of, and binds Landlord and Tenant and their respective heirs, administrators, successors and permitted assigns.

11.    Counterparts. This Amendment may be executed in any number of counterparts, each of which, when taken together, shall constitute a fully executed original document. Facsimile or electronic (email) copies of the signature pages to this Amendment shall be deemed to be originals for all purposes of this Amendment.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed as of the day and year SECOND above written.

**LANDLORD:**

**TYLER BROADWAY/CENTENNIAL LP,**
a Texas limited partnership

By:    Tyler Broadway/Centennial GP LLC,
       a Texas limited liability company,
       its general partner

       By: _____
            David C. Wilson, Manager


**TENANT:**

**FOOD CONCEPTS INTERNATIONAL, L.P.,**
a Texas limited partnership

By:    Food Concepts GPH, L. L. C.,
       a Delaware limited liability company
       its General Partner

By: _____
    Robert Lin, Executive Vice President

May 11, 2020                                                                                    VIA EMAIL

RE:    RENT DEFERRAL LETTER – Abuelo's
       Shopping Center: The Village at Cumberland Park in Tyler, TX
       Tenant Address: 8926 S. Broadway Avenue, Suite 192, Tyler, TX 75703

Dear Tenant:

This letter shall constitute the rent deferral agreement for the Lease Agreement dated September 4, 2013 (as thereafter amended, modified, supplemented, and/or assigned and hereinafter referred to as the "Lease") between the current parties, the undersigned Landlord and the undersigned Tenant, with respect to that certain premises at the Shopping Center, as more particularly described in the Lease.

Subject to the conditions set forth herein, the Minimum Guaranteed Rental payable by Tenant to Landlord shall be deferred by one hundred percent (100%) for a period of two (2) consecutive months, commencing on April 1, 2020 (the "Deferral Period"). During the Deferral Period, Tenant shall continue to be responsible for its payment obligations relating to additional rent, common area operating costs, insurance, taxes, and any other charges due to Landlord under the Lease. Upon the expiration of the Deferral Period, the Minimum Guaranteed Rental shall be due and payable pursuant to the terms of the Lease, as amended by this Rent Deferral Letter.

As a condition to Tenant receiving the rent deferral during the Deferral Period, Tenant agrees to reimburse Landlord the entire amount of the deferred Minimum Guaranteed Rental during the Deferral Period (the "Tenant Reimbursement") in twelve (12) equal, monthly installments as set forth on the invoice attached hereto as Exhibit A, commencing January 1, 2021. The Tenant Reimbursement shall be considered Minimum Guaranteed Rental and shall be due and payable pursuant to the terms of the Lease, as amended by this Rent Deferral Letter. If the Lease expires or terminates prior to the repayment of the Tenant Reimbursement, then the outstanding balance of the Tenant Reimbursement shall be due and payable in full upon Lease expiration or termination.

During the Deferral Period, Tenant acknowledges and agrees that the rent deferment set forth herein shall be in lieu of any and all claims that Tenant may have in defense of its obligation to pay Minimum Guaranteed Rental, additional rent, common area operating costs, insurance, taxes, and any other charges due to Landlord under the Lease, including but not limited to any claims of force majeure, failure of a required co-tenancy, frustration of purpose, impossibility of performance, disruption of quiet enjoyment, breach of Landlord representations and warranties, and governmental restrictions.

Tenant acknowledges and agrees that the terms, conditions and covenants of this Rent Deferral Letter are confidential and constitute proprietary information of the parties hereto. Disclosure of the terms hereof will cause Landlord irreparable harm and could adversely affect the ability of Landlord to negotiate with other tenants. Tenant, and its respective partners, officers, members, managers, shareholders, directors, employees, agents, real estate brokers and sales persons and attorneys, shall not disclose the terms and conditions of this Rent Deferral Letter to any other person, including without limitation any other tenant of the Shopping Center, without the prior written consent of the Landlord, except pursuant to an order of a court of competent jurisdiction. Tenant shall be liable for any disclosures made in violation of this by Tenant or by any entity or individual to whom the terms and conditions of this Rent Deferral Letter were disclosed or made available by Tenant. The consent by Landlord to any disclosures shall not be deemed to be a waiver on the part of Landlord of any prohibition against any future disclosure. The terms and provisions of this Rent Deferral Letter will survive the expiration or earlier termination of the Lease. If Tenant violates the provisions of this paragraph, then Tenant's ability to Minimum Guaranteed Rental as set forth herein shall

be null and void and the entire amount of the deferred Minimum Guaranteed Rental shall be immediately due to and payable to Landlord.

Except as specifically amended hereby, all provisions and covenants of the Lease are and shall remain in full force and effect as stated therein, except to the extent specifically amended by the provisions of this Letter.

This Rent Deferral Letter may be executed in one or more counterparts, each of which, when so executed and delivered, shall be deemed to be an original, but all of which when taken together, shall constitute one and the same instrument.

This Rent Deferral Letter may be executed by e-mail [in so-called "portable document format" ("PDF")] or electronic signature and shall be deemed to have been executed and delivered by each party on the date so transmitted to the other party, and in such event, each party will promptly furnish to the other party and original counterpart hereof executed by such party.

**[SIGNATURES BEGIN ON NEXT PAGE]**

**LANDLORD:**

**TYLER BROADWAY/CENTENNIAL LP,**
a Texas limited partnership

By:     Tyler Broadway/Centennial GP LLC,
a Texas limited liability company,
its general partner

By: _____
Alan P. Shor, Manager

Date of Signature:_____5/11/2020_____

**TENANT:**

**FOOD CONCEPTS INTERNATIONAL, L.P.,**
a Texas limited partnership

By:     Food Concepts GPH, L.L.C.,
a Delaware limited liability company
its General Partner

By:_____
Robert Lin, ~~Executive Vice~~ President

Date of Signature:_____5/11/2020_____

**EXHIBIT A**
**INVOICE**

RENT SCHEDULE
Tenant:   Abuelo's
SF:   7,617

| CURRENT | | | | | |
|---|---|---|---|---|---|
| From | To | Months | Rent PSF | Per Month | Totals |
| 12/01/15 | 01/31/16 | 2 | $0.00 | $0.00 | $0.00 |
| 02/01/16 | 11/30/17 | 22 | $26.00 | $16,503.50 | $363,077.00 |
| 12/01/17 | 11/30/20 | 36 | $27.00 | $17,138.25 | $616,977.00 |
| 12/01/20 | 11/30/25 | 60 | $29.00 | $18,407.75 | $1,104,465.00 |
| Totals/Avgs. | | 120 | $27.37 | $17,370.99 | $2,084,519.00 |

| Amount Of Deferred Rent: | | | | | |
|---|---|---|---|---|---|
| | 04/01/20 | | | $17,138.25 | |
| | 05/01/20 | | | $17,138.25 | |
| | | | | $34,276.50 | |
| Totals/Avgs. | | | Divided By: | 12 | Months |
| | | | | $2,856.38 | Per Month |

| MODIFIED | | | | | |
|---|---|---|---|---|---|
| From | To | Months | Rent PSF | Per Month | Totals |
| 12/01/15 | 01/31/16 | 2 | $0.00 | $0.00 | $0.00 |
| 02/01/16 | 11/30/17 | 22 | $26.00 | $16,503.50 | $363,077.00 |
| 12/01/17 | 03/31/20 | 28 | $27.00 | $17,138.25 | $479,871.00 |
| 04/01/20 | 05/31/20 | 2 | $0.00 | $0.00 | $0.00 |
| 06/01/20 | 11/30/20 | 6 | $27.00 | $17,138.25 | $102,829.50 |
| 12/01/20 | 12/31/20 | 1 | $29.00 | $18,407.75 | $18,407.75 |
| 01/01/21 | 12/31/21 | 12 | $33.50 | $21,264.13 | $255,169.50 |
| 01/01/22 | 11/30/25 | 47 | $29.00 | $18,407.75 | $865,164.25 |
| Totals/Avgs. | | 120 | $27.37 | $17,370.99 | $2,084,519.00 |